# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FRAUNHOFER-GESELLSCHAFT ZUR )
FÖRDERUNG DER ANGEWANDTEN FORSCH )
E.V., )
                               )
        Plaintiff, )
                               )    C.A. No. 17-184-VAC-SRF
        v. )
                               )
SIRIUS XM RADIO INC., )
                               )
        Defendant. )

## ANSWERING BRIEF IN SUPPORT OF FRAUNHOFER-GESELLSCHAFT ZUR FÖRDERUNG DER ANGEWANDTEN FORSCHUNG E.V.'S OPPOSITION TO MOTION TO DISMISS

Dated: May 15, 2017

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Ben J. Yorks, Esquire (pro hac vice)
IRELL & MANELLA, LLP
850 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone: (949) 760-0991
Facsimile: (949) 760-5200
Email: byorks@irell.com

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................1

II.    STATEMENT OF NATURE AND STAGE OF PROCEEDING ...................................2

III.    SUMMARY OF ARGUMENTS..................................................................................2

IV.    STATEMENT OF UNDISPUTED FACTS ....................................................................3

    A.    The MLA Was Conditional, Restricted, and Terminable Upon Breach..............3

    B.    The Sublicense Agreement. .........................................................................5

    C.    The Bankruptcy Cases. ...............................................................................5

    D.    The Parties Have Stipulated That the MLA Is an Executory Contract................7

    E.    The Compromise Order. ..............................................................................8

    F.    Rejection of The MLA By The Trustee..........................................................8

    G.    The Termination Letter. ..............................................................................9

V.    ARGUMENT .........................................................................................................11

    A.    The Rejection Deprived WorldSpace—and Derivatively, Sirius—of Any License Right. ...................................................................................11

    B.    Sirius's License Was Not Unlimited or Immune from Termination. .................15

VI.    CONCLUSION......................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 6177 Realty Associates, Inc.*,
    142 B.R. 1017 (Bankr. S.D. Fla. 1992) ...................................................................13

*AMC Technology L.L.C. v. SAP AG et al.*,
    2005 WL 3008894 (E.D. Pa. 2005) ........................................................................12

*Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*,
    296 F.3d 164 (3d Cir. 2002)....................................................................................11

*In re Biggs*,
    271 F. App'x 286 (3d Cir. 2008) .............................................................................15

*Chatlos Sys., Inc. v. Kaplan*,
    147 B.R. 96 (D. Del. 1992) *aff'd sub nom. In re TIE Commc'ns, Inc.*, 998 F.2d
    1005 (3d Cir. 1993)..................................................................................................13

*In re Crippin*,
    877 F.2d 594 (7th Cir. 1989) ..................................................................................11

*Cuban v. Kapoor Bros.*,
    652 F. Supp. 28 (E.D.N.Y. 1986) ...........................................................................13

*In re Diomed Inc.*,
    394 B.R. 260 (Bankr. D. Mass. 2008) .....................................................................12

*In re Drexel Burnham Lambert Group, Inc.*,
    138 B.R. 687 (Bankr.S.D.N.Y.1992)......................................................................18

*In re Executive Tech. Data Sys.*,
    79 B.R. 276 (Bankr. E. D. Mich. 1987) ..................................................................11

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond
    Metal Finishers, Inc.)*,
    756 F.2d 1043 (4th Cir.1985), *cert. denied,* 475 U.S. 1057 (1986).......................13

*In re Lyondell Chem. Co.*,
    416 B.R. 108 (Bankr. S.D.N.Y. 2009).....................................................................11

*Major League Baseball Promotion v. Colour–Tex*,
    729 F. Supp. 1035 (D.N.J. 1990) ............................................................................13

*Nano-Proprietary, Inc. v. Canon, Inc.*,
    537 F.3d 394 (5th Cir. 2008) ..................................................................................17

**Page(s)**

*In re Pacific Express, Inc.*,
    780 F.2d 1482 (9th Cir. 1986) ...............................................................11

*Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*,
    2015 WL 6611601 (Del. Ct. Ch. Oct. 30, 2015)....................................16

*Rhone-Poulenc Agro S.A. v. DeKalo Genetics Corp.*,
    284 F.3d 1323 (Fed. Cir. 2002)...............................................................12

*Schouten v. CSX Transp., Inc.*,
    58 F. Supp. 2d 614 (E.D. Pa. 1999) .........................................................2

*Shakey's Inc. v. Covalt*,
    704 F.2d 426 (9th Cir. 1983) ...................................................................15

*Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer*
    *Maschinenfabrik Aktiengesellschaft*,
    829 F.2d 1075 (Fed. Cir. 1987)...............................................................12

*Stewart Title Guar. Comp. v. Old Republic Nat'l Title Ins. Comp.*,
    83 F.3d 735 (5th Cir. 1996) .....................................................................11

*In re Stoltz*,
    315 F.3d 80 (2d Cir. 2002).......................................................................15

*Sunbeam Prod., Inc. v. Chicago Am. Mfg., LLC*,
    686 F.3d 372 (7th Cir. 2012) ...................................................................14

*Technology Licensing Corp. v. JVC Americas Corp.*,
    No. 12 C 1444, 2013 WL 212928 (N.D. Ill. Jan. 18, 2013) ..................17

