

1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
302 984 6000
www.potteranderson.com

**Philip A. Rovner**
**Partner**
provner@potteranderson.com
(302) 984-6140 Direct Phone
(302) 658-1192   Fax

September 21, 2017

**BY CM/ECF AND HAND DELIVERY**

The Honorable Sherry R. Fallon
U.S. District Court for the District of Delaware
U.S. Courthouse
844 North King Street
Wilmington, DE 19801

    Re: *Fraunhofer-Gesellschaft Zur Forderung der angewandten Forschung e.V. v. Sirius XM Radio, Inc.* (C.A. No. 17-00184-JFB-SRF)

Dear Judge Fallon:

We represent Defendant Sirius XM Radio, Inc. ("SXM") and submit this letter concerning the parties' current dispute over the proposed protective order.  The dispute centers on two issues: (1) whether a specific type of hardware code, called VHDL, comprises source code and therefore should be afforded heightened protections; and (2) whether the protective order should include additional provisions relating to source code to fill in gaps in this Court's Default Standard for Access to Source Code (the "Default Standard").[1]

  **I.**  **VHDL Is Source Code Requiring Heightened Protection**

The dispute over the first issue is easily resolved – industry experts, technical documentation and case law all recognize VHDL as source code, and therefore it should be subject to the same

---

[1] The parties previously submitted letter briefing on the second issue.  (Dkt. Nos. 47-50). However, at the August 15, 2017 hearing on SXM's motion to dismiss, Fraunhofer's counsel indicated for the first time that the source code issue may be mooted because Fraunhofer only sought a specific type of "code" called VHDL that Fraunhofer claimed was not source code.  Fraunhofer's reference to VHDL as "code" was inconsistent with Fraunhofer's prior statements to SXM and the Court that VHDL, a type of hardware description language (or HDL), was merely *hardware-based technical materials,* such as documents and schematics.  *See* Dckt. No. 48 (characterizing dispute as to whether heightened protection should be afforded to "**hardware**-based technical materials such as RTL, HDL, and Verilog documents and schematics.") (emphasis in original)).  Based on the ensuing colloquy, the Court directed the parties to meet and confer, but that effort proved unsuccessful.

The Honorable Sherry R. Fallon
Page 2

heightened protections for access to it. As described below, SXM's proposed paragraphs 12, 37 and 38 of the protective order should be included to provide a definition for source code that will guide the parties and in particular afford hardware-based code, such as VHDL, source code protections. Ex. A (outlining disagreements between the parties over source code provisions).

*First*, VHDL is routinely recognized as source code by industry experts. As SXM's expert, Nigel Jones, explains in his declaration (attached as Exhibit B, cited as "Jones ¶ __"), VHDL is a type of source code language that contains human-readable syntax that can be used to design, fabricate and enable the operation of individual circuits and chips. Jones ¶¶ 9-11. While source code can be software-based or hardware-based, both types of source code use the same types of programming constructs. *Id.* ¶ 10. The *only* distinction between the two is *where* the code is implemented and executed – that is, either by a processor (for software-based source code) or in an integrated circuit (for hardware-based code). *Id*. As Mr. Jones explains, software-based code and hardware-based code, such as VHDL serve the same purpose for providing instructions to achieve the tasks to be performed. *Id.* ¶ 13. To highlight the likeness of these two types of source code, a side-by-side comparison of software-based "C" code and hardware-based VHDL code demonstrates that there is little distinction between the two. *Id.* ¶¶ 14-15.

