# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FRAUNHOFER-GESELLSCHAFT ZUR FÖRDERUNG DER ANGEWANDTEN FORSCHUNG E.V., | ) ) ) | Civil Action No. 1:17-cv-00184 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SIRIUS XM RADIO INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF NIGEL JONES IN SUPPORT OF
DEFENDANT SIRIUS XM RADIO INC.'S OPENING LETTER
BRIEF REGARDING THE PROTECTIVE ORDER DISPUTE**

I, Nigel Jones, declare as follows:

1.     I have been asked by Defendant Sirius XM Radio Inc. ("Sirius XM") to submit this Declaration in the above reference action.  I understand that the parties dispute whether hardware-based code, such as VHDL or Verilog ("Hardware Code"), constitutes source code. Based on my experience and as explained below, in my opinion, Hardware Code, such as VHDL, constitutes one type of source code.

**A.     Background and Experience**

1.     I received a B.Sc. in Electrical and Mechanical Engineering from Brunel University, London in 1983.

2.     I have extensive experience over the past 34 years in embedded systems, including both software and hardware.  I have significant telecommunications experience and am familiar with both satellite and terrestrial based communications.

3.     After receiving my degree in 1983, I worked for Eurotherm International, part of the Fortune Global 500 Company Schneider Electric.  I then worked for a number of start-up companies before becoming an independent consultant in 1995.  Since then I have worked on numerous projects across numerous industries involving the design and coding of both hardware and software using various types of codes.  For example, I worked for Hughes Network Systems designing telecommunication base stations and microwave radios.  I have also had significant exposure to both satellite and terrestrial based television.  Companies I have worked with include Aegis Software, Babington Technology, DirecTV, DISH Network, Hughes Network Systems, Rockwell Automation, Sensortech Systems and Stone Aerospace.

4.     I am proficient in a number of programming languages including C, C++, Visual Basic, M Script, and VHDL.  I use these languages as part of my work to design software and hardware systems and solutions to typical engineering problems.

5.     I am a Senior Member of the Institute of Electrical and Electronics Engineers ("IEEE") and a member of the IEEE Communications Society.

6.     I am a named inventor on a number of patents including patents related to the modulation of signals.

7.     I have been admitted as a source code expert in Federal Court three times.

8.     Additional information concerning my background and qualifications is set forth in my Curriculum Vitae, which is attached as Exhibit 1 to this Declaration.

**B.     <u>Source Code Generally</u>**

9.     Source code is generally understood to be human-readable instructions, usually written in plain text, that after some form of translation is used to specify the operation of an electronic circuit, such as to perform a series or sequence of steps.

10.     Source code can be software-based code or hardware-based code.  Examples of software-based code include C, C++, Visual Basic, and M Script, while examples of hardware-based code include hardware description languages (or HDLs), such as VHDL and Verilog.  The main difference between software-based and hardware-based source code is where the code is ultimately implemented and executed, and for what the code may be used.  More specifically, software-based source code is implemented in software programs and executed by a processor (such as a software program running on a computer), while hardware-based source code is usually implemented and executed in an integrated circuit, such as a Field Programmable Gate Array (FPGA).  Hardware-based code is also used to design and/or fabricate integrated circuits or chips.  While source code may be software-based or hardware-based, both types of source code use the same types of programming constructs to provide instructions for the desired operation.  Where the code is implemented or can be executed does not change its status or classification as source code.

**C.     Hardware Code Is Source Code**

11.     Hardware Code, such as VHDL, is source code that employs a human-readable syntax that can be used to design, fabricate and/or enable the operation of integrated circuits or chips, such as customized circuits for specific or specialized purposes.  Hardware Code constitutes the constructs and instructions expressed in a form for compiling and synthesizing the code into hardware.

12.     VHDL is an acronym which stands for VHSIC Hardware Description Language. VHSIC is an acronym which stands for Very High Speed Integrated Circuit.  VHDL is a language used for designing, fabricating or describing the operation of integrated circuits.  More specifically and in more technical terms, VHDL is a hardware description language used in

electronic design automation to describe digital and mixed-signal systems such as FPGAs and integrated circuits.  VHDL can also be used as a general purpose parallel programming language.

13.     A typical use of VHDL would be as follows.  A telecommunications device receives a signal over the air.  This signal is amplified and fed to an analog to digital converter (ADC), which converts the analog signal into a digital representation.  This conversion may be occurring millions of times per second.  An FPGA, programmed in VHDL will drive the signals necessary to control the ADC.  The FPGA would also receive the digital values from the ADC, run these signals through a multitude of digital filters (also programmed in VHDL) and then forward the resulting values to, for example, another integrated circuit for further processing, again using VHDL.  Conceptually these steps could equally be performed by a general purpose processor programmed using a software-based source code language, such as Ada.  From an engineering perspective, the program written in VHDL designed to be implemented on an FPGA and the program written in Ada designed to be executed on a general purpose processor are essentially the same, with both the VHDL and Ada source code each representing a high level, human readable abstraction of the tasks to be performed.  Whether a task is programmed using VHDL or Ada is usually a function of how fast the operation needs to be performed.  Hardware based implementations are normally dramatically faster than software based implementations and usually also consume far less power.

14.     When VHDL was designed, a decision was made to make its syntax as similar as possible to the software-based programming language Ada.  Similarly, the designers of Verilog chose to make its syntax as similar as possible to the software-based programming language C.  Shown in the table below are excerpts of hardware-based source code written in VHDL and

software-based source code in the language of "C". This side-by-side comparison highlights the likeness of these two types of source code.

| VHDL (Hardware Code) | C (Software Code) |
|---|---|
| ```
library ieee;
use ieee.std_logic_1164.all;
use ieee.std_logic_unsigned.all;

entity pcore is
port (
    clk: in std_logic;
    clkdiv: in std_logic;
    rst: in std_logic;
    read: in std_logic;
    write: in std_logic;
    addr: in std_logic_vector(13 downto 0);
    din: in std_logic_vector(63 downto 0);
    dout: out std_logic_vector(63 downto 0);
    dmask: in std_logic_vector(63 downto 0);
    extin: in std_logic_vector(25 downto 0);
    extout: out std_logic_vector(25 downto 0);
    extctrl: out std_logic_vector(25 downto 0) );
end pcore;

architecture syn of pcore is

-- Users can modify this section to include their designs

end syn;
``` | ```
#include <stdio.h>
#include <stdlib.h>
#include <unistd.h>
#include <sys/types.h>
#include <sys/stat.h>
#include <fcntl.h>
#include <sys/mman.h>

#include "iflib.h"

int main (void)
{
    int fd;
    char *memp;

    fd = open(DEVICE, O_RDWR);
    memp = (char *)mmap(NULL, MTRRZ, PROT_READ, MAP_PRIVATE, fd, 0);
    if (memp  == MAP_FAILED) {
        perror(DEVICE);
        exit(1);
    }

    munmap(memp, MTRRZ);
    close(fd);
    return 0;
}
``` |

15. The illustration in the table above shows code that is implementing different operations. If the codes were written to implement the same or similar operations, the likeness and similarities of the two codes would be even greater.

16. I understand that the U.S. Court of Appeals has explained that source code refers to "a high-level programming language that is written in human-readable syntax" in the case of *Nazomi Comm'n., Inc. v. Nokia Corp.*, 739 F.3d 1339, 1340 (Fed. Cir. 2014). In my opinion, Hardware Code, such as VHDL, fall squarely within this definition.

17. I understand that the U.S. District Court for the Northern District of California provides a Patent Local Rule 2-2 Interim Model Protective Order which specifically defines source code to be "extremely sensitive 'Confidential Information or Items' representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the **algorithms or structure of software or hardware designs**, disclosure of which to another Party or Non-Party

would create a substantial risk of serious harm that could not be avoided by less restrictive means." (emphasis added). Hardware Code, such as VHDL, is used to describe the algorithms and structure of hardware designs. As such, in my opinion, Hardware Code would fall squarely within this definition of source code.

18.    I understand that the Plaintiff in this action has proposed the following definition for source code: "The term 'Source Code' shall mean the human-readable textual form of computer instructions expressed in a form for assembling, compiling, or translating into executable software."

19.    While this definition would capture software-based source code, this definition of source code proposed by Plaintiff would exclude other categories of source code, including Hardware Code, such as VHDL, as well as schematics and specifications that describe source code, that provides instructions, such as for enabling circuits and chips to perform their intended function, as described above.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Nigel Jones



Expert Witness Curriculum Vitae of **Nigel Jones. 10087 Masser Rd, Frederick MD 21702**

*Updated September 3rd 2017*

| Summary |
| --- |

An expert witness in embedded systems including both software and hardware. Extensive experience in telecommunications. Extensive experience in reverse engineering and secure systems. Excellent communication skills. Admitted in U.S. District Court as a testifying expert witness.

| Present Activities |
| --- |

**R.M.B. Consulting Inc.**, *President* 1995 – Present

Representative Expert Witness Work

- Hardware and software review of smart phones to understand their functionality and to see if the devices are infringing on patent claims.
- Software review of LTE base stations to understand their functionality and to see if the devices are infringing on patent claims.
- Hardware and software review of a system used to circumvent the rights of copyright holders.
- Reverse engineering of Television Set Top Box hardware and software for evidence that the devices were designed for piracy.
- Code review of engine control modules (ECM) to determine if the ECM can cause unintended acceleration.
- Code review to understand product security mechanisms.

Representative Design Work

- Matlab & Simulink modeling of a novel form of digital modulation that is expected to radically alter the digital communications market.
- Design and implement multiple device drivers for complex Integrated circuits used in the Telecommunications industry. Devices included AAL1 (Infineon IWE8), AAL5 (Conexant RS8234), IEEE 802.3 / Ethernet (AMD Am79C973 and Motorola MPC8260). The device drivers were written in C running in a VxWorks environment. The Ethernet / AAL5 drivers were developed as an integrated suite and achieved a performance level more than ten times faster than the fastest product available in the industry.
- Design and implementation of firmware to control two different Microwave radios.
- Hardware design of a system for use on surface mount production lines.

- Design of a highly fault tolerant, distributed data acquisition and control, system for a rebreather. Responsibilities included system architecture, hardware design and layout, embedded firmware, documentation.
- Redesign of a large LCD panel. Project required reverse engineering of an existing product, together with hardware and firmware design.
- Hardware & firmware for controlling a unique, battery powered diesel burner. This involved the control and sequencing of various motors, power management, safety interlocks, and user interface.

| Patents |
| --- |

*Method and Apparatus for Detecting Impedance*, U.S. Patent No. 7,259,572

*Method and Apparatus for Brightness Control of Indication Lights,* U.S. Patent No. 7,477,158

*Oxygen Control in Breathing Apparatus,* U.S. Patent No. 8,800,344

*Auto calibration / validation of oxygen sensor in breathing apparatus,* U.S. Patent No. 8,820,135

*Methods and Systems for Communicating,* U.S. Patent No. 8,861,327

*Software Defined Radio,* U.S. Patent No. 8,995,546

One patent pending relating to digital modulation techniques.

| Education |
| --- |

BSc., Electrical and Mechanical Engineering, *Brunel University, London*, 1983. Graduated with first class honours.

| Memberships |
| --- |

Senior member IEEE.

| Publications |
| --- |

**Articles and Papers**

Jones, Nigel. "Efficient C Code for 8-bit Microcontrollers," *Embedded Systems Programming*, Nov 1998.

Jones, Nigel. "Arrays of Pointers to Functions," *Embedded Systems Programming*, May 1999.

Jones, Nigel. "Controlling the Transmit Enable Line on RS-485 Transceivers," *Embedded Systems Programming*, Aug 1999.

Jones, Nigel.  "In Praise of the #error Directive," *Embedded Systems Programming*, Sep 1999.

Stone, am Ende, Wefer, and Jones.  "Automated 3D Mapping of Submarine Tunnels," *Robotics 2000: ASCE Conference on Robotics for Challenging Environments*, Feb 2000.

Jones, Nigel.  "A 'C' Test: The 0x10 Best Questions for Would-be Embedded Programmers," *Embedded Systems Programming*, May 2000.

Jones, Nigel.  "Support Multiple Languages," *Embedded Systems Programming*, Feb 2001.

Jones, Nigel.  "Introduction to C's Volatile Keyword," *Embedded Systems Programming*, Jul 2001.

Jones, Nigel.  "Introduction to Lint," *Embedded Systems Design*, May 2002.

Jones, Nigel.  "Introduction to MISRA-C," *Embedded Systems Design*, Jul 2002.

Jones, Nigel.  "Optimal C Constructs for the 8051," *Embedded Systems Design*, Oct 2002.

Jones, Nigel.  "Learn a New Trick with the offsetof() Macro," *Embedded Systems Design*, Mar 2004.

Jones, Nigel.  "Minimizing ISR Overhead," *Embedded Systems Design*, Jan 2007.

Sieber, Jones, et. al.  "Embedded Systems in the Poseidon MK6 Rebreather," *WISES 2009*, Jun 2009.

Jones, Nigel. "PO2 Sensor redundancy". Rebreather Forum 3 Proceedings pp. 193-202. ISBN #978-0-9800423-9-9

**Blog**

*Stack Overflow.*  Archive available at http://www.embeddedgurus.com/stack-overflow/

| Expert Witness Engagements |
|---|

- Testimony at deposition in United States District Court Eastern District of Texas Marshall Division in *Cellular Communications Equipment LLC v. AT&T Inc.. et al.* Case No: 2:15-CV-000576. Disposition: Pending.

- Testimony at deposition and at trial in United States District Court Eastern District of Texas Tyler Division in *Cellular Communications Equipment LLC v. Apple Inc. et al.* Case No: 6:14-CV-000251. Disposition: Jury found willful infringement and awarded judgement of $22.1m for past infringement.

- Testimony at deposition and at trial in United States District Court Eastern District of Texas Tyler Division in *Adaptix, Inc v. Alcatel-Lucent USA, Inc. et al.* Case Nos: 6:12-cv-00022, 6:12-cv-00122, 6:12-cv-00123. Disposition: Jury found for defendant.

- Testimony at deposition and at trial in US District Court for the Central District of California in *EchoStar Satellite Corporation, et al. v. NDS Group PLC et al.*, Case No. SA CV 03-950 DOC(JTL). Disposition: Jury found for defendant on the majority of allegations, awarding plaintiffs just $45.69 in damages. Plaintiff had sought $1.6B in damages. Costs of $14m awarded to defendant.

- Testimony at deposition in United States District Court Central District of California in *Fox Television Stations, Inc., et al v. FilmOnX et al.* Case Nos: CV12-6921-GW(JCx), CV12-6950-GW(JCx). Also in United States District Court For the District of Columbia, Case No: 13-758-RMC. Disposition: Settled.

- Testimony at deposition in United States District Court Northern District of California San Jose Division in *Adaptix, Inc., v. Apple, Inc., et al.* Case Nos: 5:13-cv-1776, 5:13-cv-1777, 5:13-cv-1778, 5:13-cv-2023. Disposition: Summary judgement for defendant.

- Testimony at deposition in United States District Court Eastern District of Texas Tyler Division in *CELL AND NETWORK SELECTION LLC, v. AT&T, Inc., AT&T Mobility LLC, MetroPCS Communications, Inc., MetroPCS Wireless, Inc., MetroPCS Texas, LLC, ZTE Corporation, ZTE (USA) Inc., and ZTE Solutions, Inc.* Case Nos: 6:13-cv-00403, 00404. Disposition: Settled.

- Testimony at deposition in United States District Court Eastern District of Texas Tyler Division in *Adaptix, Inc v. Ericsson, Inc., Telefonaktiebolaget LM Ericsson, et al.* and *Adaptix, Inc., v. T-Mobile Communications LLC* Case Nos: 6:13-cv-49, 6:13-cv-50, 6:13-cv-369. Disposition: Settled.

- Testimony at deposition in United States District Court Northern District of California San Jose Division in *Adaptix, Inc, v. Apple, Inc, Cellco Partnership d/b/a Verizon Wireless, AT&T, Inc, AT&T Mobility LLC.* Case Nos:     5:13-cv-1776,     5:13-cv-1844,     6:12-cv-0020,     6:12-cv-0120. Disposition: Summary judgement for defendant.

- Testimony at deposition in United States District Court Northern District of California San Jose Division in *Adaptix, Inc, v. AT&T, INC., AT&T Mobility LLC, HTC Corporation and HTC America, INC.* Case Nos: 5:13-cv-01844-PSG, 5:13-cv-01778-PSG. Disposition: Unknown.

- Testimony at deposition in the ITC in Certain Wireless Communications Base Stations and Components Thereof. Inv. No. 337-TA-871. Disposition: Complaint withdrawn.

- Testimony at deposition in Ontario Superior Court of Justice in *DISH Network et al. vs. Angel Electronics Inc. et al.*, Case No. CV-10-8790-00CL. Disposition: Pending.

- Testimony at deposition in US District Court for the Eastern District of New York in *Point4 Data Corporation and Dynamic Concepts, Inc. vs. Tri-State Surgical Supply & Equipment Ltd, et al.* Case number 11 CV 0726 (RJD). Disposition: Most of complaint dismissed on summary judgement. Defendant has appealed.

- Testimony at deposition in US District Court for the Central District in *Estate of Ida St. John v. Toyota Motor Corporation ,et al.,* Case No: 8:10-cv-01460-JVS-FMO. Disposition: Settled.

- Testimony at deposition in US District Court for the Central District in *Shirlene Van Alfen, et al. v. Toyota Motor Sales, U.S.A., Inc.,* Case No: CV11-08120JVS. Disposition: Settled under confidential terms. Six expert reports were simultaneously filed for plaintiffs in *Toyota Motor Corp. Unintended Acceleration, Marketing, Sales Practices, and Products Liability Litigation,* Case No: 8:10ML2151 JVS. Disposition: Settled for $1.2B.

- Testimony at hearing in WV District Court, Hunington Division in Johnson v. Ford Motor Company, Case No. 3:13-cv-6529

- Expert report in US District Court for the Southern District of New York in *WNET et al., vs. Aereo Inc.,* Case No: 12-civ-1540(AJN). Disposition: Supreme Court ruling in favor of plaintiffs.

- Expert report in US District Court for the Southern District of California in *EchoStar Satellite LLC et al., vs. Sonicview et al,* Case No: 09-cv-1553-L(WVG). Disposition: $65m summary judgment.

- Expert report in US District Court for the Southern District of California in *EchoStar Satellite LLC et al., vs. Christopher Whitcomb et al,* Case No. 11-cv-0333-W-RBB. Disposition: PI and summary judgment granted

- Expert report in US District Court for the Central District of California in *EchoStar Satellite LLC et al, vs. Warren Edwin Scheibe,* Case No: 2:10-cv-04561-SJO_E. Disposition: $25m agreed judgment.

- Expert report in US District Court for the Southern District of California in *EchoStar Satellite LLC et al, vs. Viewtech, Inc and Jung Kwak,* Case No: 07cv1273 BEN (WVG). Disposition: $214m summary judgment.

- Expert report in US District Court for the District of New Jersey in *EchoStar Satellite LLC et al., vs. Sonysat LLC et al.,* Case No: 10-cv-01337-FSH-PS. Disposition: TRO and seizure granted. Case settled.

- Expert report in Ontario Superior Court of Justice in *DISH Network et al. vs. Ravin Ramkissoon. et al.,* Case No.  09-CL-8091-00CL. Disposition: Anton Pillar request granted. Defendant jailed for contempt.

- Expert report in *Eutronix v. Texas Embedded Solution*. Disposition: Plaintiff withdrew case after submission of expert report.

- Expert report in US District Court for the Central District of California in *EchoStar Satellite LLC et al., vs. Global Technologies Inc,*. Case No: 2:07-CV-05897-JZ-PLA. Disposition: $626m summary judgment.

- Expert report in US District Court for the Northern District of California in *EchoStar Satellite LLC et al., vs. Freetech Inc.,* Case No: CV-07-6124 (JW) (RS). Disposition: $106m agreed upon judgment.

- Expert report in US District Court for the Central District of California in *EchoStar Satellite LLC et al., vs. Panarex Inc.,* Case No: CV07-5897 GPS (PLAx). Disposition: $121.7m agreed upon judgment.

- Multiple expert reports for plaintiff DirecTV in a wide ranging series of cases against end users that were alleged to have been pirating DirecTV's signal. Disposition: Verdicts favorable to the plaintiff in almost all cases.

# EXHIBIT C

1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                                   NORTHERN DISTRICT OF CALIFORNIA

10

11                                                         Case No. C

12                            Plaintiff,                    PATENT LOCAL RULE 2-2 INTERIM
                                                           MODEL PROTECTIVE ORDER
13           v.

14

15                            Defendant.

16

17   1.      PURPOSES AND LIMITATIONS

18           Disclosure and discovery activity in this action are likely to involve production of confidential,

19   proprietary, or private information for which special protection from public disclosure and from use for

20   any purpose other than prosecuting this litigation may be warranted. This Order does not confer blanket

21   protections on all disclosures or responses to discovery and the protection it affords from public disclosure

22   and use extends only to the limited information or items that are entitled to confidential treatment under

23   the applicable legal principles. As set forth in Section 14.4 below, this Protective Order does not entitle the

24   Parties to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that

25   must be followed and the standards that will be applied when a party seeks permission from the court to

26   file material under seal.

27   2.      DEFINITIONS

28           2.1      Challenging Party: a Party or Non-Party that challenges the designation of information or

items under this Order.

2.2     "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3     Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.4     Designated House Counsel: House Counsel who seek access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter.

2.5     Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

2.6     Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7     Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.8     "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9     "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2

2.10    House Counsel: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.11    Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.12    Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.13    Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.14    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.15    Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16    Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

2.17    Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3.    SCOPE

The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the

3

disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the

information lawfully and under no obligation of confidentiality to the Designating Party. Any use of

Protected Material at trial shall be governed by a separate agreement or order.

4.      DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order

shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise

directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this

action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all

appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any

motions or applications for extension of time pursuant to applicable law.

5.      DESIGNATING PROTECTED MATERIAL

5.1      Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-

Party that designates information or items for protection under this Order must take care to limit any such

designation to specific material that qualifies under the appropriate standards. To the extent it is practical

to do so, the Designating Party must designate for protection only those parts of material, documents,

items, or oral or written communications that qualify – so that other portions of the material, documents,

items, or communications for which protection is not warranted are not swept unjustifiably within the

ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be

clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or

retard the case development process or to impose unnecessary expenses and burdens on other parties)

expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for

protection do not qualify for protection at all or do not qualify for the level of protection initially asserted,

that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken

designation.

5.2      Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g.,

second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery

4

Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) <u>for information in documentary form</u> (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE") to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

(b) <u>for testimony given in deposition or in other pretrial or trial proceedings</u>, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted. When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may invoke on the record (before the deposition, hearing, or other proceeding is concluded) a right to have up to 21 days to identify the specific

portions of the testimony as to which protection is sought and to specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated for protection within the 21 days shall be covered by the provisions of this Protective Order. Alternatively, a Designating Party may specify, at the deposition or up to 21 days afterwards if that period is properly invoked, that the entire transcript shall be treated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Parties shall give the other parties notice if they reasonably expect a deposition, hearing, or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 21-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3    Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party

must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1    Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2    Meet and Confer. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3    Judicial Intervention. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14

7

days, if applicable) shall automatically waive the confidentiality designation for each challenged

designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation

at any time if there is good cause for doing so, including a challenge to the designation of a deposition

transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by

a competent declaration affirming that the movant has complied with the meet and confer requirements

imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party.

Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary

expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the

Designating Party has waived the confidentiality designation by failing to file a motion to retain

confidentiality as described above, all parties shall continue to afford the material in question the level of

protection to which it is entitled under the Producing Party's designation until the court rules on the

challenge.

7.      ACCESS TO AND USE OF PROTECTED MATERIAL

7.1     Basic Principles. A Receiving Party may use Protected Material that is disclosed or

produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending,

or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of

persons and under the conditions described in this Order. When the litigation has been terminated, a

Receiving Party must comply with the provisions of section 15 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a

secure manner that ensures that access is limited to the persons authorized under this Order.

7.2     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the

court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or

item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of

said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this

litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto

as Exhibit A;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.3     Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) Designated House Counsel of the Receiving Party (1) who has no involvement in competitive decision-making, (2) to whom disclosure is reasonably necessary for this litigation, (3) who

9

has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (4) as to whom the procedures set forth in paragraph 7.4(a)(1), below, have been followed;[1]

(c) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.4(a)(2), below, have been followed;

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

(f) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.4 <u>Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items to Designated House Counsel or Experts.</u>

(a)(1) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to Designated House Counsel any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to paragraph 7.3(b) first must make a written request to the Designating Party that (1) sets forth the full name of the Designated House Counsel and the city and state of his or her residence and (2) describes the Designated House Counsel's current and reasonably foreseeable future primary job duties and responsibilities in sufficient detail to determine if House Counsel is involved, or may become involved, in any competitive decision-making.

(a)(2) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to an Expert (as defined in this Order) any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY

---

[1] This Order contemplates that Designated House Counsel shall not have access to any information or items designated "HIGHLY CONFIDENTIAL – SOURCE CODE."

CONFIDENTIAL – SOURCE CODE" pursuant to paragraph 7.3(c) first must make a written request to the Designating Party that (1) identifies the general categories of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information that the Receiving Party seeks permission to disclose to the Expert, (2) sets forth the full name of the Expert and the city and state of his or her primary residence, (3) attaches a copy of the Expert's current resume, (4) identifies the Expert's current employer(s), (5) identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years,[2] and (6) identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

(b) A Party that makes a request and provides the information specified in the preceding respective paragraphs may disclose the subject Protected Material to the identified Designated House Counsel or Expert unless, within 14 days of delivering the request, the Party receives a written objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

(c) A Party that receives a timely written objection must meet and confer with the Designating Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within seven days of the written objection. If no agreement is reached, the Party seeking to make the disclosure to Designated House Counsel or the Expert may file a motion as provided in Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) seeking permission from the court to do so. Any such motion must describe the circumstances with specificity, set forth in detail the reasons why disclosure to Designated House Counsel or the Expert is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that risk. In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the

---

[2] If the Expert believes any of this information is subject to a confidentiality obligation to a third-party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be available to meet and confer with the Designating Party regarding any such engagement.

matter by agreement (i.e., the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

In any such proceeding, the Party opposing disclosure to Designated House Counsel or the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Designated House Counsel or Expert.

