# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRAUNHOFER-GESELLSCHAFT ZUR FÖRDERUNG DER ANGEWANDTEN FORSCHUNG E.V., | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| | )   C.A. No. 17-00184-JFB-SRF |
| v. | )<br>) |
| SIRIUS XM RADIO INC., | )<br>) |
| Defendant. | )<br>) |

### SIRIUS XM RADIO INC.'S OBJECTIONS TO THE OCTOBER 7, 2021 ORDER REGARDING EXPERT DISCLOSURE UNDER THE PROTECTIVE ORDER

OF COUNSEL:

Jonathan S. Caplan
Mark A. Baghdassarian
P. Bradley O'Neill
Shannon H. Hedvat
KRAMER LEVIN NAFTALIS
 & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
 (212) 715-9100

Dated: October 21, 2021

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendant Sirius XM Radio Inc.*

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................. 1

II. FHG SEEKS ACCESS TO SXM CONFIDENTIAL INFORMATION FOR NOKIA AND SIEMENS IN-HOUSE COUNSEL WHO COMPETE WITH SXM ......... 1

III. ARGUMENT ........................................................................................................................ 3

    A. The MJ Erred as a Matter of Law By Failing to Conduct the Requisite Balancing Test ........................................................................................................ 4

    B. The MJ Erred in Finding Heitto and Tschiedel Were Not Competitive Decisionmakers .................................................................................................... 5

    C. The MJ Erred in Finding the Risk of Competitive Harm Is Not "Substantial" ........................................................................................................ 7

    D. The MJ Erred by Finding that "Additional Protections are Warranted" but Declining to Order Such Protections ................................................................... 9

IV. CONCLUSION .................................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Affymetrix, Inc. v. Illumina, Inc.*,
   2005 WL 1801683 (D. Del. Jul. 28, 2005) ...............................................................................6

*AgroFresh Inc. v. Essentiv LLC*,
   2019 WL 4917894 (D. Del. Oct. 4, 2019) .............................................................................4, 9

*BASF Corp. v. U.S.*,
   321 F. Supp. 2d 1373 (C.I.T. 2004) ......................................................................................4, 5

*Blackbird Tech LLC v. Service Lighting & Elec. Supplies*,
   2016 WL 2904592 (D. Del. May 18, 2016) ............................................................................6

*Bridgeport Music Inc. v. UMG Recordings, Inc.*,
   2008 WL 577284, *subsequent determination*, 2008 WL 2540812
   (S.D.N.Y. Jun. 25, 2008) ..........................................................................................................8

*Cardiac Science, Inc. v. Koninklijke Philips Electronics N.V.*,
   2005 WL 8162788 (D. Minn. Feb. 4, 2005) ............................................................................4

*In re Deutsche Bank Trust Co. Americas*,
   605 F.3d 1373 (Fed. Cir. 2010)................................................................................................5

*Intel Corp v. VIA Technologies, Inc.*,
   198 F.R.D. 525 (N.D. Cal. 2000).........................................................................................6, 10

*Digital Equipment Corp. v. Micro Technology, Inc.*,
   142 F.R.D. 488 (D. Colo 1992) ..............................................................................................10

*E.E.O.C. v. City of Long Branch*,
   866 F.3d 93 (3d Cir. 2017).......................................................................................................4

*Haines v. Liggett Grp., Inc.*,
   975 F.2d 81 (3d Cir. 1992).......................................................................................................5

*Nutech Ventures v. Syngenta Seeds, Inc.*,
   2013 WL 2422876 (D. Neb. Jun. 3, 2013)...............................................................................6

*PhishMe, Inc. v. Wombat Security Techs.*,
   2017 WL 4138961 (D. Del. Sept. 8, 2017).....................................................................6, 9, 10

*Rice v. U.S.*,
   39 Fed. Cl. 747 (Fed. Cl. 1997) ...............................................................................................5

*Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*,
    682 F.Supp. 20 (D. Del. 1988)..................................................................................8

*ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC*,
    2008 WL 5634214 (E.D. Tex. Mar. 14, 2008) ..........................................................6

*Symantec Corp. v. Acronis Corp.*,
    2012 WL 3582974 (N.D. Cal. Aug. 20, 2012) ..........................................................4