*Thompkins v. Lil' Joe Records, Inc.*,
    476 F.3d 1294 (11th Cir. 2007) ...............................................................17

*In re TIE Commc'ns, Inc.*,
    998 F.2d 1005 (3d Cir. 1993)...................................................................13

*In re Yachthaven Restaurant, Inc.*,
    103 B.R. 68 (Bankr. E.D.N.Y. 1989).......................................................13

**Statutes**

11 U.S.C. § 105..........................................................................................8

11 U.S.C. § 365.................................................................................. *passim*

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

German Civ. Code § 133 ........................................................................................................4

German Civ. Code § 157 ....................................................................................................4, 15

German Civ. Code § 314 ......................................................................................................10

**Rules**

Fed. R. Bankr. P. 3001..........................................................................................................17

Fed. R. Bankr. P. 9019............................................................................................................8

**Other Authorities**

49 Am. Jur. 2d, *Landlord and Tenant* § 1185 (1995) ...................................................12

1 Milton R. Friedman, *Friedman On Leases* § 7.703 (3d ed. 1990)............................12

The plaintiff, Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V. ("Fraunhofer"),[1] submits this Brief (the "Brief") in opposition to defendant Sirius XM Radio, Inc.'s ("Sirius") Motion to Dismiss (the "Motion") Fraunhofer's Complaint (the "Complaint").

## I.    INTRODUCTION

In the Motion, Sirius contends that the Complaint should be dismissed because Sirius claims to have received an "irrevocable" license to use Fraunhofer's intellectual property (referred to herein as the "MCM Technology"), which license Sirius contends could not be terminated under any circumstances. But in fact, Sirius's right to use the MCM Technology was never intended to be unlimited and immune from termination, but rather was *wholly dependent* on the limited rights held by Fraunhofer's sublicensor, WorldSpace, Inc. ("WorldSpace"). Fraunhofer, owner of the MCM Technology, licensed the right to use the MCM Technology to the predecessor-in-interest of WorldSpace pursuant to the Master License Agreement dated March 4, 1998 (the "MLA"). (Declaration of Michael Schlicht ("Schlicht Decl."), Ex. A, ¶¶ 2.1 and 7). The master license granted in the MLA was limited by, and terminable pursuant to, the provisions in the MLA.

The sublicense that WorldSpace subsequently granted to Sirius (the "Sublicense"), which Sirius contends is still effective, was *wholly dependent* upon the survival of WorldSpace's master license right. Accordingly, Sirius's sublicense right was limited to the rights granted in the MLA, which would exist only to the extent WorldSpace's master license survived—and it did not.

Sirius's argument to the contrary is based on a fundamental misunderstanding of the contracts at issue. Sirius contends that Fraunhofer's challenge to its purported license is based upon the premise that the rejection of an executory contract pursuant to 11 U.S.C. § 365

---

[1] Fraunhofer is a partially state-funded non-profit research organization formed under the laws of the Federal Republic of Germany. It is located in Munich, Germany. (Schlicht Decl. ¶ 3).

"terminates" the rejected contract. The Complaint alleges nothing of the sort.[2] Instead, Fraunhofer contends that the rejection of the MLA terminated WorldSpace's continuing *license rights* to use the MCM Technology under the contract, and that Fraunhofer separately terminated the *contract* under its own terms. Because WorldSpace's master license was rejected and later terminated, Sirius no longer holds its wholly dependent rights to use the MCM Technology under the Sublicense. Accordingly, the Court should find that Sirius does not currently enjoy a license to the patents-in-suit, and therefore the Motion to Dismiss should be denied.

## II.    STATEMENT OF NATURE AND STAGE OF PROCEEDING

Fraunhofer's Complaint seeks a damages judgment against Sirius for patent infringement and an injunction barring further infringement. The Motion is Sirius's first responsive pleading.

## III.    SUMMARY OF ARGUMENTS

A.    The license right granted to Sirius in its Sublicense Agreement was derivative of, dependent upon, and necessarily no greater than the license right granted to WorldSpace by Fraunhofer pursuant to the MLA. These rights did not survive WorldSpace's rejection of the MLA in its bankruptcy case.

B.    Even had WorldSpace's license right survived rejection of the MLA, Fraunhofer terminated the contract granting this license in accordance with its terms, which consequently terminated the dependent intellectual property rights granted by WorldSpace to Sirius under the Sublicense.

---

[2] The Complaint provides Sirius ample notice of Fraunhofer's claims for relief under the notice pleading standard. *See Schouten v. CSX Transp., Inc.*, 58 F. Supp. 2d 614, 616 (E.D. Pa. 1999). Fraunhofer is not required to plead around Sirius's misinterpretation of the MLA.

## IV.   STATEMENT OF UNDISPUTED FACTS

### A.   The MLA Was Conditional, Restricted, and Terminable Upon Breach.

1.     Fraunhofer and WorldSpace[3] entered into the Master License Agreement on or about March 4, 1998. (Schlicht Decl., Ex. A). The MLA granted WorldSpace a license to use the MCM Technology. (*Id.*, Ex. A, ¶ 3.1).