*Second*, case law dictates that VHDL and other hardware-based code are source code and should be afforded the same protection. For example, this District has described VHDL as "source code." *See, e.g., Intel Corp. v. Broadcom Corp.*, 173 F. Supp.2d 201, 212 (D. Del. 2001) ("Intel is to provide Broadcom **VHDL source code**, simulation programs for certain functional design blocks, design reports, certain production test packages, product schematics, and certain Intel network interface card products.") (emphasis added). In the context of a background discussion, the Federal Circuit described "source code" as "a high-level programming language that is written in human-readable syntax." *Nazomi Comm'n., Inc. v. Nokia Corp.*, 739 F.3d 1339, 1340 (Fed. Cir. 2014).[2] VHDL falls squarely within this definition. Jones ¶ 16. Similarly, the definition of source code used in other districts would include VHDL. For example, the Northern District of California provides a Patent Local Rule 2-2 Interim Model Protective Order which specifically defines source code to be "extremely sensitive 'Confidential Information or Items' representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise ***describe in detail the algorithms or structure of software or hardware designs***, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means." Ex. C, ¶ 2.9. SXM's proposed definition which encompasses hardware-based code, such as VHDL would fall squarely within this definition. Jones ¶ 17. Notably, this provision includes several categories of code that Fraunhofer's definition seeks to *exclude* from source code protection here, such as VHDL, as well as schematics and specifications that describe source code. *Id.* ¶ 18-19.

---

[2] Fraunhofer relied on *Nazomi* in its prior letter briefing but misrepresented the case as "associating 'source code' with software as distinct from hardware." (Dkt. No. 48 at 3). Fraunhofer's convenient explanation of *Nazomi* misses the mark because the salient point is the broad understanding of source code outlined by the Federal Circuit. That broad understanding encompasses hardware code, such as VHDL because such code is "high-level programming language that is written in human-readable syntax" as explained by SXM's expert. Jones ¶ 15.

The Honorable Sherry R. Fallon
Page 3

This Court's decisions fully supports SXM's position that VHDL constitutes source code and should be afforded heightened protection. More particularly, in *HSM Portfolio LLC, et al v. Fujitsu Limited, et al.*, No. 1:11-cv-00770-RGA, (D. Del. Jan. 9, 2013), this Court explained that "native circuit schematic files" would not be treated as source code because they "cannot be used to directly fabricate integrated circuit chips." Ex. D, *HSM* at 2. *See also Intellectual Ventures LLC v. Altera Corp.*, D.I. 293 at 26:16-20 ("The analogy holds up in the Court's view in part because it's represented at least that these materials can be used, by those who are knowledgeable and have access to the right materials, they can be used to replicate the defendants' products."). VHDL *is used to fabricate* and *replicate circuit chips* (Jones ¶ 11), and Fraunhofer's counsel confirmed as much during the August 15, 2017 hearing – stating that the VHDL it seeks "has to do with *how you make the chips*." Tr. 58:1-2 (emphasis added).

Indeed, Fraunhofer's current counsel conceded in its *HSM* letter brief that HDL should be afforded heightened source code protection. (Ex. E, *HSM* Dkt. No. 294 at 2) (stating "there is no dispute among the parties as to the agreed treatment of either HDL Code or any physical layout file or other design file that can be used to actually fabricate a chip" which would be afforded heightened protection given to source code). Even the two competing expert declarations submitted in the *HSM* case and the resulting Protective Order agreed that HDL Source Code should be afforded heightened source code protection. (Exs. F, ¶¶ 10-11, 27, G ¶ 12, 26 and H). For these reasons, SXM respectfully submits that hardware-based code, such as VHDL, be afforded heightened source code protection.

## II. SXM's Proposed Source Provisions Fill In The Gaps In The Default Standard

SXM proposes narrowly tailored source code provisions for issues *not addressed* in the Default Standard to ensure that SXM's highly confidential code remains protected, as this District has previously permitted, and to prevent presenting this Court with piecemeal disputes over the handling of source code in this case. *See, e.g., Inventor Holdings, LLC v. Wal-Mart Stores, Inc.*, No. 13-96-GMS, 2014 WL 4370320 at *4 (D. Del. Aug. 27, 2014) (order from the Special Master imposing protective order protections beyond the Default Standard and stating source code is "extremely confidential" and poses a "heightened risk of inadvertent disclosure"). SXM's proposed provisions address (1) what constitutes source code (e.g., VHDL addressed in Section I above), (2) logistics relating to source code review and handling, and (3) how to reasonably reduce the unnecessary duplication and potential disclosure of source code.