8.   PROSECUTION BAR

Absent written consent from the Producing Party, any individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information shall not be involved in the prosecution of patents or patent applications relating to the subject matter of this action, including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office"). For purposes of this paragraph, "prosecution" includes directly or indirectly drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims.[3] To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party challenging a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, *ex parte* reexamination or *inter partes* reexamination). This Prosecution Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information is first received by the affected individual and shall end two (2) years after final termination of this action.

9.   SOURCE CODE

(a)  To the extent production of source code becomes necessary in this case, a Producing Party may designate source code as "HIGHLY CONFIDENTIAL – SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code.

(b)  Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall

---

[3] Prosecution includes, for example, original prosecution, reissue and reexamination proceedings.

be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information, including the Prosecution Bar set forth in Paragraph 8, and may be disclosed only to the individuals to whom "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information may be disclosed, as set forth in Paragraphs 7.3 and 7.4, with the exception of Designated House Counsel.

(c)   Any source code produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel or another mutually agreed upon location. The source code shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.

(d)  The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purpose of reviewing the source code other than electronically as set forth in paragraph (c) in the first instance. The Producing Party shall provide all such source code in paper form, including bates numbers and the label "HIGHLY CONFIDENTIAL – SOURCE CODE." The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution.

(e)   The Receiving Party shall maintain a record of any individual who has inspected any portion of the source code in electronic or paper form. The Receiving Party shall maintain all paper copies of any printed portions of the source code in a secured, locked area. The Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers

13

(including a testifying expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Any paper copies used during a deposition shall be retrieved by the Producing Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.

10.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE," that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[4]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

---

[4] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

11.    A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a)  The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b)  In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

1.    promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2.    promptly provide the Non-Party with a copy of the Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3.    make the information requested available for inspection by the Non-Party.

(c)  If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court.[5] Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

12.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Protective Order, the Receiving Party must

---

[5] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this court.

immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

13.     INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in a stipulated protective order submitted to the court.

14.     MISCELLANEOUS

14.1     Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

14.2     Right to Assert Other Objections. No Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

14.3     Export Control. Disclosure of Protected Material shall be subject to all applicable laws and regulations relating to the export of technical data contained in such Protected Material, including the release of such technical data to foreign persons or nationals in the United States or elsewhere. The Producing Party shall be responsible for identifying any such controlled technical data, and the Receiving Party shall take measures necessary to ensure compliance.

14.4     Filing Protected Material. Without written permission from the Designating Party or a

16

court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5(e) is denied by the court, then the Receiving Party may file the Protected Material in the public record pursuant to Civil Local Rule 79-5(e)(2) unless otherwise instructed by the court.

15. <u>FINAL DISPOSITION</u>

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

IT IS SO ORDERED.

DATED: _____  _____
                                              [Name of Judge]
                                              United States District/Magistrate Judge

17

<u>EXHIBIT A</u>

<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

I, _____ [print or type full name], of _____

[print or type full address], declare under penalty of perjury that I have read in its entirety and understand

the Protective Order that was issued by the United States District Court for the Northern District of

California on _____ [date] in the case of _____ **[insert formal name of the case and the**

**number and initials assigned to it by the court]**. I agree to comply with and to be bound by all the terms

of this Protective Order, and I understand and acknowledge that failure to so comply could expose me to

sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any

manner any information or item that is subject to this Protective Order to any person or entity except in

strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Northern District of California for the purpose of enforcing the terms of this Protective Order, even if such

enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of

_____ [print or type full address and telephone number] as my

California agent for service of process in connection with this action or any proceedings related to

enforcement of this Protective Order.


Date: _____

City and State where sworn and signed: _____

Printed name: _____
                    [printed name]

Signature: _____
                    [signature]

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HSM PORTFOLIO LLC, et al.,      :

                         :

        Plaintiffs,      :

                         :

      v.               :       Civil Action No. 11-770-RGA

                         :

FUJITSU LIMITED, et al.,        :

                         :

        Defendants.     :

**ORDER**

At the Discovery Dispute Conference on December 5, 2012, the Court resolved a number

of issues. One such issue was the level of protection to be afforded "native circuit schematic

files." After consideration of the papers submitted and argument, the Court ruled that the

Defendants had not shown that native circuit schematic files deserved the same level of

protection as computer source code. (D.I. 297, at 22-23). The consequence is that such materials

would be designated as "Highly Confidential – Outside Attorneys' Eyes Only" rather than

"Highly Confidential – Source Code." The Defendants asked for permission to submit factual

material to rebut the Plaintiffs' Expert's Declaration. The Court granted the request. (*Id.* at 68-

69). Additional letters with additional declarations were submitted. (D.I. 300, 304). There was

a request for additional oral argument. (D.I. 306). I do not think additional oral argument would

be helpful. D.Del. LR 7.1.4.

No one disputes that native circuit schematic files are highly confidential. Of course, the

usual practice is that highly confidential information is adequately protected by the "Highly

Confidential – Outside Attorneys' Eyes Only" designation.

Before the Discovery Dispute Conference, the Plaintiffs' expert opined, in essence, that

native circuit schematic files cannot be directly used to fabricate integrated circuits since they do not have the necessary information about the physical layout of the chip. (D.I. 294, p.1). The Defendants' expert opined that native circuit schematic files, with automated tools, can be easily used to generate netlists. The expert further opined that additional automated tools "use the netlists to create the physical layout. The layout contains the information needed to build the final integrated circuit." (D.I. 300, Exh. A, ¶18). The Plaintiffs' response, simply stated, is that Defendants' expert makes getting from native circuit schematic files to manufactured integrated circuits seem to be a simple, direct process whereas it is not.

I think the Defendants' expert's declaration is not inconsistent with the Plaintiffs' argument (and declarations) to the effect that native circuit schematics cannot be used to directly fabricate integrated circuit chips. Therefore, I remain unpersuaded that native circuit schematic files require the designation "Highly Confidential–Source Code."

The parties are requested to promptly submit a proposed protective order conformed to the Court's rulings.

1-9-13
Date

United States District Judge

# EXHIBIT E

# FARNAN LLP

Brian E. Farnan
302-777-0336
bfarnan@farnanlaw.com

December 4, 2012

**VIA E-FILING**
The Honorable Richard G. Andrews
United States District Judge
J. Caleb Boggs Federal Building
844 N. King Street
Unit 9, Room 6325
Wilmington, DE 19801-3555

     **RE:**   *HSM Portfolio LLC, et al. v. Fujitsu Limited, et al.*,
              (C.A. No. 1:11-cv-00770-RGA)

Dear Judge Andrews:

Plaintiffs HSM Portfolio LLC and Technology Properties Limited LLC (collectively "Plaintiffs") submit this letter brief in response to the letter brief submitted by Defendants regarding the parties' disputes relating to the entry of a protective order. The parties' dispute concerns provisions proposed by Defendants that, if adopted by the Court, would improperly impose severe restrictions on Plaintiffs' access to Defendants' basic core technical documents.

    **1.  No Good Cause Exists for Defendants' Proposed Inclusion of Circuit Schematic Files as "Source Code Materials"**

The parties' dispute is ***not*** whether *all* files related to circuit design should be exempted from the heightened restrictions and supervised review procedures used for source code. Rather, the dispute is only whether one file type – Circuit Schematics – should be treated as source code.

Defendants propose to lump all files related to circuit design into a single generic category called "Circuit Design" files, and thereby extend source code restrictions to the basic core technical documents that Defendants are obligated to produce to Plaintiffs. Defendants claim – without any supporting evidence – that all files used in the process of circuit design (including even Circuit Schematics), must be treated like source code because they allegedly share the same potential for abuse as Source Code. In support, Defendants argue that some unspecified "files can be used, for example, to automatically generate the 'photolithography masks' that are directly used to fabricate semiconductor parts." D.I. 293 at 1. Tellingly, Defendants never allege that this holds true for *circuit schematics*, because it does not.

In contrast to Defendants' lack of evidence, Plaintiffs submit the Declaration of Dr. David Liu, who explains the many ways that Circuit Schematics are "fundamentally different" from "Source Code," "HDL Source Code," and "Physical Design Files." Ex. A ¶¶ 3-18. Importantly, Circuit Schematic Files ***cannot be directly used to fabricate integrated circuits*** since they lack key information regarding the physical layout of the chip. *Id.* ¶¶ 10-18. Indeed, it is only physical layout files—not circuit schematics––that are sent to foundries for fabrication. *Id.* ¶ 17. Defendants ignore this key distinction, which was critical to Defendants' only supporting authority – Judge Stark's ruling in *Intellectual Ventures I LLC v. Altera Corp.* D.I. 293, Ex. B at 26:16-20 ("The analogy holds up in the Court's view in part because it's

December 4, 2012
Page 2

represented at least that these materials can be used, by those who are knowledgeable and have access to the right materials, they can be used to replicate the defendants' products.").

Indeed, Defendants' assertion that Circuit Schematics are always treated like source code is belied by the fact that, in other cases, several Defendants have agreed to produce Circuit Schematic Files *without* any heightened "source code" restrictions.[1]

Defendants argue further that documents written in "hardware description language" or "HDL" are a textual type of design file (and should be treated like source code) – yet Defendants ignore the fact that there is no dispute among the parties as to the agreed treatment of either HDL Code or any physical layout file or other design file that can be used to actually fabricate a chip.

Next, Defendants broadly argue that all circuit design files are among their "crown jewels" and that they would suffer "irreparable damage" if these files were lost, stolen, or misused. D.I. 293 at 2. But all highly confidential information is not accorded the same level of protection as source code merely because it is electronic; the disclosure of source code carries inherent risks not present with the disclosure of other sensitive information. Unlike a native circuit diagram or other native graphical files, source code can be readily compiled and incorporated into competing products. *See Member Servs., Inc. v. Security Mutual Life Ins.*, C.A. No. 3:06-CV-1164 (TJM/DEP), 2007 WL 2907520, at *6 (N.D.N.Y. Oct. 3, 2007). And while textual HDL Source Code and native physical layout files arguably carry similar risks as source code, graphical Circuit Schematic Files do not. *See* Ex. A at ¶¶ 7-18.

### 2. Defendants Concede that PDF Printouts of Circuit Schematic Files Are Not "Source Code Materials."

Defendants concede that PDF printouts of Circuit Schematic Files do not pose the same risks as disclosure of Source Code. D.I. 293 at 1 ("By contrast, information in other formats, such as a printout or PDF, does not pose the same risk."). Nevertheless, Defendants' proposed protective order makes no such distinction, and would require that even PDF printouts of circuit schematics be classified as Source Code Materials and reviewed on a source code computer under Defendants' supervision.[2] In contrast to Defendants' lack of evidence, chip manufacturers like Defendants regularly produce PDF printouts of circuit schematics in patent infringement cases *without requiring inspection-level protection*. *See* Ex. F ¶¶ 2-3. Indeed, it should be simple for Defendants to create a PDF printout of the complete hierarchical schematic of the integrated circuits at issue using the standard software used to design the chips. Ex. A ¶ 4. Additionally, Defendants' 250-page printing restriction, if applied to PDF printouts of circuit

---

[1] In *ProMOS Techs., Inc. v. Freescale Semiconductor, Inc.*, C.A. No. 06-788 (JJF) (D. Del.), ProMOS agreed to produce circuit schematics as "OUTSIDE ATTORNEYS' EYES ONLY" material, without heightened source code restrictions. Ex. B ¶¶ 3-4. In *Rambus Inc. v. Hynix Semiconductor Inc.*, Case No. C 05-00334 RMW (N.D. Cal.), Hynix and Micron produced circuit schematics as "CONFIDENTIAL – OUTSIDE COUNSEL ONLY" material, without heightened source code restrictions. Ex. C ¶ 20(b). In *Smart Memory Solutions, LLC v. Micron Tech., Inc.*, C.A. No. 1:11-cv-00816-LPS (D. Del.), Micron similarly produced circuit schematics without heightened source code restrictions. Ex. D ¶ 6. And in *Microlink, L.L.C. v. Intel Corp.*, C.A. No. 2:07-CV-488 (TJW) (E.D. Tex.), AMD, Sony, and Toshiba even expressly distinguished source code from circuit schematics. Ex. E ¶ 30(a)-(c).

[2] *See* D.I. 293, Ex. A ¶ 1(a), (l) (defining Source Code Materials as including all Circuit Design Files, which are "[a] computer file or files containing information descriptive of an electrical circuit for use with circuit design, simulation and/or verification software or for use in association with circuit fabrication").

Case 1:11-cv-00034-JPB-SRF  Document 57-2  Filed 09/21/17  Page 38 of 152 PageID #:
Case 1:11-cv-00070-RGA  Document 294  Filed 12/04/12  Page 3 of 3 PageID #: 4004
1005

December 4, 2012
Page 3

schematics, would prevent Plaintiffs from creating a complete hierarchical printout of even one integrated circuit. *Id.* ¶ 26; Ex. F ¶ 4.

### 3. By Over Designating Circuit Schematic Files as Source Code Materials, Defendants Would Inject Additional Delays to the Scheduling Order.

By over designating Circuit Schematic Files as Source Code Materials, Defendants seek to apply the same onerous limitations for inspection of Source Code, HDL Code, and Physical Design Files to Circuit Schematic Files. But Circuit Schematic Files are Defendants' *core technical documents*, whereas Source Code, HDL Code, and Physical Design Files are secondary evidence. Ex. A ¶ 3. Defendants' proposed restrictions would permit Defendants to locate their core technical documents at potentially 13 different places throughout the United States, and require Plaintiffs to review them under Defendants' supervision with inadequate software utilities and severe printing limitations. D.I. 293, Ex. A ¶ 11(a), (c), (f). These restrictions would allow Defendants to delay production of the core technical documents for at least 14 days *after* they are required to be produced under the Court's Scheduling Order. *Id.* ¶ 11(b) ("The Source Code Computer will be made . . . upon reasonable notice to the Producing Party, which shall not be less than ten (10) business days in advance of the first requested inspection ...."). Even more egregious, Defendants refuse to include a provision for permitting appropriate access to these core technical documents at trial.

Not only do Defendants' proposals contradict their agreements in other cases,[3] Defendants' proposals would add significant additional delays to the timeframes of the Scheduling Order, which requires Defendants to produce their core technical documents on precisely January 2, 2013 (60 days after Plaintiffs' identification of accused products)—not 14 days later. D.I. 228 ¶ 2(b). The Scheduling Order further contemplates that Plaintiffs will have a full 60 days of unfettered access to Defendants' core technical documents before the production of Plaintiffs' PICs. *Id.* ¶ 2(c). That 60-day window did not contemplate, much less account for, Plaintiffs' travel to 13 different locations across the territorial United States, supervised review of core technical documents at each of those locations, and a mandatory 10-day notice provision. Under these constraints, as well that the impossible printing restrictions of 250 pages per party – it would be impossible to effectively review, analyze, and use Defendants' core technical documents in preparing Plaintiffs' PICs. Ex. A ¶¶ 26-28.

### 4. Defendants Fail to Articulate Good Cause for Stricter Inspection Procedures.

Defendants have not provided any evidence supporting their assertion that it is not technically feasible to replicate their design environment in another location, and, regardless, Defendants have not offered to provide such an environment to review their Source Code Materials, but rather have proposed that they each have the option to provide a simple text editor, which would be worthless in Plaintiffs' review. Ex. A ¶¶ 19-25. Nor have they explained why an escrow service would provide insufficient security. Defendants have also failed to provide any

---

[3] In several instances, Defendants have produced Source Code Materials for inspection in a single location or region. Ex. G ¶ 10(a); Ex. H ¶ 8(a)-(b); Ex. I ¶ 9(a). At least two Defendants have provided software utilities that are the same or equivalent to the tools used by their engineers and employees. Ex. G ¶ 10(b). Other Defendants have allowed printing of Source Code Materials that are reasonably necessary for the preparation of the case. Ex. J ¶ 9(d).

December 4, 2012
Page 4

evidence supporting their assertion that licensing restrictions prohibit them from replicating their design environment, or that acquiring a license for Plaintiffs would result in a substantial burden to Defendants. In fact, the evidence shows just the opposite. For example, STMicro was permitted by Cadence to allow Plaintiffs' counsel to review its core technical documents using licensed software *free of charge* in another lawsuit. Ex. K ¶¶ 2-5. Defendants' strict inspection procedures impose unreasonable burdens on Plaintiffs—not Defendants—requiring Plaintiffs to incur substantial time and expense visiting up to 13 different locations, obtain software licenses that Defendants could secure without any additional expense, and potentially carry the burden of paying *half* of all costs for implementing protections imposed by Defendants.

### 5. Authors, Addressees, and Recipients of Designated Materials.

Defendants seek to prohibit access to Confidential Material by persons who are identified as authors, addressees, or recipients of the material unless they are also employees, officers, or directors of the Producing Party, and, for other Designated Materials, Defendants seek to prohibit access by such persons in any context other than a deposition. D.I. 293, Ex. A ¶¶ 7(e), 8(h), 9(h). However, Defendants have not provided any justification for limiting access of Designated Materials to these persons outside of the context of deposition, especially where such persons have presumably viewed these documents in the past. Moreover, this Court recently issued a protective order including Plaintiffs' proposal. Ex. L ¶¶ 7.2(g), 7.3(f).

### 6. The Producing Party Should Move the Court for Protection.

Defendants also seek to place the burden of moving the Court for relief from the Protective Order on the Receiving Party. D.I. 293, Ex. A ¶¶ 12, 15(d). But, this is contrary to the burden of proof, which is on the party seeking relief under a protective order. *See Xerox Corp. v. Google, Inc.*, 270 F.R.D. 182, 183 (D. Del. 2010). Plaintiffs' proposal dissuades mischief such as over-designation as well as baseless objections to expert designations, and coincides with other protective orders adopted by this Court. *See, e.g.*, Ex. L ¶ 6.3.

### 7. Attorney Work Product in Subsequent Litigation.

Defendants' concern regarding the reuse of attorney work product is unfounded because Plaintiffs' proposal specifically requires that such use will not disclose any confidential material. Further, this provision is common in other protective orders. *See, e.g.*, *Barmore v. City of Rockford*, No. 09 C 50236, 2012 WL 3779045, at *11 (N.D. Ill. Aug. 29, 2012).

### 8. Defendants Failed to Carry Their Burden of Showing Good Cause.

As the parties seeking a more restrictive protective order, the burden of establishing good cause falls on Defendants and requires a showing that "disclosure will work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d. Cir. 1994). But Defendants have failed to offer even one scintilla of evidence in support of their arguments, which are nothing more than broad, unsubstantiated allegations of harm devoid of examples or articulated reasoning. Accordingly, Defendants' proposals should be denied. *Id.*

December 4, 2012
Page 5

Respectfully submitted,

Brian E. Farnan

cc:     Counsel of Record (*via CM/ECF*).

# EXHIBIT F

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HSM PORTFOLIO LLC and TECHNOLOGY
PROPERTIES LIMITED LLC,

Plaintiff,

v.

FUJITSU LIMITED, *et al.*,

Defendants.

Civil Action No. 11-770 (RGA)

## DECLARATION OF DR. MARTIN WALKER

I, Martin Walker, declare as follows:

1.      I received my Bachelors of Science degree in Electrical Engineering from the Massachusetts Institute of Technology in 1973.  I then received my Masters of Science and Doctor of Philosophy degrees in Electrical Engineering in 1976 and 1979 from Stanford University.

2.      I have over 35 years of experience in the design of integrated circuits, including analog, digital, and RF/microwave circuits.   I also have over 25 years of experience in using electronic design automation ("EDA") tools to design integrated circuits, including experience with EDA systems, simulation, modeling, and Verilog and VHDL analysis.

3.      I have spent 20 years working in the EDA segment of the semiconductor industry. I founded Analog Design Tools in 1983 and served as Director and Chief Scientist through its acquisition, ultimately working there for seven years.  ADT pioneered the market for EDA tools in the analog design area and introduced several fundamental concepts to the market.  ADT's

tools were ultimately acquired by Cadence, a major producer of EDA tools and, I understand, a provider of EDA tools for some of the defendants in this matter. In 1995, I founded another EDA tools company called Frequency Technology (now Apache), which leads a segment of the EDA market called "Design Closure."

4.     I have consulted on business and litigation issues for many different companies in the semiconductor industry since 2001, including several litigation engagements involving EDA tools. In particular, since 2001, I have consulted in several different actions as an expert to Synopsys, another major provider of EDA tools in the market.

5.     I have published over fifty articles in the fields of circuit design and design automation and have received patents from the U.S. Patent and Trademark Office for my inventive work. My curriculum vitae is attached as Exhibit A. I am over 21 years old, a U.S. Citizen, and if called as a witness, I could testify competently to the truth of each statement herein.

**A.     Overview of the semiconductor design process and my understanding of the dispute**

6.     I have received and read the December 3, 2012 letter from Mr. Cottrell to the Honorable Richard G. Andrews and the December 4, 2012 letter from Mr. Farnan to the Honorable Richard G. Andrews. I understand that the parties dispute what types of semiconductor design files will receive protective order protections equivalent to the types of protections customarily given to software source code. I further understand that at this time the parties dispute what level of protection should be afforded to native circuit schematic files, not whether such files are or are not properly the subject of discovery in this matter. I submit this Declaration and the accompanying short video in order to both explain and demonstrate the capabilities of electronic design automation ("EDA") tools and the sensitivity of native circuit

schematic files.

7.      Because modern semiconductor products are very complex, it is virtually impossible to design and analyze them without EDA tools.  EDA tools are used to help carry out all stages of semiconductor integrated circuit ("IC") design, including logical and physical design, testing, and verification.  As explained above, I have worked in this field for 25 years, including founding two EDA tools companies and consulting as an expert in multiple litigations over EDA technology.  I am therefore well versed in the processes for designing and manufacturing semiconductor products as well as the various EDA tools used in the process.

8.      The process of manufacturing semiconductor chips involves a number of stages. These stages generally include circuit design, mask making, manufacturing of the semiconductor substrate, wafer processing, testing, and packaging.[1]  Circuit design can further be divided into two main stages: (a) logical design, and (b) physical (sometimes called "layout") design.  The logical design portion focuses on the functionalities of the circuits.  The physical design portion focuses on the implementation of the logical design on the physical silicon substrate. The output of the physical design stage is the tooling, such as photolithography masks, used to actually manufacture the integrated circuit devices.

9.      In a typical design case, the great bulk of the effort is spent in crafting, debugging, and improving an accurate and efficient logical design.  The physical design process is automated by EDA software tools.

10.     I note that plaintiffs concede that all files containing physical design information receive source-code level protection.  In contrast, I note that plaintiffs provide source-code level

---

[1] Details of the semiconductor manufacturing process can be found in resources such as Semiconductor Manufacturing Technology by Chue San Yoo, World Scientific Publishing Co., Inc. (March 2008).

protection for some logical design files but not for others. In particular, plaintiffs concede that HDL code, which is a logical design file, receives source-code level protections, but do not concede that circuit schematic files (which contain largely the same logical design information) should receive source-code level protection. As explained in more detail below, there is no justification for treating these two types of files differently, as they are both used for the same purpose in the design process and contain equally sensitive information.

**B.     The two approaches to logical circuit design: HDL and circuit schematics**

11.     There are two main approaches to creating logical circuit designs. One common approach starts with the designer creating a textual description of the operation of the circuits using a computer language referred to as a hardware description language[2] ("HDL" code). HDL is akin to computer software source code in the sense that it is textual and human readable. Next, an automated EDA tool is used to translate the HDL description into a "netlist," which is a textual list of the inputs, outputs, and interconnections among the fundamental semiconductor structures that are used to create the circuits.

12.     Alternatively, designers can use a different EDA program that provides a graphical circuit design editor to create a circuit schematic, which is a human-readable and graphical (rather than textual) representation of the "netlist" file. These native schematics are saved in a file format native to the EDA program and, like the HDL files, can be converted into the textual netlist file format using an EDA tool.

**C.     The importance of netlists: used in fabrication, simulation, verification, analysis**

13.     Because netlists contain the essential logical design information about an integrated circuit they are at the center of a host of activities in the design and fabrication

---

[2] A related concept is "RTL code," or register transfer level. For the purposes here, RTL can be considered part of HDL.

process.

14.     As indicated on the right-hand side of figure below, designers can create the physical design from a netlist in automated processes using EDA tools.  The physical design is directly used generate a product on a given manufacturing process corresponding to the original logical design.

15.     However, there is an important limitation to the physical design: the physical design is tied to a specific manufacturing process, where as a netlist can be easily retargeted to a new or different fabrication process.  Thus the netlist represents a "portable" design that is much easier to misappropriate than a physical design.  Accordingly, netlists (and the databases that are used to create them, such as the native schematics) should be accorded at least as much protection as the physical designs.

16.     Netlists are a key form of information used in every aspect of circuit design.  For example, in order to model the performance or check the veracity of a given design, an engineer would export a netlist from a native circuit schematic file so that it could be imported into a simulation or verification tool.  Netlists therefore contain the key information needed to understand and analyze the circuit.

17.     Netlists are often considered the essential intellectual property of integrated circuit design.  For example, I understand that ARM, a company which has developed the dominant microprocessor technology that is used in leading smartphones today, licenses its processor technology by providing the netlist of the processor architecture to its licensees rather than the physical design files.

18.     The figure below illustrates the central importance of netlists in both HDL-based design and schematic-based design.  The upper path starts with the textual HDL input file, which

is converted into the upper netlist.  The alternative path begins with creation of the native

schematic representation of the circuit, which is also converted into a netlist.  In either case,

additional EDA tools use the netlists to create the physical layout.  The layout contains the

information needed to build the final integrated circuit.