**Federal Statutes**

28 U.S.C. § 636(b)(1)(A)..................................................................................................4

**Rules**

Federal Rule of Civil Procedure 72(a) ........................................................................1, 3

Delaware Local Rule 72.1(a)(2) .......................................................................................1

I.  **INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 72(a) and Delaware Local Rule 72.1(a)(2), Defendant Sirius XM Radio Inc. ("SXM") respectfully objects to Magistrate Judge Fallon's (the "MJ") October 7, 2021 oral order granting Plaintiff Fraunhofer's ("FhG") motion seeking to disclose SXM's highly confidential information to employees of Siemens AG and Nokia Technologies, two third-party companies that directly compete with SXM's satellite telecommunications business.  10/7/21 Tr. ("Ex. A") at 32:19-37:25 (the "Order").  FhG seeks to use these two individuals as German licensing experts despite having previously cleared two other individuals for the very same purpose and disregarding the significant business risk and harm to SXM.  Specifically, the Order was entered despite: (1) uncontradicted evidence that SXM's highly confidential information, if made available to these personnel within Siemens and Nokia, would result in substantial competitive harm to SXM; (2) FhG's failure to explain why it was necessary to retain employees of Siemens and Nokia – two in-house counsel – as potential experts when it previously cleared two other individuals for the same purpose; and (3) the imposition of an ethical wall and other meaningful safeguards to prevent the intentional or unintentional misuse of SXM's information, which FhG not only refused to accept but conceded might not be possible.

II.  **FHG SEEKS ACCESS TO SXM CONFIDENTIAL INFORMATION FOR NOKIA AND SIEMENS IN-HOUSE COUNSEL WHO COMPETE WITH SXM**

Since 2017, SXM has, in good faith, produced highly sensitive documents, marked "Highly Confidential – Attorneys' Eyes Only," in response to FhG's discovery requests.  It is undisputed that this highly confidential information relates to (1) detailed technical information of the "[SXM] satellite broadcast systems . . . that explain how the systems operate," (2) "[SXM's] business model and strategies as well as financial, pricing, marketing, and licensing

information and efforts," and (3) "presentations, roadmaps, e-mail communications, agreements with car manufacturers, [SXM]'s key customers, among others." D.I. 462 ("Wadin Decl.") ¶¶ 7, 10.  SXM produced these documents in reliance on the protections afforded under the Protective Order (D.I. 90, the "PO"), which, *inter alia*, provides a procedure for parties to protect potentially harmful disclosure of such confidential information.  D.I. 90 at ¶¶ 34-36.  Since 2017, SXM has consented to nearly a dozen of FhG's proposed experts receiving confidential information without incident, including two other individuals that FhG has sought to use as German licensing experts in this case.

However, when FhG identified Dr. Heitto, Senior Licensing Manager with Nokia's Patent Business and Mr. Tschiedel, Senior Licensing Counsel with Siemens' Corporate IP Department, as potential licensing experts, SXM objected because, *inter alia,* both Siemens and Nokia compete directly with SXM.  D.I. 457, Exs. 1, 2; Wadin Decl. ¶¶ 13-14.  For example, SXM provides both consumer-facing and non-consumer facing data services for car manufacturers, including entertainment content and telematics such as traffic, navigation, and weather applications.  Wadin Decl. ¶ 11.  Siemens and Nokia likewise "have relationships and/or pursue business relationships with the same car manufacturers with which [SXM] has business relationships," and by providing cellular or other telecommunications delivery systems to vehicles sold by these car manufacturers, "Nokia and Siemens could compete [with SXM] for the same business from the same car manufacturers."  *Id.* ¶ 14.  Notably, both Heitto and Tschiedel work directly on patent matters related to these wireless systems.  Heitto "[l]icens[es] cellular 2G, 3G and 4G and WiFi standard essential patents to automotive value chains" at Nokia (D.I. 457, Ex. 1 at 4) while Tschiedel "commercializ[es] wireless and IT-network related patent portfolios," "generate[s] licensing income by selling patents strategically and/or by licensing IP

2

directly," "direct[s] reverse engineering projects for infringement analysis," and "maximize[s] royalty income through … deal packaging" at Siemens (D.I. 457, Ex. 2 at 2; D.I. 460-1, Ex. B).