2.     Under the MLA, Fraunhofer continued to own the MCM Technology. In fact, the MLA allowed Fraunhofer to license the MCM Technology to other users, so long as these other licensees did not compete with the "WorldSpace Business," defined in the MLA as "any business related to satellite and/or terrestrial broadcast to consumers." (*Id.*, Ex. A, ¶¶ 1.1, 2.1, 3.3-3.4).

3.     WorldSpace's license right was conditional and restricted in nature.  The opening recitals of the MLA state:

> WHEREAS, FRAUNHOFER is willing to grant such exclusive right and license to WORLDSPACE *subject to the following mutually acceptable terms and conditions.*

(*Id.*) (emphasis added). The contract further states:

> 3.1 FRAUNHOFER grants to WORLDSPACE and its Affiliates a worldwide, exclusive, irrevocable license, with the right to sublicense, under the MCM Intellectual Property Rights … *in connection with WorldSpace Business*.
>
> 3.2 FRAUNHOFER shall not have the right to use, or to license third parties to use, the MCM Technology … that competes with *the WorldSpace Business*.
>
> 3.3 If WORLDSPACE believes for any reason that WORLDSPACE or any of its Affiliates would be potentially harmed by such use by FRAUNHOFER or by a licensee of FRAUNHOFER, then WORLDSPACE shall have the right to request that FRAUNHOFER demonstrate by documentary evidence to any independent arbitrator (selected jointly by FRAUNHOFER and WORLDSPACE and

---

[3] In December 2004, WorldSpace International Network Inc., the original party to the contract, merged with WorldSpace, Inc. WorldSpace was the surviving entity.

reasonably acceptable to both) that such usage is not harmful to the interests of WORLDSPACE or its Affiliates.

(*Id.*, Ex. A, ¶¶ 3.1-3.3).

4.      Pursuant to Section 3.1 through 3.3 of the MLA: (a) WorldSpace's license to use the MCM Technology was restricted to the "WorldSpace Business," which focused upon providing services to consumers; (b) Fraunhofer, as the owner, retained the right to use the patents, and to license this technology to third parties, so long as these additional licensees did not "compete" with the "WorldSpace Business"; and (c) the use and third party license restrictions in the MLA were limited to uses and licenses that were "harmful" to "WorldSpace or its Affiliates," defined as entities owned or controlled by WorldSpace.

5.      In addition, the MLA was terminable by its own terms, which contemplated the possibility of termination in accordance with certain provisions of the contract:

> This Agreement shall be effective as of the Effective Date subject to the governmental approval or consent according to Article 9.6. *Unless earlier terminated* as provided in this Article 7, this Agreement shall continue in full force and effect until the expiration of the last to expire of the MCM Intellectual Property Rights.

(*Id.*, ¶ 7.1) (emphasis added). Stated otherwise, the license right granted to WorldSpace is "irrevocable," *unless and until it is terminated in accordance with Article 7.*

6.      Specifically, WorldSpace's license terminates if WorldSpace fails to pay (or agree in writing to pay) all sums due under Article 4 of the Agreement "as of the date of termination":

> No termination or expiration of this Agreement shall effect the rights and licenses granted to WORLDSPACE under Article 3 hereof, *provided that WORLDSPACE has paid (or has agreed in writing to pay) all of the amounts specified in Article 4 hereof as of the date of termination or expiration.*

(*Id.*, ¶ 7.4) (emphasis added).[4]

---

[4] This interpretation is consistent with German law governing the interpretation of binding declarations and contracts, namely Sections 133 and 157 of the German Civil Code ("GCC"),

## B. The Sublicense Agreement.

7.     On or about July 24, 1998, WorldSpace Management Corporation (n/k/a WorldSpace Systems Corporations or, as previously defined, WorldSpace Systems), XM Satellite Radio Inc., XM Satellite Radio Holdings Inc. (together XM Satellite and XM Holdings are referred to herein as the "XM Parties"), and third party American Mobile Satellite Corporation ("AMSC") entered into the Sublicense. (*Id.*, Ex. B).

8.     Pursuant to the Sublicense, WorldSpace Systems granted the XM Parties a sublicense to use the MCM Technology. For purposes of this Motion, Fraunhofer assumes that Sirius claims to have acquired the rights of the XM Parties when XM Satellite (which had previously merged with XM Holdings) merged with Sirius. (Compl., ¶ 26).

## C. The Bankruptcy Cases.

9.     WorldSpace and its affiliated debtors (collectively the "Debtors") filed petitions under Chapter 11 of the Bankruptcy Code on October 17, 2008 (the "Petition Date"), initiating Case Nos. 08-12412, 08-12413 and 08-12414 (the "Bankruptcy Cases"). (Compl., ¶ 26).

10.    On June 1, 2010, during a sale hearing, WorldSpace, Yazmi USA, LLC ("Yazmi") (the proposed purchaser of certain assets of WorldSpace), and Fraunhofer read a stipulation and agreement into the Bankruptcy Court record (the "Stipulation") (Friedman Decl., Ex. E; *see also* Compl., ¶ 27), which provided for the final disposition of the entirety of WorldSpace's rights under three interrelated agreements with Fraunhofer: the Project Agreement, the Frame Agreement, and the MLA (collectively, the "License Related Agreements"):

---

which govern the MLA. (Schlicht Decl., Ex. A, § 9.5). An official English translation of the GCC is available at https://www.gesetze-im-internet.de/englisch_bgb/.