Notably, Fraunhofer initially agreed to almost all of the source code provisions SXM proposed. However, when disputes arose on certain provisions during extensive discussions between the parties, Fraunhofer reversed course and withdrew its prior agreement and reverted to the Default Standard. Ex. I at 8, 10 (e-mail exchanges between the parties). SXM has tried repeatedly to reach agreement, but without success. In effect, Fraunhofer seeks to take advantage of the Default Standard's gaps on handling source code to avoid reasonable and necessary provisions.

*First*, SXM proposed paragraphs 41, 44, and 45 to address logistics relating to source code. Ex. A. Paragraph 41 provides that a party must provide seven days written notice before being permitted to review the code and must have anyone who reviews code sign a log. Such a provision will simply allow for the efficient scheduling and secure review of code, ensure that

The Honorable Sherry R. Fallon
Page 4

disclosure of such code is closely monitored and assist in any investigation if an unauthorized disclosure of code occurs. Paragraph 44 provides guidance on when, where and how printouts and photocopies of source code must be maintained. Without guidance from the Default Standard, such provisions are critical to lower the risk of disclosure of source code by ensuring that the source code is securely maintained by Fraunhofer. Paragraph 45 governs how a party may include excerpts of source code in pleadings, expert reports, and other litigation documents, thereby outlining a reasonable mechanism for the treatment of source code during depositions and in court submissions for this litigation. In the end, including such provisions will provide logistical guidance and avoid piecemeal disputes that will otherwise inevitably arise.

***Second***, SXM has proposed paragraphs 39, 40, 43 and 46 to address the unnecessary duplication and disclosure of source code. Paragraph 39 prohibits the use of recording devices, recordable media and other electronic devices inside the secure room where any source code review takes place. Such a provision is consistent with those this Court has adopted in other cases. *See e.g.*, *Inventor Holdings, LLC v. Wal-Mart Stores, Inc.*, 2014 WL 4370320, at 4 (D. Del. Aug. 27, 2014). For paragraph 40, the parties agreed to this provision except for the restriction that source code may not be copied into notes taken during a source code review. This provision is necessary to prevent Fraunhofer from copying source code verbatim into a "note" as a work-around to the prohibition against making unauthorized or additional copies. Fraunhofer's approach would necessarily increase the chances of code disclosure and decrease its protection.

For paragraphs 42 and 43, the parties previously agreed to these provisions except for the number of source code pages that may be printed. The Default Standard only provides that source code may not be printed or copied without the agreement of the producing party or further order of the Court. Ex. C, ¶ 5. SXM seeks to provide guidance on this issue by proposing that printing may be permitted and the total amount of source code printouts may not collectively exceed 500 pages. This provision is reasonable and in line with page limits this Court has previously imposed. *Inventor Holdings, LLC,* 2014 WL 4370320, at 4 (adopting defendant's proposal of 250 pages of source code printouts). Source code poses a "heightened risk of inadvertent disclosure," and "because source code is extremely confidential . . . the burden should be on the party trying to convert source code to paper." *Id.* By contrast, Fraunhofer proposed 1,000 pages in its original brief on the issue (Dckt. No. 47 at 3) and has now reverted to no restriction on printouts at all, both of which are inconsistent with the practice in this District.

Finally, paragraph 46 provides that if portions of source code are quoted in a document, the entire document is treated as source code material, which is necessary to minimize the chances of disclosure of a document where the face of the document does indicate that it has source code. Fraunhofer has proposed limiting this restriction to situations where the document has more than 50 lines of code. SXM has indicated that it is amenable and more efficient to handle this issue on a document by document basis, but Fraunhofer rejected that proposal.

For the reasons discussed above, SXM respectfully requests that the Court adopt SXM's proposed provisions that would ensure that VHDL code is provided the heightened protection that source code deserves and to fill in the gaps of the Default Standard.

The Honorable Sherry R. Fallon
Page 5

        Respectfully,

        */s/ Philip A. Rovner*

        Philip A. Rovner (#3215)

Attachments
cc:  Counsel of Record – by CM/ECF and E-mail
5397538