19.     The native schematics can also be printed out in PDF files.  As discussed in more

detail below, this lower level of protection makes sense because there is no direct path possible

from the printed through automated tools to create the netlists.



**D.      Native circuit schematic files are at least as sensitive as HDL code**

20.     Because native circuit schematics can be used by EDA tools to automatically

generate netlist descriptions of semiconductor chips, in my opinion treating HDL and schematics

differently is inconsistent and, in my experience in the business of designing and selling EDA

tools, is not a distinction that the semiconductor design industry would make.

21.     Native schematic files are at least as sensitive as HDL code, because, as I have described, they both can generate netlist files automatically, and netlists are used to fabricate end products and to analyze and verify circuit designs.

### E.     Circuit schematic files are more sensitive than PDF schematics because they can be incorporated in competitive products easily and because they contain more information than PDFs

22.     Schematics are typically stored and manipulated in the format of the program in which they were created.  For example, Cadence Design Systems is a major producer of design tools.  The circuit schematic files for these tools are typically called "Cadence databases."  As described above, these circuit schematic files can be used to automatically generate netlists. They are not only the basic repository for schematic-level information, but also for the physical characteristics of the fundamental semiconductor elements, such as their physical dimensions and other physical aspects that are ultimately incorporated into the physical design of the chip.

23.     Commercial design systems, such as Cadence, can generate printouts, screenshots, or PDFs from the circuit schematic files.  These PDFs are essentially pictures of the schematics, but once the circuit schematic files have been converted into PDFs, they lose many of the characteristics mentioned above.  In particular, whereas circuit schematic files can generate netlists, PDFs cannot, because the PDF format is not a semiconductor file format.  For example, circuit schematic files would understand that an "AND gate" is a logical device that has an output of true when one or both of its inputs has a value of true.  A PDF would only describe lines on a page that a human would recognize as an "AND gate," but that an EDA tool would not.  PDF schematics, while still very sensitive, are therefore not as sensitive as circuit schematic files, and will not necessarily contain all the information in circuit schematic files.

24.     In short, the information contained in native circuit schematic files, and the EDA

readable format of these circuit schematic files makes it easy to copy portions of circuits from one design to another, to analyze and understand designs, and to export the design to new manufacturing process technologies in a way that would be considerably more difficult with a PDF. Although the schematic information is sensitive in either format, the risk to the owner of a circuit design is particularly acute in the case of native circuit schematic files.

**F.      I do not agree with Dr. Liu's Declaration**

25.      I have read the Declaration of Dr. David Liu. Dr. Liu states that "circuit schematics are fundamentally different from source code, HDL source code, and physical design files," arguing that physical design files and "certain HDL code files" "can be used to replicate the accused products," while circuit schematics cannot. Liu Declaration at para. 6. I disagree with this view. As I describe above, both HDL code and native circuit schematic files can be used to generate netlist files, which are used for a variety of vital purposes, including to generate photolithography masks for circuit fabrication.

26.      Dr. Liu further states that circuit schematics are "more analogous to compiled object code, which is the compiled *output* of source code" and that "circuit schematics are not an input to any fabrication process (but rather the *output* of the design process)." *Id.* at para.10. I am not sure what Dr. Liu means by these statements. If by "schematics" Dr. Liu is referring to PDF schematics, I do not disagree with these statements, and I understand that the parties do not dispute the proper level of protection for PDF schematics. However, if Dr. Liu is referring to native circuit schematic files, I disagree strongly with Dr. Liu's statements. Dr. Liu's opinion overlooks the fact that native schematic files include critical information that can be extracted by an EDA tool to generate a netlist of the chip which, as discussed above, can generate inputs to the fabrication process. I also note that as to the fabrication process, HDL code and schematics both are integral to the logical design process and contain the key intellectual property that is

used to fabricate the chip.

27.     I further note that HDL code and standard software source code are also the output of the design process, but nonetheless deserve source-code level protection according to Dr. Liu.  Indeed, in my opinion, the fact that all of these files, including native schematic files, are the output of the design process is a key factor in what makes them valuable and sensitive.

28.     In paragraph 12 of his declaration, Dr. Liu explains the reasoning for his opinion that HDL code and circuit schematic files are distinct.  Dr. Liu states that HDL is "textual (as opposed to graphical)."  While true, in my opinion whether a file is textual or graphical puts form over function.  In my industry experience, the germane point is that HDL code and circuit schematic files contain equally sensitive information.  Dr. Liu also states that HDL is "human-readable."  Circuit schematic files are also human readable.

29.     Aside from these two points, the only other distinction Dr. Liu draws between HDL code and native circuit schematics is that HDL code "can be compiled (or synthesized into a logical (or gate-level) netlist."  I do not understand Dr. Liu's point.  As repeatedly discussed, both HDL code and native circuit schematics can be compiled into netlists, and netlists can be converted into physical designs and used in a host of other ways.  Thus, none of Dr. Liu's reasons for distinguishing HDL code and native circuit schematic files counters the fact that both contain equally sensitive information and would be very damaging in the hands of a competitor.

30.     For these reasons, I disagree with Dr. Liu's opinion that native circuit schematic files should not be given source-code level protection.

**G.     Attached video demonstration**

31.     In the short video accompanying this declaration, I demonstrate some of the EDA features described in this Declaration.  In the video, I first create a simple logic circuit in a blank native schematic file.  Next, I demonstrate how even a simple EDA tool (in this case, a tool

9

called LTSpice) creates a netlist based on the native graphical schematic file. As discussed above, this is the same netlist can be created from HDL code that Dr. Liu admits deserves source-code level protection. I also demonstrate a slightly more complex schematic to give an idea of how engineers can build complicated and valuable schematics. This demonstrates how native circuit schematics and HDL code contain equally sensitive information.

Signed on December 12, 2012 in Palo Alto, California

Dr. Martin Walker

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

## Expertise

### IC Design
- EDA Software
- Digital circuit design and simulation
- Analog IC design and analysis
- Analog circuit design
- RF and microwave circuit design

### Source Code
- Identification of copied source code
- Analysis of copied source code
- Analysis of alleged trade secret misappropriation
- Patent infringement of source code
- Copyright infringement of source code, including database schemas

## Contact Information:

Brass Rat Group, Inc.
378 Cambridge Ave Ste N
Palo Alto, CA 94306

www.brassratgroup.com
mwalker@brassratgroup.com
650-331-0200

## Litigation Experience

Dr. Walker has testified in jury trials and arbitration involving software technology issues, including testifying in federal court on matters relating to infringement and validity of a patent of a software system. He has been engaged as a "technology neutral" to assist in the resolution and adjudication of electronic discovery issues. Dr. Walker also has significant experience in giving deposition testimony and in preparing declarations and expert reports. Dr. Walker regularly works with attorneys to help articulate and manage the many technology issues that arise in complex litigation. He is particularly adept at explaining complex technology issues to lay audiences and, as such, has often been asked to present Markman tutorials and prepare demonstratives.

## Industry Experience

Dr. Walker is a recognized expert with over 35-years of experience in design of integrated circuits, including analog, digital and RF/microwave circuits. His analog IC circuit design experience includes analog components such as PLLs, voltage regulators and linear systems. In the digital IC design Dr. Walker has experience at the circuit level, including such structures as ESD components, level shifters, sense amps, SDRAM circuits such as DDR sequencing circuits and On-Die Termination (ODT). His RF/Microwave design experience includes microwave components (such as amplifiers, oscillators, mixers and switches) as well as sub-systems (tuners, low-noise down converters, etc).

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

Dr. Walker has over 25 years experience in electronic design automation (EDA) software systems, simulation and circuit design and modeling. He is a recognized expert in the field of EDA systems, simulation, and modeling. He also has experience with the design of digital and analog IC, with verilog and VHDL analysis, synthesis of digital ICs such as flash memory controllers, analyses and verification of metal interconnects and related process technology.

He also has acquired expertise in the analysis of alleged source code copying. He has developed specialized analysis tools that help find the "needle" of copied code in the "haystack" of large source-code databases. He has identified existence of misappropriated code as well as helped to demonstrate the lack of evidence of misappropriation.

During the course of his practice, Dr. Walker has analyzed such diverse code as EDA software, VoIP software, database schema, mail-list processing software, speech-recognition systems and stock-brokerage software. He is familiar with a wide variety of source-code repositories including CVS, RCS, Subversion, Perforce, and Rational ClearCase. Dr. Walker also has experience with reverse engineering of smart-phone applications and system-level programming. In particular, he has analyzed operation of Android and iOS applications to determine their functionality and analyze whether the functionality meets the claim limitations of patents in suit. For example, he has the operation and inter-process communication relating to Android and iOS processes that are launched on system startup.

Dr. Walker has also performed numerous reverse engineering studies of so-called SOCs. The operation of such ICs is a combination of hardware and software. The hardware is usually specified at the RTL level in Verilog or VHDL. This hardware is often controlled by software running on an embedded processor, such as an ARM. He has been asked to understand, analyze, and document the operation of the system in the context of patent infringement or (in the case of potential prior art) invalidity. Most recently, he has investigated implementation of signal processing algorithms that implement 3GPP cellular telephone standards on baseband modem ICs.

## Litigation Projects

| | | | |
|---|---|---|---|
| Date: | 2000-02 | **Thelen Reid (for Plaintiff)** | |
| | Case: | Sequence Design vs various defendants | |
| | Project: | Patent infringement relating to EDA software. Provided support for claim construction and infringement analyses. | |
| | Status: | Settled | |

| | | | |
|---|---|---|---|
| Date: | 2001-03 | **Dechert, LLP (for Plaintiff)** | |
| | Case: | Silvaco v CSI | |
| | Project: | Misappropriation of trade secrets, including copied source code. Analysis of source code written in the C language. Created the 2019(d) statement that described Silvaco's trade secretes and provided numerous declarations that supported this description. Testified at deposition | |

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

regarding source code copying, other trade secret misappropriation, and business practices.

| | |
|---|---|
| Status: | Settled on terms favorable to plaintiff |
| Testimony: | Deposition |

| | | |
|---|---|---|
| Date: | 2001-02 | **FTI Teklicon (for IRS)** |
| | Case: | IRS vs taxpayer |
| | Project: | Analysis of valuation for tax purposes of EDA software and associated royalty streams. |
| | Status: | Completed |

| | | |
|---|---|---|
| Date: | 2001-02 | **Dechert LLP (for Plaintiff)** |
| | Case: | Synopsys vs Nassda (patent infringement) |
| | Project: | Retained as testifying expert. Project involved analysis of electronic circuit simulation software written in the C programming language. Declaration, expert report, and deposition in support of claim construction. Declaration in opposition to Summary Judgment motion for non-infringement which was denied by the Court. Infringement analysis and expert report. Opposition to invalidity claims. |
| | Status: | Settled on terms favorable to plaintiff |
| | Testimony: | Deposition |
| | Expert Report: | Claim construction issues |

| | | |
|---|---|---|
| Date: | 2001-04 | **Dechert, LLP (for Plaintiff)** |
| | Case | Synopsys vs Nassda (State Action) |
| | Project: | Identification of misappropriated trade secrets relating to circuit simulation. Analysis of source code creation rates. Analysis of electronic evidence tampering. Assist with discovery issues. Manage electronic discovery of more than 300Gbytes of documents. Analysis and declarations regarding disk wiping and other evidence tampering by defendants led to the defendants' decision to settle on terms widely seen as extraordinarily favorable to Plaintiff |
| | Status: | Settled on terms favorable to plaintiff |

| | | |
|---|---|---|
| Date: | 2001 | **Law offices of Al Reynaldo (for cross-defendant Aprés)** |
| | Case | Aprés vs Ho |
| | Project: | Misappropriation of EDA-related trade secrets |
| | Status: | Settled |
| | Testimony | Testified at jury trial regarding software algorithms and development process |

| | | |
|---|---|---|
| Date: | 2003-04 | **Dechert LLP (for Plaintiff)** |
| | Case | Synopsys vs Nassda (patent infringement – '998) |
| | Project: | Claim construction analysis and declaration. There were 11 disputed |

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

terms. The Court adopted Dr. Walker's construction on all 11 terms, rejecting all of the defendants arguments.

| | |
|---|---|
| Status: | Settled pending FTC approval |

| | | |
|---|---|---|
| Date: | 2003-04 | **Dechert LLP (for Respondent)** |
| | Case | CSI vs Silvaco |
| | Project: | Arbitration resulting from alleged violation of the terms of the settlement agreement. |
| | Status: | Arbitration completed |
| | Testimony: | Three-judge arbitration panel regarding CSI's licensing, support and maintenance of certain Silvaco trade secrets |

| | | |
|---|---|---|
| Date: | 2003-04 | **Dechert LLP (for Plaintiff)** |
| | Case | HCL vs eKomas |
| | Project: | Analysis and identification of directly copied source code written in a web-host scripting language. The product at issue is a web-based application for loan management. |
| | Status: | Settled |

| | | |
|---|---|---|
| Date: | 2004 | **McDermott (for Defendant)** |
| | Case | Tera Systems vs InTime Software |
| | Project: | Patent infringement related to EDA software. Researched invalidity and supported claim construction. |
| | Status: | Settled |

| | | |
|---|---|---|
| Date: | 2004-05 | **Dechert LLP (for Plaintiff)** |
| | Case | Silvaco vs CSI – OSC re Contemp |
| | Project: | Analysis and declaration regarding the Defendants' continued use of Silvaco trade secrets. |
| | Status: | Completed |
| | Testimony: | Bench trail |

| | | |
|---|---|---|
| Date: | 2004-05 | **Dechert LLP (for Defendant)** |
| | Case | Siliconix vs AATI |
| | Project: | Patent infringement regarding method for manufacturing a semiconductor device. Support for claim construction and invalidity analysis. Researched prior art. |
| | Status: | Settled |

| | | |
|---|---|---|
| Date: | 2005 | **Kirkland & Ellis LLP (for Defendant)** |
| | Case | Berry vs Fleming, et al. |
| | Project: | Source code copyright and misappropriation of trade secrets of an SQL database schema as well as associated source code. Reviewed source code at issue. |
| | Expert | Relating to software development, non-infringement of copyright, and |

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

| | | |
|---|---|---|
| Report Status: | | analysis of forensic data to refute claims of electonic evidence spoliation Summary judgment of non-infringement of copyright for more than 90% of potential damages. Jury verdict awarding minimal damages for balance of claims |

Date: 2005 **Dechert LLP and Wilson Sonsini (for Plaintiff and Cross Defendant Synopsys)**

Case: Synopsys vs Magma (

Project: This matter involved theft of IP relating to EDA software as well as patent infringement in two venues. Analyzed Magma software written mostly in C++ for infringement identified historical software supporting invalidity of Magma patents. Provided support for claim construction and invalidity analysis.

Status: Settled on terms favorable to Synopsys.

Date: 2005 **Browne & Woods LLP (for Defendant)**

Case: Keywords vs ISE

Project: Investigated allegations of source code copying and copyright infringement of source code written in an interpreted language similar to perl. Declaration ISO of opposition to preliminary injunction.

Status: Settled

Expert Report: Regarding source code copying and inadequate description of alleged trade secrets

Date: 2005-06 **Jones, Day (for Plaintiff)**

Case: Experian v. I-Centrix

Project: Investigating allegations of source code copying and misappropriation of trade secrets. The code was originally written in fortran, but then translated into the C programming language. Performed analysis of electronic data that suggested evidence tampering on the part of defendants.

Status: Settled

Testimony: Deposition

Expert Report: Identification of literal copying of source code as well as copied algorithms. The expert report identified methods the defendants used in an attempt to disguise the misappropriated code and algorithms.

Date: 2005 **Dechert LLP (for Plaintiff)**

Case: Silvaco vs CSI End Users

Project: Analysis and declarations regarding the Defendants' continued use of Silvaco trade secrets.

Status: Stayed

Testimony: Deposition

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

| | | |
|---|---|---|
| Date: | 2006 | **Gordon Rees (for Defendant)** |
| | Case | FIS v. CalAmp |
| | Project: | Investigation of alleged misappropriation of trade secrets. Performed investigation and created expert report regarding the alleged misappropriation. |
| | Status: | Settled |
| | Expert Report: | Relating to alleged misappropriation of software trade secrets. |

| | | |
|---|---|---|
| Date: | 2006 | **Gordon Reese (for Plaintiff)** |
| | Case | LiveOps v. Teleo |
| | Project: | Misappropriation of trade secrets, copyright infringement of VoIP software systems. Investigation to detect software copying. |
| | Status: | Settled |

| | | |
|---|---|---|
| Date: | 2005 | **Dewey Ballantine (for Plaintiff)** |
| | Case | Matsushita v. MediaTek |
| | Project: | Patent infringement investigations (invalidity, claim construction, infringement) relating to various patents, including design techniques and DFM technology. Provided expert report regarding infringement and validity of the patents at issue. |
| | Status: | Settled |
| | Testimony: | Markman tutorial, for three patents at issue; deposition |
| | Expert Report: | Relating to infringement and validity of DFM patent related to processing of metallization structures. |

| | | |
|---|---|---|
| Date: | 2006 | **Court-Appointed Technology Neutral** |
| | Case | Apple Resellers et al v. Apple Computer |
| | Project: | Technology neutral appointed by Judge Jacobs May in Superior Court of Santa Clara to resolve the parties disputes regarding proper production of electronic documents |
| | Status: | Settled |
| | Testimony: | Two hearings before the Court relating to several discovery motions |
| | Expert Report: | Explained technology and issues relating to the electronic production by the various parties. |

| | | |
|---|---|---|
| Date: | 2006 | **Paul Hastings (for Defendants)** |
| | Case | iSmart International v I-Docsecure |
| | Project: | Plaintiffs allege that Defendants misrepresented certain technology in the context of an equity investment. Investigated to determine facts; provided declaration regarding business practices and lack of factual basis for claims. Source code at issue was written in a web-host scripting language. |
| | Status: | Settled |

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

| | | |
|---|---|---|
| Date: | 2006 | **Gordon & Rees (for Defendants)** |
| | Case | Microsoft vs BWT Industry Technology |
| | Project: | Provided expert opinion regarding alleged pirating of Microsoft products. |
| | Status: | Settled |

| | | |
|---|---|---|
| Date: | 2006 | **Greenan, Peffer (for Defendant & Cross-Complainant)** |
| | Case | Benedict v Mediatrac |
| | Project: | Expert testimony at a jury trial regarding standard level of care relating to IT practices. |
| | Status: | Jury award for Defendant |
| | Testimony: | Jury trial regarding software coding and management standards; deposition |

| | | |
|---|---|---|
| Date: | 2006 | **Jones Day (for Plaintiff)** |
| | Case | ST vs SanDisk |
| | Project: | Patent infringement regarding semiconductor design techniques and ESD circuits. Investigation in support of claim construction and non-infringement analysis. |
| | Status: | Settled |

| | | |
|---|---|---|
| Date: | 2007 | **McDermott Will & Emery (for Plaintiff)** |
| | Case | Matsushita v. MediaTek |
| | Project: | Patent infringement investigations (validity, claim construction, infringement) relating to various patents, including phase-lock loop design. |
| | Status: | Settled |

| | | |
|---|---|---|
| Date: | 2006 | **Dechert LLP (for Plaintiff)** |
| | Case | Silvaco vs BindKey, et al |
| | Project: | Analysis and declarations regarding misappropriation of Silvaco trade secrets, including forensic analysis of hard disk drives used by defendants. The source code was written in C++. |
| | Status: | Settled |

| | | |
|---|---|---|
| Date | 2007 | **Buchanan Ingersol (for Plaintiff)** |
| | Case | Shore Venture Group v Authentidate |
| | Project: | Analysis of source code relating to misappropriation of trade secrets and literal copying of source code. |
| | Status: | Completed |

| | | |
|---|---|---|
| Date | 2007 | **American Assoc of Arbitration** |
| | Case | Panpacifics v Tradebeam |
| | Project | Selected as an independent expert to assist the arbitration panel with technology issues |
| | Status: | Settled |

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

| Date | 2007 | **Millberg Weiss (for Plaintiff)** |
|---|---|---|
| | Case | Shareholders v Magma |
| | Project | Documented facts relating to the technical aspects of false and misleading statements made by Magma.  Provided technical consulting service to plaintiffs counsel to explain the scope and nature of the Defendants acts. |
| | Status | Setttled |
| | Expert Report: | Addressed industry-standard software coding practices and level of care relating to possible misappropriation of trade secrets by employees, misappropriation of trade secrets |

| Date | 2007- | **Miller Barondess (for Plaintiff and Cross-defendant BHE)** |
|---|---|---|
| | Case | BHE Group v MTS Products |
| | Project | Analysis of expert testimony; investigation relating to performance of computers |
| | Status | Won jury award in excess of $45,000,000 for client, BHE |
| | Testimony | Testified at jury trial relating to adequacy of the design of laptop computers; deposition. |

| Date | 2007- | **Synopsys, Inc.** |
|---|---|---|
| | Projects: | IP-related consulting activities regarding patents and patent strategy |
| | Status: | Ongoing |

| Date | 2007-08 | **Dechert, LLP (for cross-complainant Acer, Inc)** |
|---|---|---|
| | Case | HP v Acer |
| | Project | Retained as testifying expert.  Analyzed ICs regarding infringement of Acer's circuit design patents.  Analyzed and documented infringement of several different ICs.  Research included on-site inspections of IC designs using owner-supplied design tools to demonstrate infringement. |
| | Status | Settled |

| Date | 2008 | **Bergeson, LLP (for defendant Clarus)** |
|---|---|---|
| | Case | Variphy, Inc. et al, v Clarus Systems, Inc. |
| | Project | Investigate alleged misappropriation of trade secrets and source code copying of VoIP telephony and related applications. |
| | Status | Settled |

| Date | 2008 | **Wilson Sonsini (for plaintiff Sandisk Corporation)** |
|---|---|---|
| | Case | Sandisk v various Flash memory manufacturers |
| | Project | Retained as consulting expert responsible for analyzing flash memory controller products for possible infringement of SanDisk patents.  Analyzed the detailed design of various products and prepared infringement analyses.  Support depositions of technical personnel and experts. |
| | Status | Complete |

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

| Date | 2008 | **Wilson Sonsini (for defendant Go Daddy)** |
|---|---|---|
| | Case | Web.com v Go Daddy |
| | Project | Prepared and presented claim construction tutorial explaining the background technology for 4 web-hosting related patents |
| | Status | Settled |
| | Testimony: | Markman tutorial explaining technology for the web-hosting patents at issue. |

| Date | 2007- | **Jones Day (for Plaintiff On Semi)** |
|---|---|---|
| | Case | On Semiconductor v Samsung |
| | Project | Retained as testifying expert. Performed research to determine infringement and validity of four patents. Three of the patents related to circuits; one related to metallization systems. Prepared expert reports regarding infringement and validity. Prepared declarations in support of various discovery motions. Prepared Markman tutorial for all patents at issue. Assisted attorneys in deposition of Samsung's expert and other technology witnesses. |
| | Status | Settled |
| | Testimony | Deposition |
| | Expert Reports: | Relating to validity and infringement of three circuit-related patents and one metallization process technology patent |

| Date | 2008- | **Wilson Sonsini (for defendant Synopsys)** |
|---|---|---|
| | Case | Ricoh v Synopsys |
| | Project | Consulting expert. Prepared technology tutorial. Researched and assisted in preparation of a Motion for Summary Judgment for non-infringement and reply. |
| | Status: | Concluded |

| Date | 2009 | **King and Spalding (for Plaintiff Spansion)** |
|---|---|---|
| | Case | Spansion v Samsung (ITC and District Court actions) |
| | Project | Consulting expert. Provide analysis and discovery advice on evidence needed to demonstrate infringement of the patents at issue. |
| | Status | Concluded |

| Date | 2009 | **Ford Marrin Esposito Witmeyer & Gleser (for complainant Toshiba)** |
|---|---|---|
| | Case | Toshiba Medical v. Stubitsch |
| | | Testifying expert. Provided expert report and declarations relating to the sufficiency of Toshiba trade secrets descriptions and their misappropriation. Analyzed and responded to motions regarding the particularization of the trade secrets. |
| | Status | Ongoing |

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

| Date | 2009 | **Andrews Kurth (for defendant Bancorp South)** |
|---|---|---|
| | Case | Data Treasury v Wells Fargo, et al |

Testifying expert. Provided expert report relating to non-infringement of patents by Bancorp South in this extensive litigation in Eastern District of Texas. Reviewed documents and plaintiff expert reports. Developed and documented several bases for non-infringement.

| Date | 2009-2010 | **Jones Day (for Defendant/Cross Complainant Xilinx)** |
|---|---|---|
| | Case | LSI Logic/Agere vs Xilinx, Inc |

Consulting expert responsible for four patents relating to design software and logic circuits. Prepared Non-infringement analyses/invalidity analyses. Examined circuits as possible prior art

| | Status | Settled |

| Date | 2009-2010 | **Perkins-Coie (for Plaintiff ON Semi)** |
|---|---|---|
| | Case | On Semi v Hynex, Elpida, and Nanya |

Retained as testifying expert. Performed research to determine infringement and validity of five patents. Four of the patents related to circuits; one related to methods of programming flash memory systems.

| | Status | Settled |

| Date | 2009 | **Bingham McCutchin (for Defendant Google, Inc)** |
|---|---|---|
| | Case | Red Bend Software v Google |

Testifying expert. Analyzed part of the Chrome browser software accused by Red Bend of infringing a Red Bend patent. Analyzed Red Bend infringement contentions and the browser component at issue. Prepared expert declaration supporting Google's opposition to motion for preliminary injunction. Provided deposition testimony. Supported attorneys in preparing oral arguments for the hearing.

| | Status | Concluded |

| Date | 2010 | **Cotchett, Pitre & McCarthy (for Plaintiff 2kDirect)** |
|---|---|---|
| | Case | 2kDirect v. Azoogle Ads |

Testifying expert. Researched issues relating to proper practice by companies engaged in technology due diligence. Provided expert report documenting my opinions and deposition testimony relating to the opinions.