SXM timely objected to both experts. D.I. 461, ¶ 3. FhG did not timely respond to SXM's objections under the PO. Once it did respond, it refused to withdraw its proposed experts despite the clear potential of competitive harm to SXM if these individuals were granted access to SXM confidential information. *See id.*, ¶¶ 5-14. Moreover, FhG does not lack access to alternative German licensing experts that have already been cleared under the PO, particularly ones without the conflicts, issues and risk of harm to SXM that these individuals pose. D.I. 460 at 3. SXM explored ways to mitigate the harm, such as by constructing an ethical wall, but FhG repeatedly refused to adopt any such restrictions noting, in relevant part, that it "did not know if it would even be feasible to establish an ethical wall at Siemens and/or Nokia." D.I. 460-1, Ex. A at 8, Ex. C at 4, 5-6, Ex. D at 3, Ex. E at 6, 8-9.

Now, as a result of the Order (which simply relies on these individuals' promises not to misuse the confidential information or engage in competitive work relating to SXM), SXM's highly sensitive and proprietary information rests in the hands of its direct competitors' employees. The parties and the Court have no way of ensuring these employees' compliance with their promises to self-recuse in the event of a conflict toward SXM, and the MJ declined to order meaningful safeguards to enforce such compliance.

For the reasons described below, SXM respectfully requests that this Court (1) vacate the MJ's Order, (2) deny FhG's motion to permit disclosure under the PO, and (3) require Siemens and Nokia, and Heitto and Tschiedel, to turn over all physical copies and irretrievably destroy all electronic copies of SXM's highly confidential information that they have received to date.

### III.    ARGUMENT

The Court may overturn a non-dispositive order to the extent it is "clearly erroneous or []

contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). The contrary to law standard "requires the [] Court to . . . review matters of law *de novo*." *E.E.O.C. v. City of Long Branch*, 866 F.3d 93, 99 (3d Cir. 2017). Findings of fact, however, are reviewed for clear error and must be set aside if they are "devoid of minimum evidentiary support displaying some hue of credibility." *AgroFresh Inc. v. Essentiv LLC*, 2019 WL 4917894, at *1 (D. Del. Oct. 4, 2019) (finding clear error in granting motion to compel production of documents).

### A. The MJ Erred as a Matter of Law By Failing to Conduct the Requisite Balancing Test

The MJ erred as a matter of law in providing FhG's proposed experts access to SXM's confidential information without balancing any prejudice FhG would have suffered by seeking alternative experts (which is none) with the harm to SXM. "When a party opposes the disclosure of confidential information to a third-party consultant, [courts] must '*balance* [(1)] *the movant's interest in selecting the consultant most beneficial to its case, considering the specific expertise of the consultant and whether other consultants possess similar expertise*, against [(2)] the disclosing party's interest in protecting confidential commercial information from disclosure to competitors.'" *Cardiac Science, Inc. v. Koninklijke Philips Electronics N.V.*, 2005 WL 8162788, at *14 (D. Minn. Feb. 4, 2005) (emphasis added) (quoting *BASF Corp. v. U.S.*, 321 F. Supp. 2d 1373, 1378 (C.I.T. 2004)). Under this balancing test, the party supporting disclosure—here, FhG—"bears the burden of showing that there are not other experts available or that those who are available will be less useful." *Id.* (internal quotations and citations omitted).

Where a party has not presented evidence that a proposed expert is "unique," courts will deny access to confidential information where there is potential harm to the other party if such access were granted. *Symantec Corp. v. Acronis Corp.*, 2012 WL 3582974, at *3 (N.D. Cal. Aug. 20, 2012) (denying expert who "actively consults with [opposing party's] competitors"

4

access to its confidential materials because the party did not make "a showing that he possesses unique knowledge which no other experts possess"); *BASF*, 321 F. Supp. 2d at 1381 (denying access where party "has not specified with particularity why [proposed expert's] expertise is critical for conducting its defense"); *Rice v. U.S.*, 39 Fed. Cl. 747, 752 (Fed. Cl. 1997) (no access to confidential information where party "ha[d] not attempted to locate an acceptable expert").