As a result of said rejection, *everything, including all rights arising under or relating to the agreements, shall be and is hereby retained by Fraunhofer* and the license agreement will be assumed and assigned provided however, that the assumption and assignment and Yazmi's subsequent utilization of any of the intellectual property governed by the license agreement is subject to and conditioned upon Fraunhofer and Yazmi entering into a suitable business arrangement going forward within 90 days of the closing.

(Friedman Decl., Ex. E, 45:23-46:6) (emphasis added); *id.* at 46:7-10 ("In the event that Fraunhofer and Yazmi have not entered into an agreement on the going forward business arrangement as provided for in the agreement, *the license agreement will be deemed rejected*.") (emphasis added).

11.     The Stipulation immediately terminated all rights that WorldSpace held under the Project Agreement and the Frame Agreement. (*Id.*). However, it deferred the termination of WorldSpace's rights under the related MLA to allow WorldSpace one last opportunity to assign the MLA to Yazmi, as part of an asset sale. Pursuant to the Stipulation, if Fraunhofer and Yazmi did not reach an agreement between themselves within 90 days of the sale closing, WorldSpace's rights under the MLA would be extinguished as well. (*Id.*).

12.     Although the sale of assets to Yazmi was approved by the Bankruptcy Court in an order entered on June 2, 2010 (the "Sale Order") (Friedman Decl., Ex. D), this sale failed to close. (Friedman Decl., ¶ 8).

13.     The Stipulation, when read as a whole, was intended to effectuate the termination by mutual agreement of all three License Related Agreements, at the latest, upon the conclusion or failure of the Yazmi sale transaction. (Schlicht Decl., Ex. A, ¶ 7.2 ("In addition, this Agreement may be terminated by mutual written agreement between the Parties, […].")).

14.     Because no assignment of the MLA to Yazmi was concluded prior to September 30, 2010, the Termination Date fixed by the Sale Order, the MLA terminated ninety days thereafter, on December 29, 2010, pursuant to the Stipulation.

**D.    The Parties Have Stipulated That the MLA Is an Executory Contract.[5]**

15.    The MLA is an executory contract. Both parties to the MLA had a series of ongoing material duties to perform under the contract: (a) Fraunhofer agreed to refrain from suing WorldSpace for infringement of the patents covered by the license, as long as the latter complied with the terms of the MLA; (b) both parties agreed to prepare, file, and prosecute the MCM Technology rights in the countries designated by WorldSpace (Schlicht Decl., Ex. A, § 2.2); (c) both parties agreed to maintain the confidentiality of the MCM Technology (*Id.*, § 2.3); (d) Fraunhofer agreed to restrict future licenses of the MCM Technology to users who were not in competition with the "WorldSpace Business" (*Id.*, § 3.2); (e) Fraunhofer was obligated, for a minimum period of five years, to update WorldSpace with respect to any modifications or additions to the MCM Technology, to provide any applicable reports regarding the same, and to meet with WorldSpace on these matters (*Id.*, § 3.6); and (f) WorldSpace agreed to "reimburse Fraunhofer for all reasonable fees and costs incurred in connection with the preparation, filing and prosecution" of the MCM Technology rights "for the countries designated by WorldSpace" (*Id.*, § 4.2).

16.    In schedules filed in the Bankruptcy Cases, WorldSpace admitted that the MLA was an "executory" contract for purposes of 11 U.S.C. § 365. (Friedman Decl., Ex. B).

17.    WorldSpace also stipulated to the executory status of the MLA in the Stipulation entered on June 1, 2010 and approved by the Bankruptcy Court in the Sale Order. (*Id.*, Ex. E; *see also* Compl., ¶ 27).

---

[5] In its Motion, Sirius states that it is "assuming" the executory status of the MLA, *id.* at n.10, but then proceeds to make a series of arguments that are premised upon the contention that the license grant in the MLA was in fact non-executory.

### E. **The Compromise Order.**

18.     On June 18, 2009, the Debtors filed a Motion Pursuant to 11 U.S.C. § 105 and Bankruptcy Rule 9019 For Approval of Settlement Agreement (the "Compromise Motion"). (Declaration of Shannon Hedvat ("Hedvat Decl."), filed by Sirius, Ex. 5). In the Compromise Motion, the Debtors sought authority to enter into a Payment, Termination and Release Agreement (the "Settlement Agreement") with the XM Parties. *Id.* In the Settlement Agreement, the Debtors and the XM Parties agreed to: (a) terminate certain contracts that existed between the parties, excluding the Sublicense Agreement; and (b) pay the Debtors the sum of $298,517.00 in full satisfaction of the payment obligations owing under the Sublicense Agreement. *Id.*

19.     The Settlement Agreement, the Compromise Motion and the order approving the Compromise Motion (the "Compromise Order") did not provide for the assumption of either the MLA or the Sublicense Agreement. (Hedvat Decl., Exs. 5 and 6). Indeed, the Compromise Order does not reference either the MLA or the Sublicense Agreement. Accordingly, nothing in the Compromise Order or the Settlement Agreement protected Sirius's Sublicense from the effect of the later rejection and termination of the MLA. *Id.*

### F. **Rejection of The MLA By The Trustee.**

20.     On June 12, 2012, the Debtors' Chapter 11 Bankruptcy Cases were converted to Chapter 7 (the "Conversion Date"). (Bk. Ct. Dkt. No. 1601). Upon conversion, the Trustee had 60 days to assume executory contracts or unexpired leases. 11 U.S.C. § 365(d).