| | Status | Settled |

| Date | 2010 | **Duffy Sweeney (for Plaintiff Scratch)** |
|---|---|---|
| | Case | Scratch DJ LLC v Activision Publishing |

Identify source code implementing the asserted trade secrets. Determine if and to what extent defendant used misappropriated source code. Project involved code comparison between code bases in the presence of considerable third party source code.

| | Status | Settled |

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

| Date | 2010 | **Farella Brown (for Plaintiff Volterra)** |
|---|---|---|
| | Case | Volterra v Primarion |
| | | Testifying expert for matters relating to the validity or certain Volterra patents.  The patents describe integrated semiconductor power switches and their implementation in silicon.  My task involved review of the implementation of the devices and the efforts to copy those devices by the defendants.  I provided an expert report and testified at deposition. |
| | Status | Ongoing |

| Date | 2010 | **White Case (for Complainant Panasonic)** |
|---|---|---|
| | Case | Panasonic v Freescale |
| | | Testifying expert in the ITC matter.  Review the asserted claims of the patent at issue.  Determined if the claims were infringed by certain of the Defendant's designs.  Provided expert report relating to claim construction and infringement.  Testified at deposition.  The patent relates to IC design and manufacturing in general, and more particularly to the patterns of metal interconnects on the designs. |
| | Status | Settled |

| Date | 2011 | **Irell Manella (for Plaintiff Nuance) District of Massachusetts, Judge Zobel presiding** |
|---|---|---|
| | Case | Nuance v Vlingo |
| | | Testifying expert regarding infringement and validity of speech recognition methods and devices.  Analyzed source code and documented evidence of infringement.  Considered alleged prior art and identified missing elements.  The accused products are web-based speech to text software systems written in C++ and Java programming languages.  Authored expert reports concerning infringement and validity. |
| | Status | Concluded |
| | Testimony | Deposition and jury trial testimony regarding infringement and validity.  Judge Zobel encouraged the jury to pose questions directly to me, which they did on several occasions. |

| Date | 2011 | **Jones Day (for Respondent Freescale), K & L Gates (for Respondant ST Microeletroncis)** |
|---|---|---|
| | Case | Rambus v Freescale, et al |
| | | Investigation relating to DDR2 memory interface and high speed serial interfaces, and possible defenses as well as documenting substantial non-infringing use.  Created expert report documenting findings. |
| | Status | Concluded |
| | Testimony | Deposition |

Case 1:17-cv-00784-JEB-SRF Document 57-2 Filed 09/21/17 Page 64 of 152 PageID #:
1031
Case 1:11-cv-00784-RGA-SRF Document 300-1 Filed 12/19/12 Page 28 of 29 PageID #: 4223

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

| | | |
|---|---|---|
| Date | 2011 | **Jones Day (for Plaintiff Freescale)** |
| | Case | Freescale v. ChipMos |
| | | Testifying expert regarding scope of licensed patents relating to a defense of patent exhaustion. Compared the scope of patent licenses granted in two contracts. Drafted expert report. |
| | Status | Ongoing |
| | Testimony | Deposition |
| | | |
| Date | 2011 | **Alston Bird (for Complainant Richtek)** |
| | Case | Richtek v uPI |
| | | Testifying expert regarding use of misappropriated trade secrets and elements of certain third party graphics board designs in an ITC enforcement action. Conducted an investigation relating to the Respondent's continued use of Richtek intellectual property. Drafted two expert reports and witness statements. Testified at the hearing. |
| | Status | ITC Hearing concluded |
| | Testimony | ITC Hearing and Deposition |
| | | |
| Date | 2011-12 | **GCA Law (for Plaintiff and Cross Defendant Brown)** |
| | Case | Brown v TPL |
| | | Testifying expert relating to misappropriation of trade secrets asserted by TPL against Brown. Investigated nature of the trade secrets and whether Brown had identified protectable trade secrets as well as evidence of misappropriation of the trade secrets. Testified at the jury trial. |
| | Status | Ongoing |
| | Testimony | Jury trial and Deposition |
| | | |
| Date | 2012 | **Wilmer Hale (for Cross Defendant Apple)** |
| | Case | Samsung v Apple |
| | | Testifying expert relating to operation of baseband modem ICs that implement the 3GPP standard. Investigated hardware and firmware source code written in VHDL, Verilog, and C languages. Determined the signal coding and decoding in various ICs as compared operation to Samsung's alleged "standard-essential" patents. |
| | Status | Ongoing |
| | Testimony | Deposition |

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

## Employment History

| | | |
|---|---|---|
| From: | 2001 | **Brass Rat Group, Inc.** |
| To: | Current | Woodside, CA |
| | Position: | *CEO* |

Brass Rat Group is a successful Silicon Valley based consulting organization specializing in litigation consulting and business consulting in the semiconductor (IC) design field. Dr. Walker provided litigation support and expert analysis for plaintiff Synopsys in Synopsys vs Nassda, which was recently settled resulting in a "significant victory" for Synopsys.

| | | |
|---|---|---|
| From: | 2000 | **Knowledge Networks** |
| To: | 2001 | Menlo Park, CA |
| | Position: | *Chief Technology Officer* |

Knowledge Networks is a pre-IPO market research company that is leveraging internet technology to revolutionize the market research industry. KN recruited a panel of over 50,000 consumers to be interviewed on a variety of topics weekly. Dr. Walker managed KN's engineering group, which designed and created automated systems to create surveys, conduct interviews, process data, and manage the panel. He also managed the IT group which was responsible for high-availability web-based systems for fielding the interviews as well as the internal systems required to analyze the data and produce real-time reports.

| | | |
|---|---|---|
| From: | 1995 | **Sequence Design (Formerly Frequency Technology)** |
| To: | 2000 | |
| | Position: | *Founder, Founding CEO, Director & CTO* |

Sequence Design, formerly Frequency Technology, is the leader in the EDA segment called Design Closure. Sequence's products and services, consisting of pre- and post-layout optimization based on accurate layout extraction, enable designers to bring higher performance, lower-power integrated circuits quickly to tape out. Dr. Walker:

- Developed business plan and raised over $9MM in financing;
- Hired staff and led development, including defining technical product definition; Personally developed many of the basic algorithms, which resulted in five issued patents;
- Led initial marketing efforts;
- Wrote numerous technical articles advancing the company's technical position;
- Served as chief technical spokesman for the company.

| | | |
|---|---|---|
| From: | 1990 | **Symmetry Design Systems** |
| To: | 1995 | Los Altos, CA |
| | Position: | *Founder, Director & Executive Vice President* |

Symmetry, a self-funding enterprise, was a service and product business

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

specializing in the analog simulation EDA market. Products included simulation-model libraries, modeling tools, and special-purpose analog simulators. Dr Walker was responsible for a joint venture in Beijing China, where new products were developed. Symmetry was acquired by Analogy, Inc.

- Initiated Japanese and European marketing activities.
- Developed conceptual framework and user-interface model for the Sun OpenLook-based product.
- Served as technical spokesman in customer and industry forums.
- Conducted sales training in the US, Asia, and Europe.

| | | |
|---|---|---|
| From: | 1983 | **Analog Design Tools** |
| To: | 1990 | Sunnyvale, CA |
| | Position: | *Founder, Director, Founding CEO & Chief Scientist* |

ADT's first product, the Analog WorkBench, pioneered the market for Analog CAE workstations, including such fundamental concepts as multiple window CAE systems, and simulated test instruments as a paradigm for CAE user interface. ADT, which had grown to $16MM in annual sales and 150 employees, was acquired by Cadence.

- Formulated original business plan and presented concept to venture investors. Raised initial venture financing. Led fund-raising activities through the series C round.


- Served as President during formative stage. Director and Chief Scientist (CTO) from the founding through acquisition. Set the product direction. Drove the technology development.
- Formulated ADT's initial marketing strategy. The international distribution strategy focused primarily on Japan.
- Developed the Japanese market for ADT's products. Responsible for establishing and maintaining our distributor relationship, negotiating contracts, supporting customers, and building sales that amounted to 20% of the installed base.

| | | |
|---|---|---|
| From: | 1980 | **COMSAT** |
| To: | 1983 | Palo Alto, CA |
| | Position: | *Director, Microwave Systems* |

Managed a Navy sponsored program to develop high productivity techniques for manufacturing of microwave components. Developed a microwave circuit-synthesis product.

| | | |
|---|---|---|
| From: | 1973 | **Watkins-Johnson** |
| To: | 1980 | Palo Alto, CA |
| | Position: | *Member of the Technical Staff* |

Developed GaAsMESFET-based microwave amplifiers, components,

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

and tuners. Designed and produced the world's first GaAsMESFET amplifiers to be delivered in production quantities.

## Consulting History (within last 5 years)

| | | |
|---|---|---|
| From: | 2005 | **Sequence Design** |
| To: | 2007 | Santa Clara |
| | Duties: | EDA software analysis |

| | | |
|---|---|---|
| From: | 2005 | **Sabio Labs** |
| To: | 2006 | Palo Alto, CA |
| | Duties: | Created business plan, operating plan, and marketing plan for EDA startup focused on analog circuit optimization and synthesis |

| | | |
|---|---|---|
| From: | 2005 | **Synopsys, Inc** |
| To: | On-going | Mountain View, CA |
| | Duties: | Technology investigations relating to IP issues. Presented technology overview to non-technical staff |

## Patents

| Patent Number | Date Issued | Title |
|---|---|---|
| 6,643,831 | 2003 | Method and system for extraction of parasitic interconnect impedance including inductance |
| 6,381,730 | 2002 | Method and system for extraction of parasitic interconnect impedance including inductance |
| 5,901,063 | 1999 | System and method for extracting parasitic impedance from an integrated circuit layout |

## Education

| Year | College/University | Degree |
|---|---|---|
| 1987 | AEA/Stanford Executive Institute | Completed w/distinction |
| 1979 | Stanford University, Stanford, CA | Ph.D., Electrical Engineering |
| 1976 | Stanford University, Stanford, CA | MS, Electrical Engineering |
| 1973 | Massachusetts Institute of Technology, Boston, MA | BS, Electrical Engineering |

## Publications

Over fifty articles in the fields circuit design and design automation, including technical papers in peer-reviewed journals, an invited article in the IEEE Spectrum, and various conference proceedings. I have organized seminars, which were designed to enhance the technical credibility of my companies, and written numerous opinion pieces published in journals such as EETimes that served to establish and promote our corporate position. Some more recent publications are listed below.

# Martin G. Walker, PhD
## Consultant Curriculum Vitae

Martin G. Walker, Modeling the Wiring of Deep Submicron ICs, IEEE Spectrum Vol 37, No. 3, March 01, 2000 at pp. 65-71.

Martin G. Walker, Keh-Jeng (KJ) Chang, Christopher J. Bianchi, SIPP's Why Do We Need a New Standard for Interconnect Process Parameters? VLSI: Systems on a Chip, Kluwer Academic Publishers, December, 1999.

Martin Walker, Timing Errors Haunt Interconnects, Electronic Engineering Times No. 1021, August 17, 1998.

Martin Walker, Interconnect Analysis Must Move to 3-D, Electronic Engineering Times No. 980, November 10, 1997.

Martin G. Walker, The Guardband Crisis, Electronic Engineering Times No. 929 November 25, 1996 at p. 43.

In addition to the foregoing, I also submitted opinion pieces to Integrated Systems Design (May 1997), Electronic Business (April 1998), and EE Times (June, July, and September 1998).

## Professional Associations and Achievements

- 1999 Fortune Magazine "Cool Company" for Frequency Technology.
- 1984 Electronic Products New Product of the Year award for the Analog Workbench
- 1976 IEEE Microwave Applications award recognizing contributions to the design of GaAsFET amplifiers.

# EXHIBIT G

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **HSM PORTFOLIO LLC AND TECHNOLOGY PROPERTIES LIMITED LLC,** | § § § § | |
| Plaintiffs, | § § | **C.A. No. 1:11-cv-00770-RGA** |
| v. | § § | **JURY TRIAL DEMANDED** |
| **FUJITSU LIMITED, ET AL.,** | § § § | |
| Defendants. | § | |

---

## <u>DECLARATION OF DR. DAVID LIU</u>

I, David Liu, declare as follows:

1.      I received my Masters of Science degree in Electrical Engineering in 1985 and my Doctor of Philosophy degree in Electrical Engineering in 1989, both from Stanford University. I have been issued over 80 patents in the field of electrical engineering by the U.S. Patent and Trademark Office. A copy of my curriculum vitae is attached to this Declaration as Exhibit A. I am over 21 years of age, a U.S. citizen, and fully competent to make this declaration.

2.      From May of 2000 to August of 2004, I worked for Xilinx as the Senior Manager in its Technology Department, where I worked on CMOS process technology. It is my understanding that Xilinx was formerly a party to this action. This declaration is based on my experience in and general knowledge of the field, and of semiconductor design in particular, and the types of files created in the design process. Nothing in this declaration is based upon confidential or proprietary information.

## A. Circuit Schematics Are Distinct and Very Different From Source Code, HDL Code, and Physical Design Files.

3.      I have studied the asserted patents and I am familiar with the technology at issue in this action.   Based on my knowledge of the technology at issue, circuit schematics should contain most if not all of the core information that Plaintiffs will require in order to identify infringing circuitry and produce detailed infringement contentions.  In particular, Plaintiffs will need a complete hierarchical schematic of each accused chip.  In my opinion, these complete hierarchical schematics are what would be considered core technical documents related to the accused products.

4.      A complete hierarchical schematic of an integrated circuit can easily be printed in a PDF format from the software that is typically used to design and view circuit schematics of a chip. Each Defendant chip manufacturer should have the ability to print a complete hierarchical schematic for each of the integrated circuits accused in this action. Based on my industry experience, it is customary for the design engineers of chip manufacturers to regularly use both native circuit schematics as well as PDF printouts of circuit schematics in the design of the integrated circuits.

5.      I have reviewed the December 3, 2012 letter from Mr. Cottrell to the Honorable Richard G. Andrews.  I note that Defendants have proposed to apply source code level restrictions to circuit schematic files, even if they are not made available in a native format.  I also note that Defendants have proposed that "Source Code Material" be broadly defined to include circuit schematic files in addition to actual source code, HDL source code, and physical design files.

6.      In my opinion, Defendants' general definition of "Circuit Design Files" improperly fails to distinguish between files that can be used to replicate the accused

products (such as physical design files, and certain HDL code files) and files that cannot be used to replicate the accused products (such as circuit schematics). As I explain below, circuit schematics are fundamentally different from source code, HDL source code, and physical design files.

### 1. Circuit Schematics Are Not Source Code.

7.      Source code is a compilation of computer instructions and data definitions expressed in a human-readable form suitable for input to an assembler, compiler, interpreter, or other translator. Source code is distinct from the binary code understood by computer processors. Binary code uses strings of zeroes and ones to represent very basic instructions. These basic instructions can be combined using algorithms to form the complex computer programs that we use today.

8.      While it is technically possible for humans to read and write binary code, it is a very tedious task even for the most basic computer program. For this reason, software engineers developed high-level programming languages, such as C, C++, Java, etc., which provide a level of abstraction from binary code and employ natural language elements. Software engineers also developed programs to translate high-level programming languages into lower levels of code, including binary code; these translators are forms of assemblers, compilers, and interpreters.

9.      Circuit schematics, on the other hand, are graphical representations (i.e., diagrams) that show the connections between the various components of an integrated circuit. One key difference between a circuit diagrams and computer source code is that, as shown in Figures A and B, circuit schematics are graphical, while source code is textual:

**Figure A – Circuit Schematic[1]**    **Figure B – Source Code[2]**



```
/**
 * Simple HelloButton() method.
 * @version 1.0
 * @author john doe <doe.j@example.com>
 */
HelloButton()
{
    JButton hello = new JButton( "Hello, wor
    hello.addActionListener( new HelloBtnList

    // use the JFrame type until support for t
    // new component is finished
    JFrame frame = new JFrame( "Hello Button"
    Container pane = frame.getContentPane();
    pane.add( hello );
    frame.pack();
    frame.show();              // display the fra
}
```

10.    Circuit schematics are unlike source code because they are not suitable for input to an assembler, compiler, interpreter, or other translator. Indeed, since circuit schematics are not an input to any fabrication process (but rather the *output* of the design process), circuit schematics are more analogous to compiled object code, which is the compiled *output* of source code. Moreover, unlike computer source code, which can be transformed into machine code via a compiler, circuit schematics cannot be transformed into fabricated integrated circuits because circuit schematics do not contain any information regarding the physical layout of the integrated circuit. Once a circuit schematic has been finalized, an engineer must still arrange the physical location of the circuit components to fit within the core area of the integrated circuit and find appropriate paths to connect the components, accounting for various factors such as geometry, transistor timing, and speed requirements.

11.    Various constraints prevent the engineer from simply fabricating an integrated circuit using a circuit schematic. The engineer must arrange the components to

---

[1] http://en.wikipedia.org/wiki/File:4_bit_counter.svg.
[2] http://en.wikipedia.org/wiki/File:CodeCmmt002.svg.

minimize the total wire length, delay, congestion, and overall power consumption. Poor placement will not only affect the circuit's performance, but may also make the circuit non-manufacturable. In addition, the engineer must route the wires to connect the components to obey certain design rules for the integrated circuit. This process of placement and routing results in a <u>physical layout file</u>, which can be used for fabrication.

### 2. Circuit Schematics Are Not HDL Source Code.

12.     Engineers can use hardware description languages ("HDL") to create circuit designs at a higher level of abstraction than circuit schematics, which is called the register transfer level ("RTL"). HDL uses standard text-based expressions and can be compiled (or synthesized) into a logical (or gate-level) netlist. While HDL is technically distinguishable from the high-level programming languages used in software design, it is similar to source code because it is textual (as opposed to graphical), and it is human-readable instructions designed to be input into an assembler, compiler, interpreter, or other translator. Figures B and C show the similarities between HDL and source code:

**Figure B – Source Code[3]**     **Figure C – VHDL (a type of HDL)[4]**

```
/**
 * Simple HelloButton() method.
 * @version 1.0
 * @author john doe <doe.j@example.com>
 */
HelloButton()
{
    JButton hello = new JButton( "Hello, wor
    hello.addActionListener( new HelloBtnList

    // use the JFrame type until support for t
    // new component is finished
    JFrame frame = new JFrame( "Hello Button"
    Container pane = frame.getContentPane();
    pane.add( hello );
    frame.pack();
    frame.show();              // display the fra
}
```

```vhdl
1 library ieee;
2 use ieee.std_logic_1164.all;
3 use ieee.numeric_std.all;
4
5 entity signed_adder is
6   port
7   (
8     aclr  : in    std_logic;
9     clk   : in    std_logic;
10    a     : in    std_logic_vector;
11    b     : in    std_logic_vector;
12    q     : out   std_logic_vector
13  );
14 end signed_adder;
15
16 architecture signed_adder_arch of signed_adder is
17   signal q_s : signed(a'high+1 downto 0); -- extra bit wide
18
19 begin -- architecture
20   assert (a'length >= b'length)
21     report "Port A must be the longer vector if different sizes!"
22     severity FAILURE;
23   q <= std_logic_vector(q_s);
24
25   adding_proc:
26   process (aclr, clk)
27     begin
28       if (aclr = '1') then
29         q_s <= (others => '0');
30       elsif rising_edge(clk) then
31         q_s <= ('0'&signed(a)) + ('0'&signed(b));
32       end if; -- clk'd
33     end process;
34
35 end signed_adder_arch;
```

13.    For the same reasons that graphical circuit schematics are distinguishable from source code, circuit schematics are also distinguishable from HDL Code.

### 3.  Circuit Schematics Are Not Physical Design Files.

14.    Unlike circuit schematics, physical design files contain information regarding the physical layout of an integrated circuit. Once a physical layout is created, optimized, and verified by the engineer using special tools called electronic design automation ("EDA") tools, the engineer can output the physical layout of the integrated circuit as a file for fabrication by foundries. The term "physical design files" includes, for example, GDS (Graphic Database System) files, GDSII stream format files, DEF (Design Exchange Format) files, and LEF (Library Exchange Format) files.

---

[3] http://en.wikipedia.org/wiki/File:CodeCmmt002.svg.
[4] http://en.wikipedia.org/wiki/File:Vhdl_signed_adder.png.

15.     Physical layout files are organized to account for the physical constraints of the chip.  Figure D shows corresponding circuit schematics and physical layouts for the same sample integrated circuit:

**Figure D – Circuit Schematic vs. Physical Layout**



Figure 4.5: Well contacts in CMOS cell layout.  (a) Inverter schematic with transistor body terminals shown.  (b) Layout of an inverter showing the location of well contacts used to transistor body terminal connections.

16.     As these images demonstrate, the physical layout of an integrated circuit is very different from a circuit schematic for the same chip. The physical layout contains additional information concerning the placement and routing of the circuit components that cannot be derived from the circuit schematic and takes into account factors that are not considered when creating a circuit schematic, including those I mention above. For example, the physical layout in the Figure D shows different techniques for the layout of PMOS and NMOS transistors, which have contacts that are not shown in the circuit schematic.

17.    Importantly, like source code and unlike circuit schematics, the physical layout files can be used to fabricate an end product – in this case an integrated circuit. Although foundries rely upon physical design files to fabricate chips, circuit schematics are not even sent to foundries. For this reason, circuit schematic files are not susceptible to the same types of potential abuse that are inherent with source code and, to a lesser extent, HDL Code and various types of physical layout files.

18.    In the December 3, 2012 letter from Mr. Cottrell to the Honorable Richard G. Andrews, Defendants claim that "native files can be used, for example, to automatically generate the 'photolithography masks' that are directly used to fabricate semiconductor parts." Defendants do not specify the type of "native files" to which they are referring. While the Defendants' statement is generally true when applied to various native physical layout files, this claim is not accurate when applied to circuit schematic files, which cannot be used either to automatically generate photolithography masks or to fabricate semiconductor parts.

**B. The Accessibility of Source Code Materials on the Source Code Computer.**

19.    For the types of files that may be subject to source code restrictions, it is my opinion that several of the restrictions proposed by Defendants would prevent a meaningful review of the files.

20.    Defendants' proposal in paragraph 11(c) would allow them to choose between two options for providing software utilities on the source code computer: (1) "software tools with the same or equivalent functionality as the tools available to the Producing Party's engineers and employees for the review and analysis of the Source Code Materials"; or (2) "software utilities which provide the ability to (a) view, search, and line-number any source file, (b) search for a given pattern of text through a number

of files, (c) compare two files and display their differences, and (d) compute the MD5 checksum of a file." I believe Defendants' second option presents several problems.

21.     The functionality proposed by Defendants' second option would typically be found in a text editor. In my opinion, a text editor would be insufficient even to review source code because it lacks the ability to step through the code line-by-line (i.e., it lacks a "debugger" function). This problem is compounded by Defendants' proposal that would place both circuit schematics and physical layout files on the source code computer. A text editor would not allow meaningful review of circuit schematic and physical layout files, but instead would attempt to display the binary code underlying these files, and would show only meaningless "gibberish." This problem is illustrated by Figures E and F, which compare the same circuit schematic when viewed in appropriate software (Figure E) and when viewed in a text editor (Figure F):

**Figure E – Circuit Schematic in Proper Viewing Software**



**Figure F – Circuit Schematic in Text Editor**



22.    Defendants' proposal is akin to offering a generic text editor to open a .jpg picture file. Without the software that can display the graphical file, a .jpg file is useless. Similarly, the ability to display the circuit schematics and physical layout files is necessary to conduct any meaningful review of the circuit design.

23.    Even if meaningful review of graphical files was possible in a text editor, text editors lack the functionality of the design EDA tools used by Defendants' own engineers and employees. These tools allow the physical layout files to be linked to the circuit schematics for quick reference and provide different views of the chip design. This

functionality is essential for meaningful analysis of physical layout files. The inability to view Defendants' circuit designs in the same manner as its own engineers and employees is equivalent to attempting to understand how a symphony sounds by reading the sheet music. Without the correct software, a reviewer cannot appreciate the connections between the physical layout and the circuit schematic, the interactions between the various components, and the subtleties of the underlying design.

24.     Further, a text editor lacks the ability to print a complete hierarchical schematic of an integrated circuit, which is commonly found in EDA tools. While circuit schematics are two dimensional, they often are composed of many levels, which provide additional details regarding certain portions of the circuit schematic called "blocks." Each block has a separate circuit schematic. The complete hierarchical schematic of an integrated circuit will show the circuit schematic for all levels of the circuit.

25.     I would also note that Defendants' selection of such text-based software as the appropriate utility for reviewing "Source Code Material" contradicts its own definition of those materials as including both source code and HDL Code (which are text based) and circuit schematics (which are graphical representations).

## C. Printing Restrictions of Source Code Materials from the Source Code Computer.

26.     Defendants' proposal in paragraph 11(f) would limit printed portions of source code to 250 total pages. This limitation is problematic if applied only to the types of files that are properly treated as "Source Code Materials," such as HDL Code and physical layout files, because these may be thousands of pages for each chip. But if this limitation were further applied to circuit schematic files, Plaintiffs would be unable to print even a fraction of these files. Defendants' 250-page limitation would prevent

Plaintiffs from printing the complete hierarchical schematics for the chips at issue. Because each complete hierarchical circuit schematic can be over 2,000 pages when printed, this limitation would prohibit Plaintiffs from printing even one complete hierarchical circuit schematic, much less all circuit schematics for each accused product of the Defendants.

27.     Defendants' printing limitations would also require Plaintiffs to review and analyze all of Defendants' "Source Code Materials" on a source code computer under Defendants' supervision. If this restriction were applied to Circuit Schematic files, it would be impossible to effectively review, analyze, and include this information in Plaintiffs' preliminary infringement contentions without significant access to the complete hierarchical schematic files for the integrated circuits.