Here, the uncontradicted evidence showed that Siemens and Nokia are direct competitors of SXM's business; SXM would be competitively harmed if its information fell into Siemens' or Nokia's hands; and there was no guarantee that FhG's proposed experts could be insulated from matters adverse to SXM. Wadin Decl. ¶¶ 8-9, 12-15; D.I. 460 at 3-4. The MJ was obligated to balance these risks against whether Heitto and Tschiedel had unique expertise (they do not) and whether FhG would be prejudiced if it were required to seek different experts (it would not). However, the MJ did not perform this balancing test and ruled against SXM without making factual findings as to whether FhG would have been prejudiced by using alternative experts. Ex. A at 32:19-37:25; D.I. 460 at 2-3. Nor could have the evidence supported FhG's position even if the MJ undertook the requisite balancing test because FhG failed to present any evidence of Heitto's or Tschiedel's "specific expertise . . . and whether other consultants possess similar expertise." *BASF* 321 F. Supp. 2d at 1378; *see also* Ex. A at 32:19-37:25. As a result, the MJ erred as a matter of law.[1]

### B. The MJ Erred in Finding Heitto and Tschiedel Were Not Competitive Decisionmakers

In determining whether to allow in-house counsel of a competitor, like Heitto or Tschiedel, to access a party's confidential information, the court must determine "the extent to

---

[1] Any new evidence of prejudice that FhG presents in its opposition here must be rejected. *Haines v. Liggett Grp., Inc.*, 975 F.2d 81, 91 (3d Cir. 1992) ("further evidence" is not permitted).

5

which counsel is involved in 'competitive decisionmaking.'" *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010). The MJ clearly erred in holding that Heitto and Tschiedel were "sufficiently insulated from competitive decisionmaking that there is no risk of inadvertent disclosure warranting denial of access to [SXM]'s confidential material." Ex. A at 37:6-9. "Competitive decisionmaking" is a legal term of art, and companies need not be "direct competitors in the traditional understanding of the term," as the focus is on the "*ultimate potential for damaging use of the confidential information that underlies the concerns of [the] 'competitive decisionmaker' analysis*." *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC*, 2008 WL 5634214, at *6 (E.D. Tex. Mar. 14, 2008) (emphasis added); *see also Intel Corp v. VIA Technologies, Inc.*, 198 F.R.D. 525, 530 (N.D. Cal. 2000) (in-house counsel whose "advice and counsel … affect licensing decisions" are "competitive decisionmak[ers]"). As a result, courts routinely hold that licensing and IP enforcement activities constitute competitive decisionmaking. *See PhishMe, Inc. v. Wombat Security Techs*, 2017 WL 4138961, at *6 (D. Del. Sept. 8, 2017); *Blackbird Tech LLC v. Service Lighting & Elec. Supplies*, 2016 WL 2904592, at *4 (D. Del. May 18, 2016); *Affymetrix, Inc. v. Illumina, Inc.*, 2005 WL 1801683, at *2 (D. Del. Jul. 28, 2005).

It is undisputed that these licensing and IP activities are **precisely** the types of services Heitto and Tschiedel provide. D.I. 457, Ex. 1 at 4, Ex. 2 at 2; D.I. 460-1, Ex. B. Not only are they not "insulated" from competitive decisionmaking, but they personally and directly participate in it. Thus, "allowing in-house personnel such access creates a risk that [they] could use this information for undue leverage in future licensing negotiations, acquisitions, and litigation, involving not only [the disclosing party], but others in the industry." *Nutech Ventures v. Syngenta Seeds, Inc.*, 2013 WL 2422876, at *1 (D. Neb. Jun. 3, 2013); *see* Wadin Decl. ¶ 6.