21.     The Trustee did not assume the MLA within the statutory period. Accordingly, on August 12, 2012, the MLA was rejected, to the extent it had not been previously rejected and terminated pursuant to the Stipulation on December 29, 2010. On the same date, the Sublicense was also rejected because, as indicated above, the Compromise Order did not provide for its assumption by the bankruptcy estate.

### G.     The Termination Letter.

22.     On or about November 13, 2015, a Termination Letter was transmitted to WorldSpace to confirm the termination of the MLA. (Friedman Decl., Ex. A).

23.     Accordingly, to the extent the MLA survived rejection in the bankruptcy proceedings, it was terminated as of the date of the Termination Letter, based on Section 7.2 of the MLA:

> 7.2 In the event a Party hereto substantially fails to comply with any of its obligations under this Agreement and does not remedy the failure of performance within ninety (90) days after it has been notified in writing thereof, the other party may, by written notice, terminate this Agreement at the end of said period, without prejudice to any damages or legal redress to which it may be entitled. Any such termination shall not affect any payments, the rights to which have fallen due under this Agreement prior to such termination. In addition, this Agreement may be terminated by mutual written agreement between the Parties, or by WORLDSPACE at any time or for any reason upon written notice to FRAUNHOFER.

(Schlicht Decl., Ex A).

24.     WorldSpace breached the MLA as a result of the act of rejection in the Bankruptcy Cases.

25.     In addition, WorldSpace also breached the MLA through its failure to pay €16,024.57 in fees and costs due under Section 4.2.[6] (Schlicht Decl., ¶ 13 & Ex A). WorldSpace

---

[6] Section 4.2 states: "WORLDSPACE shall reimburse FRAUNHOFER for all reasonable fees and costs incurred in connection with the preparation, filing and prosecution of MCM Intellectual Property Rights for the countries designated by WORLDSPACE. Reimbursement shall be made by WORLDSPACE within sixty (60) days of receipt of a detailed and itemized invoice listing the expenses incurred by FRAUNHOFER and attaching copies of any available documentation evidencing such expenses. All final decisions regarding actions to be taken or expenses to be incurred in connection MCM Intellectual Property Rights in the countries designated by WORLDSPACE shall be made by WORLDSPACE."

acknowledged its default under the MLA in two separate schedules of the Asset Purchase Agreement, filed as an Exhibit to the Sale Order. (Friedman Decl., Ex. D, at 146 and 182).[7]

26.     The Proof of Claim Fraunhofer filed in the Bankruptcy Cases further documents the unpaid balance owed to Fraunhofer under the MLA. (Schlicht Decl., Ex. C). WorldSpace failed to pay that unpaid balance within the 90-day cure period provided under the contract, and thus Fraunhofer was entitled to terminate the MLA. (*Id.*, Ex. A, ¶ 7.2).

27.     In addition, Fraunhofer was entitled to terminate the MLA in accordance with the laws of the Federal Republic of Germany (the law governing the parties' rights in the MLA) under Section 314(1) of the German Commercial Code ("GCC"), which provides for a party's inalienable statutory right to terminate a contract for cause ("*außerordentliche Kündigung*"). Under the GCC, a contract is *immediately* terminable if a party declines to perform its obligations thereunder.[8]

28.     To the extent the MLA had not already been terminated, Fraunhofer exercised this termination right by sending the Termination Letter to WorldSpace on November 13, 2015. (Friedman Decl., Ex. A).

---

[7] One of these schedules explicitly states: "1. ***Worldspace is currently in default*** on its obligation to pay the upkeep costs for these patent filings. To the Knowledge of Sellers, Fraunhofer has continued to pay all maintenance fees required to maintain the patents." (Friedman Decl., Ex. D, at 146) (emphasis added). The other schedule references the Sublicense Agreement, and admits the existing MLA default: "Technology Licensing Agreement dated as of July 24, 1998, as amended, between Worldspace, Inc., XM Satellite Radio, Inc. (f/k/a American Mobile Radio Corporation), American Mobile Satellite Corporation and XM Satellite Radio Holdings Inc. (***Address default in license for underlying technology from Fraunhofer***)." (*Id.* at 182) (emphasis added).

[8] Due to the nature of the Motion and space limitations, Fraunhofer has only briefly addressed the controlling provisions of German law. An official English translation of the GCC is available at https://www.gesetze-im-internet.de/englisch_bgb/.

## V.    ARGUMENT

A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 168 (3d Cir. 2002). Sirius has not met and cannot meet this burden. Accordingly, the Motion should be denied.