28.     Defendants' proposal in paragraph 11(a) would allow the Defendants to locate source code at various unspecified places throughout the United States. If Plaintiffs must review the circuit schematic files for each integrated circuit on source code computers at various locations using only Defendants' proposed software utilities, it is my opinion that it would be impossible to complete the review within 60 days, let alone properly gather this information for inclusion in Plaintiffs' preliminary infringement contentions.

"I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct."

Executed on December 04, 2012 at Fremont, California.

Dr. David Liu

Case 1:17-cv-00784-JFB-SRF   Document 57-2   Filed 09/21/17   Page 84 of 152 PageID #:
Case 1:11-cv-00784-RGA   Document 291-2   Filed 12/04/22   Page 49 of 207 PageID #: 4021
1051

**Exhibit A**

# DAVID KUAN-YU LIU, Ph.D.

42063 Benbow Drive, Fremont, CA  94539 ● (510) 770-9449 or (510) 579-5029
davidkyliu@comcast.net

---

**PROFESSIONAL PROFILE**
- Technical expert with over 20 years of experience in the development of advanced CMOS devices and process technology, with special emphasis on non-volatile semiconductor memory devices and process technology, and high-voltage semiconductor devices.
- Successful track record in transitioning products from development phase to high-volume manufacturing phase, both as an individual contributor and as manager/director.
- Consultant and expert witness for semiconductor intellectual property evaluation and patent litigation, with successful deposition experience.
- Co-founder of a semiconductor memory start-up company (Progressant Technologies, Inc.); participated in its successful sale to Synopsys, Inc.
- Co-founder of an LLC in the development and licensing of intellectual property with emphasis on embedded memory technology.
- Fluent in Mandarin Chinese (native language) and English; over 5 years experience as real-time translator of church sermons and proficient in written translation.


**EDUCATION**
    **Stanford University, Palo Alto, California**
        Ph.D., Electrical Engineering (1989)
            Thesis:  Physics and Technology of Novel Conductivity-Modulated Power MOSFET's
        M.S., Electrical Engineering (1985)
            Coursework in integrated-circuit technology, semiconductor device physics, computer modeling of semiconductor devices and fabrication processes, and solid-state physics
    **University of California, Berkeley, California**
        B.S., Electrical Engineering (1983)
            Certificate of Distinction (awarded annually to the top EECS graduate)


**EXPERT WORK EXPERIENCE:**

**Case:**              **Keranos, LLC v. Analog Devices et.al.**
Jurisdiction:      Civil Case No. 2:10-CV-00207
                   United States District Court for the Eastern District of Texas
Work Product:   Claim Chart Generation and Claim Construction
Nature of Case:  Representing Keranos, LLC.  Patent infringement case concerning split gate Flash memory cell
Counsel:           Retained by Agility IP (Contact Jim Otteson)
Date:              2/09 – Present

Case 1:17-cv-00784-RGA-SBF Document 57-2 Filed 12/04/22 Page 86 of 152 PageID #: 4023
1053
Case 1:17-cv-00784-JFB-SRF Document 29-1 Filed 09/21/17 Page 10 of 20 PageID #:

| | |
|---|---|
| **Case:** | **Silicon Storage Technology, Inc. v. Xicor, LLC** |
| Jurisdiction: | Civil Case No. CV 10-01515 |
| | United States District Court for the Northern District of California |
| Work Product: | Expert report, and declarations |
| Nature of Case: | Representing Xicor concerning United States Reissue Patent RE38,370 on the process of flash memory cell. |
| Counsel: | Retained by Shore Chan Bragalong LLP (Contact Patrick Conroy) |
| Date: | 9/10 – 5/11 |

| | |
|---|---|
| **Case:** | **Fast Memory Erase, LLC v. Spansion et.al.** |
| Jurisdiction: | Civil Case No. 3:10CV-481 |
| | United States District Court for the Northern District of Texas |
| Work Product: | Declarations |
| Nature of Case: | Representing Fast Memory Erase, LLC. In defending Motion for Attorney Fees. |
| Counsel: | Retained by Shore Chan Bragalong LLP (Contact Patrick Conroy) |
| Date: | 2/10– 6/10 |

| | |
|---|---|
| **Case:** | **Fast Memory Erase, LLC v. Spansion et.al.** |
| Jurisdiction: | Civil Case No. 3-08cv0977M |
| | United States District Court for the Northern District of Texas |
| Work Product: | Expert report, declarations, and depositions |
| Nature of Case: | Representing Fast Memory Erase, LLC. Patent infringement case concerning minimizing source current during erase of Flash memory cell. |
| Counsel: | Retained by Shore Chan Bragalong LLP (Contact Patrick Conroy) |
| Date: | 2/09 – 5/10 |

**EXPERIENCE:**

10/07 to present: **Technical Consultant**

*ShoreChanBragalone.* Served as an expert witness for the case of Intersil vs. SST. Summary judgment was granted after claim charts and infringement contention were generated.

*Keranos,* Serving as an expert witness for the case of Keranos, LLC vs. Analog Devices, Inc. et. al. Overseeing the generation of claim charts and coordinating efforts in reverse engineering work on integrated circuit products.

*ShoreChanBragalone.* Served as an expert witness and testifying witness for the case of Fast Memory Erase, LLC *vs.* Spansion *et al.* (Performed claim construction, provided deposition testimony, and wrote expert report.)

*RPX Corporation.* Evaluated flash memory and CMOS image sensor patent portfolios for licensing and acquisition consideration. Assessed qualitative merits of each patent (total 76 patents) and identified potential infringers and potential licensees. Generated numerous claim charts against potential infringers based on published patents, technical papers and datasheets.

Case 1:17-cv-00784-JEB-SRF  Document 57-2  Filed 09/21/17  Page 87 of 152 PageID #:
Case 1:17-cv-00784-RGA-SRF  Document 129-1  Filed 12/04/12  Page 88 of 28 PageID #: 4024
1054

*IBM Corp*.  Reviewed and evaluated IBM's 180nm HV process technology against customer's IP and applications, with a view toward IBM's potential bid for customer's process technology offerings.  Assessed process compatibility and outlined gap/overlaps between IBM and customer.

*Law+*.  Worked as a technical expert for the lead attorney on several IP litigation cases in the area of flash memory and CMOS process technology.  Assembled critical evidence to invalidate key patent claims.  Generated claim charts for several patents.

10/07 to 4/11:   **Jonker, LLC**
Inventor and Partner.  Developed an intellectual property (IP) portfolio (7 U.S. patents granted and 3 U.S. patent applications pending) on zero-cost CMOS-logic-compatible embedded flash memory.  Successfully negotiated the acquisition of this IP portfolio by a major semiconductor company.

8/04 to 10/07:   **Maxim Integrated Products, San Jose, California**
Senior Scientist.  Responsible for developing embedded non-volatile memory process technology for battery management products.  Duties included supervising the development of integrated process flows at the 0.35μm and 0.18μm CMOS technology nodes.  Analyzed and solved process-related reliability issues.

5/00 to 8/04:   **Xilinx, Incorporated, San Jose, California**
Senior Manager.  Responsible for developing non-volatile memory process technology for flash and CPLD products, as well as advanced CMOS process technology (75nm node).  Duties included supervising the development of integrated non-volatile memory process flows at multiple CMOS technology nodes to meet product application requirements.  Analyzed and solved process-related reliability issues.

2/00 to 5/00   **Progressant Technologies, Fremont, California**
Co-Founder.  Facilitated IP development and sale of the company to Synopsys, Inc.

9/98 to 2/00   **Programmable Silicon Solutions, Sunnyvale, California**
Director of Process Engineering.  Responsible for developing a fully logic compatible embedded flash memory technology for WSMC (a semiconductor foundry).  Developed a new integrated process flow to implement a proprietary flash cell in a high-performance logic process, supervised testchip and product tapeout, process optimization, device optimization, and product yield enhancement.  Applied interpersonal skills to align the goals of the foundry technology development group to that of PSS.  Participated in the strategic planning of a technology roadmap and foundry strategy for the company.

9/97 to 9/98   **AMIC Technology, Santa Clara, California**

Case 1:17-cv-00784-JFA-SBF Document 57-2 Filed 09/21/17 Page 88 of 152 PageID#
1055
Case 1:17-cv-00784-RGA-SBF Document 291-7 Filed 12/04/22 Page 19 of 20 PageID #: 4025

Director of Flash Technology. Responsible for developing 0.35µm ETOX-based flash memory technology. Prepared the business plan and technology roadmap. Developed a new integrated process flow, supervised testchip and product tapeout, process optimization, device optimization, and product yield enhancement.

5/96 to 9/97    **Altera Corp., San Jose, California**
Device Engineering Manager. Responsible for technology development, process integration, and foundry interface for 0.35µm generation of logic and EEPROM programmable logic device technology. Duties included project schedule planning, supervision of testchip and product tapeout, process optimization, and product yield enhancement.

7/95 to 5/96    **Information Storage Devices, San Jose, California**
Technology Development Manager/Program Manager. Led a project team of 10 in technology development, process integration, and first product introduction, with a new foundry. Duties included project schedule planning, supervision of testchip and product tapeout, process optimization, resolution of sorting issues and yield enhancement.

5/92 to 7/95    **Advanced Micro Devices, Sunnyvale, California**
Member of Technical Staff. Led the development of low-energy/DINOR-type flash EPROM technology. Key individual contributor in optimizing the process and design of flash cell and periphery devices in AMD's 0.5µm and 0.35µm flash EPROM technologies. Duties included process integration, device modeling, and development of triple-well technology and high-voltage transistors for negative gate erase operation.

1/89 to 4/92    **Texas Instruments, Dallas, Texas**
Member of Technical Staff. Research and development of 16Mb generation of flash EPROM technology, as well as a new generation of antifuse-based FPGAs. Duties included process integration, device modeling, high-voltage CMOS process integration, and investigation of a novel source-side injection mechanism for EPROM channel hot-electron programming.


**AWARDS/HONORS**
U.C. Berkeley Certificate of Distinction Award, 1983
AEA Faculty Development Fellowship, 1983-1985
AMD Spotlight Award, 1995

# PATENTS

1. U.S. Patent 5,106,773, "Programmable Gate Array and Methods for Its Fabrication" (with K-L. Chen and H. Tigelaar), issued April 21, 1992.

2. U.S. Patent 5,166,557, "Gate Array with Built-in Programmable Circuitry" (with K.-L. Chen), issued November 24, 1992.

3. U.S. Patent 5,202,576, "Asymmetrical Non-Volatile Memory Cell, Arrays, and Methods for Fabricating the Same" (with M. Wong), issued April 13, 1993.

4. U.S. Patent 5,219,782, "Sublithographic Antifuse and method for Manufacturing" (with K.-L. Chen), issued June 15, 1993.

5. U.S. Patent 5,250,464, "Method of Making a Low Capacitance, Low Resistance Sidewall Antifuse Structure" (with M. Wong), issued October 5, 1993.

6. U.S. Patent 5,264,384, "Method of Making a Non-Volatile Memory Cell" (with C. Kaya), issued November 23, 1993.

7. U.S. Patent 5,300,803, "Source Side Injection Non-volatile Memory Cell," issued April 5, 1994.

8. U.S. Patent 5,365,105, "Sidewall Antifuse Structure and Method for Making," issued November 15, 1994.

9. U.S. Patent 5,371,402, "Low Capacitance, Low Resistance Sidewall Antifuse Structure and Process" (with M. Wong), issued December, 1994

10. U.S. Patent 5,395,797, "Antifuse Structure and Method of Fabrication," issued March 7, 1995.

11. U.S. Patent 5,470,773, "Method of Protecting a Stacked Gate Edge in a Semiconductor Device from Self Aligned Source (SAS) Etch" (with Y. Sun and C. Chang), issued November 28, 1995.

12. U.S. Patent 5,482,880, "Non-Volatile Memory and Fabrication Method," (with C. Kaya), issued January 9 1996.

13. U.S. Patent 5,517,443, "Method and System for Protecting a Stacked Gate Edge in a Semiconductor Device from Self Aligned Source (SAS) Etch in a Semiconductor Device," issued May 14, 1996.

14. U.S. Patent 5,521,867, "Adjustable Threshold Voltage Conversion Circuit" (with Jian Chen), issued May 28, 1996.

15. U.S. Patent 5,534,455, "Method and System for Protecting a Stacked Gate Edge in a Semiconductor Device from Self Aligned Source (SAS) Etch in a Semiconductor Device," issued July 9, 1996.

16. U.S. Patent 5,541,875, "High Energy Buried Layer Implant To Provide A Low Resistance P-Well in A Flash EPROM Array" (with Jian Chen), issued May 28, 1996.

17. U.S. Patent 5,590,076, "Channel Hot-Carrier Page Write," issued December 31, 1996.

18. U.S. Patent 5,596,531, "Method for Decreasing the Discharge Time of A Flash Memory Cell," issued January 21, 1997.

19. U.S. Patent 5,612,914, "Asymmetrical Non-volatile Memory Cell, Arrays and Methods for Fabricating Same" (with Man Wong), issued May 18, 1997.

20. U.S. Patent 5,624,859, "Method for Providing Device Isolation and Off-State Leakage Current for a Semiconductor Device," issued April 29, 1997.

21. U.S. Patent 5,625,220, "Sublithographic Antifuse," (with K.L. Chen), issued April 29, 1997.

22. U.S. Patent 5,646,430, "Non-volatile Memory Cell Having Lightly-Doped Source Region" (with C. Kaya), Issued July 8, 1997.

23. U.S. Patent 5,650,964, "Method of Inhibiting Degradation of Ultra Short Channel Charge-carrying Devices during Discharge," (with Jian Chen), Issued July 22, 1997.

24. U.S. Patent 5,652,155, "Method for Making Semiconductor circuit Including Non-ESD Transistors with Reduced Degradation Due to an Impurity Implant," Issued July 27, 1997.

25. U.S. Patent 5,656,509, "Method and Test Structure for Determining Gouging in a Flash EPROM Cell During SAS Etch," Issued July 29, 1997

26. U.S. Patent 5,661,059, "Boron Penetration to Suppress Short Channel Effect in P-channel Device," Issued August 26, 1997.

27. U.S. Patent 5,674,764, "Method of Making Asymmetrical Non-volatile Memory Cell," Issued October 7, 1997.

28. U.S. Patent 5,693,972, "Method and System for Protecting a Stacked Gate Edge in a Semiconductor Device from Self-Aligned Source (SAS) Etch in a Semiconductor Device," Issued December 2, 1997.

29. U.S. Patent 5,751,631, "Flash memory cell and a new method for sensing the content of the new memory cell," Issued May 12, 1998

30. U.S. Patent 5,789,295, "Method of Eliminating or Reducing Poly1 Oxidation at Stacked Gate Edge in Flash EPROM Process," Issued August 4, 1998.

31. U.S. Patent 5,814,854, "Highly scalable FLASH EEPROM cell," Issued September 29, 1998.

32. U.S. Patent 5,814,864, "Semiconductor Circuit Including Non-ESD Transistors with Reduced Degradation Due to an Impurity Implant," Issued September 29, 1998.

33. U.S. Patent 5,912,836, "Circuit for Detecting Both Charge Gain and Charge Loss Properties in a Non-Volatile Memory Array," Issued June 15, 1999.

34. U.S. Patent 5,930,174, "Circuit and Method for Erasing Flash Memory Array," Issued July 27, 1999.

35. U.S. Patent 5,981,994, "Method and Semiconductor circuit for Maintaining Integrity of Field Threshold Voltage Requirements," Issued November 9, 1999.

36. U.S. Patent 5,995,418, "Circuit and Method for Erasing Flash Memory Array," Issued November 30, 1999.

37. U.S. Patent 6,026,017, "Compact nonvolatile memory," Issued February 15, 2000.

38. U.S. Patent 6,027,974, "Nonvolatile memory," Issued February 22, 2000.

39. U.S. Patent 6,088,263, "Non-volatile memory using substrate electrons," Issued July 11, 2000.

40. U.S. Patent 6,091,636, "Flash memory cell and a new method for sensing the content of the new memory cell," Issued July 18, 2000.

41. U.S. Patent 6,127,225, "Memory cell having implanted region formed between select and sense transistors," Issued October 3, 2000.

42. U.S. Patent 6,159,800, "Method of forming memory cell," Issued December 12, 2000.

43. U.S. Patent 6,188,604, "Flash memory cell & array with improved pre-program and erase characteristics," Issued February 13, 2001.

44. U.S. Patent 6,185,133, "Flash EPROM using junction hot hole injection for erase," Issued February 6, 2001.

45. U.S. Patent 6,252,799, "Device with embedded Flash and EERPOM memories," Issued June 26, 2001.

46. U.S. Patent 6,326,265, "Device with Embedded Flash and EPROM Memories," Issued December 4, 2001.

47. U.S. Patent 6,417,550, "High voltage MOS devices with high gated-diode breakdown voltage and punch-through voltage," Issued July 9, 2002.

48. U.S. Patent 6,479,862, "Charge trapping device and method for implementing a transistor having a negative differential resistance mode," Issued November 12, 2002.

49. U.S. Patent 6,512,274, "CMOS-process compatible, tunable NDR (negative differential resistance) device and method of operating same," Issued January 28, 2003.

50. U.S. Patent 6,596,617, "CMOS compatible process for making a tunable negative differential resistance (NDR) device," Issued July 22, 2003.

51. U.S. Patent 6,624,026, "Nonvolatile Memory," Issued September 23, 2003.

52. U.S. Patent 6,680,245, "Method for making both a negative differential resistance (NDR) device and a non-NDR device using a common MOS process," Issued January 20, 2004.

53. U.S. Patent 6,686,631, "Negative differential resistance (NDR) device and method of operating same," Issued February 3, 2004.

54. U.S. Patent 6,693,027, "Method for configuring a device to include a negative differential resistance (NDR) characteristic," Issued February 17, 2004.

55. U.S. Patent 6,700,155, "Charge trapping device and method for implementing a transistor having a configurable threshold," Issued March 2, 2004.

56. U.S. Patent 6,711,063, "EEPROM memory cell array architecture for substantially eliminating leakage," Issued March 23, 2004.

57. U.S. Patent 6,835,979, "Nonvolatile Memory," Issued December 28, 2004.

58. U.S. Patent 6,969,894, "Variable threshold semiconductor device and method of operating same," Issued November 29, 2005.

59. U.S. Patent 6,972,234, "High Voltage MOS Devices with High Gated-Diode Breakdown Voltage and Punch-through Voltage," Issued December 6, 2005.

60. U.S. Patent 6,972,465, "CMOS process compatible, tunable negative differential resistance (NDR) device and method of operating same," Issued December 6, 2005.

61. U.S. Patent 7,067,873, "Charge Trapping Device," Issued June 27, 2006.

62. U.S. Patent 7,091,077, "Method of directionally trimming polysilicon width," Issued August 15, 2006.

63. U.S. Patent 7,109,078, "CMOS compatible process for making a charge trapping device," Issued September 19, 2006.

64. U.S. Patent 7,301,194, "Shrinkable and highly coupled double poly EEPROM with Inverter," Issued November 27, 2007.

65. U.S. Patent 7,436,710, "EEPROM memory device with cell having NMOS in a P pocket as a control gate, PMOS program/erase transistor, and PMOS access transistor in a common well," Issued October 14, 2008.

66. U.S. Patent 7,535,758, "One or Multiple-Times Programming Device," Issued May 19, 2009.

67. U.S. Patent 7,782,668, "Integrated circuit embedded with Non-volatile One-Time-Programmable and Multiple-Time Programmable memory," Issued August 24, 2010.

68. U.S. Patent 7,787,295, "Integrated circuit embedded with Non-volatile Multiple-Time Programmable memory having variable coupling," Issued August 31, 2010.

69. U.S. Patent 7,787,304, "Method of making integrated circuit embedded with Non-volatile One-Time-Programmable and Multiple-Time Programmable memory," Issued August 31, 2010

70. U.S. Patent 7,787,309, "Method of operating integrated circuit embedded with Non-volatile One-Time Programmable and Multiple-Time Programmable memory," Issued August 31, 2010.

71. U.S. Patent 7,791,955, "Method of erasing a block of memory cells," Issued September 7, 2010.

72. U.S. Patent 7,835,184, "EEPROM memory cell with first-dopant-type control gate transistor, and second-dopant type program/erase and access transistors formed in common well," Issued November 16, 2010

73. U.S. Patent 7,835,186,  "Method of programming a selected memory cell," Issued November 16, 2010.

74. U.S. Patent 7,852,672, "Integrated Circuit embedded with Non-Volatile programmable memory having variable coupling," Issued December 14, 2010

75. U.S. Patent 7,876,615, "Method of operating integrated circuit embedded with Non-Volatile programmable memory having variable coupling related application data," Issued January 25, 2011

76. U.S. Patent 7,920,426, "Non-volatile memory programmable through areal capacitive coupling," Issued April 5, 2011

77. U.S. Patent 7,944,750, "Multi-programmable Non-Volatile Memory Cell,"  Issued May 17, 2011

78. U.S. Patent 8,203,861,  "Non-Volatile One-Time Programmable and Multiple-Time Programmable Device," Issued June 19, 2012

79. U.S. Patent 8,208,299,  "Integrated Circuit Embedded with Non-Volatile Programmable Memory Having Variable Coupling and Separate Read/Write Paths," Issued June 26, 2012

80. U.S. Patent 8,300,470,  "Two Terminal Programmable Hot Channel Electron Non-Volatile Memory," Issued October 30, 2012

81. U.S. Patent 8,305,805  "Common Drain Non-Volatile Multiple-Time Programmable Memory," Issued November 6, 2012

**(additional patent applications pending)**

## PUBLICATIONS

1. S.D. Leeke, D. K. Y. Liu and J. P. McVittie, "Plasma mode trench etching with direct hydrocarbon injection," *Materials Research Society Symposium Proceedings*, Vol. 68, pp. 21-27, 1986.

2. D. K. Y. Liu and J. D. Plummer, "A novel trench-injector power device with low ON-resistance and high switching speed," *IEEE Electron Device Letters*, Vol. 9, No. 7, pp. 321-323, 1988.

3. D. M. Boisvert, D. K. Y. Liu and J. D. Plummer, "Circuit approaches to increasing IGBT switching speed," *IEEE Journal of Solid-State Circuits*, Vol. 23, No. 5, pp. 1276-1279, 1988.

4. D. K. Y. Liu and J. D. Plummer, "Device physics and optimization of conductivity-modulated power MOSFET's," *IEEE Transactions on Electron Devices*, Vol. 35, No. 12, pp. 2457-2458, 1988.

5. D. K. Y. Liu, K.-L. Chen, H. Tigelaar, J. Paterson and S. O. Chen, "Scaled dielectric antifuse structure for field-programmable gate array applications," *IEEE Electron Device Letters*, Vol. 12, No. 4, pp. 151-153, 1991.

6. M. Wong, D. K. Y. Liu, M. M. Moslehi and D. W. Reed, "Preoxidation treatment using HCl/HF vapor," *IEEE Electron Device Letters*, Vol. 12, No. 8, pp. 425-426, 1991.

7. D. K. Y. Liu, C. Kaya, M. Wong, J. Paterson and P. Shah, "Optimization of a source-side injection FAMOS cell for flash EPROM applications," *International Electron Devices Meeting Technical Digest*, pp. 315-318, 1991.

8. K.-L. Chen, D. K. Y. Liu, G. Misium, W. M. Gosney, S.-J. Wang, J. Camp and H. Tigelaar, "A sublithographic antifuse structure for field-programmable gate array applications," *IEEE Electron Device Letters*, Vol. 13, No. 1, pp. 53-55, 1992.

9. K. T. San, C. Kaya, D. K. Y. Liu, T. P. Ma, and P. Shah, "A new technique for determining capacitive coupling coefficients in flash EPROMs," *IEEE Electron Device Letters*, Vol. 13, No. 6, pp. 328-331, 1992.

10. C. Kaya, D. K. Y. Liu, J. Paterson and P. Shah, "Buried source-side injection (BSSI) for flash EPROM programming," *IEEE Electron Device Letters*, Vol. 13, No. 9, pp. 465-467, 1992.

11. M. Wong, D. K. Y. Liu and S. S.-W. Huang, "Analysis of the subthreshold slope and the linear transconductance techniques for the extraction of the capacitance coupling coefficients of floating-gate devices," *IEEE Electron Device Letters*, Vol. 13, No. 11, pp. 566-568, 1992.

12. D. K. Y. Liu and J. D. Plummer, "Design and analysis of a new conductivity-modulated power MOSFET," *IEEE Transactions on Electron Devices*, Vol. 40, No. 2, pp. 428-438, 1993.

13. J. Z. Peng, S. Haddad, H. Fang, C. Chang, S. Longcor, B. Ho, Y. Sun, D. Liu, Y. Tang, J. Hsu, S. Luan, J. Lien, "Flash EPROM endurance simulation using physics-based models," In *International Electron Devices Meeting Technical Digest*, pp. 295-298, 1994.

14. J. Chen, J. Hsu, S. Luan, Y. Tang, D. Liu, S. Haddad, C. Chang, S. Longcor, J. Lien, "Short Channel enhanced degradation during discharge of Flash EEPROM memory Cell," *International Electron Devices Meeting Technical Digest*, pp. 331-334, 1995.

15. V. H. Chan and D. Liu, "An Enhanced Erase Mechanism During Channel Fowler-Nordheim Tunneling in Flash EPROM Memory Devices," *IEEE Electron Devices Letters,* Vol. 20, No. 3, pp. 140-142, 1999.

# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **HSM PORTFOLIO LLC AND TECHNOLOGY PROPERTIES LIMITED LLC,** | § § § § | |
| **Plaintiffs,** | § § | **C.A. No. 1:11-cv-00770-RGA** |
| **v.** | § § § | **JURY TRIAL DEMANDED** |
| **FUJITSU LIMITED, ET AL.,** | § § | |
| **Defendants.** | § | |

## [PROPOSED] PROTECTIVE ORDER

Pursuant to Federal Rule of Civil Procedure 26(c), the parties agree to the entry of this Protective Order ("Order") to facilitate and expedite discovery in this action.