6

### C. The MJ Erred in Finding the Risk of Competitive Harm Is Not "Substantial"

The MJ clearly erred by accepting FhG's legal argument that "[SXM] does not point to any evidence of actual competition with Nokia or Siemens" and that "[a]ny hypothetical future competition is therefore speculative," and finding that "[t]he Court agrees [with FhG] that on this record, [SXM]'s concerns about future harm have not been demonstrated to be substantial." Ex. A at 35:25-36:6. Contrary to this conclusion, SXM provided **sworn, uncontradicted** evidence of "actual competition with Nokia [and] Siemens" from its Senior Vice President Craig Wadin:

> "Siemens and Nokia, *as competitors of [SXM]*, would have the opportunity to use such information in transactions with third parties to the detriment or competitive disadvantage of [SXM]. *For example, various car manufacturers have business relationships with [SXM]*, and [SXM]'s confidential and highly confidential information from the documents and information made available in this litigation includes a significant amount of information about confidential pricing and other terms under the agreements with these manufacturers. . . . [B]ased on my knowledge and role at [SXM], I understand that *both Siemens and Nokia have relationships and/or pursue business relationships with the same car manufacturers with which [SXM] has business relationships*. Because [SXM] provides services to car manufacturers via a satellite-based delivery system, and Nokia and/or Siemens may provide services to car manufacturers via a different telecommunications delivery system (such as a cellular system), it is possible that [SXM], Nokia and Siemens could compete for the same business from the same car manufacturers."

Wadin Decl., ¶¶ 13-14 (emphasis added).

Similarly, Mr. Wadin explained that SXM had numerous contractual arrangements with Siemens, Nokia, and their affiliates and predecessors-in-interest, including IP and software licenses. Wadin Decl. ¶ 5. Based on this, Mr. Wadin explained that "it is likely, if not virtually certain," that Siemens and Nokia will continue to have "business relationships with [SXM] in the future" and that "disclosure … could permit [Siemens and Nokia] to gain leverage over [SXM] in future business dealings or allow them to capture opportunities away from [SXM]." *Id.* ¶ 6.

In response, FhG did not produce a shred of evidence to contradict Mr. Wadin's

supported declaration. Instead, FhG simply pointed to conclusory assertions that did not refute Mr. Wadin's statements. At most, FhG could only say that that these individuals "expressly confirm in their sworn declarations that their employers do *not* compete with SXM" or that, *to date*, they "have not worked on, or been otherwise substantially involved with, any business dealings involving SXM." (D.I. 456 at 2). But such statements ignore Mr. Wadin's uncontested explanation that SXM is likely to compete with both Siemens and Nokia *in the future* and that both Heitto and Tschiedel are *directly involved in patent and technology related matters*. Indeed, the MJ disregarded SXM's significant business concerns that Mr. Wadin unequivocally set forth.

At the same time, however, the MJ accepted, without any scrutiny, representations from Heitto and Tschiedel such as Tschiedel's statement that he will "not use [SXM] information to engage in any reverse engineering, infringement analysis or to maximize revenue with respect to patent portfolios at Siemens, and the Court so orders him bound by that representation." Ex. A at 37:10-14. Such purported "assurances" are insufficient under these circumstances to mitigate the significant risk of competitive and business harm to SXM. *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.,* 682 F.Supp. 20, 22 (D. Del. 1988) ("[A]ccepting that [plaintiff's expert] is a man of great moral fiber, we nonetheless question his human ability during future years of research to separate the applications he has extrapolated from [defendant's] documents from those he develops from his own ideas").

In view of the foregoing, Siemens' and Nokia's status as parties adverse to SXM in past, present, and future transactions (Wadin Decl. ¶¶ 5-14) constitutes a competitive relationship. *Bridgeport Music Inc. v. UMG Recordings, Inc.,* 2008 WL 577284, *subsequent determination,* 2008 WL 2540812 (S.D.N.Y. Jun. 25, 2008) (granting in part motion for protective order based on "persuasive argument that [plaintiff's expert] is currently associated with entities that … do

8

business with the defendants … creating a risk that disclosing proprietary information to him could cause the defendants competitive harm"). Thus, there was nothing "speculative" about the competition between SXM and Siemens/Nokia. *AgroFresh*, 2019 WL 4917894, at *1.

### D. The MJ Erred by Finding that "Additional Protections are Warranted" but Declining to Order Such Protections

FhG's main argument has been that even though Siemens and Nokia compete directly with SXM (Wadin Decl. ¶¶ 13-14), the risk of competitive harm is mitigated because Heitto and Tschiedel claimed they would not personally get involved in such matters at their employers. But, in ruling in FhG's favor, the Order was internally inconsistent. It recognized that "some additional safeguards are warranted" in light of the evidence SXM produced, but then discounted that risk of potential harm by not imposing sufficient or enforceable safeguards. Ex. A at 36:6-7.