### A.    The Rejection Deprived WorldSpace—and Derivatively, Sirius—of Any License Right.

Both WorldSpace and Sirius (whose rights were wholly dependent on WorldSpace) forfeited any future rights granted to WorldSpace under the MLA when that contract was rejected in bankruptcy. That is because the rejection of a contract relieves a debtor of both the burdens ***and the benefits*** granted by the rejected contract. This proposition is unassailable. *See, e.g.*, *In re Pacific Express, Inc.*, 780 F.2d 1482, 1486 n. 3 (9th Cir. 1986) ("After rejection, the performance of the non-bankruptcy obligee is excused."); *In re Crippin*, 877 F.2d 594, 597 (7th Cir. 1989) ("since rejection constitutes a breach, it also excuses performance by the nonbankrupt party.... Thus, rejecting a contract allows a debtor to escape a contract's burdens; but, at the same time, the debtor must also give up any future benefit he might receive from the contract."); *Stewart Title Guar. Comp. v. Old Republic Nat'l Title Ins. Comp.*, 83 F.3d 735, 741 (5th Cir. 1996) ("It is well established that as a general proposition an executory contract must be assumed or rejected in its entirety."); *In re Executive Tech. Data Sys.*, 79 B.R. 276, 282 (Bankr. E. D. Mich. 1987) ("if a debtor elects to reject an executory contract, he rejects the benefits as well as the burdens"); *In re Lyondell Chem. Co.*, 416 B.R. 108, 115 (Bankr. S.D.N.Y. 2009).

In this case, WorldSpace rejected the MLA as a debtor-licensee. Accordingly, the "benefit" that WorldSpace forfeited through rejection was the singular benefit afforded a patent licensee—the right to use the patents without being sued for infringement. *See Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987) ("As a threshold matter, a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee."). By rejecting the MLA in the Bankruptcy Cases, WorldSpace forfeited this singular right. *See In re Diomed Inc.*, 394 B.R. 260, 268 (Bankr. D. Mass. 2008) ("Once rejection occurred, Diomed's right to continued use of the exclusive license ended.").

This rejection also terminated Sirius's right to use the MCM Technology conveyed by the Sublicense, which was wholly dependent upon the preservation of WorldSpace's rights to the master license. As a rule, the rights of a sublicensee stand or fall with the rights of a sublicensor because the sublicensee merely holds a grant of some or all of the contractual rights granted to the licensee under the master license. *See, e.g., AMC Technology L.L.C. v. SAP AG et al.*, 2005 WL 3008894 at 31 (E.D. Pa. 2005) (copyright licensee could not issue sublicenses that provided greater rights than the licensee/sublicensor enjoyed under license agreement); *See also* 1 Milton R. Friedman, Friedman On Leases § 7.703, at 385 (3d ed. 1990); 49 Am. Jur. 2d, *Landlord and Tenant* § 1185, at 921 (1995) ("The right of the sublessee to the possession of the premises, as against the original lessor, terminates with the lease or term of the original lessee * * *.").

Because a sublicensee's rights are wholly dependent on the master license, a sublicensee has no right to continue using the licensed intellectual property after termination of the master license. *See Rhone-Poulenc Agro S.A. v. DeKalo Genetics Corp.*, 284 F.3d 1323, 1334 (Fed. Cir. 2002) (finding that no bona fide purchaser rule existed to protect sublicensee when prime license

was cancelled for fraud); *In re Yachthaven Restaurant, Inc.*, 103 B.R. 68, 75 (Bankr. E.D.N.Y. 1989) (concluding that when license between city and licensee was terminated, sublicense was likewise terminated); *Cuban v. Kapoor Bros.*, 652 F. Supp. 28, 34 (E.D.N.Y. 1986) ("When Ancorp's license was not renewed, plaintiffs' sublicenses were necessarily terminated."); *Major League Baseball Promotion v. Colour–Tex*, 729 F. Supp. 1035, 1041 (D.N.J. 1990) ("A licensee who has failed to satisfy a condition of the license or has materially breached the licensing contract has no rights to give a sublicensee under which the sublicensee can take cover in a copyright infringement case, and therefore, both the licensee and the sublicensee can be held liable for acting without authorization and thereby infringing the licensor's copyright.").

Accordingly, when WorldSpace rejected its rights under the MLA, Sirius's dependent use rights ceased as well. *See generally Chatlos Sys., Inc. v. Kaplan*, 147 B.R. 96, 100 (D. Del. 1992) *aff'd sub nom.* (debtor tenant's rejection of primary lease effects a rejection of sublease); *In re TIE Commc'ns, Inc.*, 998 F.2d 1005 (3d Cir. 1993) ("These authorities demonstrate, and this Court so holds, that when a lease is deemed rejected pursuant to § 365(d)(4), any subleases under that primary lease must also be deemed rejected since the sublessee's rights in the property extinguish with those of the sublessor."); *In re 6177 Realty Associates, Inc.*, 142 B.R. 1017, 1019 (Bankr. S.D. Fla. 1992) ("Once the underlying lease is terminated, leasehold mortgagees or sublessees retain no interest that can be pursued in Bankruptcy Court or state court."). Although it was WorldSpace's choice to reject the license, Sirius's rights as a sublicensee were wholly dependent and Sirius must live with the legal consequences.