IT IS ORDERED THAT:

**1. Definitions:**

    a. **Circuit Schematic Files**. A computer file or document containing a graphical representation of an integrated circuit that shows the connections between the various components of the circuit. Circuit Schematic Files include complete hierarchical printouts (e.g., in PDF format) of schematic and logical netlist views that are used for abstract level simulation, but not for device fabrication. Circuit Schematic Files do not include Physical Design Files.

    b. **Physical Design Files**. A computer file or document that shows the physical arrangement of the components of the integrated circuit, also called the circuit layout. Physical Design Files are typically the final output product of

1

integrated circuit design that is used by a foundry to fabricate an integrated circuit. Physical Design Files may include, for example, GDS (Graphic Database System), GDSII stream format, DEF (Design Exchange Format), and LEF (Library Exchange Format) files, but do not include Circuit Schematic Files.

c. **Confidential Material.** A Producing Party may designate as CONFIDENTIAL, in whole or in part, any non-public Material which the party has a good faith belief constitutes or contains trade secret or other confidential or proprietary business, technical, research, development, sales, marketing, financial, or other commercial information and which is to be disclosed or produced to a party, expert or witness in the action.

d. **Defendant Group**. Any one of the following: (a) Fujitsu Limited, Fujitsu America, Inc., and Fujitsu Semiconductor America, Inc., (b) Advanced Micro Devices, Inc., (c) Qualcomm Inc., (d) SK Hynix Inc., SK Hynix America Inc., and Hynix Semiconductor Manufacturing America Inc., (e) Marvell Semiconductor, Inc., (f) Micron Technology, Inc., (g) ProMOS Technologies Inc., (h) SanDisk Corporation, (i) Sony Corporation, Sony Corporation of America, Sony Electronics Inc., Sony Computer Entertainment Inc., and Sony Computer Entertainment America, LLC, (j) STMicroelectronics N.V. and STMicroelectronics, Inc., (k) Toshiba Corporation, Toshiba America, Inc., and Toshiba America Electronic Components, Inc., (l) ON Semiconductor Corporation, or (m) Zoran Corporation.

2

Case 1:17-cv-00184-JRB-SRF Document 57-3 Filed 09/31/17 Page 99 of 152 PageID #:
Case 1:11-cv-00770-RGA Document 314-2 Filed 01/17/13 Page 3 of 33 PageID #:4417
1066

e. **Designated Material(s).** Any document, thing, or information designated as
CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE
ATTORNEYS' EYES ONLY, or CONFIDENTIAL, HIGHLY
CONFIDENTIAL - SOURCE CODE pursuant to this Order.

f. **HDL Source Code.** A computer file or files that contain electronic hardware
descriptions in a hardware description language, such as Verilog or VHDL.
HDL Source Code refers only to native electronic files that are in a human-
readable format suitable for input to an assembler, compiler, interpreter,
synthesis tool, or other translator.

g. **Highly Confidential - Outside Attorneys' Eyes Only.** A Producing Party
may designate as HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS'
EYES ONLY, in whole or in part, any Material that contains or reflects
information that is extremely confidential and/or sensitive in nature and the
Producing Party reasonably believes that the disclosure of such Material may
cause immediate economic harm or competitive disadvantage to the
Producing Party.

h. **Highly Confidential - Source Code.** A Producing Party may designate all
Source Code Material as HIGHLY CONFIDENTIAL - SOURCE CODE.

i. **Material.** Any document, thing, or information.

j. **Producing Party.** A party or non-party that produces, makes available, or
otherwise discloses Material in this action.

k. **Receiving Party.** A party that receives or is provided access to Material
from a Producing Party.

3

Case 1:17-cv-00184-JFB-SRF  Document 57-2  Filed 09/21/17  Page 100 of 152 PageID #:
1067
Case 1:11-cv-00770-RGA  Document 314  Filed 01/17/13  Page 46 of 55 PageID #: 4418

l.  **Source Code**. A compilation of computer instructions and data definitions expressed in a human-readable form suitable for input to an assembler, compiler, interpreter, or other translator, including HDL Source Code.

m. **Source Code Material.** All Source Code, HDL Source Code, or Physical Design Files.  Source Code Material does not include Circuit Schematic Files.

**2. Designating Materials.** The designation of Materials as CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE shall be made, where practical, by marking each page of a document, each separate part or component of a thing, or each separate item of other information in a conspicuous manner with the appropriate legend. If it is not practical to so mark the Material itself, a container for or a tag attached to the Material shall be so marked. The marking shall state either: CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE or other similar legend. The designation or non-designation of any such material under this Protective Order shall not be admissible as evidence in this action for any purpose, except as provided herein.

When electronic files or documents are printed for use at deposition, in a court proceeding, or for provision in printed form to an expert or consultant pre-approved pursuant to paragraph 12, the party printing the electronic files or documents shall affix a legend to the printed document corresponding to the confidentiality designation assigned by the Producing Party and include the production number associated with the native file.

Where electronic files and documents are produced in native electronic format, such electronic files and documents shall be designated for protection under this Order by appending

4

to the file names or designators information indicating whether the file contains "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS EYES ONLY," or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS EYES ONLY – SOURCE CODE" material, or shall use any other reasonable method for so designating Protected Materials produced in electronic format.

If a party seeks to use in this litigation a .tiff, .pdf, or other image format version of a document produced in native file format, that party shall provide a copy of the document to the Producing Party at the time of use. If the party seeking to use the native file format of the document provides the document in printed form, it shall add the term "NOT NATIVE FORMAT" to the original designation. Notwithstanding the forgoing, no Party can modify the content of any document produced in native file format.

Where a party sends, whether by email or otherwise, information containing Designated Material of another, the correspondence shall be appropriately marked: (a) in the case of email, by a prominently located indication (e.g. in the subject line or first line of the email) that the email contains the Designated Material of the Producing Party; or (b) in the case of paper, by a prominent indication on its cover or envelope and on its face.

**3. Oral Designation of Materials for Inspection.** In lieu of marking the original of Material prior to inspection, the Producing Party or its counsel may orally designate any Material being produced solely for inspection by counsel for a party as CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE, thereby making it, and the information it contains, subject to this Order. However, each copy of such Material subsequently delivered to inspecting counsel must be marked CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or

5

HIGHLY CONFIDENTIAL - SOURCE CODE as required by this Order at the time it is so delivered in order to make the Material and copies of the Material subject to this Order. A Producing Party is not precluded by this Order from disclosing or using the Material produced by that party in any manner as it may deem appropriate.

**4. Designation of Deposition Transcripts.** Parties or testifying persons or entities may designate depositions and other testimony with the appropriate designation by indicating on the record at the time the testimony is given or by sending written notice of how portions of the transcript of the testimony is designated within fourteen (14) days of receipt of the transcript of the testimony. If no indication on the record is made, all information disclosed during a deposition shall be deemed "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" until the time within which it may be appropriately designated as provided for herein has passed. Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such Protected Material. In such cases the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order. In the event the deposition is videotaped, the original and all copies of the videotape shall be marked by the video technician to indicate that the contents of the videotape are subject to this Protective Order, substantially similar to the following: "This videotape contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed, except pursuant to the terms of the operative Protective Order in this matter or pursuant to written stipulation of the parties." Counsel for any Producing Party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter and videographer (if any), any person who is not authorized by this Protective Order to receive or access Protected Material based on the

6

designation of such Protected Material. Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

**5. Limits on Use and Disclosure of Designated Materials.** Except upon consent of the designating party or upon order of the Court, all CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE Material produced in this action shall not be used by any Receiving Party or disclosed to anyone for any purpose other than in connection with this action and any appeals. Material designated CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE shall not be disclosed by the Receiving Party to anyone other than those persons designated in paragraphs 7, 8, and 9 below consistent with the provisions therein, as the case may be, unless and until the restrictions herein are removed by order of the Court or by the Producing Party. Nothing in this Order shall bar or otherwise restrict a Producing Party from having access to or using, without notification of any other party or non-party, Material designated CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE that the Producing Party has produced in this action.

**6. Cross-Production of Defendant Confidential Material.** No Defendant is required to produce or make available its Designated Material to any other Defendant or Defendants, but nothing in this Order shall preclude such disclosure, in which case, Designated Material disclosed to a Defendant from another Defendant shall be maintained pursuant to this Order. Notwithstanding the provisions of this Protective Order, except for Defendants' Designated Material used in Court filings and oral argument in Court, Plaintiffs shall not disclose Defendant's Protected Material to any other Defendant, without the express prior consent of the Defendant that produced the Protected

7

Material. Without the express prior written consent of the Defendant that produced the Protected Material, no expert or consultant retained by a Defendant in this matter shall have access to "CONFIDENTIAL," "HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL - SOURCE CODE" Discovery Material produced by another Defendant in this matter.

7. **Access to Confidential Material.** Access to Material designated as CONFIDENTIAL under this Order and to any portion of any transcript, brief, affidavit, letter, memorandum or other Material that contains, refers to, or reveals Material so designated shall be limited to:

    a.  outside counsel of record for the parties, including their partners, counsel, and associates, who assist them in this matter;

    b.  the clerical employees of such counsel of record (including secretaries, paralegals, and clerks) and litigation support service personnel who are actually assisting such counsel in the preparation of this case;

    c.  inside counsel, employees, officers and directors of a Receiving Party, as well as their immediate paralegals and staff, to whom disclosure is reasonably necessary for this case, provided that: (a) each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; and (b) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in paragraph 12 below;

    d.  outside experts or consultants retained by the Receiving Party to assist in this action, provided that the expert or consultant has been qualified under the terms of this Order and no unresolved objections to that expert or consultant remain;

e.  in the context of a deposition, any bona fide potential or actual witness who is explicitly named in the CONFIDENTIAL Material as an author or recipient (and any counsel of any such witness);

f.  court reporters involved in transcribing depositions or other proceedings in this litigation, and videographers involved in recording depositions;

g.  the Court and any court of appellate jurisdiction;

h.  Court personnel involved with this case;

i.  members of the jury in this case;

j.  graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

k.  mock jurors who have signed an undertaking or agreement agreeing not to publicly disclose Protected Material and to keep any information concerning Protected Material confidential;

l.  any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order;

m.  any other persons with the prior written consent of the Producing Party; and

n.  any other persons with the prior authorization of the Court.

**8. Access to Highly Confidential Material - Outside Attorneys' Eyes Only Material.** Access to Material designated as HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY and to any portion of any transcript, brief, affidavit, letter, memorandum or other Material that contains, refers to, or reveals Material so designated, shall be limited to the following:

9

a. outside counsel of record for the parties, including their partners, counsel, and associates who assist them in this matter;

b. the clerical employees of such outside counsel (including secretaries, paralegals, and clerks) and litigation support service personnel who are actually assisting such counsel in the preparation of this case;

c. any outside expert or consultant retained by the Receiving Party to assist in this action, provided that the expert or consultant has been qualified under the terms of this Order and no unresolved objections to that expert or consultant remain;

d. court reporters, stenographers and videographers retained to record testimony taken in this action;

e. the Court, jury, and court personnel;

f. graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

g. any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order;

h. In the context of a deposition, any person who appears as the author or as an addressee on the face of the document or who has been identified by the Producing Party as having been provided with the document or the information by the Producing Party;

i. any other persons with the prior written consent of the Producing Party; and

10

          j.  any other persons with the prior authorization of the Court.

    **9. Access to Highly Confidential - Source Code Material.** Access to Material designated as HIGHLY CONFIDENTIAL - SOURCE CODE and to any portion of any transcript, brief, affidavit, letter, memorandum or other Material that contains, refers to, or reveals Material so designated, shall be limited to the following:

        a.  outside counsel of record for the parties, including their partners, counsel, and associates who assist them in this matter;

        b.  the clerical employees of such outside counsel (including secretaries, paralegals, and clerks) and litigation support service personnel who are actually assisting such counsel in the preparation of this case;

        c.  For the Plaintiffs, not more than five (5) experts or consultants per Defendant Group, and for each Defendant Group, not more than five (5) experts or consultants retained by the Receiving Party to assist in this action, provided that the expert or consultant has been qualified under the terms of this Order and no unresolved objections to that expert or consultant remain. Plaintiffs, or any Defendant Group, may seek leave to allow additional experts or consultants access under this provision upon a showing of good cause;

        d.  Court reporters, stenographers and videographers retained to record testimony taken in this action;

        e.  the Court, jury, and court personnel;

        f.  not more than three (3) graphics, translation, design, and/or trial consulting personnel, provided that: (a) each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

11

g. any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order;

h. In the context of a deposition, any person who appears as the author or as an addressee on the face of the document or who has been identified by the Producing Party as having been provided with the document or the information by the Producing Party;

i. any other persons with the prior written consent of the Producing Party; and

j. any other persons with the prior authorization of the Court.

**10.** In addition to the limitations of paragraphs 7, 8 and 9 of this Protective Order, any outside counsel for a Receiving Party or the immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff, who access Designated Material subject to the terms of this Protective Order must not be involved in competitive decision making, as defined by U.S. Steel v. United States, 730 F.2d 1465, 1468 n.3 (Fed.Cir. 1984), on behalf of a Party or a competitor of a Party with respect to the technology at issue in this lawsuit.

**11. Disclosure and Review of Source Code Material.**

a. All Producing Parties that make Source Code Materials available must produce them for inspection in electronic format. Any Source Code Material that is produced shall be made available for inspection in a secure location either at the offices of the Producing Party's primary counsel, or at a facility owned, leased, managed, or operated by the Producing Party that is within the

12

territorial limits of the United States of America, as elected by the Producing Party.

A Producing Party and Receiving Party may agree to allow inspection of Source Code Material in an additional location; however, there is no obligation to permit inspection of Source Code Material in any such additional location.

b.  All Source Code Material shall be made available by the Producing Party to the Receiving Party's outside counsel and/or experts in a secure room on a secured computer having a password-protected account having read-only access and without Internet access, network access to other computers, or access to external drives or media, as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal or other transfer of any Source Code Material outside or away from the computer on which the Source Code Material is provided for inspection (the "Source Code Computer" in the "Source Code Review Room"). The above security restrictions are optional, not mandatory, and may be implemented at the Producing Party's election. Use of any input/output device (e.g., USB memory stick, CDs, floppy disk, portable hard drive, etc.) is prohibited while using a computer containing or accessing the Source Code Computer. The Source Code Computer will be made available during regular business hours, upon reasonable notice to the Producing Party, which shall not be less than ten (10) business days in advance of the first requested inspection and not less than three (3) business days in advance of any subsequent inspection.

13

c. The Producing Party must ensure that software tools for viewing and searching the Source Code Materials are available on or through the Source Code Computer. Such tools should be the same or equivalent to the tools the Producing Party's engineers and employees could use to review the Source Code Materials. If, after using its best efforts, the Producing Party is unable to obtain cost-free licenses for the Receiving Party's use of such software tools, the parties will meet and confer regarding the availability of alternative software tools. If the parties agree that a license must be purchased for software tools, the parties shall split the costs equally. The Producing Party shall also identify the file types of Source Code Materials being provided for inspection and shall be available to confer with the Receiving Party regarding software that is known to be able to open those file types. The Receiving Party's outside counsel and/or experts may then request that additional commercially available software tools for viewing and searching Source Code Materials be installed on the secured computer, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code Material consistent with all of the protections herein. Licensed copies of agreed upon additional commercially available software tool(s) shall be installed on the Source Code Computer by the Producing Party, and paid for by the Receiving Party. The Receiving Party must provide the Producing Party with the software tool(s) at least ten (10) days in advance of

14

Case 1:17-cv-00184-JFB-SRF Document 57-3 Filed 09/21/17 Page 111 of 152 PageID #:
1078
Case 1:11-cv-00770-RGA Document 314 Filed 01/17/13 Page 18 of 33 PageID #:4423

the date upon which the Receiving Party wishes to have the additional software tools available for use on the Source Code Computer. The Receiving Party must also provide access to and use of the software tool to the Producing Party, its outside counsel and experts for sixty (60) days after any expert report, declaration or other court filing containing information or opinions derived from the use of the additional software tools.

d. No recordable media, recordable devices, input/output devices or other electronic devices, including without limitation sound recorders, computers, cellular telephones, smartphone devices, personal digital assistants (PDAs), peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Review Room. The Producing Party will provide the Receiving Party a private room outside of the Source Code Review Room to store and/or operate cellular telephones and/or smartphone devices.

e. The Receiving Party's outside counsel and/or experts shall be entitled to take notes relating to the Source Code Material but may not copy the Source Code Material into the notes and may not take such notes electronically on the Source Code Computer itself or any other computer. All such notes will be taken on bound (spiral or other type of permanently bound) notebooks. Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the Receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Review Room. The Producing Party shall not be responsible for any items left in the room following each inspection session.

15

f.  No copies of all or any portion of the Source Code Material may leave the room in which the Source Code Material is inspected except as otherwise provided herein. Further, no other written or electronic record of the Source Code Material is permitted except as otherwise provided herein. The Producing Party shall make available a printer with commercially reasonable printing speeds for on-site printing during inspection of the Source Code Material. The Receiving Party shall not print Source Code Material in order to review blocks of Source Code Material elsewhere in the first instance, i.e., as an alternative to reviewing that Source Code Material or electronically on the Source Code Computer, as the Parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of code or diagrams for review and analysis elsewhere, and that printing is permitted only when necessary to prepare court filings, pleadings, or papers served in this case, such as infringement contentions or a testifying expert's expert report. Source Code Material shall be printed in size twelve (12) point font or larger. The Receiving Party may print only the portions of the Source Code Materials that are reasonably necessary to prepare its case. Upon printing any such portions of Source Code Material the printed pages shall be collected by the Producing Party.

g.  The Producing Party shall Bates number, copy, and label "HIGHLY CONFIDENTIAL - SOURCE CODE" any pages printed by the Receiving Party. Within fourteen (14) days, the Producing Party shall either (i) provide one copy of the printed pages to the Receiving Party or (ii) file a motion for

16

Protective Order from the Court if it believes that the printed portions are excessive and/or not done for a permitted purpose. The printed pages shall constitute part of the Source Code Materials produced by the Producing Party in this action.

h. All persons who intend to review a Producing Party's Source Code Material on behalf of a Receiving Party, whether in the Source Code Review Room or not, including members of a Receiving Party's outside law firm, shall be identified in writing to the Producing Party at least seven (7) days in advance of the first time that such person reviews such Source Code Material. Such identification shall be in addition to any other disclosure required under this Order.

i. All persons viewing Source Code Material in the Source Code Review Room shall sign on each day they view Source Code Material a log that will include the names of persons who enter the Source Code Review Room to view the Source Code Material and when they enter and depart. The Producing Party shall be entitled to a copy of the log upon one (1) day's advance notice to the Receiving Party.

j. Other than as provided above, the Receiving Party will not copy, remove, or otherwise transfer any Source Code Material from the Source Code Computer including, without limitation, copying, removing, or transferring the Source Code Material onto any recordable media or recordable device. The Receiving Party will not electronically transmit any Source Code Material in any way

17

from the Producing Party's facilities or the offices of its outside counsel of record.

k. Copies of Source Code Material that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers. Except as provided in this Order or upon the express written permission of the Producing Party, the Receiving Party may not create additional electronic images, or any other images, or make electronic copies, of the Source Code Material from any paper copy of Source Code Material for use in any manner. Images or copies of Source Code Material shall not be included in correspondence between the Parties (references to production numbers may be used instead). In papers filed with the Court, the Receiving Party shall only include such excerpts as are reasonably necessary for the purposes for which such portion of the Source Code Material is used. Where the Producing Party has provided the express written permission required under this provision for a Receiving Party to create electronic copies of Source Code Material, the Receiving Party shall maintain a log of all such electronic copies of any portion of Source Code Material in its possession or in the possession of its retained consultants, including the names of the reviewers and/or recipients of any such electronic copies, and the locations and manner in which the electronic copies are stored.

To the extent portions of Source Code Material are quoted in a document, either (1) the entire document will be stamped and treated as "HIGHLY

18

Case 1:17-cv-00184-JEB-SRF  Document 57-2  Filed 09/21/17  Page 115 of 152 PageID #:
1082
Case 1:11-cv-00770-RGA  Document 314  Filed 01/17/13  Page 19 of 33 PageID #: 4433

CONFIDENTIAL –SOURCE CODE" or (2) those pages containing quoted Source Code will be separately bound, and stamped and treated as "HIGHLY CONFIDENTIAL –SOURCE CODE." Each Defendant is not obligated to make any of its Source Code Material available to any of the other co-defendants in this action. Plaintiffs may not share one Defendant's Source Code Material with any other Defendant.

**12. Disclosure to Non-Party Experts and Consultants.** A party desiring to disclose documents or other Materials designated as CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE to non-party experts or consultants shall first obtain from each expert or consultant a completed consent form in the form attached as Exhibit A. Each non-party consultant or expert to whom a party proposes to give access to HIGHLY CONFIDENTIAL Material designated pursuant to this Protective Order by a Producing Party shall be identified by notice in writing to counsel of said Producing Party and other counsel of record at least ten (10) days before being given such access. Such notice in writing shall include for the non-party consultant or expert to whom disclosure is proposed: (i) the name of the Person; (ii) the present employer, employer's address and title of the Person; (iii) any previous or current relationship (personal or professional) with any of the Parties; (iv) an identification of all of the Person's employment and consulting relationships within the last five (5) years, including direct relationships and relationships through entities owned or controlled by the Person, the dates of the consultancy or employment, a brief description of the subject matter of the consultancy or employment; (v) an up-to-date curriculum vitae of the Person; (vi) a list of the cases in which the Person has testified at deposition or trial within the last five (5) years; and (vii) a statement that such expert or consultant is not a current officer, director, or employee of a Party or

19

of a competitor of a Party, nor anticipated at the time of retention to become an officer, director, or employee of a Party or of a competitor of a Party; and such expert or consultant is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party with respect to the technology at issue in this lawsuit. To the extent that there is a confidential employment or consultation arrangement, the proposing party shall disclose, to the extent possible without violating any confidentiality obligations, (i) the industry in which the relationship(s) took place, (ii) the general technology involved (iii) the dates of the relationship(s), (iv) a statement of whether the relationship(s) was with a competitor of Defendant, and (v) any non-confidential information available about the relationship(s) that would describe or tend to describe the circumstances of the relationship(s). If any of the information in (i) through (v) above cannot be disclosed because of confidentiality obligations, the proposing party must identify which category or categories of information is or are not being disclosed. A party proposing such non-party consultant or expert shall respond within ten (10) days to any reasonable request for additional information regarding the employment or consulting relationships or other professional activities of the proposed non-party consultant or expert.

Should the Producing Party object within such ten (10) day period to the disclosure of its Designated Material to the proposed non-party consultant or expert, the Parties shall meet and confer via telephone or in person within seven (7) days following the objection and attempt in good faith to resolve the dispute on an informal basis. If the dispute is not resolved, the Producing Party will have seven (7) days from the date of the meet and confer to seek relief from the Court. Failure of the Producing Party to file such a motion shall be deemed a waiver of any objection to the disclosure of information to the proposed person, subject to the terms of this Order. If relief is

sought, designated materials shall not be disclosed to the non-party consultant or expert in question until the Court resolves the objection.

**13. Use of Designated Materials at Depositions.** Except as otherwise approved by the Producing Party or by an order of this Court, a Receiving Party may use CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE Material in deposing only (a) an individual who has had or who is eligible to have access to the CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE Material by virtue of his or her employment with the Producing Party or who has been designated by the Producing Party to testify on behalf of the Producing Party on topics to which the CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE Material pertains; (b) an individual identified in the CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE Material as an author, addressee, or recipient of such CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE Material; (c) a third-party expert or consultant duly qualified under paragraph 11 (who shall first have signed a completed consent form in the form attached as Exhibit A).

**14. Persons Permitted in Depositions.** If during the course of a deposition taken in the action any questions are to be asked or any answers are to be given containing confidential information or regarding any Material designated CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE, then only persons designated in paragraphs 7, 8, or 9 above, as the case may be, the deponent (and the

Case 1:17-cv-00184-JFB-SRF  Document 57-3  Filed 09/21/17  Page 118 of 152 PageID #:
1085
Case 1:11-cv-00770-RGA  Document 314  Filed 01/17/13  Page 22 of 33 PageID #:4436

deponent's counsel, including their staff and associates, in the case of a separately represented non-party), and the reporter and/or videographer shall be allowed to be present during such portion of the deposition. It shall be the obligation of the Producing Party of the Material to invoke this provision. This paragraph shall not be deemed to authorize disclosure of any confidential Material to any person to whom disclosure is prohibited under this Order.

**15. Challenges to Designations and Resolution of Disputes.** A party may challenge the designation of Designated Material only as follows:

> a. A Receiving Party may at any time request that the Producing Party cancel or modify the Designated Material designation with respect to any document or information contained therein by serving written notice of its disagreement with the designation on outside counsel for the Producing Party. This notice shall particularly identify the documents or information that the Receiving Party contends should be differently designated, and shall state the grounds for the objection.

> b. The Producing Party or its counsel shall thereafter, within ten (10) days following receipt of the objection, respond to such objection in writing by either: (i) agreeing to remove or modify the designation or (ii) explain its basis for refusing to do so. If the Producing Party fails to provide such answer it will be deemed to have acquiesced to the Receiving Party's objection, and the challenged designation(s) will be deemed removed.

> c. If the Producing Party properly responds and refuses to change the challenged designation, the Parties shall confer within ten (10) days of the Producing

22

Case 1:17-cv-00184-JFB-SRF   Document 57-3   Filed 09/21/17   Page 119 of 152 PageID #:
Case 1:11-cv-00770-RGA   Document 314   Filed 01/17/13   Page 23 of 33 PageID #:4437
1086

Party's response, either in person, in writing, or by telephone and make a good faith effort to resolve the dispute.

d.  If the Parties are unable to resolve their dispute, the Receiving Party may contact the Court to obtain a date for a hearing on whether the Discovery Material in question is entitled to the status and protection of the Producing Party's designation.  At least forty-eight (48) hours before the hearing, the Producing Party must file a 3-page letter brief with the Court regarding the disputed designation(s).  The Parties' entry into this Order shall not preclude or prejudice any Party from arguing for or against any designation, establish any presumption that a particular designation is valid, or alter the burden of proof that would otherwise apply in a dispute over discovery or disclosure of information.