In particular, the MJ repeated that Heitto and Tschiedel would follow the PO and would "take 'commonsense' precautions to secure any materials provided to them" (Ex. A at 36:8-10), but neither the MJ nor FhG ever specified what these "commonsense" precautions would consist of, other than storing information in a home office or computer and using a non-professional e-mail account. *Id.* at 36:8-16; D.I. 460-1, Ex. E at 8. Not only does the use of unsecured, personal devices and e-mail accounts present its own risks of disclosures when handling ***highly sensitive*** information, but courts have found that even these safeguards do not cure the risk that confidential information will be misused. *See, e.g., PhishMe*, 2017 WL 4138961, at *8 (finding "risk of inadvertent disclosure or competitive misuse is high" despite expert stating "he will not store any AEO Material in computer systems accessible to business personnel").

Notably, neither the PO nor "additional safeguards" address the significant concern that these individuals may find themselves "in the untenable position of having to either refuse to offer crucial legal advice [as in-house licensing counsel to Siemens or Nokia] or risk disclosing

9

protected information." *Intel*, 198 F.R.D. at 530; *see also PhishMe*, 2017 WL 4138961, at *8. The only safeguard against misuse the MJ put in place was the Heitto's and Tschiedel's promises not to "be personally involved in competitive activity with [SXM]." Ex. A at 37:10-17. But a mere promise to abide by the PO, without any teeth, is insufficient in a situation such as this one. *Digital Equipment Corp. v. Micro Technology, Inc.,* 142 F.R.D. 488, 491 (D. Colo 1992) ("[o]nce … confidential and proprietary data is reviewed … it will become part of [the expert's] general acquired knowledge, which cannot be 'unlearned' or utilized only on a selective basis"). FhG admitted that it did not know if it would even be feasible to establish an ethical wall at Siemens or Nokia. D.I. 460-1, Ex. A, at 9, 18; Ex. C, at 1; Ex. E at 9. Neither FhG nor the MJ denied that, without a well-structured ethical wall, there is no practical way to monitor Heitto's and Tschiedel's compliance with the PO. The only entities in a position to monitor such compliance are Nokia and Siemens themselves and they are ***not subject to the Order***.

Finally, the MJ clearly erred in stating that "[SXM] has not identified any specific existing matter at Nokia or Siemens which would require constructing an ethical wall prohibiting access by the expert to matters relating to and/or adverse to [SXM]." Ex. A at 36:17-21. Again, Mr. Wadin's unrebutted declaration identified multiple, specific matters, including ongoing competition for business from car manufacturers (Wadin Decl. ¶¶ 12-14) and past, present, and future contractual relationships between SXM, Nokia, and Siemens (*id.* ¶¶ 5-6). To prevent competitive harm to SXM, Heitto and Tschiedel *must* be insulated off from these specifically-identified matters through something more than the honor system, especially since it will be impossible for the parties or the court to monitor their compliance.

### IV.   CONCLUSION

For the reasons explained above, SXM requests that the Court sustain SXM's Objections.

|  |  | POTTER ANDERSON & CORROON LLP |
|---|---|---|
| OF COUNSEL: | By: | */s/ Philip A. Rovner* |
|  |  | Philip A. Rovner (# 3215) |
| Jonathan S. Caplan |  | Jonathan A. Choa (#5319) |
| Mark A. Baghdassarian |  | 1313 North Market Street 6th Floor |
| Shannon H. Hedvat |  | Wilmington, Delaware 19801 |
| KRAMER LEVIN NAFTALIS |  | Telephone: (302) 984-6000 |
|  & FRANKEL LLP |  | Facsimile: (302) 658-1192 |
| 1177 Avenue of the Americas |  | provner@potteranderson.com |
| New York, NY 10036 |  | jchoa@potteranderson.com |
|  (212) 715-9100 |  |  |
|  |  | *Attorneys for Defendant Sirius XM Radio Inc.* |
| Dated: October 21, 2021 |  |  |