Sirius's arguments over the effect of rejection, in addition to being inapposite, ignore a critical fact: Unlike most license rejection cases, WorldSpace rejected the license as the *debtor-licensee*, not the debtor-licensor. *Cf. Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*

*(In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043 (4th Cir.1985), *cert. denied,* 475 U.S. 1057 (1986) (following the "typical" fact pattern, wherein a licensee's right to use a particular technology was eliminated by the rejection of its license by the licensor). The legislative purpose of Section 365(n) was to mitigate the effect of rejection upon the licensees of intellectual property in the "typical" situation, when a *debtor-licensor* rejects a license. 11 U.S.C. § 365(n). In that case, Section 365(n) carves out an exception to the general rule—that rejection deprives the licensee of further use rights—by allowing the non-debtor licensee to elect to continue using the technology previously available under the rejected license, as long as it continues to pay the applicable royalty to the debtor.[9] When a *licensee* rejects a license contract, it is rejecting the burdens and the one key benefit—the use right granted by its licensor. In contrast, when a licensor rejects a license contract, the rejected benefit is the licensor's right to the consideration payable for the license. Section 365(n) stands for the proposition that a rejecting *licensor* does not necessarily have the right to eliminate a non-debtor licensee's license. By contrast, in the case of the rejecting debtor-licensee, the debtor is voluntarily relinquishing this license right, which is the only "benefit" provided by a license agreement.

Sirius could have attempted to exercise the rights afforded under Section 365(n) *as against WorldSpace*. However, this statute provides no recourse against Fraunhofer. Because WorldSpace rejected the MLA and had no surviving license right left for Sirius to demand a right to use, any attempt by Sirius to assert this exception against WorldSpace would have been futile. Stated otherwise, 11 U.S.C. § 365(n) does not afford Sirius the right to jump over WorldSpace

---

[9] Sirius's citation to *Sunbeam Prod., Inc. v. Chicago Am. Mfg., LLC*, 686 F.3d 372 (7th Cir. 2012) is inapposite because, as Sirius admits in its briefing, Motion at 14-15, the rejecting party was a *debtor-licensor*, and therefore protected under Section 365(n).

and demand that Fraunhofer, a non-debtor, honor its sublicense. Accordingly, Sirius's attempt to find shelter under Section 365(n) fails.

Moreover, even if Sirius's rights somehow continued after WorldSpace's rejection of the MLA (which they did not), those rights definitively ended when the contract was terminated. As discussed above, *supra* Part III, the MLA was terminated through one or more distinct acts. First, Fraunhofer and WorldSpace terminated the MLA by mutual agreement on June 1, 2010, through the Stipulation entered in the Bankruptcy Cases. Second, even if the contract survived the Stipulation, it was terminated, at the latest, when the Termination Letter was transmitted to the Trustee on November 13, 2015. (Friedman Decl., Ex. A).[10]

**B. <u>Sirius's License Was Not Unlimited or Immune from Termination.</u>**

In the Motion, Sirius endeavors to avoid the effect of the rejection by contending that the use of the term "irrevocable" in the license granted to its predecessor meant that it could never be terminated under any circumstances. This argument is contrary to governing law.

The term "irrevocable" was not intended to vest the license granted by the MLA with the extraordinary attributes asserted by Sirius. As an initial matter, the interpretation urged by Sirius has no foundation in German law, which governs interpretation of the MLA. (Schlicht Decl., Ex. A, ¶ 9.5). Moreover, the term "irrevocable" is not a magic bullet under U.S. law, which is governed by the maxim that "[a] written contract must be read as a whole and every part interpreted with reference to the whole." *Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983); *see also* GCC §§ 133 and 157 (embodying the same maxim under German law; official

---

[10] The Termination Letter was effective post-rejection because the rejected contract was no longer property of the Worldspace estate, and hence not subject to the automatic stay. *See In re Biggs*, 271 F. App'x 286 (3d Cir. 2008) ("To start with the lease has been rejected pursuant to 11 U.S.C. § 365(d)(1) and thus for this reason alone it has been "abandoned and [is] no longer property of the estate."); *In re Stoltz*, 315 F.3d 80, 86 (2d Cir. 2002) ("A rejected lease is abandoned and no longer property of the estate.").

English translation available at https://www.gesetze-im-internet.de/englisch_bgb/); *see also Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at \*14-17 (Del. Ct. Ch. Oct. 30, 2015) (concluding that a contract providing for a "perpetual" and "irrevocable" license was in fact terminable because another section of the contract "contemplates expressly that the parties' obligations may be 'terminated by the termination or expiration of this Agreement'" and such language would be superfluous if the license were irrevocable). When the MLA is read as a whole, it is clear that the license right granted in the MLA was conditional *and terminable*.