Notwithstanding any challenge to a designation, the Discovery Material in question shall continue to be treated as designated under this Order until one of the following occurs: (a) the Producing Party who designated the Discovery Material in question withdraws such designation in writing; or (b) the Court rules that the Discovery Material in question is not entitled to the designation.

**16. Maintenance of Designated Materials.** Each recipient of Material designated CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE shall maintain such Material in a secure, safe area and shall exercise, at minimum, the same standard of care with respect to the storage, custody, use and dissemination of such Material as is exercised by the Receiving Party with respect to its own confidential Material.

23

Case 1:17-cv-00184-JFB-SRF Document 57-3 Filed 09/21/17 Page 130 of 152 PageID #:
Case 1:11-cv-00770-RGA Document 314 Filed 01/17/13 Page 24 of 33 PageID #:4433
1087

**17. No Waiver of Confidentiality.** Production of Material by a party is not deemed to be a publication of the discovery Material produced as to void or make voidable whatever claim that party may have as to the confidential nature of the Materials.

**18. Filing Designated Material**.

    a.  Absent written permission from the Producing Party or a court Order secured after appropriate notice to all interested persons, a Receiving Party may not file or disclose in the public record any Designated Material.

    b.  Any Party is authorized under Delaware Civil Local Rule 5.1.3 and Delaware Revised Administrative Procedures Governing Filing and Service, Rule G(1), to file under seal with the Court any brief, document or materials that are designated as Protected Material under this Order.

**19. Inadvertent Disclosure of Designated Material.** Production of any Material without a designation of confidentiality or an incorrect designation will not be deemed to waive a later claim as to its proper designation, nor will it prevent the Producing Party from designating such Material as CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE. All Materials so re-designated shall be fully subject to this Order as if they had been initially designated at the re-designated level. Following any re-designation of Material, the Receiving Party shall take reasonable steps to comply with the re-designation including, without limitation, retrieving all copies and excerpts of any re-designated material from persons not entitled to receive it. The Receiving Party shall not be liable for any harm caused by any disclosures resulting from the Producing Party's inadvertent disclosure or failure to designate Materials in accordance with this Order, nor shall the Receiving Party be in breach of this

Case 1:17-cv-00184-JFB-SRF   Document 57-3   Filed 09/21/17   Page 121 of 152 PageID #:
1088
Case 1:11-cv-00770-RGA   Document 314   Filed 01/17/13   Page 28 of 33 PageID #:4439

Order for any use of such Materials before the Receiving Party receives such notice that such Materials are protected under one of the categories of this Order.

### 20. Unauthorized Disclosure of Designated Material.

      a.  In the event of a disclosure of any Designated Material pursuant to this Order to any person or persons not authorized to receive such disclosure under this Protective Order, the Party responsible for having made such disclosure, and each Party with knowledge thereof, shall immediately, and in no event later than three (3) days after such Party's discovery of the unauthorized or inadvertent disclosure, notify counsel for the Producing Party whose Designated Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure. The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Designated Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made.

      b.  Unauthorized or inadvertent disclosure does not change the status of Designated Material or waive the right to hold the disclosed document or information as Protected.

**21. Patent Prosecution Bar.** Absent the written consent of the Producing Party, any attorney for or representing Plaintiffs, whether in-house or outside counsel, and any person associated with Plaintiffs who obtains, receives, has access to, or otherwise learns, in whole or in part, "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" shall not be involved, directly or indirectly, in any of the

25

Case 1:17-cv-00184-JFB-SRF   Document 57-3   Filed 09/21/17   Page 133 of 152 PageID #:
Case 1:11-cv-00770-RGA   Document 314   Filed 01/17/13   Page 26 of 33 PageID #:4440
1089

following activities: advising on, consulting on, supervising, preparing, prosecuting, drafting, editing, and/or amending of patent applications, specifications, claims, and/or responses to office actions or post-grant review of any of the patents-in-suit, or otherwise affecting the scope of claims in patents or patent applications relating to the field of invention of the patents-in-suit or the accused instrumentalities, including semiconductor, logic and memory devices, before any foreign or domestic agency, including the United States Patent and Trademark Office. If any such proceedings are instituted in the future, the Parties agree that Plaintiffs' in-house or outside counsel who have obtained, received, had access to, or otherwise learned, in whole or in part, "HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL - SOURCE CODE" materials of Defendant or Defendants will not participate in such proceedings. These prohibitions shall begin when the affected individual first accesses "HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL - SOURCE CODE" materials, and shall end one (1) year after the final resolution of this action, including all appeals. This section does not bar Plaintiffs' outside counsel from participating in either *ex parte* or *inter partes* reexaminations of any of the patents-in-suit.

**22. Development Bar.** Unless otherwise permitted in writing between Producing Party and Receiving Party, any outside expert or consultant retained by the Receiving Party who is to be given access to documents or source code designated as "HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL - SOURCE CODE" produced by a Producing Party must agree in writing not to perform hardware or software development work or product development work intended for commercial purposes substantially related to the particular technology or information disclosed in the Protected Material from the time of first receipt of such material through the date the outside expert or consultant ceases to have access to any material

26

designated "HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL - SOURCE CODE," as well as any materials that contain or disclose Protected Material so designated.

**23. Inadvertent Disclosure of Work Product or Privileged Material.** Pursuant to Federal Rule of Civil Procedure 26(b)(5)(B), if information subject to a claim of attorney-client privilege, work-product immunity, or any other applicable claim of privilege or immunity is inadvertently or unintentionally produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or immunity for such information. Upon request by the Producing Party, the Receiving Party shall promptly return, sequester, or destroy the specified information and any copies it has;[1] must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the Court under seal for a determination of the claim. The Producing Party must preserve the information until the claim is resolved. Nothing in this paragraph·shall prejudice the right of any party to seek discovery of communications, documents, and things to which a claim of privilege has been made.

**24. Other Proceedings.** By entering this Order and limiting the disclosure of information in this case, the Court does not intend to preclude another Court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE pursuant to this order, shall promptly notify that party of the

---

[1] Except for the copy that is sent to the Court under seal should the Receiving Party decide to challenge the Producing Party's claim of privilege.

motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

**25. Territorial Limitation**. No Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" may leave the territorial boundaries of the United States of America. Without limitation, this prohibition extends to such Protected Material (including copies) in physical and electronic form. The viewing of such Protected Material through electronic means outside the territorial limits of the United States of America is similarly prohibited. Notwithstanding this prohibition, such Protected Material, exclusive of material designated "HIGHLY CONFIDENTIAL – SOURCE CODE," and to the extent otherwise permitted by law, may be taken outside the territorial limits of the United States if it is reasonably necessary for a deposition taken in a foreign country, and may be accessible to any outside counsel in non-U.S. offices of counsel of record for any Receiving Party. The restrictions contained within this paragraph may be amended through the consent of the Producing Party to the extent that such agreed to procedures conform with applicable export control laws and regulations.

**26. Termination of Litigation.** After termination of this Litigation, the provisions of this Order shall continue to be binding, except with respect to those documents and information that become a matter of public record.

        a. **Jurisdiction.** This Court retains and shall have continuing jurisdiction over the parties and recipients of the Protected Material for enforcement of the provisions of this Order following termination of this litigation.

        b. **Destruction of Designated Material.** Within sixty (60) days after termination of these actions by non-appealable dismissal, judgment, or settlement, counsel for the party or parties receiving Designated Material shall destroy or return all

28

Designated Material received, except as provided for in subparagraph (c) below, and notify the Designating Party of any such destruction.

c. **Retention of Designated Material.** Counsel for the party or parties receiving Designated Material may retain a copy of any pleading, transcript (e.g., deposition, hearing, or trial), or exhibit thereto, regardless of its confidentiality designation. The party or parties receiving the Designated Material shall be entitled to keep their attorney work product that refers or relates to any Designated Material. Attorney work product may be used in subsequent litigation provided that any such work product does not include, use, or disclose, for any purpose, any Designated Material or any information contained in or derived from any Designated Material.

**27. Privileged or Designated Materials.** Nothing in this Order shall be construed as requiring disclosure of privileged Materials, Materials subject to protection under the attorney work product doctrine, or Materials which are otherwise beyond the scope of permissible discovery. Nothing herein shall impair any party's right to challenge, by motion or otherwise, a Producing Party's assertion of a privilege with respect to any Designated Materials.

**28. Modification.** Nothing in this Order shall be construed to prevent a party or non-party from seeking such further provisions regarding confidentiality as may be appropriate, moving the Court for relief pursuant to paragraph 15, or, separately, moving the Court for modification of any of the terms of this Order on a going-forward basis.

**29. No Waiver of Objections to Admissibility.**

    a. Nothing in this Order shall be construed as a waiver by a party of any objections that might be raised as to the admissibility at trial of any evidentiary Materials.

    b. By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order. This Order shall not constitute a waiver of the right of any Party to claim in this action or otherwise that any Designated Material, or any portion thereof, is privileged or otherwise non-discoverable, or is not admissible in evidence in this action or any other proceeding

    **30. Limitations of Order.** The designation of Materials as CONFIDENTIAL, HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE under this Order shall not restrict the use of information, documents or knowledge:

    a. in the public domain or becomes part of the public domain by publication or by other means, except an unauthorized act or omission on the part of the receiving party;

    b. acquired by publicly available means;

    c. independently developed by the Receiving Party without use of or reliance on the Producing Party's CONFIDENTIAL, HIGHLY CONFIDENTIAL -

OUTSIDE ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL - SOURCE CODE Material;

d. acquired by the Receiving Party from an independent source who is under no restriction as to use or obligations as to confidences; and

e. was, prior to disclosure by the Producing Party, rightfully in the possession or knowledge of the Receiving Party; or

f. is or becomes known to the receiving party without any breach of any protective order or other confidentiality obligation.

However, in case of a dispute regarding such independent or prior acquisition, development or possession, the person or entity seeking to use any such information, document or knowledge shall bear the burden of proof to show that one of events described in this subsection has come to pass. Nothing in this Order shall supersede any preexisting agreement between the parties with respect to the confidentiality of Materials exchanged between the parties by means other than production in this action. Notwithstanding anything to the contrary above, nothing in this Protective Order shall be construed to change the burdens of proof or legal standards applicable in disputes regarding whether particular Designated Material is confidential, which level of confidentiality is appropriate, whether disclosure should be restricted, and if so, what restrictions should apply.

**31. Binding Effect.** This Order is binding upon the parties, including their respective corporate parents, subsidiaries and affiliates and their respective attorneys, agents, representatives, officers and employees and others as set forth in this Order.

**32. Headings.** The headings used in this Order are supplied for convenience only and shall not be taken into account in the interpretation of this Order.

SO ORDERED this the 17th day of January, 2013.

UNITED STATES DISTRICT JUDGE

## EXHIBIT A

| HSM PORTFOLIO LLC AND | § | |
|---|---|---|
| **TECHNOLOGY PROPERTIES** | § | |
| **LIMITED LLC,** | § | |
| | § | |
| Plaintiffs, | § | C.A. No. 1:11-cv-00770-RGA |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| **FUJITSU LIMITED, ET AL.,** | § | |
| | § | |
| Defendants. | § | |

## CONSENT TO BE BOUND BY PROTECTIVE ORDER

     I, _____, acknowledge and declare that I have received a

copy of the Protective Order ("Order") in *HSM Portfolio LLC and Technologies Properties*

*Limited LLC v. Fujitsu Limited, et al.*, United States District Court, District of Delaware,

Civil Action No. 11-770-RGA. Having read and understood the terms of the Order, I agree to

be bound by the terms of the Order and consent to the jurisdiction of said Court for the

purpose of any proceeding to enforce the terms of the Order.

     Name of individual: _____

     Present occupation/job description: _____

     _____

     _____

     Name of Company or Firm: _____

     Address:_____

     Dated: _____

                             _____

                             [Signature]

# EXHIBIT I

**Baghdassarian, Mark**

| | |
|---|---|
| **From:** | Baghdassarian, Mark |
| **Sent:** | Thursday, September 21, 2017 9:20 AM |
| **To:** | Benzmiller Sultanian, Heather; Hedvat, Shannon H.; Abruzzese, Peter A.; Caplan, Jonathan S.; provner@potteranderson.com |
| **Cc:** | bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com) |
| **Subject:** | RE: Fraunhofer v. Sirius XM: Protective Order Meet and Confer |

Counsel,

Thank you for your e-mail. We respond below to each of the points in your e-mail in turn. As we are approaching the deadline to file our opening letter briefs, we would appreciate a prompt response to the second point below.

First, as we previously explained during our meet and confer, we do not understand your question about whether code that falls within Fraunhofer's proposed definition may be relevant to the instant action. Based on current understanding of Fraunhofer's infringement contentions, we believe that such code would be relevant. That is why SXM's proposed definition captured both software-based code as well as hardware-based code.

Second, we disagree with your characterization of the source code provisions at issue. As you know, the source code provisions have been the subject of extensive discussions whereby SXM has compromised to try and reach agreement on the provisions. It was our understanding that your willingness to agree to some of SXM's proposed provisions late yesterday revealed Fraunhofer's effort to compromise for the first time. We now understand that was not the case. Nevertheless, SXM is willing to agree to delete the following language from the proposed provisions in an effort to try to resolve this dispute or at least narrow the issues:

For paragraph 37: "To the extent that there are differences between the Default Standard and this Order, this Order shall control."

For paragraph 42: "In no event may Source Code be scanned using optical character recognition ("OCR") technology."

For paragraph 46, we can agree to delete the entire paragraph: "To the extent portions of Protected Material are quoted in a document, the entire document will be stamped and treated as Source Code material."

Third, we will have to agree to disagree on Fraunhofer's proposal that an arbitrary 50 lines of code in a document will determine how to designate that document. We understand that the parties will brief this issue as well.

Regards,
Mark

**Mark Baghdassarian**
Partner

1

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9193 | F: 212-715-8362
mbaghdassarian@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Wednesday, September 20, 2017 6:49 PM
**To:** Hedvat, Shannon H.; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; provner@potteranderson.com
**Cc:** bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** [EXTERNAL] RE: Fraunhofer v. Sirius XM: Protective Order Meet and Confer

Counsel:

Thank you for your prompt response. We would like to clarify certain issues in response to your characterization of the nature of the dispute.

First, we understand that Sirius XM disagrees with Fraunhofer's position regarding the definition of source code. However, at the conclusion of the last meet and confer, Sirius XM agreed to consult with its technical advisers and client representatives to determine whether source code, as Fraunhofer defines it, is likely to be relevant in this case. We ask that you let us know your view on that issue by tomorrow at the latest, so we can address it in our responsive letter brief as need be.

Second, we disagree with your characterization regarding whether the parties have agreement on any of Sirius XM's proposed provisions for the review of source code. As we stated in our earlier email, Fraunhofer does not agree that any of the provisions it identified are necessary to include in the protective order, but rather identified certain provisions in a good faith effort to reach an appropriate global compromise. In that spirit, we ask that you identify which of the remaining provisions that Sirius XM would be willing to set aside as part of such a possible compromise.

Finally, we do not agree that it is efficient to address disputes regarding source code excerpts contained in otherwise relevant documents on a case-by-case basis. We presented our proposal in an attempt to streamline such document-specific disputes and outline an efficient means for producing relevant documents without compromising the security of any source code. We intend to include this proposal in our letter brief to the Court.

Please respond as soon as possible with your position on the points discussed above.

Regards,

Heather Benzmiller Sultanian
Associate
Irell & Manella LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660
Direct Phone: 949.760.5232
Email: hsultanian@irell.com

**From:** Hedvat, Shannon H. [mailto:SHedvat@KRAMERLEVIN.com]
**Sent:** Wednesday, September 20, 2017 7:55 AM
**To:** Benzmiller Sultanian, Heather; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; ~Rovner, Phil
**Cc:** bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** RE: Fraunhofer v. Sirius XM: Protective Order Meet and Confer

Counsel:

Thank you for your e-mail.  In light of your e-mail, we believe it is necessary to outline the nature of the dispute that will be briefed to the Court.

First, Sirius XM disagrees with Fraunhofer's position that source code does not encompass VHDL, Verilog and/or RTL, and that these types of code should not be afforded source code protection under the protective order.

Second, your e-mail has presented challenges in determining where the parties have agreement and disagreement regarding the other source code provisions.  To help determine where the parties now disagree, we have attached a document that outlines the disputed portions of the source code provisions.  Please note that the redlined portions in the attached draft reflect the areas of disagreement.  Please confirm that this is the nature of the dispute.

Finally, regarding your proposal pertaining to the designation of documents based on whether the document has 50 contiguous lines of source code, we suggest handling this issue on a document by document basis.  The proposed 50 lines is an arbitrary marker and it very well may be the case that Sirius XM will insist on the highest level designation depending on what code is present in the document.  Having said that, we are certainly amenable to handling this issue if and when the issue arises.

We look forward to your prompt response.

Regards,
Shannon



**Shannon H. Hedvat**
Associate

**KRAMER LEVIN**
**NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9185 | F: 212-715-8385 | M: 973-809-4768
shedvat@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Tuesday, September 19, 2017 11:40 AM
**To:** Hedvat, Shannon H.; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; provner@potteranderson.com
**Cc:** bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** [EXTERNAL] RE: Fraunhofer v. Sirius XM: Protective Order Meet and Confer

Counsel:

Thank you for your response concerning several of the requested follow-up items from the meet and confer.  Our recollection was somewhat different as we had understood there would be a simultaneous exchange of information.  Nonetheless, in light of your response providing information on certain of the items we discussed, Fraunhofer hereby provides the information requested by Sirius XM.

First, consistent with its previous letter briefing, Fraunhofer defines "source code" as follows: "The term 'Source Code' shall mean the human-readable textual form of computer instructions expressed in a form for assembling, compiling, or translating into executable software."  In support of this definition, Fraunhofer expects to rely on at least the authority identified in its earlier letter briefing, including: *Nazomi Comm., Inc. v. Nokia Corp.*, 739 F.3d 1339, 1340 (Fed. Cir. 2014); *HSM Portfolio LLC v. Fujitsu Ltd.*, 2013 WL 12233636 (D. Del. Jan. 9, 2013); and Lydia Pallas Loren & Andy Johnson-Laird, *Computer Software-Related Litigation: Discovery and the Overly-Protective Order*, 6 Fed. Cts. L. Rev. (2012). Fraunhofer may identify additional case law or other support for its position, which will be identified in its letter briefing filed in advance of the September 26 hearing.

As discussed during the meet and confer, we ask that you confirm whether Sirius XM takes the position that source code, as defined above, will likely be relevant to any claims or defenses in this action, and let us know your view as soon as possible.

Second, Fraunhofer has reviewed Sirius XM's proposed provisions concerning the review of source code once again, and has identified the following as provisions that Fraunhofer may consider accepting solely as part of an appropriate global compromise:

- To the extent production or inspection of Source Code becomes necessary in this Action, a Producing Party may designate Source Code as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE" if it comprises or includes confidential, proprietary and/or trade secret Source Code.  The Parties agree that, in addition to the provisions set forth herein, disclosure and review of Source Code shall be subject to the Court's Default Standard for Access to Source Code.

- Protected Material designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE" shall be subject to all of the protections afforded to such information as set forth in this Order, and may be disclosed only to the individuals to whom "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE" information may be disclosed as set forth in this Order.

- Prior to any inspection of Source Code that the Producing Party has made available for inspection, the Receiving Party shall provide at least seven (7) days' written notice that it wishes to inspect such Source Code.  Such notice shall include an identification of all persons who will attend the review of the Source Code.  Such identification shall be in addition to any other disclosure required under this Order.  All persons viewing Source Code shall sign on each day they view Source Code a log that will include the names of persons who enter the locked room to view the Source Code and when they enter and depart.

- A Receiving Party may request in writing, from the Producing Party, printouts of the Source Code.  Outside Counsel for the Designating Party will keep the original printouts of the Source Code and shall provide copies of such original printouts to Outside Counsel for the Receiving Party within seven (7) business days of the Receiving Party's written request for printouts.

- If the Receiving Party's Outside Counsel or Experts obtain printouts of photocopies of Source Code, the Receiving Party shall ensure that such Outside Counsel and/or Experts keep the printouts or photocopies in a secured locked area in the offices of such Outside Counsel or Expert.  The Receiving Party may also temporarily keep the printouts or photocopies at: (i) the Court for any proceeding(s) relating to the Source Code, for the dates associated with the proceeding(s); (ii) the sites where any deposition(s) relating to the Source Code are taken, for the dates associated with the deposition(s); and (iii) any intermediate locations reasonably necessary to transport the printouts or photocopies (e.g., a hotel prior to a Court proceeding or deposition).

- A Receiving Party may include excerpts of Source Code in a pleading, exhibit, expert report, discovery document, deposition transcript, and/or other Court document, provided that such excerpts are limited to only what is reasonably necessary for such document and that the documents containing Source Code are appropriately

marked under this Order, restricted to those who are entitled to have access to them as specified in this Order, and, if filed with the Court, filed under seal in accordance with this Order.

Fraunhofer does not agree that any of the above provisions is necessary to protect the confidentiality of source code material, and maintains its position that the Default Standard provides ample security for any source code that may be reviewed in this case. However, in the interest of reaching an agreement, Fraunhofer is willing to consider accepting one or more of the above provisions if Sirius XM is likewise willing to compromise.  Please let us know if Sirius XM is open to such a compromise approach.

Finally, in addition to the two items you identified, there was also a third item discussed during our meet and confer that Sirius XM agreed to consider.  Specifically, we had proposed that non-source-code documents that nonetheless contain source code excerpts be treated in the following manner:

- Documents with excerpts of fewer than 50 contiguous lines of source code would be produced under the "Highly Confidential – Attorneys' Eyes Only" designation.
- Documents with excerpts of 50 or more contiguous lines of source code would be produced with the block of source code redacted under the "Highly Confidential – Attorneys' Eyes Only" designation, and unredacted versions would be produced under the "Highly Confidential – Attorneys' Eyes Only – Source Code" designation.

We ask for your response regarding this proposal and the other items mentioned above as soon as possible, and in any event no later than noon tomorrow (Wednesday, September 20) to provide ample time for the parties to attempt a full or partial resolution of issues in advance of the court-ordered briefing.

Regards,

Heather Benzmiller Sultanian
Associate
Irell & Manella LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660
Direct Phone:  949.760.5232
Email:  hsultanian@irell.com

---

**From:** Hedvat, Shannon H. [mailto:SHedvat@KRAMERLEVIN.com]
**Sent:** Monday, September 18, 2017 12:01 PM
**To:** Benzmiller Sultanian, Heather; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; ~Rovner, Phil
**Cc:** bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** RE: Fraunhofer v. Sirius XM: Protective Order Meet and Confer

Counsel,

There were two issues for which Sirius XM agreed to provide some information: (1) whether source code under Fraunhofer's definition might be relevant to the instant action; and (2) identification of case law on which Sirius XM may rely for purposes of the letter briefing on the instant dispute about the source code provisions of the protective order.

We find your e-mail curious regarding a simultaneous exchange of information on the first issue.  As Sirius XM explained during our August 22 call, Sirius XM would only be able to assess whether source code "as Fraunhofer proposes it" is relevant after Fraunhofer provides a definition for source code and upon receipt of Fraunhofer's infringement contentions (that were served after the close of business on Friday, September 15).  While we have your contentions, we have yet to be provided with a proposed definition for source code.  Please provide the definition as soon as possible

for our consideration.  Notwithstanding the fact that we still do not have Fraunhofer's proposed definition, we are operating under the assumption that source code will be at issue in the instant action.

On the second issue, at this point, Sirius XM expects to rely on at least the following case law in support of its position: *Nazomi Comm'n., Inc. v. Nokia Corp.*, 739 F.3d 1339 (Fed. Cir. 2014) and *HSM Portfolio LLC, et al v. Fujitsu Limited, et al.*, No. 1:11-cv-00770-RGA, D.I. 311 (D. Del. Jan. 9, 2013).  To the extent Sirius XM identifies additional case law and support for its position, Sirius XM will identify that case law in its letter briefing.

We look forward to receiving Fraunhofer's responses to the issues raised in your e-mail as soon as possible.

Shannon

**Shannon H. Hedvat**
Associate

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9185 | F: 212-715-8385 | M: 973-809-4768
shedvat@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Thursday, September 14, 2017 7:24 PM
**To:** Baghdassarian, Mark; Hedvat, Shannon H.; Abruzzese, Peter A.; Caplan, Jonathan S.; provner@potteranderson.com
**Cc:** bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** [EXTERNAL] Fraunhofer v. Sirius XM: Protective Order Meet and Confer

Counsel:

We are writing to follow up on the outstanding issues from our August 22 meet and confer regarding the disputed source code provisions in the proposed protective order.  At the conclusion of that discussion, Fraunhofer agreed to provide the following information:

1) A written statement of its proposed definition of "source code," and any additional support for that position; and
2) A list of any source code provisions proposed by Sirius XM that Fraunhofer would consider accepting.

Sirius XM also agreed to consult with its client representatives and provide certain information.  If you want a reminder of what those items were, we are happy to provide it.  Alternatively, please tell us your understanding so we can confirm that we are still on the same page regarding the parties' respective expectations (which we were at the conclusion of the meet and confer).  Either way, please just let us know.

We propose that the parties simultaneously exchange emails containing this information next Tuesday, September 19 at 3pm EST.  Please confirm whether that timing works for you.