The MLA is not an absolute and unlimited license because it is not exclusive in a strict sense. Fraunhofer merely granted WorldSpace a *field-exclusive* license for the "WorldSpace Business." (Schlicht Decl., Ex. A, ¶ 3.2). Fraunhofer continued to "*own all right, title and interest in and to any and all MCM Intellectual Property Rights,*" (*Id.*, ¶ 2.1), including the right to grant (exclusive) licenses to the MCM Technology outside the "WorldSpace Business." In addition, the conditional nature of the so-called "irrevocability" of the MLA is made explicit by its own terms:

> This Agreement shall be effective as of the Effective Date subject to the governmental approval or consent according to Article 9.6. *Unless earlier terminated as provided in this Article 7,* this Agreement shall continue in full force and effect until the expiration of the last to expire of the MCM Intellectual Property Rights.

(Schlicht Decl., Ex. A, ¶ 7.1) (italics added); s*ee also* (*id.*, ¶ 7.4 ("No termination or expiration of this Agreement shall effect the rights and licenses granted to WORLDSPACE under Article 3, hereof, *provided that WORLDSPACE has paid (or has agreed in writing to pay) all of the amounts specified in Article 4 hereof as of the date of termination or expiration.*")) (emphasis added). The intent is clear: WorldSpace's purportedly "irrevocable" license *can* be terminated if WorldSpace fails to pay (or agree in writing to pay) all sums due under Article 4 of the Agreement "as of the date of termination," or under any other condition provided for in Article 7.

This termination language would be meaningless—nonsensical even—if in fact the license granted by the MLA were "irrevocable" in the manner that Sirius contends.[11]

The predicate "default" necessary for termination of the license under Article 7 was admitted by WorldSpace in a filing made in the Bankruptcy Cases. (Friedman Decl., Ex. D, at 146 and 182). WorldSpace admitted that it failed to pay the fees and costs incurred by Fraunhofer under Section 4.2 of the MLA—a default that was still extant on the date the Termination Letter was transmitted. (Schlicht Decl., ¶ 13). And Fraunhofer's Proof of Claim filed in the Bankruptcy Cases—a filing vested with prima facie validity by Federal Rule of Bankruptcy Procedure 3001—documents this uncured and now incurable monetary breach. (*Id.*, Ex. C ("The Debtor owes Fraunhofer 16.024,57 euros (approximately $22,628.30 USD) for amounts arising between May 31, 2009 and June 2, 2010 in connection with the License Agreement.")). Accordingly, the termination of the MLA was effective by its own terms, fatally undermining Sirius's contention that the MLA could not be terminated in any way.

The cases cited by Sirius to support its argument that the MLA was irrevocable are factually inapposite because they involved attempts to undo prepetition transfers of *absolute ownership* through rejection. In *Thompkins v. Lil' Joe Records, Inc.*, a musician **sold** his copyrights to the debtor prepetition and retained only a royalty right. 476 F.3d 1294, 1297 (11th Cir. 2007). Since the sale of the copyrights in *Thompkins* was completed prepetition, the

---

[11] The cases cited by Sirius as evidence that licenses labeled "irrevocable" are not subject to termination are clearly distinguishable because there was no indication that the licenses in those cases expressly provided for the right to terminate. *See Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 400 (5th Cir. 2008) (license provided that it "shall continue in full force and effect until expiration of the last to expire of the LICENSED PATENTS," without any apparent provisions providing for termination under other circumstances); *Technology Licensing Corp. v. JVC Americas Corp.*, No. 12 C 1444, 2013 WL 212928, at *2 (N.D. Ill. Jan. 18, 2013). Here, by contrast, the MLA set forth explicit termination provisions that allowed for the parties to terminate the license under the identified circumstances.

"rejection" of this contract during the case could not undo this completed act. Likewise, in *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687, 711 (Bankr.S.D.N.Y.1992), the bankruptcy estate rejected a contract in an attempt to retrieve bonds that had been transferred to an executive pursuant to an employment agreement. The *Drexel* court held that since *title* to the bonds had passed prepetition, this transfer could not be undone by rejection. *See* 138 B.R. 687, 710 (Bankr. S.D.N.Y. 1992) ("We conclude that under the terms of the parties' contract, Cohen held both legal title and the equitable interest in the escrowed bonds."). In this case, by contrast, ownership of the MCM Technology remained with Fraunhofer at all times, and was never transferred. WorldSpace and Sirius obtained only a license to use the MCM technology, which remained executory at all times.

**VI.** **CONCLUSION**

The rejection of the MLA and the later termination of this contract in its entirety deprived WorldSpace of the right to use the MCM technology. This, in turn, deprived Sirius of its wholly dependent license right. Accordingly, the Court should find that Sirius no longer holds any valid sublicense rights to the MCM technology, and therefore deny the Motion to Dismiss.

Dated: May 15, 2017                    Respectfully submitted,

                                       FARNAN LLP

                                       /s/ Brian E. Farnan
                                       Brian E. Farnan (Bar No. 4089)
                                       Michael J. Farnan (Bar No. 5165)
                                       919 Market Street, 12th Floor
                                       Wilmington, Delaware 19801
                                       Telephone: (302) 777-0300
                                       Facsimile: (302) 777-0301
                                       bfarnan@farnanlaw.com
                                       mfarnan@farnanlaw.com

                                       Ben J. Yorks, Esquire (pro hac vice)
                                       IRELL & MANELLA, LLP

850 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone: (949) 760-0991
Facsimile: (949) 760-5200
Email: byorks@irell.com