Regards,

Heather Benzmiller Sultanian
Associate
Irell & Manella LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660
Direct Phone:  949.760.5232
Email:  hsultanian@irell.com

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

## Hedvat, Shannon H.

| | |
|---|---|
| **From:** | Benzmiller Sultanian, Heather <hsultanian@irell.com> |
| **Sent:** | Monday, August 21, 2017 6:57 PM |
| **To:** | Hedvat, Shannon H.; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; provner@potteranderson.com; bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com) |
| **Subject:** | [EXTERNAL] RE: Fraunhofer v. Sirius XM: Revised Draft Protective Order |

Counsel:

We are available to meet and confer tomorrow at 1pm EST. Please use the following dial-in information:

Dial-In: 866.349.7797
Conference ID: 9497605232

Regards,
Heather

Heather Benzmiller Sultanian
Associate
Irell & Manella LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660
Direct Phone:  949.760.5232
Email:  hsultanian@irell.com

**From:** Hedvat, Shannon H. [mailto:SHedvat@KRAMERLEVIN.com]
**Sent:** Monday, August 21, 2017 2:39 PM
**To:** Benzmiller Sultanian, Heather; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; ~Rovner, Phil; bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** RE: Fraunhofer v. Sirius XM: Revised Draft Protective Order

Counsel:

At this stage, it appears that there is no need to address the inaccuracies and inconsistencies in your response or the fact that you would not address or identify the nature of the dispute as we requested.  Nevertheless, we are pleased that Fraunhofer is now willing to meet and confer.  We are available tomorrow between 11am and 2pm EST.  Please let us know your availability.

Regards,
Shannon

**Shannon H. Hedvat**
Associate

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9185 | F: 212-715-8385 | M: 973-809-4768
shedvat@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Monday, August 21, 2017 4:01 PM
**To:** Hedvat, Shannon H.; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; provner@potteranderson.com; bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** [EXTERNAL] RE: Fraunhofer v. Sirius XM: Revised Draft Protective Order

Counsel:

With respect to the two substantive issues you have identified, first, Fraunhofer maintains its position that VHDL and other hardware-related code are not "source code" under the well-established meaning of that term. Sirius XM has not identified any basis for treating hardware-related code or other non-code documents as "source code," or for affording such materials any specialized protections beyond the substantial protections already afforded to highly confidential materials under the agreed-upon portions of the protective order.

Second, in light of the parties' shared view that "source code" may not be needed in this case, Fraunhofer does not believe that the protective order needs provisions governing the procedures for disclosing and reviewing source code. To the extent that either party wishes to rely upon source code at a later point in the case, Fraunhofer's proposal sent last week provides a procedure for the parties to confer at that point to resolve any remaining disputes. As we stated several months ago when the parties first reached an impasse as to the source code provisions, Fraunhofer's response to Sirius XM's litany of provisions is that the Default Standard provides the appropriate starting point for discussion. To the extent that you feel that the Default Standard is lacking, we invite you identify a few specific provisions that you feel are necessary to address your concerns, which we remain willing to consider. That said, it appears your current position is to simply revert back to your original "source code" proposal in its entirety, which we do not believe is appropriate or acceptable for reasons already communicated to you and the Court. But again, we think this dispute is mooted by our shared understanding that source code will not be needed in this case, under the traditional, well-established definition of "source code" (i.e., instructions that can be compiled into electronic *software* files).

Finally, your email does not accurately represent Fraunhofer's position regarding a meet-and-confer. As we indicated just last Friday, we are happy to meet and confer now that both parties' positions are on the table. Let us know if you would like to set up a time to talk further and we can do so.

We look forward to your response.

Regards,
Heather

Heather Benzmiller Sultanian
Associate
Irell & Manella LLP
840 Newport Center Drive

Suite 400
Newport Beach, CA 92660
Direct Phone:  949.760.5232
Email:  hsultanian@irell.com

---

**From:** Hedvat, Shannon H. [mailto:SHedvat@KRAMERLEVIN.com]
**Sent:** Monday, August 21, 2017 9:41 AM
**To:** Benzmiller Sultanian, Heather; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; ~Rovner, Phil; bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** RE: Fraunhofer v. Sirius XM: Revised Draft Protective Order

Counsel:

We disagree with the contentions in your e-mail and find it disappointing that Fraunhofer has refused to first engage in a meet and confer so Sirius XM can better understand Fraunhofer's new position.  Specifically, because Fraunhofer did not share its new position regarding VHDL prior to submitting letter briefs and before argument on the issue was set to begin at last week's hearing, we believed the most efficient way to understand the current dispute between the parties was to have a meet and confer to flush out the issues and make sure Fraunhofer will not again raise at the last minute additional issues.  Unfortunately, you refused.

Nevertheless, in an effort to move the process along, we have summarized our understanding of the two disputes that may require resolution by the Court.  First, based on Fraunhofer's statements to the Court regarding VHDL, the parties disagree over whether code such as VHDL or other similar source code (such as HDL, etc.) should be afforded specialized protection under the protective order.  Second, if such code is afforded specialized protection, the parties disagree over whether only the Default Standard will apply as Fraunhofer contends, or whether Sirius XM's provisions that incorporate the Default Standard and fill in gaps in that standard will apply.  Please confirm that this is the nature of the dispute.

We have also attached a proposal to account for these potential disputes and ask Fraunhofer to confirm whether or not it will agree to any of the provisions proposed by Sirius XM in the attached.

We look forward to hearing from you.

Shannon

**Shannon H. Hedvat**
Associate

**KRAMER LEVIN**
**NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9185 | F: 212-715-8385 | M: 973-809-4768
shedvat@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Friday, August 18, 2017 4:51 PM
**To:** Hedvat, Shannon H.; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; provner@potteranderson.com;

bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** [EXTERNAL] RE: Fraunhofer v. Sirius XM: Revised Draft Protective Order

Counsel:

Your email does not accurately represent Fraunhofer's position at the hearing.  Ben Yorks was perfectly clear that, although Fraunhofer did not presently anticipate needing "source code" (i.e., instructions that can be compiled into electronic software files), we still intend to seek production of the VHDL "code" that is used as part of the process of making the physical hardware chips that are part of the infringing Sirius XM system:

> Our view right now is that we probably will not need to see source code to prove our case. The technology, which Fraunhofer developed, it has to do with really **hardware** and things that are embedded in [chips]. There's no source code here that's running it. …

> I do want to note though, there is a code that we would want to look at. It has to do with how you make the chips. It's called [V]HDL. And it is code, but it's not a code that's running on the chip. A code that they used that ultimately creates the net list, the terms of the [mask], **how they make the chips themselves**.

There is nothing about what Ben Yorks said at the hearing that remotely suggests that this VHDL "code" is the same thing as "source code" – and it is not.  HDL stands for "**Hardware** Description Language."

That said, if you disagree with any aspect of our proposed protective order draft, then the next step would be for you to prepare and send a written counter-proposal or redline for us to consider.  At that point, we would be happy to meet and confer with you further as needed.

Regards,
Heather

Heather Benzmiller Sultanian
Associate
Irell & Manella LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660
Direct Phone:  949.760.5232
Email:  hsultanian@irell.com

**From:** Hedvat, Shannon H. [mailto:SHedvat@KRAMERLEVIN.com]
**Sent:** Friday, August 18, 2017 1:08 PM
**To:** Benzmiller Sultanian, Heather; Baghdassarian, Mark; Abruzzese, Peter A.; Caplan, Jonathan S.; ~Rovner, Phil; bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** RE: Fraunhofer v. Sirius XM: Revised Draft Protective Order

Counsel:

Thank you for providing an updated draft of the Protective Order.  We are surprised by Fraunhofer's ever changing positions relating to the dispute on source code provisions.  Prior to the August 15th hearing, the dispute centered on whether certain provisions should be added to the Default Standard to fill in the gaps.  Then, without informing Sirius XM either prior to the hearing or even during the break at the hearing before the Court took up the protective order issues, Fraunhofer for the first time indicated that source code provisions would not be needed.  Curiously, however, Fraunhofer represented to the Court at the same time that "there *is code* that [Fraunhofer] would want to look at.  It

4

has to do with how you make the chips. It's called *vHDL*." 08-15-2017 Transcript at 57:25-58:2 (emphasis added). Sirius XM informed the Court that Fraunhofer had not previously raised such an issue but such code encompassed source code, but was willing to avoid burdening the Court with the issue as it appeared that Fraunhofer was willing to negotiate resolution to this eleventh-hour dispute.

Now, however, you are proposing that VHDL is "hardware-related documents" and does not constitute source code and thus should not be treated as such under the Protective Order. Fraunhofer's new position demonstrates that the dispute surrounding what constitutes source code remains unresolved. In fact, Fraunhofer mischaracterizes the nature of VHDL and reveals a position entirely inconsistent with its representations to the Court. This inconsistency is further highlighted by your reliance on a case (*HSM Portfolio*) that is not applicable to the situation here.

While it appears that the parties will need to raise this dispute with the Court, we believe we need to have a meet and confer so that we can confirm the nature of the dispute in view of Fraunhofer's changing positions so that the specific issues that need resolution by the Court are identified. Please advise of your availability for a meet and confer on Monday.

Regards,
Shannon

**Shannon H. Hedvat**
Associate

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9185 | F: 212-715-8385 | M: 973-809-4768
shedvat@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Thursday, August 17, 2017 12:05 PM
**To:** Baghdassarian, Mark; Hedvat, Shannon H.; Abruzzese, Peter A.; Caplan, Jonathan S.; provner@potteranderson.com; bfarnan@farnanlaw.com; Michael J. Farnan (mfarnan@farnanlaw.com); Yorks, Ben; McPhie, David; Alan Friedman (afriedman@lwgfllp.com)
**Subject:** [EXTERNAL] Fraunhofer v. Sirius XM: Revised Draft Protective Order

Counsel:

Please find attached a revised version of the Protective Order reflecting the outcome of the proceedings in Court earlier this week. Specifically, we have (1) incorporated Fraunhofer's proposed prosecution bar and (2) eliminated the language regarding source code and added a single paragraph (¶ 35) setting forth the proposal we referred to at the hearing.

Regarding (2), note that the new proposed language is directed to source code only and does not include any provision for special treatment of hardware-related documents, such as VHDL. Although SXM expressed at the hearing that such documents could "still qualify under the umbrella and definition of source code," Fraunhofer maintains its position that such documents are not source code and do not merit the additional protections typically afforded to source code. Indeed, as discussed in Fraunhofer's letter briefing, at least one court in this district has already specifically

considered and rejected the argument that hardware "circuit schematic files" should be treated as "source code" for purposes of a protective order. *HSM Portfolio LLC v. Fujitsu Ltd.*, No. 11-770-RGA, 2013 WL 12233636, at *1 (D. Del. Jan. 9, 2013).  We therefore expect that SXM will produce responsive hardware-related technical documents, including VHDL, under the "HIGHLY CONFIDENTIAL  - ATTORNEYS' EYES ONLY" designation of the Protective Order.

Please let us know if the attached draft is acceptable to SXM, and we can proceed to file the final Protective Order with the Court.

Regards,

Heather Benzmiller Sultanian
Associate
Irell & Manella LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660
Direct Phone:  949.760.5232
Email:  hsultanian@irell.com

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

**Baghdassarian, Mark**

| | |
|---|---|
| **From:** | Benzmiller Sultanian, Heather <hsultanian@irell.com> |
| **Sent:** | Monday, August 07, 2017 3:39 PM |
| **To:** | Baghdassarian, Mark; Hedvat, Shannon H.; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan |
| **Cc:** | provner@potteranderson.com; Abruzzese, Peter A.; Caplan, Jonathan S. |
| **Subject:** | [EXTERNAL] RE: Fraunhofer v. Sirius XM: Revisions to Protective Order |

Mark,

Fraunhofer agrees to the proposed language below for the definition of an "Expert" in the Protective Order, and accepts your proposal to address any objections to potential experts on a case-by-case basis.

Regards,

Heather Benzmiller Sultanian
Associate
Irell & Manella LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660
Direct Phone:  949.760.5232
Email:  hsultanian@irell.com

---

**From:** Baghdassarian, Mark [mailto:MBaghdassarian@KRAMERLEVIN.com]
**Sent:** Thursday, August 03, 2017 1:14 PM
**To:** Benzmiller Sultanian, Heather; Hedvat, Shannon H.; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** ~Rovner, Phil; Abruzzese, Peter A.; Caplan, Jonathan S.
**Subject:** RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Counsel:

We write concerning the current dispute over the protective order specifically relating to the definition of "Expert" in the draft protective order exchanged between the parties.  In an effort to narrow the issues on this dispute, Sirius XM proposes that the parties agree that any objections to potential experts will be addressed on a case-by-case basis at the time an expert is identified.  Under such an approach, each party will preserve all objections to any expert identified during the course of this case, including to the use of former employees of a party as experts.  This would make the definition of Expert read as follows:

> The term "Expert" shall mean a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its Outside Counsel to serve as an expert witness or as a consultant in this Action, and (2) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

This approach is the one that Fraunhofer proposed in Mrs. Benzmiller Sultanian's e-mail of June 15, 2017.  We look forward to your response.

Regards,
-Mark

**Mark Baghdassarian**
Partner

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9193 | F: 212-715-8362
mbaghdassarian@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Friday, June 16, 2017 3:22 PM
**To:** Hedvat, Shannon H.; Baghdassarian, Mark; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** provner@potteranderson.com; Abruzzese, Peter A.; Caplan, Jonathan S.
**Subject:** [EXTERNAL] RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Shannon,

We agree that the parties are at an impasse, and the Court will need to resolve our disputes.  Our understanding is that the next step is for local counsel to jointly call the Court this afternoon to initiate the dispute resolution procedures outline in the Scheduling Order.

Thank you,

**Heather Benzmiller Sultanian**
Irell & Manella LLP
Direct Phone:  949.760.5232
Email:  hsultanian@irell.com

**From:** Hedvat, Shannon H. [mailto:SHedvat@KRAMERLEVIN.com]
**Sent:** Friday, June 16, 2017 8:56 AM
**To:** Benzmiller Sultanian, Heather; Baghdassarian, Mark; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** ~Rovner, Phil; Abruzzese, Peter A.; Caplan, Jonathan S.
**Subject:** RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Heather,

We thank you for your e-mail, but it seems that the parties are at an impasse and will require the Court to resolve this dispute.

Our proposed provisions pertaining to source code are reasonable and consistent with the current practice in Delaware for such sensitive information.  As we have explained during our multiple meet and confers, and as exemplified by

2

protective orders parties have adopted in Delaware and other districts, it is necessary to include additional protections beyond those provided for in the Default Standard which was proposed several years ago.  While Sirius XM thought Fraunhofer might be willing to agree to a number of these proposals based on the exchange of drafts, we now understand that Fraunhofer has rejected all of the proposed provisions.

With respect to the prosecution bar, we cannot agree to your proposed language as it is too narrow and fails to consider the scope of IPR and other post-grant proceedings.

We are available for a call this morning if you think that would be helpful, but it appears that we will need to inform the court that the parties have disputes with respect to the proposed protective order.  Please let us know how you would like to proceed.

Shannon

**Shannon H. Hedvat**
Associate

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9185 | F: 212-715-8385 | M: 973-809-4768
shedvat@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of  the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Thursday, June 15, 2017 11:10 PM
**To:** Hedvat, Shannon H.; Baghdassarian, Mark; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** provner@potteranderson.com; Abruzzese, Peter A.; Caplan, Jonathan S.
**Subject:** [EXTERNAL] RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Shannon,

Thank you for your response.

With respect to source code, we feel strongly that the appropriate starting point for discussion is the Default Standard adopted by the Delaware courts, and that it is reasonable to adopt the Default Standard as-is. To the extent that you feel the Default Standard is lacking, please feel free to identify which specific provisions need to be added to address your concerns, and we will consider those.  If your position is to revert to your original proposal in its entirety, then we will need to present this dispute to the Court for resolution.

On the issue of the prosecution bar, we will await your response after consulting with your client to see if we can reach agreement on this issue.

Finally, we are confirming our position that a per se prohibition on experts who are employees or former employees of the parties or competitors is not reasonable, and that any objections to experts are better addressed on a case-by-case basis.

I am available for a call tomorrow morning between 11am and 2pm EST (8am-11am PST) if you think it would be productive to resolve any further disputes.

Thank you,
Heather

**From:** Hedvat, Shannon H. [mailto:SHedvat@KRAMERLEVIN.com]
**Sent:** Thursday, June 15, 2017 4:02 PM
**To:** Benzmiller Sultanian, Heather; Baghdassarian, Mark; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** ~Rovner, Phil; Abruzzese, Peter A.; Caplan, Jonathan S.
**Subject:** RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Heather,

Thank you for your e-mail.

On the issue regarding source code, we had provided a number of provisions relating to source code for the proposed protective order.  During our call earlier today, we agreed that you would review these source code provisions with David McPhie and specifically identify which provisions your client would be agreeable to including in the protective order so that we could determine the scope of the dispute.  You have now requested that we "propose just a few discrete additional concepts in addition to the Default Standard."  However, you have our proposed provisions and we think it would be most efficient, as we discussed today, for you to identify any of those provisions to which your client will agree.  With that information, we can determine the scope of the dispute, if any, after you outline your client's position.

Regarding your proposal on the prosecution bar, you explained during our call earlier today that it would be necessary to exclude IPR proceedings from the bar because they are "categorically different" from other "patent proceedings" and are more akin to "litigation."  While we disagree with your description of IPR proceedings, we will consult with our client regarding your proposal to see if we can reach agreement on this point and get back to you.

Finally, please confirm that your client is not willing to compromise on the definition of "Expert" as discussed earlier today.

Please let us know your availability for a call tomorrow morning to finalize the remaining disputes.

Thank you,
Shannon

**Shannon H. Hedvat**
Associate

**KRAMER LEVIN**
**NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9185 | F: 212-715-8385 | M: 973-809-4768
shedvat@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of  the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Thursday, June 15, 2017 4:18 PM
**To:** Hedvat, Shannon H.; Baghdassarian, Mark; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** provner@potteranderson.com; Abruzzese, Peter A.; Caplan, Jonathan S.
**Subject:** [EXTERNAL] RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Shannon,

Per your request earlier today, we have reviewed your proposed Source Code provisions again, and our position remains that the Default Standard is sufficient here.  We think the extensive restrictions in your proposal are unnecessary and unduly burdensome for anyone who may seek to perform a source code review in this case.  That said, we remain willing to work with you on a compromise.  Specifically, if you would like to propose just a few discrete additional concepts in addition to the Default Standard, we would be happy to consider adding a few additional provisions that address issues of specific concern for you – assuming that would allow the parties to present an agreed proposal to the Court with respect to source code.  Of course, if you would prefer to simply present the dispute for resolution by the Court, that is also an option.

With respect to the prosecution bar, we have a further compromise proposal that we think may resolve the issue.  We propose that the prosecution bar would apply to post-grant proceedings like an IPR only with respect to efforts to amend claims and not other activities.  The revised portion of the prosecution bar would read as follows (with the new revised portion underlined):

> For purposes of this Paragraph, "prosecution" includes drafting, editing, amending, supervising and/or providing advice for the purpose of affecting the scope of patent claims, whether through the submission of patent applications, responding to office actions, <u>or seeking to amend claims in post-grant review proceedings (such as inter partes review).  This Prosecution Bar does preclude any other participation in post-grant review proceedings that is not directed to amending claims, such as defending the validity of claims in a written Patent Owner Response or at a hearing.</u>

Please let us know if this compromise approach is acceptable to Sirius.

Thank you,

**Heather Benzmiller Sultanian**
Irell & Manella LLP
Direct Phone:  949.760.5232
Email:  hsultanian@irell.com

---

**From:** Hedvat, Shannon H. [mailto:SHedvat@KRAMERLEVIN.com]
**Sent:** Thursday, June 15, 2017 7:39 AM
**To:** Benzmiller Sultanian, Heather; Baghdassarian, Mark; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** ~Rovner, Phil; Abruzzese, Peter A.; Caplan, Jonathan S.
**Subject:** RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Heather,

12:30pm EST works for us.  Speak with you then.

Thanks,
Shannon



**Shannon H. Hedvat**
Associate

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9185 | F: 212-715-8385 | M: 973-809-4768
shedvat@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Thursday, June 15, 2017 1:32 AM
**To:** Hedvat, Shannon H.; Baghdassarian, Mark; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** provner@potteranderson.com; Abruzzese, Peter A.; Caplan, Jonathan S.
**Subject:** [EXTERNAL] RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Shannon,

Thank you for these revisions.  It appears we are getting close.  A redline containing our revisions to the latest draft is attached. As we see it, here are the remaining items to be resolved:

1) Definition of "Expert": We think a per se prohibition on experts who are employees or former employees is not reasonable, but rather should be addressed on a case-by-case basis.  You have suggested that this is a standard practice in Delaware, but have not provided any support for that position.  Indeed, by way of example, the attached protective order from a case that went to trial in Delaware a few years ago did not impose any such categorical rule on experts. In addition, the Federal Rules expressly contemplate that an expert may be a party's employee: "Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report . . . if the witness is one . . . whose duties as the party's employee regularly involve giving expert testimony." FRCP 26(a)(2)(B).  Under our proposal, the parties still have the right to object to any specific expert who is a current or former employee of any party or competitor.  We think it better to handle this on a case-by-case basis.

2) Source Code: It appears there are still a number of disagreements on the details of the source code provisions.  In trying to find a way to resolve these matters, we took a closer look at the District of Delaware's Default Standard for Access to Source Code, which is referenced in the first paragraph of the source code provisions that you proposed.  By way of compromise, we propose that the parties simply agree to abide by the Default Standard in this case.  This would eliminate the need for the detailed provisions on source code in the current draft and allow us to get past our disputes over definitional and procedural issues regarding Source Code review.

3) In-House Counsel Access: It seems we have been able to work out our differences for the most part on this issue – thank you.  As a final modification, we request and propose that the provisions for access by two In-House Counsel for "Confidential" materials alternatively permit access by one In-House Counsel and one outside

German counsel.  Both such counsel would still be bound by the corresponding provisions in the Protective Order.

4) Prosecution Bar: We have agreed to restore the prosecution bar, with the modification that it should not cover post-grant review proceedings such as IPR proceedings.  As you know, such proceedings are more akin to litigation than to patent prosecution, and do not raise the same concerns underlying a prosecution bar.

5) Public Proceedings: With respect to the first point you raised below,  we deleted "pretrial or trial proceedings" and "trial, court appearance, or hearing which is open to the public" from Paragraphs 20 and 33 because in both cases those provisions have to do with filing material under seal, which of course is not applicable in the case of proceedings in open court.  Of course, the general provisions of the Protective Order already prohibit disclosure in a public setting such as a court hearing, and the parties will need to work out how to address these issues at an appropriate time (e.g., by sealing the courtroom, appropriate redactions, etc.).  Thus, there is no need to address public hearings in these particular paragraphs.

Are you available at 12:30p EST/9:30a PST tomorrow morning for a call to discuss these issues?  If so, we can use the following dial-in information:

Dial-in: 866-349-7797
Conference ID: 9497605232#

Thank you,
Heather Benzmiller Sultanian

---

**From:** Hedvat, Shannon H. [mailto:SHedvat@KRAMERLEVIN.com]
**Sent:** Wednesday, June 14, 2017 1:22 PM
**To:** Benzmiller Sultanian, Heather; Baghdassarian, Mark; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** ~Rovner, Phil; Abruzzese, Peter A.; Caplan, Jonathan S.
**Subject:** RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Heather,

Thank you for Fraunhofer's revisions to the draft.  Attached please find Sirius XM's changes to the version you circulated last night.  We have a few questions on your revisions:

First, we do not understand why "pretrial or trial proceedings" and "trial, court appearance, or hearing which is open to the public" were deleted from Paragraphs 20 (Depositions and Testimony) and 33 (Use of Protected Material in Court and Sealed Filings), respectively.  Please explain.

Second, we do not understand why the Prosecution Bar was deleted from the draft.  Yesterday, we had agreed and no issue was raised regarding the inclusion of a prosecution bar, which is normal practice in protective orders in Delaware.  We also understood from yesterday's discussion that the parties agreed that no Protected Materials under the Protective Order would be used for any purpose other than for the litigation.  As a result, we had agreed to include language that the use of Protected Material for acquiring patents would be prohibited, and we have added such language to the draft protective order.  If Fraunhofer now disagrees, please provide an explanation.

Finally, we kept the language prohibiting experts who are employees or former employees of a party.  In order to determine if we can resolve this issue, please provide any support you can regarding Fraunhofer's view on this issue.

Please let us know your availability for a call this afternoon or tomorrow morning to discuss any outstanding issues.

Shannon

**Shannon H. Hedvat**
Associate

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036
| O: 212-715-9185 | F: 212-715-8385 | M: 973-809-4768
shedvat@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Benzmiller Sultanian, Heather [mailto:hsultanian@irell.com]
**Sent:** Wednesday, June 14, 2017 12:43 AM
**To:** Baghdassarian, Mark; Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Michael J. Farnan
**Cc:** provner@potteranderson.com; Abruzzese, Peter A.; Caplan, Jonathan S.; Hedvat, Shannon H.
**Subject:** [EXTERNAL] RE: Fraunhofer v. Sirius XM: Revisions to Protective Order

Counsel:

As discussed on our call this morning, attached please find Fraunhofer's revisions to the draft proposed protective order in redline.

Best,

Heather Benzmiller Sultanian

**From:** Baghdassarian, Mark [mailto:MBaghdassarian@KRAMERLEVIN.com]
**Sent:** Thursday, June 08, 2017 3:03 PM
**To:** Brian E. Farnan; afriedman@lwgfllp.com; Yorks, Ben; McPhie, David; Benzmiller Sultanian, Heather; Michael J. Farnan
**Cc:** ~Rovner, Phil; Abruzzese, Peter A.; Caplan, Jonathan S.; Hedvat, Shannon H.
**Subject:** Fraunhofer v. Sirius XM: Revisions to Protective Order

Counsel:

Attached please find Sirius XM's revisions (clean and redline) to the draft proposed protective order.  After you have had an opportunity to review, please let us know if you wish to discuss.

Regards,
-Mark

**Mark Baghdassarian**
Partner

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas

8

New York, New York 10036
| O: 212-715-9193 | F: 212-715-8362
mbaghdassarian@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.