# Exhibit A

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4    FRAUNHOFER-GESELLSCHAFT ZUR      :    CIVIL ACTION NO.
      FORDERUNG DER ANGEWANDTEN        :
 5    FORSCH E.V.,                     :
                    Plaintiff,         :
 6    v                                :
                                       :
 7    SIRIUS XM RADIO, INC.,           :
                                       :
 8              Defendant.             :    17-184-JFB-SRF

 9                          - - -

10                    Wilmington, Delaware
                      Thursday, October 7, 2021
11                    Telephone Conference

12                          - - -

13    BEFORE:      HONORABLE SHERRY R. FALLON, Magistrate Judge

14    APPEARANCES:            - - -

15

16              FARNAN, LLP
                BY:  BRIAN E. FARNAN, ESQ.

17                  and

18              IRELL & MANELLA, LLP
                BY:  KELSEY SCHUETZ, ESQ., and
19                   DAVID McPHIE, ESQ.
                     (Newport Beach, California)
20
                         Counsel for Plaintiff
21

22              POTTER ANDERSON & CORROON, LLP
                BY:  PHILIP A. ROVNER, ESQ.
23
                    and
24

25                            Brian P. Gaffigan
                              Registered Merit Reporter
```

2

```
1   APPEARANCES:  (Continued)
2
3               KRAMER LEVIN NAFTALIS & FRANKEL, LLP
                BY:  MARK A. BAGHDASSARIAN, ESQ.
4                    (New York, New York)

5                    Counsel for Defendant

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22               - oOo -

23          P R O C E E D I N G S

24          (REPORTER'S NOTE:  The following telephone

25   conference was held remotely, beginning at 2:03 p.m.)
```

4

```
1            THE COURT:  All right.  Very well.  Are there
2   any other observers or participants on the line who have not
3   yet announced their appearance on the record?
4            All right.  Hearing none, I will just remind
5   everyone briefly if you are not speaking, please place your
6   microphone on mute so that I don't have any interference on
7   the call when I hear from the respective counsel making the
8   arguments, and I will do the same.
9            I will like to start with the issue of the
10  access by the Fraunhofer licensing expert Dr. Heitto and
11  Mr. Tschiedel, if I'm pronouncing their names correctly,
12  having access to Sirius XM confidential information under
13  the protective order.  And what I would like the focus on is
14  this argument that has been raised by Sirius XM about future
15  competitive harm.
16           So I would like to start out of out of turn.
17  Even though I received Fraunhofer's brief, letter briefing
18  prior to receiving the response by Sirius XM, I would like
19  to ask a few questions of counsel for Sirius XM who will
20  lead the argument to get things started off.
21           And then each side certainly will have its full
22  opportunity to be heard, but I can inform the parties as I
23  always do on these calls, I have thoroughly been through
24  the submissions and exhibits and I don't need a lot of
25  background.  I even went back and reviewed the previous
```

3

```
1            THE COURT:  Good afternoon, everyone.  This is
2   Magistrate Judge Sherry Fallon, dialing in for the discovery
3   dispute teleconference in Fraunhofer versus Sirius XM.  I'll
4   start with appearances for the record.
5            I believe we have our court stenographer Mr.
6   Gaffigan on the line; is that correct.
7            THE COURT REPORTER:  Yes, Your Honor.  I'm on
8   the line.  Thank you.
9            THE COURT:  Thank you.
10           And also my law clerk and my fall intern are
11  also participating today.
12           So I will now start with appearances of counsel
13  on the record starting with Delaware counsel for the record,
14  Fraunhofer.
15           MR. FARNAN:  Good afternoon, Your Honor.  Brian
16  Farnan on behalf of the plaintiff.  And with me is David
17  McPhie and Kelsey Schuetz from Irell & Manella; and also on
18  the line is Thomas Fischer from Fraunhofer.
19           THE COURT:  All right.  Thank you very much.
20           And I will do the same for the defendants for
21  Sirius XM.  Let's start with Delaware counsel, please.
22           MR. ROVNER:  Good afternoon, Your Honor.  This
23  is Phil Rovner from Potter Anderson.  And with me on the
24  line is my co-counsel from Kramer Levin, Mark Baghdassarian
25  and Shannon Hedvat.
```

5

```
1   submissions that were made before I bumped the conference
2   from the previous date in September to this date because of
3   what I felt were new arguments or material being raised by
4   Sirius XM for the first time in its responsive brief that
5   had not been vetted in a meet and confer session.
6            So with that, who will take the lead for Sirius
7   XM?
8            MR. BAGHDASSARIAN:  Good afternoon, Your Honor.
9   Mark Baghdassarian.
10           I'll be taking the lead.
11           THE COURT:  A few problem questions before --
12           MR. McPHIE:  Your Honor?
13           THE COURT:  I'm sorry.  Who is speaking?
14           MR. McPHIE:  I'm sorry.  Your Honor, this is
15  David McPhie for Fraunhofer.
16           There is a logistical issue I just want to
17  raise out of an abundance of caution right at the outset
18  here which has to do with the fact we do have a client
19  representative Thomas Fischer of Fraunhofer who is on the
20  line.
21           I don't know if Sirius XM intends to get into
22  anything they would consider to be Sirius XM confidential
23  information.  If that is the case, we're happy to have
24  him come off the line and join later when we discuss the
25  deposition issues or proceed as Your Honor sees fit.  I
```

6

1  don't know if that is necessary or not but I wanted to
2  raise it just to be careful.
3  　　　　THE COURT:  Thank you for flagging that.
4  　　　　The questions I'm about to ask Mr. Baghdassarian
5  I don't intend to have elicit with a response that
6  encompasses any Sirius XM confidential information, at least
7  I hope it will not.  And I will ask that all counsel be
8  mindful of not disclosing confidential information to
9  individuals who are not authorized under the protective
10 order to hear such information and to please flag it as we
11 go forward so that we can put a pause on the argument while
12 we ask those, if it's just Mr. Fischer, I imagine it is, to
13 disconnect from the call.
14 　　　　But hopefully, like I said, I have read most
15 of the materials and -- all of the materials and all of the
16 exhibits and I have my own set of questions that are going
17 to assist me in reaching a decision on the motions that are
18 pending before me.  And I don't see any reason why it should
19 dive into any confidential information of either side under
20 the protective order, but if it does, it is certainly
21 inadvertent, and if it does, I expect counsel to flag it
22 for me, so as I said, we'll put a pause on it at that time.
23 　　　　So with that, Mr. Wag Baghdassarian, my first
24 question to you is, is it undisputed by Sirius XM that
25 neither Dr. Heitto (long i) or Heitto (long e) or

8

1  No. 449 and it is Exhibit No. 2, and it is Dr. Heitto's
2  rebuttal declaration that was submitted by Fraunhofer.  And
3  specifically I believe you are referring to paragraph 14.
4  　　　　I'm not intending to put words in your mouth,
5  I'm just trying to expedite this.  Am I accurate so far?
6  　　　　MR. BAGHDASSARIAN:  Yes.
7  　　　　THE COURT:  In looking at paragraph 14, what I
8  read in that paragraph is that Dr. Heitto is aware of a
9  separate entity named Alcatel's Space that was involved in
10 the satellite radio business.  And then he goes on to say
11 the distinction with that company operating as a separate
12 legal entity within the Alcatel Group and that he has never
13 been employed by Alcatel Space.
14 　　　　And then that is the preface for him saying he
15 is not aware of ever having been substantially involved in
16 any business transactions involving Alcatel Space.  And then
17 he provides further information with respect to the transfer
18 of that business of Alcatel Space.
19 　　　　So again, I'm not seeing this.  If I'm missing
20 something from Sirius XM's perspective, I'm not seeing this
21 as a serious red flag.  That, for example, compared to the
22 expert's licensing experts that the Court permitted Sirius
23 XM to retain and to have access to Fraunhofer confidential
24 information, the contrast is that both of those experts had
25 undisputed prior access as attorneys to confidential

7

1  Mr. Tschiedel has had prior exposure to Sirius XM
2  confidential material through their respective employment
3  history with Nokia and Siemens?
4  　　　　MR. BAGHDASSARIAN:  Thank you, Judge Fallon.
5  　　　　So the answer to your question is I don't
6  believe so.  And part of the reason for that is, is looking
7  at the statements made by Fraunhofer's counsel in their, in
8  their letter brief and even, for example, the declaration
9  of, I believe it is of Dr. Heitto where he says that he was
10 not substantially involved in any transactions involving
11 satellite radio technology.
12 　　　　The qualifier there is part of a concern here
13 is that Dr. Heitto historically prior to Nokia acquiring
14 Alcatel Lucent worked for Alcatel Lucent which was very much
15 involved in satellite broadcasting and even with Sirius XM's
16 predecessor.  And his qualifier limited statement there to
17 us suggests that he very well may have been involved, and he
18 could not make the same representation that Mr. Tschiedel I
19 believe did about, about not being involved at all.
20 　　　　So I think that I hope answers your question.
21 　　　　THE COURT:  I'm looking at that paragraph.  And
22 for the record, and I would ask counsel to follow this
23 format as well, you are referring, Mr. Baghdassarian, to the
24 previous submission when this matter was originally on the
25 calendar for September.  And it is submission Docket Item

9

1  information and privileged information of Fraunhofer.
2  　　　　So I don't see this rising to that level.  How
3  should the court equate it to that if in fact it is Sirius
4  XM's view that it does rise to the same or similar level?
5  　　　　MR. BAGHDASSARIAN:  I think there are two issues
6  there, Your Honor.
7  　　　　The first issue is the statements that you read
8  from Dr. Heitto's declaration that just is suggesting that
9  it was a different entity.  But that is an ultimately
10 related entity, and he is not denying that he has or may
11 have knowledge about that.
12 　　　　But separate from that in the analysis that you
13 drew to Sirius's licensing expert, that gets to the core
14 of not so much about having access to prior confidential
15 information, this is more of the competitive harm of
16 really going forward where you have, you know, not only
17 Dr. Heitto's in-house counsel decisionmaker but Mr.
18 Tschiedel who is in that position in companies that from
19 our perspective it really is disputed that there are inner
20 sections, clear historical and current intersections between
21 Nokia, Siemens, and ultimately Sirius XM here about the
22 potential harm about future business interactions and future
23 competitive interactions.
24 　　　　But I think there are two issues there.
25 　　　　THE COURT:  Let me understand, see if I'm

10

1  understanding your argument. On balance, the greater
2  concern to Sirius XM is future harm, not withstanding it
3  feels that the use of the phrase "substantially involved" is
4  problematic with respect to past involvement with Sirius XM
5  and its expert. Do I have that correctly? The focus is
6  more on future harm?
7          MR. BAGHDASSARIAN:  The focus is more on future
8  harm. This, the historical interactions, transactions
9  even coming to the current transactions existing among the
10  companies, it is that history that really bolsters and
11  makes real the concern of likely interaction going forward,
12  and the potential harm that could be caused by these two
13  in-house counsel getting access to the very detailed
14  significant confidential information that Sirius XM has
15  produced in this lawsuit.
16          THE COURT:  All right. And then tell me where
17  the protections that Fraunhofer has checked off as put forth
18  in their letter briefing, and we'll probably hear more about
19  those at oral argument today, why those protections are
20  insufficient and what, if any, is necessary if, in fact, the
21  Court would permit these experts to have access.
22          MR. BAGHDASSARIAN:  All right. Yes, Your Honor.
23          So our reading of Fraunhofer's letter really
24  boils down to the protections that they have offered boils
25  down to two:

11

1          One, they agree to be bound by the terms of the
2  protective order.
3          Well, that is true of any expert. And they have
4  suggested that, well, that alone should be a sufficient
5  protection.
6          But the problem here, Your Honor, is this is not
7  the typical traditional expert situation. Notwithstanding
8  they try to say it is, it is not.
9          What we're talking about here are two in-house
10  counsel from competitors of Sirius XM in the telecommunication
11  space.
12          Normally with I think every other expert in this
13  case, except for these two, you know, they get cleared in
14  the protective order, they gain access to confidential
15  information, and then the case ends and they go about doing
16  additional consulting work. And the parties at that point
17  don't know where they're going to end up.
18          Here, we know we have in front of us two
19  in-house counsel decisionmakers at Siemens and Nokia who are
20  asking to get access to confidential information, and the
21  protection that they're going to say, well, hey, we agree to
22  be bound by the terms of the protective order doesn't do
23  very much here because we know where they're going. We know
24  they're going right back into their jobs at Siemens and
25  Nokia as in-house counsel licensing experts. In fact, they

1  said as much.
2          And neither will agree that, and they can't
3  agree ultimately, to say that they won't be involved in
4  future transactions, whether directly with Sirius XM or
5  involved --
6          THE COURT:  You got cut off, Mr. Baghdassarian.
7  Can you repeat?
8          I'm not sure what happened to your microphone,
9  if you have actually muted yourself, but I can't hear you.
10          MR. BAGHDASSARIAN:  Can you hear me now?
11          THE COURT:  I can. And you left off at the
12  point where they're going to go back to their jobs with
13  Nokia and Siemens, and that is where I lost you.
14          MR. BAGHDASSARIAN:  Right. So they're going
15  back to -- this is just to pick up on the point I was
16  making is that these individuals as potential experts in
17  this case are going back to two companies that we know have
18  a competitive relationship with Sirius XM. And neither have
19  agreed or I imagine can even agree because of the historical
20  and current and ongoing relationships among these companies
21  to not be involved in any direct relationship or
22  interactions with Sirius XM or potentially competitive
23  situations where they're pursuing overlapping customers as
24  we have raised in our briefing.
25          So that is the fundamental difference here.

13

1  That this is not the normal traditional experts who come in
2  and do their consulting work and then they go out into the
3  world and they have to agree not to use their stuff. That
4  is theoretical.
5          What we have here is a very real, that they're
6  going back. We know what they're going back to, Your Honor.
7  They're going back to Siemens and Nokia. And as the case
8  law makes clear, they're going learn this information. And
9  they -- the case law presumes that the Delaware District
10  Court case we highlighted to you says, well, they are
11  honorable people so they'll agree to be bound by their
12  terms. The problems is how do that separate in their mind
13  what they learn in connection with the confidential
14  information they will learn in this case and divorce that
15  from what their job responsibilities are. And that, that
16  is really the one of the fundamental concerns we have.
17          And the case law recognizes that and
18  distinguishes the situation from the traditional expert
19  situation from where you have in-house counsel that are
20  working for and will turn to their job in connection with
21  a competitive relationship with Sirius XM.
22          So the promise to abide by the terms of the
23  protective order doesn't do what it needs to do with regard
24  to that protection.
25          The other protections that they have afforded,

1  well, they're going to use "common sense precaution."

2  Again, we happen to have the same issue here.

3  Okay?  And we cited to you the case law recognizes that,

4  you know, these unspecified commonsense precautions are not

5  enough under the circumstances.

6  In the *FishMe* case, that is, you know, 2017 WL

7  4138961 the Court denied access to in-house counsel despite

8  counsel pledging "not to store any confidential information

9  in computer systems accessible to business personnel.

10  That is the common sense caution that Fraunhofer

11  said they would do.  And this Court has said that that is

12  not enough.

13  Those are the only two they have outlined.

14  The bigger concern is the unwillingness and, in

15  fact, their very candid admission to us that they cannot

16  implement an ethical law at Nokia or Siemens.

17  In fact, Your Honor, we don't even know if Nokia

18  and Siemens know about this potential tension by Fraunhofer

19  of these two in-house counsel.  We have asked the question.

20  We have asked to understand the systems in place there, the

21  potential interactions, the potential of sharing a

22  reformation.  We have asked for a lot of information and we

23  have gotten nothing from Fraunhofer, from Siemens, or from

24  Nokia.

25  And the concern is that, you know, in this

1  the case law recognizes is that once the information is

2  learned, it can't be unlearned.  And when you -- and as you

3  noted, Mr. Tschiedel's job responsibilities are highly

4  concerning.  Another way to characterize it is he looks to

5  figure out ways to monetize, monetize patents.  And that,

6  as a defendant in a patent infringement case with a

7  licensing issue, that is highly concerning.

8  And I take your point about having more teeth

9  there.  The problem is how does Mr. Tschiedel, from Sirius

10  XM's perspective, delineate his mind?  Fact No. 1.

11  And this is what the case recognizes.  That when

12  they're going back, they have in-house counsel positions in

13  competitive companies.  We know that there is a risk of

14  harm there.  And the issue is the Court Order, while it has

15  teeth, there is no way to know in that circumstance, you

16  know, whether it is intentional or unintentional whether

17  that information will be used.  There is absolutely no way

18  to police that under any circumstances.

19  And this is why the case law says if they're

20  going to return to a position, particularly a decisionmaking

21  position as in-house counsel, and that can create the

22  risk of competitive harm in the marketplace, that is why

23  confidential information is blocked from those type of,

24  those type of individuals.

25  THE COURT:  All right.  Is there anything

15

17

1  situation going forward, there is an unwillingness or a lack

2  of ability to put an ethical law in place.  To ensure, for

3  example, that information about, hey, we're about to do a

4  deal with Sirius XM or, you know, we're going to try to

5  pitch GM and yet Sirius XM is pitching GM for something

6  similar here.

7  There have been no insurance providers at all

8  despite this has been going on for a long time here, and we

9  have been asking for information about this.

10  There has been no willingness to engage in that,

11  to do that or to provide any information other than to say

12  we can't do it or we won't do it.  So that is why the

13  protections are not sufficient here.

14  THE COURT:  What about Mr. Tschiedel's

15  representation that he will not use Sirius XM information

16  to engage in any reverse engineering, infringement analysis

17  or to maximize revenue with respect to patent portfolios at

18  Siemens and having the Court enforce that as an order:

19  rather than just a representation in a declaration, put some

20  teeth into it: along with an order that both experts shall

21  not be personally involved in any competitive activity

22  against XM.  Would that alleviate the concerns that you just

23  expressed on behalf of your client?

24  MR. BAGHDASSARIAN:  So the answer to that

25  question is no, Your Honor.  And here is why, is that as

1  further before I hear from Fraunhofer?

2  MR. BAGHDASSARIAN:  Your Honor, just one other

3  quick thing.

4  You know, one of the things I was thinking

5  about in preparation for today's hearing was, you know, if

6  this were a situation, for example, where a plaintiff, a

7  plaintiff is sued for Ford Motor Company, for example, and

8  the plaintiff wanted to hire in-house, an in-house licensing

9  expert from GM, Ford would object to that because they

10  wouldn't want GM getting access to their confidential

11  information or licensing or other agreements.  There really

12  would be no dispute about that expert not being allowed to

13  get confidential information.

14  And we think this is, this is that, you know,

15  highly unusual analogous situation where in-house counsel at

16  two major telecommunication companies should not be given

17  access to that information, particularly where -- and I

18  don't want anyone to lose sight of this -- there are two

19  other experts here and potentially many others that

20  Fraunhofer could present that don't plead any of these

21  issues, that don't plead any of this risk of harm.

22  And in fact, there is case law we presented

23  to you to say, well, if they can't show why these two

24  individuals are indispensable, well, they're not left

25  without anything.  They're not left without experts that

18
20

1  they have chosen to use.  It's just that their risk of

2  harm here outweighs, you know, using these two particular

3  experts.

4        THE COURT:  All right.  Does Fraunhofer want to

5  address all of those points, please?

6        MS. SCHUETZ:  Yes, Your Honor.  This is Kelsey

7  Schuetz on behalf of the plaintiff Fraunhofer; and I will be

8  address those many points.  If there is not something more

9  specific you would like me to start, I might just start at

10  the top, if that is okay.

11        THE COURT:  Yes.  If you won't mind speaking

12  just a little slower, to make sure we have a clear record.

13  And the delay in transmission of the audio on the phone

14  creates a little bit of a problem for me.  Your words are

15  kind of blending together.

16        MS. SCHUETZ:  Absolutely, Your Honor.  I will

17  speak much slower.

18        I would just like to begin by pointing out that

19  your reading of paragraph 14 of the Heitto declaration we

20  believe is correct.  The purpose of these declarations, one

21  of the purpose of them was to rebut this new information

22  that we received in the Wadding declaration that Sirius XM

23  submitted.  And part of that declaration was to point to six

24  agreements over the course of 20 years that supposably

25  established that there was prior transactional history

1        So we don't see any, any meaningful risk that

2  there could be future harm based on their employment with

3  Siemens and Nokia.

4        Does Your Honor have any questions about that?

5  I can pause for a second.  And I think not.  I will move to

6  the next point perhaps about --

7        THE COURT:  I'm more interested in, the focus

8  here is on future farm, and you have laid as at best you

9  can on behalf of Fraunhofer through their respective

10  affidavits of licensing experts their historical background

11  with their respective employer.

12        The focus here as I pinned down Mr. Baghdassarian

13  on this is on future harm.  And Mr. Baghdassarian made a

14  number of points about the work that each of these experts

15  performed in their day-to-day jobs as in-house counsel in a

16  telecommunication -- with a telecommunications company that

17  is directly competitive with Sirius XM at least vis-à-vis

18  the customers identified by Sirius XM as car manufacturers.

19        He made an analogy to what would occur in a

20  case where Ford and GM were competitors and the party would

21  retain an expert at GM to prove the case against Ford, and

22  that would create an imbalance and provocative situation

23  where one competitor would then have free access to the

24  other competitor's notes, sensitive information.

25        So those are the points I would like you to

19
21

1  between these parties that would either demonstrate that

2  these experts had previously received confidential

3  information or that there is a risk of future competitive

4  harm going forward.

5        But in Dr. Heitto and Tschiedel's declaration,

6  we went line by line through those agreements to show they

7  were not relevant to this case, they involved separate

8  entities, and they do not pose any risk of harm in the

9  future.

10        Moreover, we have specifically and repeatedly

11  represented to Sirius XM that these experts had not

12  previously been exposed to any Sirius XM confidential

13  information.  So really the issue here is not about past

14  exposure at all.  It's all about future harm.

15        And moreover, that history does not show any

16  likelihood of harm going forward.  As Your Honor correctly

17  pointed out, if anything, the Sirius XM expert that

18  Fraunhofer had previously objected to posed any greater risk

19  of future harm because they have previously been adverse to

20  Fraunhofer and, if anything, that is, that is more probative

21  evidence that they would in the future be in a position to

22  be adverse to Fraunhofer, unlike here where there is nothing

23  in the past to show these experts had ever been adverse to

24  Sirius XM or would be in a position to receive Sirius XM's

25  confidential information.

1  address on behalf of Fraunhofer.

2        MS. SCHUETZ:  Right, Your Honor.  I think that

3  has hit an ongoing issue with this dispute.  And that is

4  that Sirius XM has really assumed that Siemens and Nokia

5  are competitors with this company, with Sirius XM, but that

6  is just simply not the case.

7        And the law is clear that Sirius XM has the

8  burden to establish that there is a risk of future

9  competitive harm, and that risk requires establishing these

10  competitors are competitors in the first place which hasn't

11  been established here at all.  They have not pointed to any

12  specific car manufacturers that might, that Siemens and

13  Nokia might compete with Sirius XM for business.  We have

14  nothing to go off of that would lead us to believe that that

15  is the case.  That they do actually compete with business

16  with these car manufacturers.

17        They have pointed to potential future direct

18  competition between Sirius XM and these companies, but as

19  we went through, the agreements they rely on for that

20  assumption are not related to the technology at issue in

21  this case.  And moreover, they're collaborative.  They're

22  not even competitive.

23        In Mr. Heitto and Dr. Tschiedel's declaration,

24  they made clear assertions using Sirius XM's own definition

25  of its competitive landscape from public filings to show

22

1    these companies do not engage in the type of business that
2    Sirius XM does.
3            All we have is this blanket assertion that
4    because they both operate within the telecommunications
5    industry that that necessarily means that they're
6    competitors, but it doesn't.
7            And we have cited case law, Your Honor, for
8    example, the Marsfal (phonetic) case held that it's common,
9    it's almost assumed in these kind of cases that expert
10   witnesses will be employed in the same industry.
11           That makes sense because that is where their
12   expertise comes from.  That is why they're qualified to
13   opine on these issues.
14           So it's not surprising that they are employed
15   within the same telecommunication space, but what we would
16   be required to preclude their access to confidential
17   information would be a specific factual showing that there
18   is real direct competition between these entities, and there
19   isn't any evidence of that in the record.
20           THE COURT:  If there is no evidence, do I take
21   it that in the event the Court were to permit these experts
22   to have access to Sirius XM's confidential information that
23   Fraunhofer and the expert could abide by a court order that
24   both experts shall not be personally involved in any
25   competitive activity against Sirius XM?

23

1            MS. SCHUETZ:  If Your Honor were inclined to
2    make that order about their future employment, we would ask
3    that that applies to both sides.  As I mentioned previously,
4    the experts at Sirius XM had proposed it was undisputed that
5    they had had prior access to Fraunhofer's confidential
6    information and had been engaged adversely to Fraunhofer in
7    the past.
8            But there is no requirement in the protective
9    order that, that an expert would be precluded from the --
10   engage in any competitive activity going forward, particularly
11   where there is no evidence that that is likely to happen.  But
12   if your court were inclined to adopt that, we would ask that
13   it apply equally to both sides.
14           We also -- here, XM cited a case, the *Boehringer*
15   case which held that where there is a large in-house legal
16   department, that means if the future issue arises regarding
17   any competitive activity about the opposing party in the
18   future, the attorneys "reroute it to another attorney to
19   avoid any violation of the protective order."
20           And that is the situation we're dealing with here
21   because these aren't large in-house legal departments that
22   if there were some sort of future engagement, competitive or
23   collaborative with Sirius XM, it would be easy for them to not
24   handle that, and that would be something they could do under
25   the current protective order which requires them not -- and

24

1    this Court's Order from the last time we were here saying that
2    these experts are ordered not to misuse any confidential
3    information obtained in this case for anything outside of this
4    litigation.
5            THE COURT:  Okay.  Anything further with respect
6    to any arguments raised by Mr. Baghdassarian or any
7    arguments and/or exhibits that you placed before the Court
8    in submissions on behalf of Fraunhofer?
9            MS. SCHUETZ:  Yes, Your Honor.  I would just
10   like to address briefly their suggestion that we have
11   refused to institute an ethical wall in this case.  And I
12   think we have made clear both to Sirius XM counsel and to
13   the Court in this briefing that we're not opposed to
14   additional safeguards.
15           And indeed as we walked through with
16   Mr. Baghdassarian, we have many identified safeguards that
17   could be used to prevent misuse of confidential information
18   in this case, but the problem with an ethical wall is that
19   it functions and its function is to prevent any information
20   that is already within that company from reaching the
21   individual.  And I would just make clear there really is no
22   path information or interactions between the companies in
23   Sirius XM that could make their way to Dr. Heitto or
24   Mr. Tschiedel.
25           So in that case, it's not that we're opposed to

25

1    it or we're not willing to enact additional safeguards, it's
2    just we want to nail down safeguards in this case, which we
3    believe we have given the existing order, the protective
4    order, Exhibit A, and the many commonsense safeguards we
5    proposed as well as an offer to keep track of all of the
6    confidential documents that are ultimately provided to the
7    experts, and then disclose a list of those documents when
8    they submit their expert report.
9            THE COURT:  All right.  Very well.  Thank you.
10           Mr. Baghdassarian, any further comment on
11   this issue?  I think I have my arms around it, but you are
12   certainly entitled to make some counter arguments to what I
13   have just heard from Fraunhofer's counsel, Ms. Schuetz.
14           MR. BAGHDASSARIAN:  Yes.  Thank you, Your Honor.
15   Just a few points.
16           First on her statements that there is no
17   evidence of competition between Sirius XM and these
18   companies.
19           That is just not true.  Mr. Wasim set forth in a
20   good amount of detail the competitive nature between the
21   companies.  In fact, as we pointed out in our letter, when
22   you look at the declarations from Dr. Heitto and Mr.
23   Tschiedel, they don't deny any of the statements.  They
24   just say, well, hey, we were not -- we individually were not
25   involved in that.  They don't deny the competitive landscape.

26

1    In fact, what they do in their declarations is
2    cite to Sirius XM's SEC disclosures and say, oh, here is
3    where Sirius XM competes.  And what these two individuals
4    did was paraphrase from Sirius XM's SEC filings.
5    But when you go and look at the SEC filing,
6    Your Honor, as you see at the top of page 2 of our letter
7    brief, we didn't paraphrase it, we quoted it.  And when you
8    quote it, you see that Sirius XM's business competes with
9    "multimedia systems connected to the internet enabled
10   smartphone or wireless modem inside the vehicle, traffic
11   services including smartphones, including GPS mapping with
12   sophisticated database, database management from navigation
13   and connected vehicle services."
14   This is where the companies compete.  There
15   is no question they compete.  In fact, Mr. Wasim gives a
16   particular example of where they compete, where there is
17   the data services that car companies want, want to use and
18   transmit.
19   And Sirius comes to the, Sirius comes to the car
20   companies with its satellite-based technology.
21   Now, Nokia seems comes with different technology
22   but they both compete in the same business, say use my
23   technology.  Don't use the other guys.  But that is very
24   much competing in the marketplace for overlapping customers
25   for that business.  And it's these individuals are getting

27

1    access to our confidential information and that, and that
2    potentially can be used going forward.  Because they're
3    returning to a decisionmaking role as in-house counsel, that
4    is where the case law says no, they don't, they don't get
5    access to the confidential information.
6    The next point I want to make is something I
7    heard for the first time in all of this about, well,
8    there is a procedure in place to somehow divert potential
9    competitive work, whether it's competitive with Sirius XM or
10   directly involves Sirius XM which starts to get into this
11   ethical wall.
12   But, Your Honor, this is three and-a-half months
13   that we have been doing this.  We can have gone back and
14   forth, letters, multiple letters to Your Honor.  They have
15   made that representation nowhere.  And that is highly
16   concerning to hear that for the first time not at the 11th
17   hour but during the hearing on this very issue.
18   And so the last, the last point I'll make here
19   is when you look at what Mr. Tschiedel's job is and what Dr.
20   Heitto's job is, they are very much involved in the
21   competitive landscape that Sirius XM is involved in, and
22   we think for those reasons should not be granted access to
23   Sirius's confidential information made available in this
24   case.
25   THE COURT:  Along the lines of further, I'll

28

1    let you respond in a moment, but I do have a question for
2    Mr. Baghdassarian, Ms. Schuetz before I hear from you.
3    Mr. Baghdassarian, can you address please the
4    Court's question that I directed to Ms. Schuetz regarding
5    could the parties, could Fraunhofer live with a court order
6    that both of their proffered experts shall not be personally
7    involved in any competitive activity against Sirius XM?
8    Ms. Schuetz's response is they could live with
9    it but it should be a broader application to both sides'
10   experts retained in this case.
11   What is your reaction to the Court entering an
12   order applicable to all experts to ensure that there is a
13   balance here and each side has some assurances that their
14   retained -- the other side's retained expert will not be
15   inadvertently using information obtained under the protective
16   order to the disadvantage of the producing party?
17   MR. BAGHDASSARIAN:  Your Honor, I think that
18   that, that shifts the focus away and ultimately ignores
19   where how differently situated Mr. Tschiedel and Dr. Heitto
20   are with the other expert.
21   For all the experts, with the exception of Dr.
22   Chrocziel, which I think was different circumstances than we
23   have here, none of the experts, other experts in this case,
24   involved in this case have any issues been raised regarding
25   potential competitive harm going forward.  It is only

29

1    because --
2    THE COURT:  If there is no issue, then why not
3    agree for language either as an amendment to the protective
4    order or in the form of an order to be entered by the Court
5    separately that all experts are bound by this?  If it's of
6    no concern for Sirius XM's experts because they're in a
7    different position as you have described, then Heitto and
8    Tschiedel, why not, what is the downside to agreeing to it
9    so that there is some balance and fairness here into what
10   the Court enters, just like a protective order is applicable
11   to both sides, and it is not one sided, a one-sided order.
12   MR. BAGHDASSARIAN:  I don't.  Your Honor, I
13   don't have an issue with that part.  The issue I have with
14   it is equating where Dr. Heitto and Mr. Tschiedel sit as
15   in-house counsel for -- with companies that are competitive
16   to Sirius XM which creates the very real scenario where they
17   are in there.  And I come back to the case law about how
18   these individual in-house counsel are given confidential
19   information they can't learn.
20   This is not a situation where maybe another
21   expert in this case may go off at some point in the future
22   and do something that he is bound by the protective order.
23   This is a very real situation that, you know, basically it's
24   another, what was suggested and what you are asking me is
25   an additional Court Order to require what is required in

30

1  the protective order.  And what we're saying is that in the
2  circumstance when you are talking about in-house counsel at
3  competitive companies, that, that is insufficient as opposed
4  to experts who are not returning, and our jobs, our daily
5  jobs are not in-house competitive decisionmakers.  That is,
6  that is my answer to the question.  I just, I don't want to
7  portray that I believe that we should equate where Dr.
8  Heitto and Mr. Tschiedel are with the other experts in this
9  case.
10            THE COURT:  I understand your argument.
11            All right.  Let me hear back then very briefly,
12  Ms. Schuetz.  We have been at this for 45 minutes, and I
13  think I do have my arms around the dispute.  So if there are
14  any final points you wish to make without repeating
15  arguments that I have already heard, you have the floor.
16            MS. SCHUETZ:  Yes, Your Honor.
17            For the first point that the Tschiedel and
18  Heitto declarations corroborate this idea there is
19  competition between Sirius XM and these companies, it's just
20  not true.
21            Sirius XM is relying on an allegation that
22  Nokia is a mobile cellphone services provider, which they
23  are not, which Dr. Heitto established in his declaration.
24  That company was sold to Microsoft and then spun off to
25  another company called H&B which he has no involvement with.

31

1            And Siemens is based on allegations that
2  they're a provider of connected vehicle services, but Mr.
3  Tschiedel did identify the one small collaborative agreement
4  between Sirius XM and a separate Siemens entity called
5  Siemens Mobility which is also irrelevant to this case and
6  separately managed, and Mr. Tschiedel does not work for
7  Siemens Mobility.  So there is no corroboration of any
8  competitive environment that Mr. Tschiedel or Dr. Heitto
9  would find themselves in.
10            Second, to this point of this idea of diverting
11  work to other individuals within their department with a
12  new allegation, it is not.  It is not a new allegation.  It
13  was simply a reading of the case, the cases that Sirius XM
14  cited.
15            The court in that case did find that that would
16  be a viable solution.  And that was the point I was making
17  was that reference.
18            And to your point about -- or Mr. Baghdassarian's
19  point about these experts being differently situated because
20  they can't unlearn the information once it has been in their
21  mind, their experts are no differently situated.  That is
22  something that can impact any expert in this case.  And as I
23  previously mentioned, their experts actually have an inverse
24  offer from Fraunhofer in the past, so there is even a greater
25  risk that could happen in the future.

32

1            THE COURT:  All right.  Give me a moment,
2  counsel.
3            I'm sorry.  Mr. Baghdassarian, did you --
4            MR. BAGHDASSARIAN:  Yes.  May I briefly respond?
5            THE COURT:  Yes, but the argument has to come to
6  an end at some point.  We have other matters to address
7  today, but go ahead.
8            MR. BAGHDASSARIAN:  Of course.  Understood, Your
9  Honor.
10            Just on the differently situated.  I come
11  back to the positions that these individuals have.  In
12  particular, Mr. Tschiedel, he presented in our briefing
13  that his job is to monetize the company's patents, and Dr.
14  Heitto's licensing activities in the context of a
15  competitive relationship.  And, you know, ultimately our
16  experts are not unlike these two individuals working for a
17  company that has direct competitive relationships with
18  Sirius XM.
19            THE COURT:  All right.  Thank you, everyone.  I
20  am prepared to make a ruling on the bench.  The transcript
21  will serve as the Order of the Court.  I will not be
22  separately issuing a written memorandum opinion and order.
23            Any party who wishes to take objections to my
24  bench ruling may do so within the time period prescribed
25  in Federal Rule of Civil Procedure Rule 72(a) governing

33

1  non-dispositive motions.  And Judge Bataillon, the District
2  Judge assigned to this case, will review my order, my bench
3  ruling from this transcript and determine whether it is
4  clearly erroneous or contrary to law in considering any
5  objection.
6            Here, Fraunhofer seeks an order from the Court
7  allowing its licensing expert, Dr. Heitto.  And for the
8  benefit our court stenographer, Mr. Gaffigan, that is
9  spelled H-e-i-t-t-o, and Mr. Tschiedel, and that is
10  spelled T-s-c-h-i-e-d-e-l, access to Sirius XM's
11  confidential information subject to the protective order.
12            For the reasons which follow and subject to the
13  conditions which are incorporated in this order, the experts
14  shall be granted access to Sirius XM's confidential
15  information.
16            The Court has previously permitted two licensing
17  experts retained by Sirius XM to have access to Fraunhofer
18  confidential information despite both experts undisputed
19  prior access as attorneys to Fraunhofer's confidential and
20  privileged information from other cases.
21            It is undisputed that neither Dr. Heitto or
22  Mr. Tschiedel has prior exposure to SXM's confidential
23  material through employment or consultation on past
24  litigation matters.  The Court does not construe paragraph
25  14 in Dr. Heitto's affidavit as Fraunhofer -- I'm sorry,

34

1  and, yes, Dr. Heitto's affidavit as any type of confirmation
2  there has been historical past exposure by Dr. Heitto to
3  Sirius XM for confidential information.
4        In any event, however, like Sirius XM's experts,
5  Dr. Heitto and Mr. Tschiedel have agreed to fully comply with
6  the Court's April 21 order and, therefore, it is so ordered
7  that each expert shall "abide by their obligation not to use
8  confidential information or privileged information that these
9  experts obtained outside of the scope of the case to form any
10 opinions or for any use whatsoever in connection with this
11 instant case."
12        I'm, of course, quoting from the transcript of
13 the April 21 conference and the order I entered with respect
14 to Sirius XM's expert.
15        In addition, both of these experts have signed
16 the protective order certification agreeing to the use of
17 protected material for purposes of the instant litigation
18 only.
19        Notwithstanding the foregoing, the Court will
20 address Sirius XM's concern about future competitive harm.
21 Sirius XM claims these experts could cause future
22 competitive harm to Sirius XM by transmitting Sirius XM
23 confidential information obtained from this case to others
24 at Nokia and Siemens or by being selected to work on
25 potential future projects involving Sirius XM.  Both

35

1  experts deny all such allegations in their declaration.
2        Sirius XM's key concern is competition among
3  Sirius XM, Nokia, and Siemens, and as SXM puts it in their
4  responsive letter brief, "the significant likelihood that
5  going forward, SXM will enter into additional negotiations
6  or agreements with Nokia and Siemens or compete for business
7  from the same customers."
8        I'm quoting from Document Item No. 460 at page 1.
9        The "same customers" are identified as car
10 manufacturers.  And Sirius XM asserts that it would be
11 put at a competitive disadvantage if its confidential
12 information about, for example, its business model pricing
13 and commercial strategies or the Court were to disclose to
14 Nokia and Siemens and they used it to improve their own
15 positions in negotiation or in competition with Sirius XM
16 and business dealings with the same car manufacturers.
17        Fraunhofer argues that Sirius XM has failed to
18 show any meaningful risk of future competitive harm and that
19 significant safeguards are already in place to avoid
20 competitive harm.
21        Fraunhofer points out that Sirius XM canceled
22 past dealings with Nokia and Siemens relate to separate
23 decisions, businesses, and projects that have no connection
24 to either expert's employment.
25        Fraunhofer argues that Sirius XM does not

1  point to any evidence of actual competition with Nokia or
2  Siemens.  Any hypothetical future competition is therefore
3  speculative.
4        The Court agrees that on this record, Sirius
5  XM's concerns about future harm have not been demonstrated
6  to be substantial.  Nonetheless, the Court finds some
7  additional safeguards are warranted.
8        The experts have committed to be bound by the
9  protective order and will take "commonsense" precautions to
10 secure any materials provided to them in the litigation.
11        In addition to such commonsense precautions, the
12 Court orders that each expert shall not store Sirius XM
13 confidential information in their respective Nokia and
14 Siemens email accounts or other data storage systems which
15 pose a risk of inadvertent disclosure to unauthorized
16 individuals.
17        The Court finds that Sirius XM has not
18 identified any specific existing matter at Nokia or Siemens
19 which would require constructing an ethical wall prohibiting
20 access by the expert to matters relating to and/or adverse
21 to Sirius XM.
22        In the event this existing status should change
23 or Sirius XM has a reasonable and good faith basis to seek
24 further relief, such as an ethical wall, this order is
25 without prejudice for Sirius XM to seek further relief as

37

1  appropriate following a meaningful -- and I do emphasize
2  "meaningful" -- meet and confer with Fraunhofer.
3        Furthermore, the Court finds that the status of
4  Dr. Heitto and Mr. Tschiedel as in-house counsel is not an
5  inflexible bar to access the opposing party's confidential
6  material.  The Court finds that both experts are
7  sufficiently insulated from competitive decisionmaking that
8  there is no risk of inadvertent disclosure warranting denial
9  of access to Sirius XM's confidential material.
10        In the case of Mr. Tschiedel, he has confirmed
11 he will not use Sirius XM information to engage in any
12 reverse engineering, infringement analysis or to maximize
13 revenue with respect to patent portfolios at Siemens, and
14 the Court so orders him bound by that representation.
15        The Court further orders that both experts, Dr.
16 Heitto and Mr. Tschiedel, shall not be personally involved
17 in any competitive activity with Sirius XM.
18        Lastly, it appears by order that Fraunhofer
19 shall track and ultimately disclose a list of these specific
20 confidential documents disclosed to the experts consistent
21 with the practice adopted by the parties for other experts
22 in the case.
23        This bench ruling serves as the Order of the
24 Court with respect to the issues concerning access to
25 confidential information under the protective order.

**38**

1      Are the parties ready to move forward with the

2   other issues that were combined with this hearing today

3   regarding what I will generally refer to as logistical

4   issues concerning the 12 voluntary witnesses that Fraunhofer

5   is producing for deposition by Sirius XM?  If so, who will

6   take the lead with respect to those issues for Sirius XM?

7          MR. BAGHDASSARIAN:  Your Honor, this is Mark

8   Baghdassarian.

9          May I ask a question about your order on the

10  exposure of confidential information to the two individuals?

11         THE COURT:  Go ahead.

12         MR. BAGHDASSARIAN:  And my question is, as you

13  mentioned, Sirius XM has an opportunity to have Judge

14  Bataillon review that order.  And as parties have done when

15  objections were filed, they await Judge Bataillon's ruling

16  on an order.

17         I just want to make sure that that same approach

18  occurs here because if Judge Bataillon -- we were to file

19  objections and Judge Bataillon were to sustain those

20  objections, that obviously would prevent the disclosure of

21  confidential information on that point.  So I just wanted to

22  raise that point now because of the sensitive nature of this

23  issue.

24         THE COURT:  What I would suggest is this:  That

25  after our conference concludes today, the parties meet and

**39**

1   confer on that issue, and that if you can't reach agreement,

2   that the parties just send me, you know, follow the

3   discovery dispute procedure to hold the ruling in abeyance

4   and set a time frame for it to be held in abeyance.

5          My concern is about the delay that has already

6   occurred in this case.  And I'm not faulting either side for

7   that.  There were a number of issues, including appeals to

8   the Fed Circuit, as all of you know.  I won't go into the

9   procedural history of the case.

10         But I'm inclined to move this along quickly.

11  And while in certain instances, there is good reason for

12  abeyance, particularly when it comes to issues of, for

13  example, an in camera privilege review and my finding that

14  documents held back as privileged should be turned over, I,

15  in some cases, would put a ruling in abeyance pending the

16  time expiration for objections to be filed and for a ruling

17  on the objections.

18         But my concern is also that I think there are a

19  number of other pending objections in this case.  And due to

20  Judge Bataillon's very, very busy schedule, I'm not sure

21  that they have been dealt with, and I'm not sure how quickly

22  they will be dealt with.  And I am concerned about this one

23  standing in the queue until Judge Bataillon's schedule would

24  permit him to get to it.  And I don't want it to hinder the

25  progress of expert discovery.

**40**

1          So those are my concerns.  And that is why I

2   would ask counsel to get a copy of this transcript, to take

3   a look at these concerns, have a meaningful meet and confer

4   about them, and then send me a joint letter of no more

5   than four pages about the issue of holding this ruling in

6   abeyance.

7          And if the parties can't agree, then each side

8   can set forth their position and proposal in that four

9   page letter.  And I don't think I will need another

10  teleconference with all of you to figure it out but I will

11  take a look at each side's positions and make a decision

12  accordingly.  But hopefully, a meet and confer and having

13  heard my concerns, the parties may be able to work it out.

14         And why don't you get that letter to me by

15  October, I'll say October 15th because it is a Monday

16  holiday in which the Court is closed.  And I want to give

17  each side an opportunity to digest the process and the

18  ruling with your respective clients and come up with a path

19  forward as well as time for a meaningful meet and confer.

20         MR. BAGHDASSARIAN:  Thank you, Your Honor.

21         THE COURT:  All right.  So let's --

22         MR. McPHIE:  Your Honor?

23         THE COURT:  Go ahead.  Who is speaking?  I'm

24  sorry.

25         MR. McPHIE:  Your Honor, this is David McPhie

**41**

1   from Fraunhofer.  And I will be addressing the deposition

2   issues.

3          I did have one additional point of clarification

4   regarding the order that Your Honor just issued, which is

5   that the order that experts shall not be personally involved

6   in competitive activity going forward, I want to be clear

7   that, my assumption is that applies to both the SXM as well

8   as the Fraunhofer experts.  I just wanted to confirm that is

9   correct.

10         THE COURT:  That is not correct.  Presently, the

11  only matter before me is the Fraunhofer experts, Dr. Heitto

12  and Dr. Tschiedel.  I think if there is an application for an

13  order, a similar order, again, the parties should meet and

14  confer on a Form of Order or an amendment to the protective

15  order that is either mutually agreeable and balanced for both

16  sides or if it is a disputed issue and there is a reason for

17  having that apply as well to Sirius XM's experts, then that

18  should be teed up as a regular discovery dispute so I can hear

19  both sides on that.

20         I'll just, without pre-deciding the issue, there

21  are distinctions as to the backgrounds and the job

22  description, so to speak, of each side's set of experts.

23  And while I do try to be fair and uniform in the application

24  of my ruling, particularly when it comes to enforcement and

25  interpretation of the protective order, there may be

42   44

1  instances where it just simply isn't one side fits all.

2          So that is all I will say on that point. All

3  right?

4          MR. McPHIE: Understood, Your Honor. Thank you.

5  We'll follow that approach.

6          THE COURT: All right. Well, let me first

7  address, counsel, and eliminate this issue of in person

8  versus remote deposition.

9          I don't see any need -- and I will be direct

10  with all of you. I don't see any need to circle back to a

11  decision and an order that I already entered in this case as

12  it is clearly stated in the transcript from about a year ago

13  now. I think that hearing was in October where I ordered

14  that the witnesses in Germany, the German witnesses appear

15  remotely. I don't see any change in circumstance under

16  our current restrictions related to the health pandemic to

17  deviate from that order.

18          And also, my concern is that it took quite some

19  time and effort to get the list of the depositions and the

20  dates for them set such that to now revert to a different

21  logistical format for conducting the depositions on an

22  expectation and a hope that travel restrictions will be

23  lifted is not going to persuade me to add any more delay

24  into this case to get these depositions done.

25          And I can also speak from personal experience,

43

1  having just come back from Europe in September, that even

2  if restrictions are lifted, as Sirius XM expects they will

3  be in November, on international travel into the U.S., as an

4  American citizen, trying to come back to the United States,

5  it was no easy task, to be sure, that I had a slot for an

6  antigen test within a three day window of my return flight

7  to the United States, having been in different cities in

8  Europe that have different testing facilities and availability.

9          Also, the concern even with the travel documents

10  in hand that I might not get back if there was a

11  cancellation of a flight or a connection missed or a flight

12  delay, that would alter the expiration of my test results

13  from three days to a greater number of days such that they

14  were no longer valid.

15          These were my worries, and they don't have

16  anything to do with the arguments raised by counsel except

17  indirectly. That my personal experience and my practicality

18  also guides my ruling in these disputes, not just along with

19  the case authorities and the law and what each side has done

20  to try and be fair and reasonable in resolving a dispute.

21          So that is what guides me here. And I'm not

22  turning about and changing my ruling. I order that the

23  depositions go forward remotely.

24          So that ruling is not changing from my previous

25  ruling. The parties are certainly free to work out whatever

1  alternative arrangements they want to make as long as it's

2  mutually agreeable.

3          I mean should, all of a sudden, there be no

4  pandemic come November 1, and, you know, travel is free and

5  unrestricted. If the parties want to double back and

6  mutually agree to something, you are always free to do that.

7          But given the current status of the pandemic,

8  travel restrictions as they exist today and my prior ruling,

9  there is no circumstances that would warrant me to deviate

10  from that previous ruling.

11          So having said that, let's deal with the other

12  logistical issues, if there is still an issue about timing,

13  about how many hours in a day, about putting on these other

14  three witnesses that are anticipated to be two hours apiece

15  on to other deposition days at the end of the schedule.

16  Let's address all of that if the parties up to now have not

17  been able to work it out.

18          I'll hear from Sirius XM first. And it is

19  Sirius XM who I believe is seeking to alter the logistical

20  format of these depositions.

21          MR. BAGHDASSARIAN: Your Honor, it's Mark

22  Baghdassarian. I'll address these issues.

23          Quite frankly, I'm shocked we're in front of you

24  on issues like this. This is, these are things that I would

25  think the parties should be able to work out, but as Your

45

1  Honor knows better than anyone, there is not a lot we can

2  agree on.

3          On, you know, the timing of the depositions, the

4  start time, the hours per day, again, this again is what I

5  thought was a pretty simple issue. You know, we had asked

6  for, you know, a 9:00-9:30 start. They said 7:00 a.m.

7  start. We came in with 8:00-8:30 as a compromise. And they

8  just, they would not, they would not budge.

9          And the only explanation we got for it, well, it

10  is for the convenience of our witnesses.

11          You know, these witnesses are plaintiff's, in

12  a case that was brought -- that they brought in the United

13  States, you know, taking advantage of the United States

14  court system. And, you know, we're fighting about an hour,

15  hour and-a-half here, that seems to me that we should be

16  able to compromise on.

17          So that is one, that is one part of it.

18          The other part of it is this kind of this seven

19  hours for four hour thing that Fraunhofer wanted to, to

20  basically impose on us. And we just asked for, well, let's

21  split it up equal, about equal each day. And we can --

22  sometimes as depositions go where, you know, you are going

23  to be six hours and five hours, maybe it will be seven hours

24  and four hours, but let's have some flexibility to build

25  into this.

46

1    And, again, there is, there is no agreement we
2    can get there.
3         You know, the next issue is really this check
4    translator.  This one I'm having a lot of trouble
5    understanding why we're in disagreement.
6         All we're asking for here is they want to have a
7    check translator.  We said okay.  And I thought we had
8    agreement on this.  That, you know, any time the check
9    translator comes in, well, let's just, let's just figure out
10   a way to get that time added up so that, you know, we're not
11   spending even more time, more of our time on the record and
12   we can focus on substance.
13        I thought we had agreement back in August.  We
14   had an email exchange about this.  We said let's work out
15   the logistics.  I thought we were getting close to that.
16   But they said no, no, that is going to count against your
17   time.
18        And it's really concerning, for example, Your
19   Honor, to present a witness, one of these witnesses with an
20   English version document that they authored, and to have --
21   for them to say, hey, I need -- I would like this translated
22   so that I can understand what it means.  You know, that
23   makes no sense to me, to have an English translated document
24   they wrote translated for them into German.  That is just a
25   very good example of a way to, quite frankly, you know,

47

1    waste our file and, you know, "run out the clock" on us.
2         So that's the issue there.  And all we thought
3    is we thought it was a reasonable accommodation to say,
4    okay, for the time spent on a check translator, we'll
5    capture that time and it won't count against our time.  It's
6    just that simple.
7         I don't know if you wanted me to address the
8    third issue about the, about the witnesses that we had asked
9    to move to the end of the schedule or if you wanted to take
10   these, one by one.  I wasn't sure if I was rambling on too
11   long here.
12        THE COURT:  No.  Typically I do take them one by
13   one, but they're all interconnected and they're brief
14   issues.  So why don't you address the three witnesses tacked
15   on at the end.
16        From what I understand, this is based on your
17   client's Sirius XM estimation that these three witnesses --
18   and for the record they're Schuch, S-c-h-u-c-h, Nagel,
19   N-a-g-e-l, and Meltzer, M-e-l-t-z-e-r.  And it is my
20   understanding that by SXM's own estimation that you are only
21   anticipating three hours with each.
22        Now, I understand an estimate is an estimate,
23   it's not the real thing.  Nonetheless, I was having trouble
24   why we can't tack them on at the end rather than having them
25   in another round separately which would necessitate and,

48

1    you know, another round potential of travel to London in
2    December after the Thanksgiving holiday for six hours
3    estimated of depositions.
4         MR. BAGHDASSARIAN:  Your Honor, let me address
5    that.
6         So the estimate that we gave was an estimate.
7    What our approach was, and again there was, sure, it's all
8    in the correspondence, a lot of back and forth on this
9    issue.  But what we had proposed is we have identified these
10   three individuals, say, well, we may not even need them,
11   depending on what we -- how we depose the others.  And the
12   schedule that has ultimately been agreed to as you can see
13   is a pretty compressed -- it's a very compressed schedule.
14   What, 13 out of 19 days, however we presented it.
15        Our only point here was at some point,
16   Fraunhofer did agree.  I guess they have agreed they will
17   tack them on at the end.
18        And the issue with tacking on at the end, that
19   it is so compressed, there is zero time, there is no time
20   at all to digest because we're basically doing depositions
21   every single day for a two and-a-half week period, to digest
22   the information we get so we can figure out in a reasonable
23   way, you know, should we even do these depositions or not?
24        So what we were looking for, and the issue here
25   is that you have that Thanksgiving week right at the end,

49

1    right at the end of that, at the end of that schedule.
2         All we were looking for, because these witnesses
3    have availability, was just to give us a little bit of time
4    to digest, to digest the information so we wouldn't have to
5    be not only taking depositions day after day and then
6    overlapping days in that last week of the schedule for no
7    real reason other than to save a week or 10 days in the
8    schedule.
9         So that is all we were looking to do here.  And
10   Fraunhofer said, no, we're not going to do that.  We're
11   going to do this time frame.  And that is really where the,
12   the core of the dispute here is.
13        THE COURT:  All right.  Let me hear from
14   Fraunhofer on all these issues.
15        MR. McPHIE:  All right, Your Honor.  And again
16   this is David McPhie addressing the issues for Fraunhofer.
17        I'll start, I guess I will go in order, the same
18   that we did earlier.
19        As we indicated in our brief, the question
20   about how time would be allocated between the two days was
21   actually part of a stipulation that was filed with the Court
22   jointly.  This is D.I. 441, at page 2.  There were a few
23   items in that stipulation where we said, hey, we need to
24   meet and confer on this.
25        This is not one of them.  This is somewhere

50

1  where we said we had an agreement in principle which was to
2  do seven hours on the first day and four hours on the second
3  day. And the reason for that --
4        THE COURT: Stop.
5        MR. McPHIE: The reason for that is a very
6  practical one.
7        THE COURT: Excuse me, Mr. McPhie.
8        MR. McPHIE: Yes.
9        THE COURT: On that same page, Document Item
10  No. 441, the bullet point you are referring to is
11  Fraunhofer will schedule each witness to be available for
12  two consecutive days. Specifically, each witness will be
13  available on the first day for up to about seven hours of
14  questioning on the record and on the second day for up to
15  about four hours of questioning on the record.
16        And then at the very last subpoint of this
17  page 2 of 441, it says: XM has proposed that the timing
18  and amount of time for each day of any deposition may need
19  to be adjusted based on the locations of the attorneys and
20  witnesses for the depositions due to differences in time
21  zones.
22        Why does this have to be before the Court? Why
23  does it have to be in black and white? What is a court to
24  do? I can order that it be seven days or four days, but I
25  can also order, as a contingency, that we can't proceed with

51

1  the stamina of the witness, the stamina of the lawyers, the
2  need to take breaks for meals. And if circumstances warrant
3  it, the parties should mutually agree to adjust the time
4  depending on what witness is being deposed and when.
5        I mean I don't understand why this is a point of
6  such disagreement that it has to come before the Court.
7        MR. McPHIE: Your Honor, I don't, I don't
8  understand it either. I don't understand why did Sirius XM
9  decide to bring this issue because typically with respect
10  to that issue about flexibility, which is what I heard Mr.
11  Baghdassarian just talk about, we had stated expressly in
12  meet-and-confer discussions as well as in writing that we're
13  willing to be flexible. That if a witness needs to cut
14  something short a few minutes or, hey, let's say they're
15  going seven hours one day but they just have, they have to
16  finish a line of questions and then they'll be done.
17        Well, that is fine. We are flexible and
18  accommodating in terms of how that cutoff applies exactly.
19        With present to issues of stamina and for the
20  attorneys going forward, the court reporters, to have a
21  seven hour deposition is no issue. This is what we do every
22  day, day in and day out. We have done it when we took
23  depositions of Sirius XM witnesses. It's what is provided
24  under the federal rules. And it is a significant benefit to
25  the parties and the witness in terms of efficiency because

52

1  that means you can get it done, one and done, on a single
2  day.
3        And what I am concerned about, Your Honor, is to
4  stretch out needlessly if there is a witness who is doing
5  okay when we get to hour five or hour six, the witness is
6  doing fine, wants to finish it. The attorneys of course are
7  used to doing it. The court reporter, no issue there.
8        That suddenly it gets cut short, and we all have
9  to show up for a second day: the witness, the attorneys,
10  the court reporter, the translators. When in fact if we had
11  just done a basic seven hour day like you traditionally do,
12  we could have easily been done in a single day.
13        And I don't see that it is any bother to the
14  Sirius XM attorneys because they're starting at 7:00 a.m.,
15  which is exactly the time when we on the West Coast started
16  the remote depositions of Sirius XM witnesses, when we took
17  all of their depositions in this case.
18        It's a little on the early side. That's fine.
19  You go for a seven hour deposition that starts a little bit
20  early. Really, this is no prejudice on either side. Just
21  proceed in the same way that we did or for the Sirius XM
22  witnesses.
23        So we tried to accommodate, yet we originally
24  asked if the witnesses in Europe could basically have the
25  depositions proceed on their business day, so it would start

53

1  at say 8:00 or 9:00 a.m., Europe time. That was our initial
2  proposal. That would have been much earlier for Sirius XM.
3        And so you can see in Exhibit 15, I believe it
4  was, we backed off of that. We said that is fine. We'll
5  have our witnesses start later in the day, around noon in
6  London, and you can start at 7:00 a.m., just the same time
7  where we started.
8        So I don't see an issue here in terms of keeping
9  what the parties had at least tentatively agreed to in D.I.
10  441. And with respect to that last bullet point about
11  meaning to adjust timing based on time zones and that sort
12  of thing, I guess I don't understand how that impacts it
13  here. It's a 4 or 5 hour difference. They knew that.
14  Sirius XM knew that we were having witnesses in Europe and
15  that there would be a time difference between here and New
16  York. It's about four or five hours. This is not the sort
17  of case where you have witnesses in Korea or something like
18  that where you might have a much more substantial time
19  difference.
20        So I think just sticking with the plan that was
21  set forth in 441, which again was at least a tentative
22  agreement, makes a lot more practical sense, consistent with
23  the federal rule, and if there are a few minutes here and
24  there which we have to be flexible, of course, we're willing
25  to do that. But we think that strikes the best balance for

54   56

1 everyone here.

2         THE COURT:  All right.  I will let you get to

3 the other issues as well, but I want to hear back from

4 Mr. Baghdassarian on the timing issues.

5         Is there any -- is the solution to this to make

6 the 7:00 a.m. the default start time, and seven hours on the

7 first day, the default consistently with the federal rules?

8 I know the federal rules weren't contemplating the remote

9 deposition in such differing time zones with the witness and

10 potentially lawyers involved in the deposition.

11         But is a solution here to make that the

12 default and then to let the parties in real-time adjust as

13 circumstances warrant?  I mean I don't know how the court

14 can fashion relief here.  You know, it's all contingent on

15 what occurs that particular day in the deposition.

16         MR. BAGHDASSARIAN:  Your Honor, I need to

17 apologize because my -- for some reason, my phone cut out

18 when you asked Mr. McPhie the question about what, what the

19 August 13th filing showed.  But I did get, I did get back

20 on, and I didn't want to interrupt Mr. McPhie's arguments as

21 he went through the issue on the start time.  So I don't

22 have the exact time.

23         THE COURT:  I was just pointing out that even

24 though that page 2 of the Document Item 441, that the August

25 13th agreement with respect to format and logistics for each

1         MR. ROVNER:  Your Honor, this is Phil Rovner for

2 Sirius XM.

3         THE COURT:  Go ahead.

4         MR. ROVNER:  I don't know how much

5 Mr. Baghdassarian missed, but I do want to comment, in case

6 he did, on something that Mr. McPhie said.  I think it has

7 bearing on what we're talking about here.

8         Mr. McPhie stressed that the reason we should

9 have seven hour depositions here is that we do it every day.

10 As lawyers, this is what we do.  We do seven hours.  And

11 that is true.

12         But in this case, all of the depositions that we

13 will be taking are going to be translated.  So this is not a

14 typical deposition that is seven hours, and that we have to

15 have this, this discussion.

16         If every deposition proceeds with a translator,

17 as we have been told they will, this is not a typical seven

18 hours, and we will need to be flexible.  So to have to

19 default to seven hours when no deposition is supposed to be

20 seven hours because of the translator seems silly.

21         So we think that we should just be flexible

22 here.  And as Mr. Baghdassarian said, if we have to go six

23 hours and five, so be it.  But to say seven when we're --

24 when this is not a deposition in English seems not the way

25 to go.

55   57

1 deposition indicated that seven hours on the first day, four

2 hours on the second day.  I was reading SXM's bullet point

3 at the very bottom of that page 2 that said basically, it

4 left some adjustment room for circumstances based on the

5 locations of the attorneys and the witnesses due to

6 differences in time zones.

7         So, you know, that's all I was asking.  How

8 black and white is this?

9         MR. BAGHDASSARIAN:  Yes, and I understand that.

10 And I think -- I don't think it is that black and white.  I

11 think the intent of all of it was for the parties to see how

12 the depositions went and try to figure out, you know, what

13 the best approach is.

14         For example, you know, if we're at the five

15 and-a-half hour point and we have, we have an hour of

16 questions left, of course, there is no reason to come back

17 the next day.  But if there still at least that amount of

18 time left, if there is another four, four and-a-half hours

19 of questioning, it does make sense potentially if there is

20 an appropriate breaking point.

21         And all we're looking for is to have that

22 flexibility in real-time.  And our concern is and has always

23 been Fraunhofer saying no, we're not, we're not going to

24 agree to that.  And that is why we have this, we have this

25 particular dispute in front of you.

1         THE COURT:  All right.  Anything else?

2         MR. McPHIE:  Your Honor, may I?

3         THE COURT:  Mr. McPhie, go ahead.

4         MR. McPHIE:  Yes.  If I may respond to that last

5 point.

6         The point about seven hours under the federal

7 rules is a response to Mr. Baghdassarian questioning whether

8 the witness, the attorneys, the reporter would have, I think

9 the word he used, was "stamina" to go for a seven hour day

10 on the record.  And I think it's clear that they are.

11 That's the only point there.

12         I think the idea of having a default where we

13 say let's go for seven hours on the record starting at 7:00

14 a.m., and if there needs to be some sort of accommodation,

15 flexibility, we're open to that.  We said that expressly in

16 our meet and confer as well as in Exhibit K.  You can read

17 it.

18         We have always said that we're willing to be

19 flexible and appear in minutes there, but let's have a

20 default so we at least know parameters of what we are going

21 into for the witnesses, if not for no other reason.  To go

22 in and say I understand I'm going to be available for up to

23 seven hours on the record on Day One, so they can schedule

24 their lives accordingly.

25         I think that is all I have to say on that first

58

1 point, unless Your Honor has other questions.

2 THE COURT: No. On the first point, the default

3 is 7:00 a.m. Eastern start time, and the default is seven

4 hours on the first day, followed by four hours on the second

5 day.

6 Having said what the defaults are, I am ordering

7 the parties, both sides, to be sensible and flexible to

8 adjust to the particular circumstances of a particular

9 deponent and deposition day, and make adjustments as needed

10 without the necessity of getting the Court on the line

11 during the course of the deposition to deal with timing

12 issues.

13 So now I will ask Mr. McPhie to address the

14 translation time. This is one where I could see some -- not

15 that I think either party would behave improperly or in a

16 manner that would irritate the Court, but I could see a

17 means of maneuvering the translation time into a strategic

18 advantage to eat away at the questioning party's time.

19 But is there a way to deal with this? I mean

20 again, this strikes me as something that I can't really

21 speculate on, you know, because until this happens in

22 real-time, it may be a nonissue. It may be that the

23 translation goes on uneventfully as in most cases where a

24 translator is needed to assist in the process. And as

25 far as the check translator, I don't really see that as

59

1 potentially eating away at the other side's time, but if

2 it's going to be used inadvertently or otherwise in that

3 fashion, then there has to be some relief that the other

4 side can count on having the full value of the two days of

5 deposition to finish its questioning.

6 I mean the intent here is to make this a

7 meaningful exercise for both sides. So how do we address

8 this?

9 MR. McPHIE: Thank you, Your Honor. Let me try

10 to address it briefly.

11 Point No. 1 is that when this issue came up of

12 translation time earlier, the Court granted and used the

13 word "generous additional time" with four additional hours.

14 And the Court noticed that was actually above what the cases

15 cited usually allowed, but that it was providing extra time

16 sort of out of an abundance of caution for Sirius XM.

17 But I think a lot of these issues about what

18 about translation time, this has already been fully

19 accounted for in some manner.

20 The second point is, is it a nonissue? I think

21 that is part of the issue here. We don't think it is ripe.

22 We tried to accommodate the hypothetical

23 concerns of Sirius XM by letting them know, yes, if you want

24 to track check interpreter time on the record, go ahead and

25 do that. Please just do it. We can coordinate to make that

60

1 happen.

2 And if at the end of a deposition something

3 crazy happens and you find out, hey, this check interpreter

4 seems to have been abusive here under the circumstances, and

5 it actually turns out that out of the deposition, a third of

6 the time was taken up by the check interpreter or a fourth

7 or whatever, at that point, yes, well, let's talk about it.

8 I think the parties at that point would be reasonable and

9 discuss it, but then you have a concrete issue that can be

10 addressed and we track it in a way so it can be, it can be

11 addressed.

12 It's an unusual approach. I haven't seen Sirius

13 XM point to any case where we adopt such a manner of having

14 some sort of strict rule where you count the time and then

15 deduct it at the end.

16 I worry a little bit about mischief I guess on

17 the other end as well where, where you potentially have

18 someone who is counting up time and using it against us in

19 an improper way.

20 We tried to say that if there is a significant

21 translation issue that needs to happen with a document or

22 something like that, let's just go off the record. And that

23 is not a problem. If there is a witness who for whatever

24 reason is looking at a document and says I'm really not

25 comfortable responding here, well, that is fine. But that

61

1 is the sort of commonsense stuff that lawyers do all the

2 time in a deposition.

3 So I feel like with those accommodations, that

4 Sirius XM has everything that it can reasonably ask for.

5 And I don't see the need at this stage with, with the issue

6 not being ripe for resolution, I don't see the need to put

7 on an additional laborious mechanism for counting and

8 deducting time which I worry could actually end up creating

9 more disputes than it would avoid them.

10 But that's what I have to say on the second

11 point.

12 THE COURT: All right. Anything further on that

13 point, Mr. Baghdassarian?

14 MR. BAGHDASSARIAN: Yes, Your Honor. Just

15 briefly.

16 Because of the translator, depositions are going

17 to go something like this:

18 Question asked, question translated.

19 Potentially questions fixed or with the second

20 translator responds in German, translator from German to

21 English, and then the following question asked. That is

22 going to take extra time.

23 To me, to account for the translation of

24 documents and the check interpreter, this is not

25 theoretical, this is going to happen. The check translator

62

1 is there, and we should be able to easily track that time.
2 The videographer can do that. We just track that time. And
3 then that, that just doesn't count. It's not theoretical at
4 all. It is going to happen.
5      Under Mr. McPhie's approach is that, okay, well,
6 let's see if this is an issue, and then what do we do? Now
7 we come back to Your Honor with a fight over this, over
8 however much time it is and then we have to go and redo the
9 deposition again?
10      You know, he mentioned laborious. That is much,
11 a much worse situation than just having an understanding of
12 the rules of the game going in. Let's just track this time,
13 which we can, and, and it just won't count against our time.
14 It's just, it's fair and reasonable. That way we don't, we
15 don't have to worry about we know the rules of the game
16 going in. And if there is some mischief on either side, as
17 Mr. McPhie raises, we can bring that to Your Honor, but just
18 having us, knowing the rules of the game going in, there
19 should be no issue at that point.
20      THE COURT: Well, I'll set the parties
21 straight --
22      MR. McPHIE: Your Honor --
23      THE COURT: -- in case -- I heard enough on
24 this. I will set the parties straight in case it wasn't
25 clear. When I gave you an order with my guidance on

64

1      And I am not going to make a blanket order that
2 this check translation does not -- you know, it's going to
3 be giving Sirius XM additional time. I mean both sides are
4 certainly free to check the amount of time needed for
5 translation, and if one or the other side believes it is
6 unnecessarily lengthy and delays the process, you can bring
7 it to my attention and seek sanctions. But I'm not going to
8 make a blanket order on a situation that has not come about
9 and is hard to envision coming about in these circumstances.
10      You know, this happens all the time in
11 litigation. The services of a translator are needed. And
12 it does prolong the process, but it shouldn't be used to
13 intentionally prolong or eat away at a party's time for
14 questioning.
15      And if it does, and if it happens inadvertently
16 and there is a problem with the translator as opposed to,
17 you know, any other -- things out of the control of counsel,
18 then that is something that we'll have to deal with, too.
19      I don't know how you are vetting your
20 translators. I gave you my guidance on it previously to
21 make sure that person was experienced, certified, et cetera.
22 But I leave it to the parties to work these things out and
23 to do it in a sensible and flexible manner.
24      That leaves the final issue of the three
25 witnesses.

63

1 engaging a translator for these depositions that I do
2 not expect that there will be any mischief in the use of
3 translation or in the time that it takes to translate
4 questions and responses and potentially documents in the
5 record.
6      If either side is engaging in any mischief and
7 that gets back to me, there will be sanctions, and there
8 will be briefing on sanctions.
9      I think both sides are aware of where I stand on
10 this. I was in private practice myself for 25 years and had
11 occasion to engage in full trials where the translation
12 services were necessary and all sorts of language issues as
13 well as sign language, a full trial in sign language. So I am
14 fully aware of the additional time embedded in having a
15 translator participate in a deposition or a court proceeding,
16 and that was the basis behind my ruling previously.
17      This issue is not ripe. To the extent one or
18 the other or both sides engage in their own variation of
19 mischief with respect to using the translator as a weapon to
20 eat away that time or unnecessarily prolong the deposition
21 or whatever other mischief can be created, that will be met
22 with sanctions.
23      I think both sides are sensible enough to
24 proceed accordingly. If there is a real concern, I expect
25 it to be brought to the attention of the Court immediately.

65

1      Mr. McPhie, what do we do about that to ensure
2 that there is not an artificial pressure or time constraint
3 on Sirius XM if they find that they do want to have their
4 time with these witnesses, even though presently it does not
5 look like they will take much time. If that turns out not
6 to be the case or it turns out that the deposition schedule
7 isn't conducive to have these witnesses tacked on, what do
8 we do about this?
9      MR. McPHIE: Thank you, Your Honor.
10      So there are a few contingencies I guess the way
11 this could play out.
12      It seems the parties are agreed the most likely
13 outcome is that these three depositions will not happen.
14 They're not -- they were never listed under Rule 26. We
15 don't intend to bring them to trial. We told Sirius XM we
16 don't think they have relevant noncumulative information.
17      I think that is the most likely outcome. And if
18 that is the outcome, of course, there is no problem at all.
19 We go forward and we tell these witnesses that you don't
20 have to fly to London after all. I'm hoping we can get
21 notice of that soon enough before they fly out to London as
22 opposed to after. But I do think that is the most likely
23 thing, so that is not a problem.
24      If it turns out that one or more of these
25 depositions goes forward, in that case, we have been told

66

1 that it would most likely be a very short deposition. An

2 example that was used on our call was maybe two hours.

3      On the 17th of November, we have the whole day

4 free. That we think that that is ample time to cover one,

5 two, or maybe even three of these witnesses. If we just

6 need to just do a quick check in with them to see what they

7 know, okay, you don't know anything. That is fine, or ask

8 about a particular document. We think that can be handled

9 very efficiently on the 17th.

10      We also have on the 19th Ms. Mehler is scheduled

11 to go seven hours in the 18th, up to four hours on the 19th.

12      So if we really do need to -- if we're not

13 able to get it all done on the 17th, it looks like we'll

14 have half a day on the 19th to be able to do any mop up, if

15 necessary.

16      And that will allow us to take care of these

17 witnesses and just get it done in one trip as opposed to

18 having things hanging out there and having further delay.

19      So I think that is not a problem. We've had

20 situations certainly when we took the Sirius XM witnesses

21 where we had multiple witnesses. We have had one time

22 three important witnesses in one week that we were taking,

23 and that is a crunch. You have got to fit that in, but it

24 is what you do, and the law firms in this case are certainly

25 more than capable of handling that.

67

1      So we think all things considered, this is a,

2 it's a reasonable approach. It's an approach where we

3 actually tried to accommodate Sirius XM by putting them at

4 the end. We had them at the beginning. We had them

5 interspersed at the beginning of the schedule originally.

6 Sirius XM really insisted they wanted them at the end. So

7 this is our effort to accommodate to fit them in. I think

8 our offer is more than reasonable at this point.

9      That is what I have on the third point.

10      THE COURT: All right. Mr. Baghdassarian,

11 anything further?

12      MR. BAGHDASSARIAN: Yes, just briefly.

13      So under the current schedule, Your Honor, I

14 know you don't have it in front of you, Mr. McPhie is

15 talking about the 17th and the 18th.

16      The part of the issue here is what I mentioned

17 before, is that, you know, we have accommodated this, you

18 know, what we believe is a truncated schedule, again to move

19 along the case.

20      But we are basically taking depositions

21 continuously for the week before and that week, the 16th and

22 the 18th or the 19th again, and then following up from the

23 week, the week before that; you know, that basically that

24 entire week. And all we were looking for, as I mentioned

25 before, is to have the ability to digest just briefly some

68

1 of these depositions so we can make a determination about

2 whether it makes sense to proceed with these witnesses or

3 not.

4      And what I have heard from Mr. McPhie is it

5 just doesn't allow for any event. And, in fact, if, to

6 accommodate the witnesses, it would be easier for us to be

7 able to have that brief interlude in between them to be able

8 to say, yes, we are going to proceed or, no, we're not going

9 to proceed with those depositions which will actually allow

10 them not to fly out to London, so it benefits the witnesses

11 and counsel to be able to digest the materials.

12      Again, whether or not the witnesses will have

13 relevant information, we're going to find out. Just so you

14 know, I know Mr. McPhie said they never have been put on

15 their 26(a) disclosures.

16      That is not true. They were until depositions

17 started last year. So I think they, I think they were first

18 thought to be potential trial witnesses but not now. They

19 obviously pulled them back. That's when they pulled them

20 back, we said, well, we maybe ought to take these people if

21 the others that you are giving us have the information we're

22 looking for.

23      THE COURT: All right. I have --

24      MR. McPHIE: May I, briefly?

25      THE COURT: Just one question for

69

1 Mr. Baghdassarian first.

2      I have Document Item No. 458 in front of me open

3 to Exhibit L, the first page, as the current deposition

4 schedule. Current as of September 29th email sent from

5 Mr. McPhie to Mr. Baghdassarian.

6      Do I have the -- is that the most accurate

7 schedule? And it does show these witnesses being put on at

8 the end.

9      MR. McPHIE: I believe. That's the week, the

10 week of the 16th that they're put on for.

11      THE COURT: Right. I have the 17th, Nagle, and

12 then Meltzer, and Chu potentially on the 17th. That was the

13 day that Mr. McPhie said was free in its entirety, and then

14 there is a half day as well on the 19th which potentially

15 Meltzer and Chu put on for that day.

16      All right. Let me hear, Mr. McPhie wanted to

17 make a few additional comments before I give the parties my

18 order on this.

19      MR. McPHIE: Yes, Your Honor.

20      I believe maybe there might have been some

21 confusion or misunderstanding on the part of opposing

22 counsel. I don't believe these witnesses were ever listed

23 in our Rule 26 disclosures at any point.

24      It is not an issue of them being added and then

25 taken off. I believe that is correct. I don't see any

70

1 reason why we can't fit them in, get this done, and move on
2 with this case given that they have already cleared the
3 time, they are available, we're going to be there in London.
4 Let's get this done so we can move forward.
5          That's all.
6          THE COURT:  All right.  Well, that is certainly
7 the way the Court's preference and the way the way the
8 schedule appears as I said in this Exhibit 11, Document Item
9 No. 458, it seems to the Court to be a reasonable and
10 workable schedule.  As I said earlier, these things are
11 predictable until both sides are actually doing the
12 deposition.  No one here on this call can know what will
13 come about in terms of things that might potentially upset
14 the schedule.  The parties will deal with that in real-time.
15          To the extent a meaningful meet and confer does
16 not resolve it, you can come back to the Court without
17 prejudice to seek relief.  If there need to be additional
18 days set aside for these or for any other deponents on this
19 schedule because of circumstances beyond the control of
20 counsel and additional relief from the Court as required,
21 then this ruling is without prejudice to do that.
22          But I would again direct the parties to be
23 sensible, to be flexible, and to adjust to circumstances
24 to the best of your ability so that these depositions go
25 forward uneventfully within the schedule that was set by the

71

1 parties to do them.
2          With that, I think that concludes all of our
3 business today.
4          Is there anything further from Fraunhofer?
5          MR. McPHIE:  Nothing further on these issues,
6 Your Honor.
7          Just to highlight one issue that you will see
8 coming up that there has been an issue that has arisen with
9 respect to the narrowing order that Your Honor issued a few
10 months back, and so I expect that we will present that to
11 Your Honor in due time.
12          THE COURT:  All right.  Very well.  Please,
13 again, have a meaningful meet and confer and try to come to
14 terms with it as best you can.  But if it can't be resolved,
15 it certainly is something I will entertain at the
16 appropriate time when the parties follow the procedures to
17 get it before me.
18          Is there anything further on behalf of Sirius
19 XM, Mr. Baghdassarian?
20          MR. BAGHDASSARIAN:  Nothing further from Sirius
21 XM, Your Honor.  Thank you.
22          I will just say that the issue Mr. McPhie
23 raised, it will shock you to learn that there will be an
24 accompanying issue from Sirius XM if that ends up getting
25 presented to the Court.  But we'll leave that for a wait and

1 see.
2          THE COURT:  Very well.  I will, you know, not
3 say anything until I am presented with a request to schedule
4 a teleconference on that joint dispute.  And I will then
5 look on my calendar.
6          All right.  Thank you, everyone, for your
7 time today.  This concludes our teleconference.  I am
8 disconnecting from the call.
9          (Telephone conference ends at 3:52 p.m.)
10
11          I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.
12
13          /s/ Brian P. Gaffigan
          Official Court Reporter
14          U.S. District Court
15
16
17
18
19
20
21
22
23
24
25

**/**

/s [1] - 72:13

**1**

1 [4] - 16:10, 35:8, 44:4, 59:11
10 [1] - 49:7
11 [1] - 70:8
11th [1] - 27:16
12 [1] - 38:4
13 [1] - 48:14
13th [2] - 54:19, 54:25
14 [4] - 8:3, 8:7, 18:19, 33:25
15 [1] - 53:3
15th [1] - 40:15
16th [2] - 67:21, 69:10
17-184-JFB-SRF [1] - 1:8
17th [6] - 66:3, 66:9, 66:13, 67:15, 69:11, 69:12
18th [3] - 66:11, 67:15, 67:22
19 [1] - 48:14
19th [5] - 66:10, 66:11, 66:14, 67:22, 69:14

**2**

2 [6] - 8:1, 26:6, 49:22, 50:17, 54:24, 55:3
20 [1] - 18:24
2017 [1] - 14:6
2021 [1] - 1:10
21 [2] - 34:6, 34:13
25 [1] - 63:10
26 [2] - 65:14, 69:23
26(a [1] - 68:15
29th [1] - 69:4
2:03 [1] - 2:25

**3**

3:52 [1] - 72:9

**4**

4 [1] - 53:13
4138961 [1] - 14:7
441 [6] - 49:22, 50:10, 50:17, 53:10, 53:21, 54:24
449 [1] - 8:1
45 [1] - 30:12
458 [2] - 69:2, 70:9

**460** [1] - 35:8

**5**

5 [1] - 53:13

**7**

7 [1] - 1:10
72(a [1] - 32:25
7:00 [6] - 45:6, 52:14, 53:6, 54:6, 57:13, 58:3

**8**

8:00 [1] - 53:1
8:00-8:30 [1] - 45:7

**9**

9:00 [1] - 53:1
9:00-9:30 [1] - 45:6

**A**

a.m [7] - 45:6, 52:14, 53:1, 53:6, 54:6, 57:14, 58:3
abeyance [5] - 39:3, 39:4, 39:12, 39:15, 40:6
abide [3] - 13:22, 22:23, 34:7
ability [3] - 15:2, 67:25, 70:24
able [10] - 40:13, 44:17, 44:25, 45:16, 62:1, 66:13, 66:14, 68:7, 68:11
absolutely [2] - 16:17, 18:16
abundance [2] - 5:17, 59:16
abusive [1] - 60:4
access [27] - 4:10, 4:12, 8:23, 8:25, 9:14, 10:13, 10:21, 11:14, 11:20, 14:7, 17:10, 17:17, 20:23, 22:16, 22:22, 23:5, 27:1, 27:5, 27:22, 33:10, 33:14, 33:17, 33:19, 36:20, 37:5, 37:9, 37:24
accessible [1] - 14:9
accommodate [5] - 52:23, 59:22, 67:3,

67:7, 68:6
accommodated [1] - 67:17
accommodating [1] - 51:18
accommodation [2] - 47:3, 57:14
accommodations [1] - 61:3
accompanying [1] - 71:24
accordingly [3] - 40:12, 57:24, 63:24
account [1] - 61:23
accounted [1] - 59:19
accounts [1] - 36:14
accurate [3] - 8:5, 69:6, 72:11
acquiring [1] - 7:13
ACTION [1] - 1:4
activities [1] - 32:14
activity [7] - 15:21, 22:25, 23:10, 23:17, 28:7, 37:17, 41:6
actual [1] - 36:1
add [1] - 42:23
added [2] - 46:10, 69:24
addition [2] - 34:15, 36:11
additional [15] - 11:16, 24:14, 25:1, 29:25, 35:5, 36:7, 41:3, 59:13, 61:7, 63:14, 64:3, 69:17, 70:17, 70:20
address [16] - 18:5, 18:8, 21:1, 24:10, 28:3, 32:6, 34:20, 42:7, 44:16, 44:22, 47:7, 47:14, 48:4, 58:13, 59:7, 59:10
addressed [2] - 60:10, 60:11
addressing [2] - 41:1, 49:16
adjust [5] - 51:3, 53:11, 54:12, 58:8, 70:23
adjusted [1] - 50:19
adjustment [1] - 55:4
adjustments [1] - 58:9
admission [1] - 14:15
adopt [2] - 23:12, 60:13
adopted [1] - 37:21
advantage [2] - 45:13, 58:18
adverse [4] - 19:19, 19:22, 19:23, 36:20
adversely [1] - 23:6

affidavit [2] - 33:25, 34:1
affidavits [1] - 20:10
afforded [1] - 13:25
afternoon [4] - 3:1, 3:15, 3:22, 5:8
ago [1] - 42:12
agree [14] - 11:1, 11:21, 12:2, 12:3, 12:19, 13:3, 13:11, 29:3, 40:7, 44:6, 45:2, 48:16, 51:3, 55:24
agreeable [2] - 41:15, 44:2
agreed [6] - 12:19, 34:5, 48:12, 48:16, 53:9, 65:12
agreeing [2] - 29:8, 34:16
agreement [8] - 31:3, 39:1, 46:1, 46:8, 46:13, 50:1, 53:22, 54:25
agreements [5] - 17:11, 18:24, 19:6, 21:19, 35:6
agrees [1] - 36:4
ahead [6] - 32:7, 38:11, 40:23, 56:3, 57:3, 59:24
Alcatel [6] - 7:14, 8:12, 8:13, 8:16, 8:18
Alcatel 's [1] - 8:9
allegation [3] - 30:21, 31:12
allegations [2] - 31:1, 35:1
alleviate [1] - 15:22
allocated [1] - 49:20
allow [3] - 66:16, 68:5, 68:9
allowed [2] - 17:12, 59:15
allowing [1] - 33:7
almost [1] - 22:9
alone [1] - 11:4
alter [2] - 43:12, 44:19
alternative [1] - 44:1
amendment [2] - 29:3, 41:14
American [1] - 43:4
amount [4] - 25:20, 50:18, 55:17, 64:4
ample [1] - 66:4
analogous [1] - 17:15
analogy [1] - 20:19
analysis [3] - 9:12, 15:16, 37:12
AND [1] - 1:2

affidavit [2] - 33:25,
and-a-half [5] - 27:12, 45:15, 48:21, 55:15, 55:18
Anderson [1] - 3:23
ANDERSON [1] - 1:22
ANGEWANDTEN [1] - 1:4
announced [1] - 4:3
answer [3] - 7:5, 15:24, 30:6
answers [1] - 7:20
anticipated [1] - 44:14
anticipating [1] - 47:21
antigen [1] - 43:6
apiece [1] - 44:14
apologize [1] - 54:17
appeals [1] - 39:7
appear [2] - 42:14, 57:19
appearance [1] - 4:3
appearances [2] - 3:4, 3:12
APPEARANCES [2] - 1:14, 2:1
applicable [2] - 28:12, 29:10
application [3] - 28:9, 41:12, 41:23
applies [3] - 23:3, 41:7, 51:18
apply [2] - 23:13, 41:17
approach [8] - 38:17, 42:5, 48:7, 55:13, 60:12, 62:5, 67:2
appropriate [3] - 37:1, 55:20, 71:16
April [2] - 34:6, 34:13
argues [2] - 35:17, 35:25
argument [7] - 4:14, 4:20, 6:11, 10:1, 10:19, 30:10, 32:5
arguments [8] - 4:8, 5:3, 24:6, 24:7, 25:12, 30:15, 43:16, 54:20
arisen [1] - 71:8
arises [1] - 23:16
arms [2] - 25:11, 30:13
arrangements [1] - 44:1
artificial [1] - 65:2
aside [1] - 70:18
assertion [1] - 22:3
assertions [1] - 21:24
asserts [1] - 35:10
assigned [1] - 33:2
assist [2] - 6:17, 58:24
assumed [2] - 21:4,

22:9
**assumption** [2] - 21:20, 41:7
**assurances** [1] - 28:13
**attention** [2] - 63:25, 64:7
**attorney** [1] - 23:18
**attorneys** [10] - 8:25, 23:18, 33:19, 50:19, 51:20, 52:6, 52:9, 52:14, 55:5, 57:8
**audio** [1] - 18:13
**August** [3] - 46:13, 54:19, 54:24
**authored** [1] - 46:20
**authorities** [1] - 43:19
**authorized** [1] - 6:9
**availability** [2] - 43:8, 49:3
**available** [5] - 27:23, 50:11, 50:13, 57:22, 70:3
**avoid** [3] - 23:19, 35:19, 61:9
**await** [1] - 38:15
**aware** [4] - 8:8, 8:15, 63:9, 63:14

**B**

**backed** [1] - 53:4
**background** [2] - 4:25, 20:10
**backgrounds** [1] - 41:21
**Baghdassarian** [26] - 3:24, 5:9, 6:4, 6:23, 7:23, 12:6, 20:12, 20:13, 24:6, 24:16, 25:10, 28:2, 28:3, 32:3, 38:8, 44:22, 51:11, 54:4, 56:5, 56:22, 57:7, 61:13, 67:10, 69:1, 69:5, 71:19
**BAGHDASSARIAN** [26] - 2:3, 5:8, 7:4, 8:6, 9:5, 10:7, 10:22, 12:10, 12:14, 15:24, 17:2, 25:14, 28:17, 29:12, 32:4, 32:8, 38:7, 38:12, 40:20, 44:21, 48:4, 54:16, 55:9, 61:14, 67:12, 71:20
**Baghdassarian 's** [1] - 31:18
**balance** [4] - 10:1, 28:13, 29:9, 53:25
**balanced** [1] - 41:15

**bar** [1] - 37:5
**based** [7] - 20:2, 26:20, 31:1, 47:16, 50:19, 53:11, 55:9
**basic** [1] - 52:11
**basis** [2] - 36:23, 63:16
**Bataillon** [4] - 33:1, 38:14, 38:18, 38:19
**Bataillon 's** [3] - 38:15, 39:20, 39:23
**Beach** [1] - 1:19
**bearing** [1] - 56:7
**BEFORE** [1] - 1:13
**begin** [1] - 18:18
**beginning** [3] - 2:25, 67:4, 67:5
**behalf** [7] - 3:16, 15:23, 18:7, 20:9, 21:1, 24:8, 71:18
**behave** [1] - 58:15
**behind** [1] - 63:16
**believes** [1] - 64:5
**bench** [4] - 32:20, 32:24, 33:2, 37:23
**benefit** [2] - 33:8, 51:24
**benefits** [1] - 68:10
**best** [5] - 20:8, 53:25, 55:13, 70:24, 71:14
**better** [1] - 45:1
**between** [12] - 9:20, 19:1, 21:18, 22:18, 24:22, 25:17, 25:20, 30:19, 31:4, 49:20, 53:15, 68:7
**beyond** [1] - 70:19
**bigger** [1] - 14:14
**bit** [4] - 18:14, 49:3, 52:19, 60:16
**black** [3] - 50:23, 55:8, 55:10
**blanket** [1] - 22:3, 64:1, 64:8
**blending** [1] - 18:15
**blocked** [1] - 16:23
**Boehringer** [1] - 23:14
**boils** [2] - 10:24
**bolsters** [1] - 10:10
**bother** [1] - 52:13
**bottom** [1] - 55:3
**bound** [7] - 11:1, 11:22, 13:11, 29:5, 29:22, 36:8, 37:14
**breaking** [1] - 55:20
**breaks** [1] - 51:2
**BRIAN** [1] - 1:16
**Brian** [3] - 1:25, 3:15, 72:13
**brief** [8] - 4:17, 5:4, 7:8, 26:7, 35:4,

47:13, 49:19, 68:7
**briefing** [6] - 4:17, 10:18, 12:24, 24:13, 32:12, 63:8
**briefly** [9] - 4:5, 24:10, 30:11, 32:4, 59:10, 61:15, 67:12, 67:25, 68:24
**bring** [4] - 51:9, 62:17, 64:6, 65:15
**broadcasting** [1] - 7:15
**broader** [1] - 28:9
**brought** [3] - 45:12, 63:25
**budge** [1] - 45:8
**build** [1] - 45:24
**bullet** [3] - 50:10, 53:10, 55:2
**bumped** [1] - 5:1
**burden** [1] - 21:8
**business** [16] - 8:10, 8:16, 8:18, 9:22, 14:9, 21:13, 21:15, 22:1, 26:8, 26:22, 26:25, 35:6, 35:12, 35:16, 52:25, 71:3
**businesses** [1] - 35:23
**busy** [1] - 39:20
**BY** [4] - 1:16, 1:18, 1:22, 2:3

**C**

**calendar** [2] - 7:25, 72:5
**California** [1] - 1:19
**camera** [1] - 39:13
**canceled** [1] - 35:21
**cancellation** [1] - 43:11
**candid** [1] - 14:15
**cannot** [1] - 14:15
**capable** [1] - 66:25
**capture** [1] - 47:5
**car** [7] - 20:18, 21:12, 21:16, 26:17, 26:19, 35:9, 35:16
**care** [1] - 66:16
**careful** [1] - 6:2
**case** [68] - 5:23, 11:13, 11:15, 12:17, 13:7, 13:9, 13:10, 13:14, 13:17, 14:3, 14:6, 16:1, 16:6, 16:11, 16:19, 17:22, 19:7, 20:20, 20:21, 21:6, 21:15, 21:21, 22:7, 22:8, 23:14, 23:15, 24:3, 24:11, 24:18,

24:25, 25:2, 27:4, 27:24, 28:10, 28:23, 28:24, 29:17, 29:21, 30:9, 31:5, 31:13, 31:15, 31:22, 33:2, 34:9, 34:11, 34:23, 37:10, 37:22, 39:6, 39:9, 39:19, 42:11, 42:24, 43:19, 45:12, 52:17, 53:17, 56:5, 56:12, 60:13, 62:23, 62:24, 65:6, 65:25, 66:24, 67:19, 70:2
**cases** [6] - 22:9, 31:13, 33:20, 39:15, 58:23, 59:14
**caused** [1] - 10:12
**caution** [3] - 5:17, 14:10, 59:16
**cellphone** [1] - 30:22
**certain** [1] - 39:11
**certainly** [9] - 4:21, 6:20, 25:12, 43:25, 64:4, 66:20, 66:24, 70:6, 71:15
**certification** [1] - 34:16
**certified** [1] - 64:21
**certify** [1] - 72:11
**cetera** [1] - 64:21
**change** [2] - 36:22, 42:15
**changing** [2] - 43:22, 43:24
**characterize** [1] - 16:4
**check** [13] - 46:3, 46:7, 46:8, 47:4, 58:25, 59:24, 60:3, 60:6, 61:24, 61:25, 64:2, 64:4, 66:6
**checked** [1] - 10:17
**chosen** [1] - 18:1
**Chrocziel** [1] - 28:22
**Chu** [2] - 69:12, 69:15
**circle** [1] - 42:10
**Circuit** [1] - 39:8
**circumstance** [3] - 16:15, 30:2, 42:15
**circumstances** [12] - 14:5, 16:18, 28:22, 44:9, 51:2, 54:13, 55:4, 58:8, 60:4, 64:9, 70:19, 70:23
**cite** [1] - 26:2
**cited** [5] - 14:3, 22:7, 23:14, 31:14, 59:15
**cities** [1] - 43:7
**citizen** [1] - 43:4
**Civil** [1] - 32:25
**CIVIL** [1] - 1:4
**claims** [1] - 34:21

**clarification** [1] - 41:3
**clear** [10] - 9:20, 13:8, 18:12, 21:7, 21:24, 24:12, 24:21, 41:6, 57:10, 62:25
**cleared** [2] - 11:13, 70:2
**clearly** [2] - 33:4, 42:12
**clerk** [1] - 3:10
**client** [2] - 5:18, 15:23
**client 's** [1] - 47:17
**clients** [1] - 40:18
**clock** [1] - 47:1
**close** [1] - 46:15
**closed** [1] - 40:16
**co** [1] - 3:24
**co-counsel** [1] - 3:24
**Coast** [1] - 52:15
**collaborative** [3] - 21:21, 23:23, 31:3
**combined** [1] - 38:2
**comfortable** [1] - 60:25
**coming** [3] - 10:9, 64:9, 71:8
**comment** [2] - 25:10, 56:5
**comments** [1] - 69:17
**commercial** [1] - 35:13
**committed** [1] - 36:8
**common** [3] - 14:1, 14:10, 22:8
**commonsense** [5] - 14:4, 25:4, 36:9, 36:11, 61:1
**companies** [17] - 9:18, 10:10, 12:17, 12:20, 16:13, 17:16, 21:18, 22:1, 24:22, 25:18, 25:21, 26:14, 26:17, 26:20, 29:15, 30:3, 30:19
**Company** [1] - 17:7
**company** [8] - 8:11, 20:16, 21:5, 24:20, 30:24, 30:25, 32:17
**company 's** [1] - 32:13
**compared** [1] - 8:21
**compete** [7] - 21:13, 21:15, 26:14, 26:15, 26:16, 26:22, 35:6
**competes** [2] - 26:3, 26:8
**competing** [1] - 26:24
**competition** [8] - 21:18, 22:18, 25:17, 30:19, 35:2, 35:15, 36:1, 36:2
**competitive** [39] -

4:15, 9:15, 9:23,
12:18, 12:22, 13:21,
15:21, 16:13, 16:22,
19:3, 20:17, 21:9,
21:22, 21:25, 22:25,
23:10, 23:17, 23:22,
25:20, 25:25, 27:9,
27:21, 28:7, 28:25,
29:15, 30:3, 30:5,
31:8, 32:15, 32:17,
34:20, 34:22, 35:11,
35:18, 35:20, 37:7,
37:17, 41:6

**competitor** [1] - 20:23
**competitor 's** [1] -
20:24
**competitors** [6] -
11:10, 20:20, 21:5,
21:10, 22:6
**comply** [1] - 34:5
**compressed** [3] -
48:13, 48:19
**compromise** [2] -
45:7, 45:16
**computer** [1] - 14:9
**concern** [14] - 7:12,
10:2, 10:11, 14:14,
14:25, 29:6, 34:20,
35:2, 39:5, 39:18,
42:18, 43:9, 55:22,
63:24
**concerned** [2] - 39:22,
52:3
**concerning** [6] - 16:4,
16:7, 27:16, 37:24,
38:4, 46:18
**concerns** [7] - 13:16,
15:22, 36:5, 40:1,
40:3, 40:13, 59:23
**concludes** [1] - 38:25,
71:2, 72:7
**concrete** [1] - 60:9
**conditions** [1] - 33:13
**conducive** [1] - 65:7
**conducting** [1] - 42:21
**confer** [12] - 5:5, 37:2,
39:1, 40:3, 40:12,
40:19, 41:14, 49:24,
51:12, 57:16, 70:15,
71:13
**Conference** [1] - 1:11
**conference** [5] - 2:25,
5:1, 34:13, 38:25,
72:9
**confidential** [46] -
4:12, 5:22, 6:6, 6:8,
6:19, 7:2, 8:23, 8:25,
9:14, 10:14, 11:14,
11:20, 13:13, 14:8,
16:23, 17:10, 17:13,
19:2, 19:12, 19:25,

22:16, 22:22, 23:5,
24:2, 24:17, 25:6,
27:1, 27:5, 27:23,
29:18, 33:11, 33:14,
33:18, 33:19, 33:22,
34:3, 34:8, 34:23,
35:11, 36:13, 37:5,
37:9, 37:20, 37:25,
38:10, 38:21
**confirm** [1] - 41:8
**confirmation** [1] -
34:1
**confirmed** [1] - 37:10
**confusion** [1] - 69:21
**connected** [2] - 26:9,
26:13, 31:2
**connection** [5] -
13:13, 13:20, 34:10,
35:23, 43:11
**consecutive** [1] -
50:12
**consider** [1] - 5:22
**considered** [1] - 67:1
**considering** [1] - 33:4
**consistent** [2] - 37:20,
53:22
**consistently** [1] - 54:7
**constraint** [1] - 65:2
**constructing** [1] -
36:19
**construe** [1] - 33:24
**consultation** [1] -
33:23
**consulting** [2] - 11:16,
13:2
**contemplating** [1] -
54:8
**context** [1] - 32:14
**contingencies** [1] -
65:10
**contingency** [1] -
50:25
**contingent** [1] - 54:14
**Continued** [1] - 2:1
**continuously** [1] -
67:21
**contrary** [1] - 33:4
**contrast** [1] - 8:24
**control** [2] - 64:17,
70:19
**convenience** [1] -
45:10
**coordinate** [1] - 59:25
**copy** [1] - 40:2
**core** [2] - 9:13, 49:12
**correct** [5] - 3:6,
18:20, 41:9, 41:10,
69:25
**correctly** [3] - 4:11,
10:5, 19:16
**correspondence** [1] -

48:8
**corroborate** [1] -
30:18
**corroboration** [1] -
31:7
**CORROON** [1] - 1:22
**counsel** [38] - 3:12,
3:13, 3:21, 3:24, 4:7,
4:19, 6:7, 6:21, 7:7,
7:22, 9:17, 10:13,
11:10, 11:19, 11:25,
13:19, 14:7, 14:8,
14:19, 16:12, 16:21,
17:15, 20:15, 24:12,
25:13, 27:3, 29:15,
29:18, 30:2, 32:2,
37:4, 40:2, 42:7,
43:16, 64:17, 68:11,
69:22, 70:20
**Counsel** [2] - 1:20, 2:4
**count** [6] - 46:16,
47:5, 59:4, 60:14,
62:3, 62:13
**counter** [1] - 25:12
**counting** [2] - 60:18,
61:7
**course** [8] - 18:24,
32:8, 34:12, 52:6,
53:24, 55:16, 58:11,
65:18
**court** [14] - 3:5, 9:3,
22:23, 23:12, 28:5,
31:15, 33:8, 45:14,
50:23, 51:20, 52:7,
52:10, 54:13, 63:15
**Court** [44] - 8:22,
10:21, 13:10, 14:7,
14:11, 15:18, 16:14,
22:21, 24:7, 24:13,
28:11, 29:4, 29:10,
29:25, 32:21, 33:6,
33:16, 33:24, 34:19,
35:13, 36:4, 36:6,
36:12, 36:17, 37:3,
37:6, 37:14, 37:15,
37:24, 40:16, 49:21,
50:22, 51:6, 58:10,
58:16, 59:12, 59:14,
63:25, 70:9, 70:16,
70:20, 71:25, 72:13,
72:14
**COURT** [56] - 1:1, 3:1,
3:7, 3:9, 3:19, 4:1,
5:11, 5:13, 6:3, 7:21,
8:7, 9:25, 10:16,
12:6, 12:11, 15:14,
16:25, 18:4, 18:11,
20:7, 22:20, 24:5,
25:9, 27:25, 29:2,
30:10, 32:1, 32:5,
32:19, 38:11, 38:24,
40:21, 40:23, 41:10,

42:6, 47:12, 49:13,
50:4, 50:7, 50:9,
54:2, 54:23, 56:3,
57:1, 57:3, 58:2,
61:12, 62:20, 62:23,
67:10, 68:23, 68:25,
69:11, 70:6, 71:12,
72:2
**Court's** [4] - 24:1,
28:4, 34:6, 70:7
**cover** [1] - 66:4
**crazy** [1] - 60:3
**create** [2] - 16:21,
20:22
**created** [1] - 63:21
**creates** [2] - 18:14,
29:16
**creating** [1] - 61:8
**crunch** [1] - 66:23
**current** [9] - 9:20,
10:9, 12:20, 23:25,
42:16, 44:7, 67:13,
69:3, 69:4
**customers** [5] - 12:23,
20:18, 26:24, 35:7,
35:9
**cut** [4] - 12:6, 51:13,
52:8, 54:17
**cutoff** [1] - 51:18

## D

**D.I** [2] - 49:22, 53:9
**daily** [1] - 30:4
**data** [2] - 26:17, 36:14
**database** [2] - 26:12
**date** [1] - 5:2
**dates** [1] - 42:20
**DAVID** [1] - 1:19
**David** [4] - 3:16, 5:15,
40:25, 49:16
**day-to-day** [1] - 20:15
**days** [12] - 43:13,
44:15, 48:14, 49:6,
49:7, 49:20, 50:12,
50:24, 59:4, 70:18
**deal** [6] - 15:4, 44:11,
58:11, 58:19, 64:18,
70:14
**dealing** [1] - 23:20
**dealings** [2] - 35:16,
35:22
**dealt** [2] - 39:21, 39:22
**December** [1] - 48:2
**decide** [1] - 51:9
**deciding** [1] - 41:20
**decision** [3] - 6:17,
40:11, 42:11
**decisionmaker** [1] -
9:17

**decisionmakers** [2] -
11:19, 30:5
**decisionmaking** [3] -
16:20, 27:3, 37:7
**decisions** [1] - 35:23
**declaration** [11] - 7:8,
8:2, 9:8, 15:19,
18:19, 18:22, 18:23,
19:5, 21:23, 30:23,
35:1
**declarations** [4] -
18:20, 25:22, 26:1,
30:18
**deduct** [1] - 60:15
**deducting** [1] - 61:8
**default** [8] - 54:6,
54:7, 54:12, 56:19,
57:12, 57:20, 58:2,
58:3
**defaults** [1] - 58:6
**Defendant** [2] - 1:8,
2:4
**defendant** [1] - 16:6
**defendants** [1] - 3:20
**definition** [1] - 21:24
**DELAWARE** [1] - 1:2
**Delaware** [5] - 1:10,
3:13, 3:21, 13:9
**delay** [5] - 18:13, 39:5,
42:23, 43:12, 66:18
**delays** [1] - 64:6
**delineate** [1] - 16:10
**demonstrate** [1] - 19:1
**demonstrated** [1] -
36:5
**denial** [1] - 37:8
**denied** [1] - 14:7
**deny** [3] - 25:23,
25:25, 35:1
**denying** [1] - 9:10
**department** [2] -
23:16, 31:11
**departments** [1] -
23:21
**deponent** [1] - 58:9
**deponents** [1] - 70:18
**depose** [1] - 48:11
**deposed** [1] - 51:4
**deposition** [29] - 5:25,
38:5, 41:1, 42:8,
44:15, 50:18, 51:21,
52:19, 54:9, 54:10,
54:15, 55:1, 56:14,
56:16, 56:19, 56:24,
58:9, 58:11, 59:5,
60:2, 60:5, 61:2,
62:9, 63:15, 63:20,
65:6, 66:1, 69:3,
70:12
**depositions** [28] -
42:19, 42:21, 42:24,

43:23, 44:20, 45:3, 45:22, 48:3, 48:20, 48:23, 49:5, 50:20, 51:23, 52:16, 52:17, 52:25, 55:12, 56:9, 56:12, 61:16, 63:1, 65:13, 65:25, 67:20, 68:1, 68:9, 68:16, 70:24

**DER** [1] - 1:4
**described** [1] - 29:7
**description** [1] - 41:22
**despite** [3] - 14:7, 15:8, 33:18
**detail** [1] - 25:20
**detailed** [1] - 10:13
**determination** [1] - 68:1
**determine** [1] - 33:3
**deviate** [2] - 42:17, 44:9
**dialing** [1] - 3:2
**difference** [4] - 12:25, 53:13, 53:15, 53:19
**differences** [2] - 50:20, 55:6
**different** [7] - 9:9, 26:21, 28:22, 29:7, 42:20, 43:7, 43:8
**differently** [4] - 28:19, 31:19, 31:21, 32:10
**differing** [1] - 54:9
**digest** [7] - 40:17, 48:20, 48:21, 49:4, 67:25, 68:11
**direct** [6] - 12:21, 21:17, 22:18, 32:17, 42:9, 70:22
**directed** [1] - 28:4
**directly** [3] - 12:4, 20:17, 27:10
**disadvantage** [2] - 28:16, 35:11
**disagreement** [2] - 46:5, 51:6
**disclose** [3] - 25:7, 35:13, 37:19
**disclosed** [1] - 37:20
**disclosing** [1] - 6:8
**disclosure** [3] - 36:15, 37:8, 38:20
**disclosures** [3] - 26:2, 68:15, 69:23
**disconnect** [1] - 6:13
**disconnecting** [1] - 72:8
**discovery** [4] - 3:2, 39:3, 39:25, 41:18
**discuss** [2] - 5:24, 60:9
**discussion** [1] - 56:15

**discussions** [1] - 51:12
**dispositive** [1] - 33:1
**dispute** [10] - 3:3, 17:12, 21:3, 30:13, 39:3, 41:18, 43:20, 49:12, 55:25, 72:4
**disputed** [2] - 9:19, 41:16
**disputes** [2] - 43:18, 61:9
**distinction** [1] - 8:11
**distinctions** [1] - 41:21
**distinguishes** [1] - 13:18
**DISTRICT** [2] - 1:1, 1:2
**District** [3] - 13:9, 33:1, 72:14
**dive** [1] - 6:19
**divert** [1] - 27:8
**diverting** [1] - 31:10
**divorce** [1] - 13:14
**Docket** [1] - 7:25
**Document** [7] - 35:8, 50:9, 54:24, 69:2, 70:8
**document** [5] - 46:20, 46:23, 60:21, 60:24, 66:8
**documents** [7] - 25:6, 25:7, 37:20, 39:14, 43:9, 61:24, 63:4
**done** [13] - 38:14, 42:24, 43:19, 51:16, 51:22, 52:1, 52:11, 52:12, 66:13, 66:17, 70:1, 70:4
**double** [1] - 44:5
**down** [4] - 10:24, 10:25, 20:12, 25:2
**downside** [1] - 29:8
**Dr** [30] - 4:10, 6:25, 7:9, 7:13, 8:1, 8:8, 9:8, 9:17, 19:5, 21:23, 24:23, 25:22, 27:19, 28:19, 28:21, 29:14, 30:7, 30:23, 31:8, 32:13, 33:7, 33:21, 33:25, 34:1, 34:2, 34:5, 37:4, 37:15, 41:11, 41:12
**drew** [1] - 9:13
**due** [4] - 39:19, 50:20, 55:5, 71:11
**during** [2] - 27:17, 58:11

## E

**E.V** [1] - 1:5

**early** [2] - 52:18, 52:20
**easier** [1] - 68:6
**easily** [2] - 52:12, 62:1
**Eastern** [1] - 58:3
**easy** [2] - 23:23, 43:5
**eat** [3] - 58:18, 63:20, 64:13
**eating** [1] - 59:1
**efficiency** [1] - 51:25
**efficiently** [1] - 66:9
**effort** [2] - 42:19, 67:7
**either** [11] - 6:19, 19:1, 29:3, 35:24, 39:6, 41:15, 51:8, 52:20, 58:15, 62:16, 63:6
**elicit** [1] - 6:5
**eliminate** [1] - 42:7
**email** [3] - 36:14, 46:14, 69:4
**embedded** [1] - 63:14
**emphasize** [1] - 37:1
**employed** [3] - 8:13, 22:10, 22:14
**employer** [1] - 20:11
**employment** [5] - 7:2, 20:2, 23:2, 33:23, 35:24
**enabled** [1] - 26:9
**enact** [1] - 25:1
**encompasses** [1] - 6:6
**end** [18] - 11:17, 32:6, 44:15, 47:9, 47:15, 47:24, 48:17, 48:18, 48:25, 49:1, 60:2, 60:15, 60:17, 61:8, 67:4, 67:6, 69:8
**ends** [3] - 11:15, 71:24, 72:9
**enforce** [1] - 15:18
**enforcement** [1] - 41:24
**engage** [7] - 15:10, 15:16, 22:1, 23:10, 37:11, 63:11, 63:18
**engaged** [1] - 23:6
**engagement** [1] - 23:22
**engaging** [2] - 63:1, 63:6
**engineering** [2] - 15:16, 37:12
**English** [4] - 46:20, 46:23, 56:24, 61:21
**ensure** [3] - 15:2, 28:12, 65:1
**enter** [1] - 35:5
**entered** [3] - 29:4, 34:13, 42:11
**entering** [1] - 28:11
**enters** [1] - 29:10

**entertain** [1] - 71:15
**entire** [1] - 67:24
**entirety** [1] - 69:13
**entities** [2] - 19:8, 22:18
**entitled** [1] - 25:12
**entity** [5] - 8:9, 8:12, 9:9, 9:10, 31:4
**environment** [1] - 31:8
**envision** [1] - 64:9
**equal** [1] - 45:21
**equally** [1] - 23:13
**equate** [2] - 9:3, 30:7
**equating** [1] - 29:14
**erroneous** [1] - 33:4
**ESQ** [5] - 1:16, 1:18, 1:19, 1:22, 2:3
**establish** [1] - 21:8
**established** [3] - 18:25, 21:11, 30:23
**establishing** [1] - 21:9
**estimate** [4] - 47:22, 48:6
**estimated** [1] - 48:3
**estimation** [2] - 47:17, 47:20
**et** [1] - 64:21
**ethical** [7] - 14:16, 15:2, 24:11, 24:18, 27:11, 36:19, 36:24
**Europe** [5] - 43:1, 43:8, 52:24, 53:1, 53:14
**event** [4] - 22:21, 34:4, 36:22, 68:5
**evidence** [6] - 19:21, 22:19, 22:20, 23:11, 25:17, 36:1
**exact** [1] - 54:22
**exactly** [2] - 51:18, 52:15
**example** [13] - 7:8, 8:21, 15:3, 17:6, 17:7, 22:8, 26:16, 35:12, 39:13, 46:18, 46:25, 55:14, 66:2
**except** [2] - 11:13, 43:16
**exception** [1] - 28:21
**exchange** [1] - 46:14
**excuse** [1] - 50:7
**exercise** [1] - 17:9
**Exhibit** [6] - 8:1, 25:4, 53:3, 57:16, 69:3, 70:8
**exhibits** [3] - 4:24, 6:16, 24:7
**exist** [1] - 44:8
**existing** [4] - 10:9, 25:3, 36:18, 36:22
**expect** [4] - 6:21, 63:2,

63:24, 71:10
**expectation** [1] - 42:22
**expects** [1] - 43:2
**expedite** [1] - 8:5
**experience** [2] - 42:25, 43:17
**experienced** [1] - 64:21
**expert** [25] - 4:10, 9:13, 10:5, 11:3, 11:7, 11:12, 13:18, 17:9, 17:12, 19:17, 20:21, 22:9, 22:23, 23:9, 25:8, 28:14, 28:20, 29:21, 31:22, 33:7, 34:7, 34:14, 36:12, 36:20, 39:25
**expert's** [2] - 8:22, 35:24
**expertise** [1] - 22:12
**experts** [52] - 8:22, 8:24, 10:21, 11:25, 12:16, 13:1, 15:20, 17:19, 17:25, 18:3, 19:2, 19:11, 19:23, 20:10, 20:14, 22:21, 22:24, 23:4, 24:2, 25:7, 28:6, 28:10, 28:12, 28:21, 28:23, 29:5, 29:6, 30:4, 30:8, 31:19, 31:21, 31:23, 32:16, 33:13, 33:17, 33:18, 34:4, 34:9, 34:15, 34:21, 35:1, 36:8, 37:6, 37:15, 37:20, 37:21, 41:5, 41:8, 41:11, 41:17, 41:22
**expiration** [2] - 39:16, 43:12
**explanation** [1] - 45:9
**exposed** [1] - 19:12
**exposure** [5] - 7:1, 19:14, 33:22, 34:2, 38:10
**expressed** [1] - 15:23
**expressly** [2] - 51:11, 57:15
**extent** [2] - 63:17, 70:15
**extra** [2] - 59:15, 61:22

## F

**facilities** [1] - 43:8
**fact** [13] - 5:18, 9:3, 10:20, 11:25, 14:15, 14:17, 16:10, 17:22, 25:21, 26:1, 26:15, 52:10, 68:5

**factual** [1] - 22:17

**failed** [1] - 35:17

**fair** [3] - 41:23, 43:20, 62:14

**fairness** [1] - 29:9

**faith** [1] - 36:23

**fall** [1] - 3:10

**FALLON** [1] - 1:13

**Fallon** [2] - 3:2, 7:4

**far** [2] - 8:5, 58:25

**farm** [1] - 20:8

**FARNAN** [3] - 1:15, 1:16, 3:15

**Farnan** [1] - 3:16

**fashion** [2] - 54:14, 59:3

**faulting** [1] - 39:6

**Fed** [1] - 39:8

**Federal** [1] - 32:25

**federal** [5] - 51:24, 53:23, 54:7, 54:8, 57:6

**felt** [1] - 5:3

**few** [4] - 4:19, 5:11, 25:15, 49:22, 51:14, 53:23, 65:10, 69:17, 71:9

**fight** [1] - 62:7

**fighting** [1] - 45:14

**figure** [5] - 16:5, 40:10, 46:9, 48:22, 55:12

**file** [2] - 38:18, 47:1

**filed** [3] - 38:15, 39:16, 49:21

**filing** [2] - 26:5, 54:19

**filings** [2] - 21:25, 26:4

**final** [2] - 30:14, 64:24

**fine** [6] - 51:17, 52:6, 52:18, 53:4, 60:25, 66:7

**finish** [3] - 51:16, 52:6, 59:5

**firms** [1] - 66:24

**first** [20] - 5:4, 6:23, 9:7, 21:10, 25:16, 27:7, 27:16, 30:17, 42:6, 44:18, 50:2, 50:13, 54:7, 55:1, 57:25, 58:2, 58:4, 68:17, 69:1, 69:3

**Fischer** [3] - 3:18, 5:19, 6:12

**FishMe** [1] - 14:6

**fit** [4] - 5:25, 66:23, 67:7, 70:1

**fits** [1] - 42:1

**five** [5] - 45:23, 52:5, 53:16, 55:14, 56:23

**fixed** [1] - 61:19

**flag** [3] - 6:10, 6:21, 8:21

**flagging** [1] - 6:3

**flexibility** [4] - 45:24, 51:10, 55:22, 57:15

**flexible** [9] - 51:13, 51:17, 53:24, 56:18, 56:21, 57:19, 58:7, 64:23, 70:23

**flight** [3] - 43:6, 43:11

**floor** [1] - 30:15

**fly** [3] - 65:20, 65:21, 68:10

**focus** [7] - 4:13, 10:5, 10:7, 20:7, 20:12, 28:18, 46:12

**follow** [5] - 7:22, 33:12, 39:2, 42:5, 71:16

**followed** [1] - 58:4

**following** [4] - 2:24, 37:1, 61:21, 67:22

**FOR** [1] - 1:2

**Ford** [4] - 17:7, 17:9, 20:20, 20:21

**FORDERUNG** [1] - 1:4

**foregoing** [2] - 34:19, 72:11

**form** [2] - 29:4, 34:9

**Form** [1] - 41:14

**format** [4] - 7:23, 42:21, 44:20, 54:25

**FORSCH** [1] - 1:5

**forth** [6] - 10:17, 25:19, 27:14, 40:8, 48:8, 53:21

**forward** [19] - 6:11, 9:16, 10:11, 15:1, 19:4, 19:16, 23:10, 27:2, 28:25, 35:5, 38:1, 40:19, 41:6, 43:23, 51:20, 65:19, 65:25, 70:4, 70:25

**four** [14] - 40:5, 40:8, 45:19, 45:24, 50:2, 50:15, 50:24, 53:16, 55:1, 55:18, 58:4, 59:13, 66:11

**fourth** [1] - 60:6

**frame** [2] - 39:4, 49:11

**FRANKEL** [1] - 2:2

**frankly** [2] - 44:23, 46:25

**FRAUNHOFER** [1] - 1:4

**Fraunhofer** [47] - 3:3, 3:14, 3:18, 4:10, 5:15, 5:19, 8:2, 8:23, 9:1, 10:17, 14:10, 14:18, 14:23, 17:1, 17:20, 18:4, 18:7,

19:18, 19:20, 19:22, 20:9, 21:1, 22:23, 23:6, 24:8, 28:5, 31:24, 33:6, 33:17, 33:25, 35:17, 35:21, 35:25, 37:2, 37:18, 38:4, 41:1, 41:8, 41:11, 45:19, 48:16, 49:10, 49:14, 49:16, 50:11, 55:23, 71:4

**Fraunhofer 's** [6] - 4:17, 7:7, 10:23, 23:5, 25:13, 33:19

**FRAUNHOFER - GESELLSCHAFT** [1] - 1:4

**free** [7] - 20:23, 43:25, 44:4, 44:6, 64:4, 66:4, 69:13

**front** [5] - 11:18, 44:23, 55:25, 67:14, 69:2

**full** [4] - 4:21, 59:4, 63:11, 63:13

**fully** [3] - 34:5, 59:18, 63:14

**function** [1] - 24:19

**functions** [1] - 24:19

**fundamental** [2] - 12:25, 13:16

**furthermore** [1] - 37:3

**future** [29] - 4:14, 9:22, 10:2, 10:6, 10:7, 12:4, 19:3, 19:9, 19:14, 19:19, 19:21, 20:2, 20:8, 20:13, 21:8, 21:17, 23:2, 23:16, 23:18, 23:22, 29:21, 31:25, 34:20, 34:21, 34:25, 35:18, 36:2, 36:5

**G**

**Gaffigan** [4] - 1:25, 3:6, 33:8, 72:13

**gain** [1] - 11:14

**game** [3] - 62:12, 62:15, 62:18

**generally** [1] - 38:3

**generous** [1] - 59:13

**German** [4] - 42:14, 46:24, 61:20

**Germany** [1] - 42:14

**GESELLSCHAFT** [1] - 1:4

**given** [5] - 17:16, 25:3, 29:18, 44:7, 70:2

**GM** [5] - 15:5, 17:9, 17:10, 20:20, 20:21

**governing** [1] - 32:25

**GPS** [1] - 26:11

**granted** [3] - 27:22, 33:14, 59:12

**greater** [4] - 10:1, 19:18, 31:24, 43:13

**Group** [1] - 8:12

**guess** [5] - 48:16, 49:17, 53:12, 60:16, 65:10

**guidance** [2] - 62:25, 64:20

**guides** [2] - 43:18, 43:21

**guys** [1] - 26:23

**H**

**H&B** [1] - 30:25

**half** [7] - 27:12, 45:15, 48:21, 55:15, 55:18, 66:14, 69:14

**hand** [1] - 43:10

**handle** [1] - 23:24

**handled** [1] - 66:8

**handling** [1] - 66:25

**hanging** [1] - 66:18

**happy** [1] - 5:23

**hard** [1] - 64:9

**harm** [25] - 4:15, 9:15, 9:22, 10:2, 10:6, 10:8, 10:12, 16:14, 16:22, 17:21, 18:2, 19:4, 19:8, 19:14, 19:16, 19:19, 20:2, 20:13, 21:9, 28:25, 34:20, 34:22, 35:18, 35:20, 36:5

**health** [1] - 42:16

**hear** [14] - 4:7, 6:10, 10:18, 12:9, 12:10, 17:1, 27:16, 28:2, 30:11, 41:18, 44:18, 49:13, 54:3, 69:16

**heard** [8] - 4:22, 25:13, 27:7, 30:15, 40:13, 51:10, 62:23, 68:4

**hearing** [5] - 4:4, 17:5, 27:17, 38:2, 42:13

**Hedvat** [1] - 3:25

**HEITTO** [1] - 33:9

**Heitto** [25] - 4:10, 6:25, 7:9, 7:13, 8:8, 18:19, 19:5, 21:23, 24:23, 25:22, 28:19, 29:7, 29:14, 30:8, 30:18, 30:23, 31:8, 33:7, 33:21, 34:2, 34:5, 37:4, 37:16, 41:11

**Heitto 's** [7] - 8:1, 9:8,

9:17, 27:20, 32:14, 33:25, 34:1

**held** [5] - 2:25, 22:8, 23:15, 39:4, 39:14

**hereby** [1] - 72:11

**highlight** [1] - 71:7

**highlighted** [1] - 13:10

**highly** [4] - 16:3, 16:7, 17:15, 27:15

**hinder** [1] - 39:24

**hire** [1] - 17:8

**historical** [5] - 9:20, 10:8, 12:19, 20:10, 34:2

**historically** [1] - 7:13

**history** [5] - 7:3, 10:10, 18:25, 19:15, 39:9

**hit** [1] - 21:3

**hold** [1] - 39:3

**holding** [1] - 40:5

**holiday** [2] - 40:16, 48:2

**Honor** [59] - 3:7, 3:15, 3:22, 5:8, 5:12, 5:14, 5:25, 9:6, 10:22, 11:6, 13:6, 14:17, 15:25, 17:2, 18:6, 18:16, 19:16, 20:4, 21:2, 22:7, 23:1, 24:9, 25:14, 26:6, 27:12, 27:14, 28:17, 29:12, 30:16, 32:9, 38:7, 40:20, 40:22, 40:25, 41:4, 42:4, 44:21, 45:1, 46:19, 48:4, 49:15, 51:7, 52:3, 54:16, 56:1, 57:2, 58:1, 59:9, 61:14, 62:7, 62:17, 62:22, 65:9, 67:13, 69:19, 71:6, 71:9, 71:11, 71:21

**HONORABLE** [1] - 1:13

**honorable** [1] - 13:11

**hope** [3] - 6:7, 7:20, 42:22

**hopefully** [2] - 6:14, 40:12

**hoping** [1] - 65:20

**hour** [14] - 27:17, 45:14, 45:15, 45:19, 51:21, 52:5, 52:11, 52:19, 53:13, 55:15, 56:9, 57:9

**hours** [35] - 44:13, 44:14, 45:4, 45:19, 45:23, 45:24, 47:21, 48:2, 50:2, 50:13, 50:15, 51:15, 53:16,

54:6, 55:1, 55:2, 55:18, 56:10, 56:14, 56:18, 56:19, 56:20, 56:23, 57:6, 57:13, 57:23, 58:4, 59:13, 66:2, 66:11
**house** [22] - 9:17, 10:13, 11:9, 11:19, 11:25, 13:19, 14:7, 14:19, 16:12, 16:21, 17:8, 17:15, 20:15, 23:15, 23:21, 27:3, 29:15, 29:18, 30:2, 30:5, 37:4
**hypothetical** [2] - 36:2, 59:22

## I

**idea** [3] - 30:18, 31:10, 57:12
**identified** [5] - 20:18, 24:16, 35:9, 36:18, 48:9
**identify** [1] - 31:3
**ignores** [1] - 28:18
**imagine** [2] - 6:12, 12:19
**imbalance** [1] - 20:22
**immediately** [1] - 63:25
**impact** [1] - 31:22
**impacts** [1] - 53:12
**implement** [1] - 14:16
**important** [1] - 66:22
**impose** [1] - 45:20
**improper** [1] - 60:19
**improperly** [1] - 58:15
**improve** [1] - 35:14
**IN** [2] - 1:1, 1:2
**in-house** [22] - 9:17, 10:13, 11:9, 11:19, 11:25, 13:19, 14:7, 14:19, 16:12, 16:21, 17:8, 17:15, 20:15, 23:15, 23:21, 27:3, 29:15, 29:18, 30:2, 30:5, 37:4
**inadvertent** [3] - 6:21, 36:15, 37:8
**inadvertently** [3] - 28:15, 59:2, 64:15
**INC** [1] - 1:7
**inclined** [3] - 23:1, 23:12, 39:10
**including** [3] - 26:11, 39:7
**incorporated** [1] - 33:13
**indeed** [1] - 24:15
**indicated** [2] - 49:19,

55:1
**indirectly** [1] - 43:17
**indispensable** [1] - 17:24
**individual** [2] - 24:21, 29:18
**individually** [1] - 25:24
**individuals** [12] - 6:9, 12:16, 16:24, 17:24, 26:3, 26:25, 31:11, 32:11, 32:16, 36:16, 38:10, 48:10
**industry** [2] - 22:5, 22:10
**inflexible** [1] - 37:5
**inform** [1] - 4:22
**information** [65] - 4:12, 5:23, 6:6, 6:8, 6:10, 6:19, 8:17, 8:24, 9:1, 9:15, 10:14, 11:15, 11:20, 13:8, 13:14, 14:8, 14:22, 15:3, 15:9, 15:11, 15:15, 16:1, 16:17, 16:23, 17:11, 17:13, 17:17, 18:21, 19:3, 19:13, 19:25, 20:24, 22:17, 22:22, 23:6, 24:3, 24:17, 24:19, 24:22, 27:1, 27:5, 27:23, 28:15, 29:19, 31:20, 33:11, 33:15, 33:18, 33:20, 34:3, 34:8, 34:23, 35:12, 36:13, 37:11, 37:25, 38:10, 38:21, 48:22, 49:4, 65:16, 68:13, 68:21
**infringement** [3] - 15:16, 16:6, 37:12
**initial** [1] - 53:1
**inner** [1] - 9:19
**inside** [1] - 26:10
**insisted** [1] - 67:6
**instances** [2] - 39:11, 42:1
**instant** [2] - 34:11, 34:17
**institute** [1] - 24:11
**insufficient** [2] - 10:20, 30:3
**insulated** [1] - 37:7
**insurance** [1] - 15:7
**intend** [2] - 6:5, 65:15
**intending** [1] - 8:4
**intends** [1] - 5:21
**intent** [2] - 55:11, 59:6
**intentional** [1] - 16:16
**intentionally** [1] - 64:13

**interaction** [1] - 10:11
**interactions** [6] - 9:22, 9:23, 10:8, 12:22, 14:21, 24:22
**interconnected** [1] - 47:13
**interested** [1] - 20:7
**interference** [1] - 4:6
**interlude** [1] - 68:7
**intern** [1] - 3:10
**international** [1] - 43:3
**internet** [1] - 26:9
**interpretation** [1] - 41:25
**interpreter** [4] - 59:24, 60:3, 60:6, 61:24
**interrupt** [1] - 54:20
**intersections** [1] - 9:20
**interspersed** [1] - 67:5
**inverse** [1] - 31:23
**involved** [21] - 7:10, 7:15, 7:17, 7:19, 8:9, 8:15, 10:3, 12:3, 12:5, 12:21, 15:21, 19:7, 22:24, 25:25, 27:20, 27:21, 28:7, 28:24, 37:16, 41:5, 54:10
**involvement** [2] - 10:4, 30:25
**involves** [1] - 27:10
**involving** [3] - 7:10, 8:16, 34:25
**IRELL** [1] - 1:18
**Irell** [1] - 3:17
**irrelevant** [1] - 31:5
**irritate** [1] - 58:16
**issue** [50] - 4:9, 5:16, 9:7, 14:2, 16:7, 16:14, 19:13, 21:3, 21:20, 23:16, 25:11, 27:17, 29:2, 29:13, 38:23, 39:1, 40:5, 41:16, 41:20, 42:7, 44:12, 45:5, 46:3, 47:2, 47:8, 48:9, 48:18, 48:24, 51:9, 51:10, 51:21, 52:7, 53:8, 54:21, 59:11, 59:21, 60:9, 60:21, 61:5, 62:6, 62:19, 63:17, 64:24, 67:16, 69:24, 71:7, 71:8, 71:22, 71:24
**issued** [2] - 41:4, 71:9
**issues** [26] - 5:25, 9:5, 9:24, 17:21, 22:13, 28:24, 37:24, 38:2, 38:4, 38:6, 39:7,

39:12, 41:2, 44:12, 44:22, 44:24, 47:14, 49:14, 49:16, 51:19, 54:3, 54:4, 58:12, 59:17, 63:12, 71:5
**issuing** [1] - 32:22
**Item** [4] - 7:25, 35:8, 50:9, 54:24, 69:2, 70:8
**items** [1] - 49:23

## J

**job** [7] - 13:15, 13:20, 16:3, 27:19, 27:20, 32:13, 41:21
**jobs** [5] - 11:24, 12:12, 20:15, 30:4, 30:5
**join** [1] - 5:24
**joint** [2] - 40:4, 72:4
**jointly** [1] - 49:22
**Judge** [11] - 1:13, 3:2, 7:4, 33:1, 33:2, 38:13, 38:15, 38:18, 38:19, 39:20, 39:23

## K

**keep** [1] - 25:5
**keeping** [1] - 53:8
**Kelsey** [2] - 3:17, 18:6
**KELSEY** [1] - 1:18
**key** [1] - 35:2
**kind** [3] - 18:15, 22:9, 45:18
**knowing** [1] - 62:18
**knowledge** [1] - 9:11
**knows** [1] - 45:1
**Korea** [1] - 53:17
**KRAMER** [1] - 2:2
**Kramer** [1] - 3:24

## L

**laborious** [2] - 61:7, 62:10
**lack** [1] - 15:1
**laid** [1] - 20:8
**landscape** [3] - 21:25, 25:25, 27:21
**language** [4] - 29:3, 63:12, 63:13
**large** [2] - 23:15, 23:21
**last** [8] - 24:1, 27:18, 49:6, 50:16, 53:10, 57:4, 68:17
**lastly** [1] - 37:18
**law** [17] - 3:10, 13:8,

13:9, 13:17, 14:3, 14:16, 15:2, 16:1, 16:19, 17:22, 21:7, 22:7, 27:4, 29:17, 33:4, 43:19, 66:24
**lawsuit** [1] - 10:15
**lawyers** [4] - 51:1, 54:10, 56:10, 61:1
**lead** [5] - 4:20, 5:6, 5:10, 21:14, 38:6
**learn** [5] - 13:8, 13:13, 13:14, 29:19, 71:23
**learned** [1] - 16:2
**least** [6] - 6:6, 20:17, 53:9, 53:21, 55:17, 57:20
**leave** [2] - 64:22, 71:25
**leaves** [1] - 64:24
**left** [6] - 12:11, 17:24, 17:25, 55:4, 55:16, 55:18
**legal** [3] - 8:12, 23:15, 23:21
**lengthy** [1] - 64:6
**letter** [10] - 4:17, 7:8, 10:18, 10:23, 25:21, 26:6, 35:4, 40:4, 40:9, 40:14
**letters** [1] - 27:14
**letting** [1] - 59:23
**level** [2] - 9:2, 9:4
**LEVIN** [1] - 2:2
**Levin** [1] - 3:24
**licensing** [11] - 4:10, 8:22, 9:13, 11:25, 16:7, 17:8, 17:11, 20:10, 32:14, 33:7, 33:16
**lifted** [2] - 42:23, 43:2
**likelihood** [2] - 19:16, 35:4
**likely** [6] - 10:11, 23:11, 65:12, 65:17, 65:22, 66:1
**limited** [1] - 7:16
**line** [11] - 3:6, 3:8, 3:18, 3:24, 4:2, 5:20, 5:24, 19:6, 51:16, 58:10
**lines** [1] - 27:25
**list** [3] - 25:7, 37:19, 42:19
**listed** [2] - 65:14, 69:22
**litigation** [5] - 24:4, 33:24, 34:17, 36:10, 64:11
**live** [2] - 28:5, 28:8
**lives** [1] - 57:24
**LLP** [4] - 1:15, 1:18,

1:22, 2:2
**locations** [2] - 50:19,
55:5
**logistical** [5] - 5:16,
38:3, 42:21, 44:12,
44:19
**logistics** [2] - 46:15,
54:25
**London** [6] - 48:1,
53:6, 65:20, 65:21,
68:10, 70:3
**look** [7] - 25:22, 26:5,
27:19, 40:3, 40:11,
65:5, 72:5
**looking** [10] - 7:6,
7:21, 8:7, 48:24,
49:2, 49:9, 55:21,
60:24, 67:24, 68:22
**looks** [2] - 16:4, 66:13
**lose** [1] - 17:18
**lost** [1] - 12:13
**Lucent** [1] - 7:14

## M

**M-e-l-t-z-e-r** [1] - 47:19
**Magistrate** [2] - 1:13,
3:2
**major** [1] - 17:16
**managed** [1] - 31:6
**management** [1] -
26:12
**Manella** [1] - 3:17
**MANELLA** [1] - 1:18
**maneuvering** [1] -
58:17
**manner** [3] - 58:16,
59:19, 60:13, 64:23
**manufacturers** [5] -
20:18, 21:12, 21:16,
35:10, 35:16
**mapping** [1] - 26:11
**MARK** [1] - 2:3
**Mark** [4] - 3:24, 5:9,
38:7, 44:21
**marketplace** [2] -
16:22, 26:24
**Marsfal** [1] - 22:8
**material** [6] - 5:3, 7:2,
33:23, 34:17, 37:6,
37:9
**materials** [4] - 6:15,
36:10, 68:11
**matter** [3] - 7:24,
36:18, 41:11
**matters** [3] - 32:6,
33:24, 36:20
**maximize** [2] - 15:17,
37:12
**McPhie** [38] - 1:19,
3:17, 5:12, 5:14,

5:15, 40:22, 40:25,
42:4, 49:15, 49:16,
50:5, 50:7, 50:8,
51:7, 54:18, 56:6,
56:8, 57:2, 57:3,
57:4, 58:13, 59:9,
62:17, 62:22, 65:1,
65:9, 67:14, 68:4,
68:14, 68:24, 69:5,
69:9, 69:13, 69:16,
69:19, 71:5, 71:22
**McPhie 's** [2] - 54:20,
62:5
**meals** [1] - 51:2
**mean** [6] - 44:3, 51:5,
54:13, 58:19, 59:6,
64:3
**meaning** [1] - 53:11
**meaningful** [9] - 20:1,
35:18, 37:1, 37:2,
40:3, 40:19, 59:7,
70:15, 71:13
**means** [5] - 22:5,
23:16, 46:22, 52:1,
58:17
**mechanism** [1] - 61:7
**meet** [12] - 5:5, 37:2,
38:25, 40:3, 40:12,
40:19, 41:13, 49:24,
51:12, 57:16, 70:15,
71:13
**meet-and-confer** [1] -
51:12
**mehler** [1] - 66:10
**Meltzer** [3] - 47:19,
69:12, 69:15
**memorandum** [1] -
32:22
**mentioned** [6] - 23:3,
31:23, 38:13, 62:10,
67:16, 67:24
**Merit** [1] - 1:25
**met** [1] - 63:21
**microphone** [2] - 4:6,
12:8
**Microsoft** [1] - 30:24
**might** [7] - 18:9,
21:12, 21:13, 43:10,
53:18, 69:20, 70:13
**mind** [4] - 13:12,
16:10, 18:11, 31:21
**mindful** [1] - 6:8
**minutes** [4] - 30:12,
51:14, 53:23, 57:19
**mischief** [6] - 60:16,
62:16, 63:2, 63:6,
63:19, 63:21
**missed** [2] - 43:11,
56:5
**missing** [1] - 8:19
**misunderstanding** [1]

- 69:21
**misuse** [2] - 24:2,
24:17
**mobile** [1] - 30:22
**Mobility** [2] - 31:5,
31:7
**model** [1] - 35:12
**modem** [1] - 26:10
**moment** [2] - 28:1,
32:1
**Monday** [1] - 40:15
**monetize** [3] - 16:5,
32:13
**months** [2] - 27:12,
71:10
**mop** [1] - 66:14
**moreover** [3] - 19:10,
19:15, 21:21
**most** [7] - 6:14, 58:23,
65:12, 65:17, 65:22,
66:1, 69:6
**motions** [2] - 6:17,
33:1
**Motor** [1] - 17:7
**mouth** [1] - 8:4
**move** [7] - 20:5, 38:1,
39:10, 47:9, 67:18,
70:1, 70:4
**MR** [47] - 3:15, 3:22,
5:8, 5:12, 5:14, 7:4,
8:6, 9:5, 10:7, 10:22,
12:10, 12:14, 15:24,
17:2, 25:14, 28:17,
29:12, 32:4, 32:8,
38:7, 38:12, 40:20,
40:22, 40:25, 42:4,
44:21, 48:4, 49:15,
50:5, 50:8, 51:7,
54:16, 55:9, 56:1,
56:4, 57:2, 57:4,
59:9, 61:14, 62:22,
65:9, 67:12, 68:24,
69:9, 69:19, 71:5,
71:20
**MS** [6] - 18:6, 18:16,
21:2, 23:1, 24:9,
30:16
**multimedia** [1] - 26:9
**multiple** [2] - 27:14,
66:21
**mute** [1] - 4:6
**muted** [1] - 12:9
**mutually** [4] - 41:15,
44:2, 44:6, 51:3

## N

**NAFTALIS** [1] - 2:2
**Nagel** [1] - 47:18
**NAGEL** [1] - 47:19
**Nagle** [1] - 69:11

**nail** [1] - 25:2
**named** [1] - 8:9
**names** [1] - 4:11
**narrowing** [1] - 71:9
**nature** [2] - 25:20,
38:22
**navigation** [1] - 26:12
**necessarily** [1] - 22:5
**necessary** [4] - 6:1,
10:20, 63:12, 66:15
**necessitate** [1] - 47:25
**necessity** [1] - 58:10
**need** [16] - 4:24, 40:9,
42:9, 42:10, 46:21,
48:10, 49:23, 50:18,
51:2, 54:16, 56:18,
61:5, 61:6, 66:6,
66:12, 70:17
**needed** [4] - 58:9,
58:24, 64:4, 64:11
**needlessly** [1] - 52:4
**needs** [4] - 13:23,
51:13, 57:14, 60:21
**negotiation** [1] - 35:15
**negotiations** [1] - 35:5
**never** [3] - 8:12, 65:14,
68:14
**new** [5] - 2:3, 5:3,
18:21, 31:12
**New** [2] - 2:3, 53:15
**Newport** [1] - 1:19
**next** [4] - 20:6, 27:6,
46:3, 55:17
**NO** [1] - 1:4
**Nokia** [23] - 7:3, 7:13,
9:21, 11:19, 11:25,
12:13, 13:7, 14:16,
14:17, 14:24, 20:3,
21:4, 21:13, 26:21,
30:22, 34:24, 35:3,
35:6, 35:14, 35:22,
36:1, 36:13, 36:18
**non** [1] - 33:1
**non-dispositive** [1] -
33:1
**noncumulative** [1] -
65:16
**none** [2] - 4:4, 28:23
**nonetheless** [2] -
36:6, 47:23
**nonissue** [2] - 58:22,
59:20
**noon** [1] - 53:5
**normal** [1] - 13:1
**normally** [1] - 11:12
**NOTE** [1] - 2:24
**noted** [1] - 16:3
**notes** [2] - 20:24,
72:11
**nothing** [5] - 14:23,
19:22, 21:14, 71:5,

71:20
**notice** [1] - 65:21
**noticed** [1] - 59:14
**notwithstanding** [1] -
11:7, 34:19
**November** [3] - 43:3,
44:4, 66:3
**nowhere** [1] - 27:15
**number** [4] - 20:14,
39:7, 39:19, 43:13

## O

**object** [1] - 17:9
**objected** [1] - 19:18
**objection** [1] - 33:5
**objections** [7] - 32:23,
38:15, 38:19, 38:20,
39:16, 39:17, 39:19
**obligation** [1] - 34:7
**observers** [1] - 4:2
**obtained** [3] - 24:3,
28:15, 34:9, 34:23
**obviously** [2] - 38:20,
68:19
**occasion** [1] - 63:11
**occur** [1] - 20:19
**occurred** [1] - 39:6
**occurs** [2] - 38:18,
54:15
**October** [4] - 1:10,
40:15, 42:13
**OF** [1] - 1:2
**offer** [3] - 25:5, 31:24,
67:8
**offered** [1] - 10:24
**Official** [1] - 72:13
**once** [2] - 16:1, 31:20
**One** [1] - 57:23
**one** [35] - 11:1, 13:16,
17:2, 17:4, 18:20,
20:23, 29:11, 31:3,
39:22, 41:3, 42:1,
45:17, 46:4, 46:19,
47:10, 47:12, 47:13,
49:25, 50:6, 51:15,
52:1, 58:14, 63:17,
64:5, 65:24, 66:4,
66:17, 66:21, 66:22,
68:25, 70:12, 71:7
**one-sided** [1] - 29:11
**ongoing** [2] - 12:20,
21:3
**oOo** [1] - 2:22
**open** [2] - 57:15, 69:2
**operate** [1] - 22:4
**operating** [1] - 8:11
**opine** [1] - 22:13
**opinion** [1] - 32:22
**opinions** [1] - 34:10

**opportunity** [3] - 4:22, 38:13, 40:17
**opposed** [6] - 24:13, 24:25, 30:3, 64:16, 65:22, 66:17
**opposing** [3] - 23:17, 37:5, 69:21
**oral** [1] - 10:19
**Order** [6] - 16:14, 24:1, 29:25, 32:21, 37:23, 41:14
**order** [57] - 4:13, 6:10, 6:20, 11:2, 11:14, 11:22, 13:23, 15:18, 15:20, 22:23, 23:2, 23:9, 23:19, 23:25, 25:3, 25:4, 28:5, 28:12, 28:16, 29:4, 29:10, 29:11, 29:22, 30:1, 32:22, 33:2, 33:6, 33:11, 33:13, 34:6, 34:13, 34:16, 36:9, 36:24, 37:18, 37:25, 38:9, 38:14, 38:16, 41:4, 41:5, 41:13, 41:15, 41:25, 42:11, 42:17, 43:22, 49:17, 50:24, 50:25, 62:25, 64:1, 64:8, 69:18, 71:9
**ordered** [3] - 24:2, 34:6, 42:13
**ordering** [1] - 58:6
**orders** [3] - 36:12, 37:14, 37:15
**originally** [3] - 7:24, 52:23, 67:5
**otherwise** [1] - 59:2
**ought** [1] - 68:20
**outcome** [3] - 65:13, 65:17, 65:18
**outlined** [1] - 14:13
**outset** [1] - 5:17
**outside** [2] - 24:3, 34:9
**outweighs** [1] - 18:2
**overlapping** [3] - 12:23, 26:24, 49:6
**own** [5] - 6:16, 21:24, 35:14, 47:20, 63:18

## P

**p.m** [2] - 2:25, 72:9
**page** [9] - 26:6, 35:8, 40:9, 49:22, 50:9, 50:17, 54:24, 55:3, 69:3
**pages** [1] - 40:5
**pandemic** [3] - 42:16, 44:4, 44:7

**paragraph** [6] - 7:21, 8:3, 8:7, 8:8, 18:19, 33:24
**parameters** [1] - 57:20
**paraphrase** [2] - 26:4, 26:7
**part** [10] - 7:6, 7:12, 18:23, 29:13, 45:17, 45:18, 49:21, 59:21, 67:16, 69:21
**participants** [1] - 4:2
**participate** [1] - 63:15
**participating** [1] - 3:11
**particular** [8] - 18:2, 26:16, 32:12, 54:15, 55:25, 58:8, 66:8
**particularly** [5] - 16:20, 17:17, 23:10, 39:12, 41:24
**parties** [32] - 4:22, 11:16, 19:1, 28:5, 37:21, 38:1, 38:14, 38:25, 39:2, 40:7, 40:13, 41:13, 43:25, 44:5, 44:16, 44:25, 51:3, 51:25, 53:9, 54:12, 55:11, 58:7, 60:8, 62:20, 62:24, 64:22, 65:12, 69:17, 70:14, 70:22, 71:1, 71:16
**party** [5] - 20:20, 23:17, 28:16, 32:23, 58:15
**party 's** [3] - 37:5, 58:18, 64:13
**past** [8] - 10:4, 19:13, 19:23, 23:7, 31:24, 33:23, 34:2, 35:22
**patent** [3] - 15:17, 16:6, 37:13
**patents** [2] - 16:5, 32:13
**path** [2] - 24:22, 40:18
**pause** [3] - 6:11, 6:22, 20:5
**pending** [3] - 6:18, 39:15, 39:19
**people** [2] - 13:11, 68:20
**per** [1] - 45:4
**performed** [1] - 20:15
**perhaps** [1] - 20:6
**period** [2] - 32:24, 48:21
**permit** [3] - 10:21, 22:21, 39:24
**permitted** [2] - 8:22, 33:16
**person** [2] - 42:7,

64:21
**personal** [2] - 42:25, 43:17
**personally** [5] - 15:21, 22:24, 28:6, 37:16, 41:5
**personnel** [1] - 14:9
**perspective** [3] - 8:20, 9:19, 16:10
**persuade** [1] - 42:23
**Phil** [2] - 3:23, 56:1
**PHILIP** [1] - 1:22
**phone** [2] - 18:13, 54:17
**phonetic** [1] - 22:8
**phrase** [1] - 10:3
**pick** [1] - 12:15
**pinned** [1] - 20:12
**pitch** [1] - 15:5
**pitching** [1] - 15:5
**place** [6] - 4:5, 14:20, 15:2, 21:10, 27:8, 35:19
**placed** [1] - 24:7
**Plaintiff** [2] - 1:5, 1:20
**plaintiff** [5] - 3:16, 17:6, 17:7, 17:8, 18:7
**plaintiff 's** [1] - 45:11
**plan** [1] - 53:20
**play** [1] - 65:11
**plead** [2] - 17:20, 17:21
**pledging** [1] - 14:8
**point** [44] - 11:16, 12:12, 12:15, 16:8, 18:23, 20:6, 27:6, 27:18, 29:21, 30:17, 31:10, 31:16, 31:18, 31:19, 32:6, 36:1, 38:21, 38:22, 41:3, 42:2, 48:15, 50:10, 51:5, 53:10, 55:2, 55:15, 55:20, 57:5, 57:6, 57:11, 58:1, 58:2, 59:11, 59:20, 60:7, 60:8, 60:13, 61:11, 61:13, 62:19, 67:8, 67:9, 69:23
**pointed** [4] - 19:17, 21:11, 21:17, 25:21
**pointing** [2] - 18:18, 54:23
**points** [7] - 18:5, 18:8, 20:14, 20:25, 25:15, 30:14, 35:21
**police** [1] - 16:18
**portfolios** [2] - 15:17, 37:13
**portray** [1] - 30:7
**pose** [2] - 19:8, 36:15

**posed** [1] - 19:18
**position** [7] - 9:18, 16:20, 16:21, 19:21, 19:24, 29:7, 40:8
**positions** [4] - 16:12, 32:11, 35:15, 40:11
**potential** [12] - 9:22, 10:12, 12:16, 14:18, 14:21, 21:17, 27:8, 28:25, 34:25, 48:1, 68:18
**potentially** [12] - 12:22, 17:19, 27:2, 54:10, 55:19, 59:1, 60:17, 61:19, 63:4, 69:12, 69:14, 70:13
**Potter** [1] - 3:23
**POTTER** [1] - 1:22
**practical** [2] - 50:6, 53:22
**practicality** [1] - 43:17
**practice** [2] - 37:21, 63:10
**pre** [1] - 41:20
**pre-deciding** [1] - 41:20
**precaution** [1] - 14:1
**precautions** [3] - 14:4, 36:9, 36:11
**preclude** [1] - 22:16
**precluded** [1] - 23:9
**predecessor** [1] - 7:16
**predictable** [1] - 70:11
**preface** [1] - 8:14
**preference** [1] - 70:7
**prejudice** [4] - 36:25, 52:20, 70:17, 70:21
**preparation** [1] - 17:5
**prepared** [1] - 32:20
**prescribed** [1] - 32:24
**present** [4] - 17:20, 46:19, 51:19, 71:10
**presented** [5] - 17:22, 32:12, 48:14, 71:25, 72:3
**presently** [2] - 41:10, 65:4
**pressure** [1] - 65:2
**presumes** [1] - 13:9
**pretty** [2] - 45:5, 48:13
**prevent** [3] - 24:17, 24:19, 38:20
**previous** [5] - 4:25, 5:2, 7:24, 43:24, 44:10
**previously** [9] - 19:2, 19:12, 19:18, 19:19, 23:3, 31:23, 33:16, 63:16, 64:20
**pricing** [1] - 35:12
**principle** [1] - 50:1

**private** [1] - 63:10
**privilege** [1] - 39:13
**privileged** [4] - 9:1, 33:20, 34:8, 39:14
**probative** [1] - 19:20
**problem** [10] - 5:11, 11:6, 16:9, 18:14, 24:18, 60:23, 64:16, 65:18, 65:23, 66:19
**problematic** [1] - 10:4
**problems** [1] - 13:12
**procedural** [1] - 39:9
**procedure** [2] - 27:8, 39:3
**Procedure** [1] - 32:25
**procedures** [1] - 71:16
**proceed** [8] - 5:25, 50:25, 52:21, 52:25, 63:24, 68:2, 68:8, 68:9
**proceeding** [2] - 63:15, 72:11
**proceeds** [1] - 56:16
**process** [4] - 40:17, 58:24, 64:6, 64:12
**produced** [1] - 10:15
**producing** [2] - 28:16, 38:5
**proffered** [1] - 28:6
**progress** [1] - 39:25
**prohibiting** [1] - 36:19
**projects** [2] - 34:25, 35:23
**prolong** [3] - 63:20, 64:12, 64:13
**promise** [1] - 13:22
**pronouncing** [1] - 4:11
**proposal** [2] - 40:8, 53:2
**proposed** [4] - 23:4, 25:5, 48:9, 50:17
**protected** [1] - 34:17
**protection** [2] - 11:5, 11:21, 13:24
**protections** [5] - 10:17, 10:19, 10:24, 13:25, 15:13
**protective** [22] - 4:13, 6:9, 6:20, 11:2, 11:14, 11:22, 13:23, 23:8, 23:19, 23:25, 25:3, 28:15, 29:3, 29:10, 29:22, 30:1, 33:11, 34:16, 36:9, 37:25, 41:14, 41:25
**prove** [1] - 20:21
**provide** [1] - 15:11
**provided** [3] - 25:6, 36:10, 51:23
**provider** [2] - 30:22,

31:2
**providers** [1] - 15:7
**provides** [1] - 8:17
**providing** [1] - 59:15
**provocative** [1] -
20:22
**public** [1] - 21:25
**pulled** [2] - 68:19
**purpose** [2] - 18:20,
18:21
**purposes** [1] - 34:17
**pursuing** [1] - 12:23
**put** [13] - 6:11, 6:22,
8:4, 10:17, 15:2,
15:19, 35:11, 39:15,
61:6, 68:14, 69:7,
69:10, 69:15
**puts** [1] - 35:3
**putting** [2] - 44:13,
67:3

## Q

**qualified** [1] - 22:12
**qualifier** [2] - 7:12,
7:16
**questioning** [7] -
50:14, 50:15, 55:19,
57:7, 58:18, 59:5,
64:14
**questions** [10] - 4:19,
5:11, 6:4, 6:16, 20:4,
51:16, 55:16, 58:1,
61:19, 63:4
**queue** [1] - 39:23
**quick** [2] - 17:3, 66:6
**quickly** [2] - 39:10,
39:21
**quite** [3] - 42:18,
44:23, 46:25
**quote** [1] - 26:8
**quoted** [1] - 26:7
**quoting** [2] - 34:12,
35:8

## R

**RADIO** [1] - 1:7
**radio** [2] - 7:11, 8:10
**raise** [3] - 5:17, 6:2,
38:22
**raised** [7] - 4:14, 5:3,
12:24, 24:6, 28:24,
43:16, 71:23
**raises** [1] - 62:17
**rambling** [1] - 47:10
**rather** [2] - 15:19,
47:24
**reach** [1] - 39:1
**reaching** [2] - 6:17,

24:20
**reaction** [1] - 28:11
**read** [4] - 6:14, 8:8,
9:7, 57:16
**reading** [4] - 10:23,
18:19, 31:13, 55:2
**ready** [1] - 38:1
**real** [12] - 10:11, 13:5,
22:18, 29:16, 29:23,
47:23, 49:7, 54:12,
55:22, 58:22, 63:24,
70:14
**real-time** [4] - 54:12,
55:22, 58:22, 70:14
**really** [18] - 9:16, 9:19,
10:10, 10:23, 13:16,
17:11, 19:13, 21:4,
24:21, 46:3, 46:18,
49:11, 52:20, 58:20,
58:25, 60:24, 66:12,
67:6
**reason** [13] - 6:18, 7:6,
39:11, 41:16, 49:7,
50:3, 50:5, 54:17,
55:16, 56:8, 57:21,
60:24, 70:1
**reasonable** [9] -
36:23, 43:20, 47:3,
48:22, 60:8, 62:14,
67:2, 67:8, 70:9
**reasonably** [1] - 61:4
**reasons** [2] - 27:22,
33:12
**rebut** [1] - 18:21
**rebuttal** [1] - 8:2
**receive** [1] - 19:24
**received** [3] - 4:17,
18:22, 19:2
**receiving** [1] - 4:18
**recognizes** [4] -
13:17, 14:3, 16:1,
16:11
**record** [18] - 3:4, 3:13,
4:3, 7:22, 18:12,
22:19, 36:4, 46:11,
47:18, 50:14, 50:15,
57:10, 57:13, 57:23,
59:24, 60:22, 63:5
**red** [1] - 8:21
**redo** [1] - 62:8
**refer** [1] - 38:3
**reference** [1] - 31:17
**referring** [3] - 7:23,
8:3, 50:10
**reformation** [1] -
14:22
**refused** [1] - 24:11
**regard** [1] - 13:23
**regarding** [5] - 23:16,
28:4, 28:24, 38:3,
41:4

**Registered** [1] - 1:25
**regular** [1] - 41:18
**relate** [1] - 35:22
**related** [3] - 9:10,
21:20, 42:16
**relating** [1] - 36:20
**relationship** [4] -
12:18, 12:21, 13:21,
32:15
**relationships** [2] -
12:20, 32:17
**relevant** [3] - 19:7,
65:16, 68:13
**relief** [6] - 36:24,
36:25, 54:14, 59:3,
70:17, 70:20
**rely** [1] - 21:19
**relying** [1] - 30:21
**remind** [1] - 4:4
**remote** [3] - 42:8,
52:16, 54:8
**remotely** [2] - 2:25,
42:15, 43:23
**repeat** [1] - 12:7
**repeatedly** [1] - 19:10
**repeating** [1] - 30:14
**report** [1] - 25:8
**Reporter** [2] - 1:25,
72:13
**reporter** [3] - 52:7,
52:10, 57:8
**REPORTER** [1] - 3:7
**REPORTER 'S** [1] -
2:24
**reporters** [1] - 51:20
**representation** [5] -
7:18, 15:15, 15:19,
27:15, 37:14
**representative** [1] -
5:19
**represented** [1] -
19:11
**request** [1] - 72:3
**require** [2] - 29:25,
36:19
**required** [3] - 22:16,
29:25, 70:20
**requirement** [1] - 23:8
**requires** [2] - 21:9,
23:25
**reroute** [1] - 23:18
**resolution** [1] - 61:6
**resolve** [1] - 70:16
**resolved** [1] - 71:14
**resolving** [1] - 43:20
**respect** [13] - 8:17,
10:4, 15:17, 24:5,
34:13, 37:13, 37:24,
38:6, 51:9, 53:10,
54:25, 63:19, 71:9
**respective** [6] - 4:7,

7:2, 20:9, 20:11,
36:13, 40:18
**respond** [3] - 28:1,
32:4, 57:4
**responding** [1] -
60:25
**responds** [1] - 61:20
**response** [4] - 4:18,
6:5, 28:8, 57:7
**responses** [1] - 63:4
**responsibilities** [2] -
13:15, 16:3
**responsive** [2] - 5:4,
35:4
**restrictions** [4] -
42:16, 42:22, 43:2,
44:8
**results** [1] - 43:12
**retain** [2] - 8:23, 20:21
**retained** [4] - 28:10,
28:14, 33:17
**return** [2] - 16:20, 43:6
**returning** [2] - 27:3,
30:4
**revenue** [2] - 15:17,
37:13
**reverse** [2] - 15:16,
37:12
**revert** [1] - 42:20
**review** [3] - 33:2,
38:14, 39:13
**reviewed** [1] - 4:25
**ripe** [3] - 59:21, 61:6,
63:17
**rise** [1] - 9:4
**rising** [1] - 9:2
**risk** [14] - 16:13,
16:22, 17:21, 18:1,
19:3, 19:8, 19:18,
20:1, 21:8, 21:9,
31:25, 35:18, 36:15,
37:8
**role** [1] - 27:3
**room** [1] - 55:4
**round** [2] - 47:25, 48:1
**Rovner** [2] - 3:23, 56:1
**ROVNER** [4] - 1:22,
3:22, 56:1, 56:4
**Rule** [4] - 32:25,
65:14, 69:23
**rule** [2] - 53:23, 60:14
**rules** [7] - 51:24, 54:7,
54:8, 57:7, 62:12,
62:15, 62:18
**ruling** [1] - 32:20,
32:24, 33:3, 37:23,
38:15, 39:3, 39:15,
39:16, 40:5, 40:18,
41:24, 43:18, 43:22,
43:24, 43:25, 44:8,
44:10, 63:16, 70:21

**run** [1] - 47:1

## S

**safeguards** [7] -
24:14, 24:16, 25:1,
25:2, 25:4, 35:19,
36:7
**sanctions** [4] - 63:7,
63:8, 63:22, 64:7
**satellite** [4] - 7:11,
7:15, 8:10, 26:20
**satellite -based** [1] -
26:20
**save** [1] - 49:7
**scenario** [1] - 29:16
**schedule** [23] - 39:20,
39:23, 44:15, 47:9,
48:12, 48:13, 49:1,
49:6, 49:8, 50:11,
57:23, 65:6, 67:5,
67:13, 67:18, 69:4,
69:7, 70:8, 70:10,
70:14, 70:19, 70:25,
72:3
**scheduled** [1] - 66:10
**Schuch** [1] - 47:18
**SCHUCH** [1] - 47:18
**Schuetz** [6] - 3:17,
18:7, 25:13, 28:2,
28:4, 30:12
**SCHUETZ** [7] - 1:18,
18:6, 18:16, 21:2,
23:1, 24:9, 30:16
**Schuetz 's** [1] - 28:8
**scope** [1] - 34:9
**SEC** [3] - 26:2, 26:4,
26:5
**second** [10] - 20:5,
31:10, 50:2, 50:14,
52:9, 55:2, 58:4,
59:20, 61:10, 61:19
**sections** [1] - 9:20
**secure** [1] - 36:10
**see** [24] - 6:18, 9:2,
9:25, 20:1, 26:6,
26:8, 42:9, 42:10,
42:15, 48:12, 52:13,
53:3, 53:8, 55:11,
58:14, 58:16, 58:25,
61:5, 61:6, 62:6,
66:6, 69:25, 71:7,
72:1
**seeing** [2] - 8:19, 8:20
**seek** [4] - 36:23,
36:25, 64:7, 70:17
**seeking** [1] - 44:19
**seeks** [1] - 33:6
**sees** [1] - 5:25
**selected** [1] - 34:24
**send** [2] - 39:2, 40:7

**sense** [7] - 14:1, 14:10, 22:11, 46:23, 53:22, 55:19, 68:2

**sensible** [4] - 58:7, 63:23, 64:23, 70:23

**sensitive** [2] - 20:24, 38:22

**sent** [1] - 69:4

**separate** [7] - 8:9, 8:11, 9:12, 13:12, 19:7, 31:4, 35:22

**separately** [4] - 29:5, 31:6, 32:22, 47:25

**September** [4] - 5:2, 7:25, 43:1, 69:4

**serious** [1] - 8:21

**serve** [1] - 32:21

**serves** [1] - 37:23

**services** [7] - 26:11, 26:13, 26:17, 30:22, 31:2, 63:12, 64:11

**session** [1] - 5:5

**set** [11] - 6:16, 25:19, 39:4, 40:8, 41:22, 42:20, 53:21, 62:20, 62:24, 70:18, 70:25

**seven** [24] - 45:18, 45:23, 50:2, 50:13, 50:24, 51:15, 51:21, 52:11, 52:19, 54:6, 55:1, 56:9, 56:10, 56:14, 56:17, 56:19, 56:20, 56:23, 57:6, 57:9, 57:13, 57:23, 58:3, 66:11

**shall** [9] - 15:20, 22:24, 28:6, 33:14, 34:7, 36:12, 37:16, 37:19, 41:5

**Shannon** [1] - 3:25

**sharing** [1] - 14:21

**SHERRY** [1] - 1:13

**Sherry** [1] - 3:2

**shifts** [1] - 28:18

**shock** [1] - 71:23

**shocked** [1] - 44:23

**short** [3] - 51:14, 52:8, 66:1

**show** [8] - 17:23, 19:6, 19:15, 19:23, 21:25, 35:18, 52:9, 69:7

**showed** [1] - 54:19

**showing** [1] - 22:17

**side** [14] - 4:21, 6:19, 28:13, 39:6, 40:7, 40:17, 42:1, 43:19, 52:18, 52:20, 59:4, 62:16, 63:6, 64:5

**side's** [4] - 28:14, 40:11, 41:22, 59:1

**sided** [2] - 29:11

**sides** [12] - 23:3, 23:13, 29:11, 41:16, 41:19, 58:7, 59:7, 63:9, 63:18, 63:23, 64:3, 70:11

**sides '** [1] - 28:9

**Siemens** [26] - 7:3, 9:21, 11:19, 11:24, 12:13, 13:7, 14:16, 14:18, 14:23, 15:18, 20:3, 21:4, 21:12, 31:1, 31:4, 31:5, 31:7, 34:24, 35:3, 35:6, 35:14, 35:22, 36:2, 36:14, 36:18, 37:13

**sight** [1] - 17:18

**sign** [2] - 63:13

**signed** [1] - 34:15

**significant** [5] - 10:14, 35:4, 35:19, 51:24, 60:20

**silly** [1] - 56:20

**similar** [3] - 9:4, 15:6, 41:13

**simple** [2] - 45:5, 47:6

**simply** [3] - 21:6, 31:13, 42:1

**single** [3] - 48:21, 52:1, 52:12

**Sirius** [125] - 3:3, 3:21, 4:12, 4:14, 4:18, 4:19, 5:4, 5:6, 5:21, 5:22, 6:6, 6:24, 7:1, 7:15, 8:20, 8:22, 9:3, 9:21, 10:2, 10:4, 10:14, 11:10, 12:4, 12:18, 12:22, 13:21, 15:4, 15:5, 15:15, 16:9, 18:22, 19:11, 19:12, 19:17, 19:24, 20:17, 20:18, 21:4, 21:5, 21:7, 21:13, 21:18, 21:24, 22:2, 22:22, 22:25, 23:4, 23:23, 24:12, 24:23, 25:17, 26:2, 26:3, 26:4, 26:8, 26:19, 27:9, 27:10, 27:21, 28:7, 29:6, 29:16, 30:19, 30:21, 31:4, 31:13, 32:18, 33:10, 33:14, 33:17, 34:3, 34:4, 34:14, 34:20, 34:21, 34:22, 34:25, 35:2, 35:3, 35:10, 35:15, 35:17, 35:21, 35:25, 36:4, 36:12, 36:17, 36:21, 36:23, 36:25, 37:9, 37:11, 37:17, 38:5, 38:6, 38:13, 41:17, 43:2,

44:18, 44:19, 47:17, 51:8, 51:23, 52:14, 52:16, 52:21, 53:2, 53:14, 56:2, 59:16, 59:23, 60:12, 61:4, 64:3, 65:3, 65:15, 66:20, 67:3, 67:6, 71:18, 71:20, 71:24

**SIRIUS** [1] - 1:7

**Sirius 's** [2] - 9:13, 27:23

**sit** [1] - 29:14

**situated** [4] - 28:19, 31:19, 31:21, 32:10

**situation** [12] - 11:7, 13:18, 13:19, 15:1, 17:6, 17:15, 20:22, 23:20, 29:20, 29:23, 62:11, 64:8

**situations** [2] - 12:23, 66:20

**six** [5] - 18:23, 45:23, 48:2, 52:5, 56:22

**slot** [1] - 43:5

**slower** [2] - 18:12, 18:17

**small** [1] - 31:3

**smartphone** [1] - 26:10

**smartphones** [1] - 26:11

**sold** [1] - 30:24

**solution** [3] - 31:16, 54:5, 54:11

**someone** [1] - 60:18

**sometimes** [1] - 45:22

**somewhere** [1] - 49:25

**soon** [1] - 65:21

**sophisticated** [1] - 26:12

**sorry** [5] - 5:13, 5:14, 32:3, 33:25, 40:24

**sort** [7] - 23:22, 53:11, 53:16, 57:14, 59:16, 60:14, 61:1

**sorts** [1] - 63:12

**Space** [4] - 8:9, 8:13, 8:16, 8:18

**space** [2] - 11:11, 22:15

**speaking** [4] - 4:5, 5:13, 18:11, 40:23

**specific** [5] - 18:9, 21:12, 22:17, 36:18, 37:19

**specifically** [4] - 8:3, 19:10, 50:12

**speculate** [1] - 58:21

**speculative** [1] - 36:3

**spelled** [2] - 33:9,

33:10

**spending** [1] - 46:11

**spent** [1] - 47:4

**split** [1] - 45:21

**spun** [1] - 30:24

**stage** [1] - 61:5

**stamina** [4] - 51:1, 51:19, 57:9

**stand** [1] - 63:9

**standing** [1] - 39:23

**start** [17] - 3:4, 3:12, 3:21, 4:9, 4:16, 18:9, 45:4, 45:6, 45:7, 49:17, 52:25, 53:5, 53:6, 54:6, 54:21, 58:3

**started** [4] - 4:20, 52:15, 53:7, 68:17

**starting** [3] - 3:13, 52:14, 57:13

**starts** [2] - 27:10, 52:19

**statement** [1] - 7:16

**statements** [4] - 7:7, 9:7, 25:16, 25:23

**States** [4] - 43:4, 43:7, 45:13

**STATES** [1] - 1:1

**status** [3] - 36:22, 37:3, 44:7

**stenographer** [2] - 3:5, 33:8

**stenographic** [1] - 72:11

**sticking** [1] - 53:20

**still** [2] - 44:12, 55:17

**stipulation** [2] - 49:21, 49:23

**stop** [1] - 50:4

**storage** [1] - 36:14

**store** [2] - 14:8, 36:12

**straight** [2] - 62:21, 62:24

**strategic** [1] - 58:17

**strategies** [1] - 35:13

**stressed** [1] - 56:8

**stretch** [1] - 52:4

**strict** [1] - 60:14

**strikes** [2] - 53:25, 58:20

**stuff** [2] - 13:3, 61:1

**subject** [2] - 33:11, 33:12

**submission** [2] - 7:24, 7:25

**submissions** [3] - 4:24, 5:1, 24:8

**submit** [1] - 25:8

**submitted** [2] - 8:2, 18:23

**subpoint** [1] - 50:16

**substance** [1] - 46:12

**substantial** [2] - 36:6, 53:18

**substantially** [3] - 7:10, 8:15, 10:3

**sudden** [1] - 44:3

**suddenly** [1] - 52:8

**sued** [1] - 17:7

**sufficient** [2] - 11:4, 15:13

**sufficiently** [1] - 37:7

**suggest** [1] - 38:24

**suggested** [2] - 11:4, 29:24

**suggesting** [1] - 9:8

**suggestion** [1] - 24:10

**suggests** [1] - 7:17

**supposably** [1] - 18:24

**supposed** [1] - 56:19

**surprising** [1] - 22:14

**sustain** [1] - 38:19

**SXM** [3] - 35:3, 35:5, 41:7

**SXM's** [3] - 33:22, 47:20, 55:2

**system** [1] - 45:14

**systems** [4] - 14:9, 14:20, 26:9, 36:14

---

## T

**tack** [2] - 47:24, 48:17

**tacked** [2] - 47:14, 65:7

**tacking** [1] - 48:18

**task** [1] - 43:5

**technology** [5] - 7:11, 21:20, 26:20, 26:21, 26:23

**teed** [1] - 41:18

**teeth** [1] - 15:20, 16:8, 16:15

**telecommunication** [4] - 11:10, 17:16, 20:16, 22:15

**telecommunications** [2] - 20:16, 22:4

**teleconference** [4] - 3:3, 40:10, 72:4, 72:7

**Telephone** [1] - 1:11

**telephone** [2] - 2:24, 72:9

**tension** [1] - 14:18

**tentative** [1] - 53:21

**tentatively** [1] - 53:9

**terms** [9] - 11:1, 11:22, 13:12, 13:22, 51:18, 51:25, 53:8,

70:13, 71:14
**test** [2] - 43:6, 43:12
**testing** [1] - 43:8
**Thanksgiving** [2] -
48:2, 48:25
**THE** [57] - 1:1, 1:2,
3:1, 3:7, 3:9, 3:19,
4:1, 5:11, 5:13, 6:3,
7:21, 8:7, 9:25,
10:16, 12:6, 12:11,
15:14, 16:25, 18:4,
18:11, 20:7, 22:20,
24:5, 25:9, 27:25,
29:2, 30:10, 32:1,
32:5, 32:19, 38:11,
38:24, 40:21, 40:23,
41:10, 42:6, 47:12,
49:13, 50:4, 50:7,
50:9, 54:2, 54:23,
56:3, 57:1, 57:3,
58:2, 61:12, 62:20,
62:23, 67:10, 68:23,
68:25, 69:11, 70:6,
71:12, 72:2
**themselves** [1] - 31:9
**theoretical** [3] - 13:4,
61:25, 62:3
**therefore** [2] - 34:6,
36:2
**thinking** [1] - 17:4
**third** [3] - 47:8, 60:5,
67:9
**Thomas** [2] - 3:18,
5:19
**thoroughly** [1] - 4:23
**three** [12] - 27:12,
43:6, 43:13, 44:14,
47:14, 47:17, 47:21,
48:10, 64:24, 65:13,
66:5, 66:22
**Thursday** [1] - 1:10
**timing** [6] - 44:12,
45:3, 50:17, 53:11,
54:4, 58:11
**today** [8] - 3:11, 10:19,
32:7, 38:2, 38:25,
44:8, 71:3, 72:7
**today's** [1] - 17:5
**together** [1] - 18:15
**took** [4] - 42:18,
51:22, 52:16, 66:20
**top** [2] - 18:10, 26:6
**track** [7] - 25:5, 37:19,
59:24, 60:10, 62:1,
62:2, 62:12
**traditional** [3] - 11:7,
13:1, 13:18
**traditionally** [1] -
52:11
**traffic** [1] - 26:10
**transactional** [1] -

18:25
**transactions** [5] -
7:10, 8:16, 10:8,
10:9, 12:4
**transcript** [6] - 32:20,
33:3, 34:12, 40:2,
42:12, 72:11
**transfer** [1] - 8:17
**translate** [1] - 63:3
**translated** [5] - 46:21,
46:23, 46:24, 56:13,
61:18
**translation** [11] -
58:14, 58:17, 58:23,
59:12, 59:18, 60:21,
61:23, 63:3, 63:11,
64:2, 64:5
**translator** [17] - 46:4,
46:7, 46:9, 47:4,
56:16, 56:20, 58:24,
58:25, 61:16, 61:20,
61:25, 63:1, 63:15,
63:19, 64:11, 64:16
**translators** [2] - 52:10,
64:20
**transmission** [1] -
18:13
**transmit** [1] - 26:18
**transmitting** [1] -
34:22
**travel** [6] - 42:22, 43:3,
43:9, 44:4, 44:8,
48:1
**trial** [3] - 63:13, 65:15,
68:18
**trials** [1] - 63:11
**tried** [4] - 52:23,
59:22, 60:20, 67:3
**trip** [1] - 66:17
**trouble** [1] - 46:4,
47:23
**true** [6] - 11:3, 25:19,
30:20, 56:11, 68:16,
72:11
**truncated** [1] - 67:18
**try** [7] - 11:8, 15:4,
41:23, 43:20, 55:12,
59:9, 71:13
**trying** [2] - 8:5, 43:4
**Tschiedel** [23] - 4:11,
7:1, 7:18, 9:18, 16:9,
24:24, 25:23, 28:19,
29:8, 29:14, 30:8,
30:17, 31:3, 31:6,
31:8, 32:12, 33:9,
33:22, 34:5, 37:4,
37:10, 37:16, 41:12
**TSCHIEDEL** [1] -
33:10
**Tschiedel's** [5] -
15:14, 16:3, 19:5,

21:23, 27:19
**turn** [2] - 4:16, 13:20
**turned** [1] - 39:14
**turning** [1] - 43:22
**turns** [4] - 60:5, 65:5,
65:6, 65:24
**two** [25] - 9:5, 9:24,
10:12, 10:25, 11:9,
11:13, 11:18, 12:17,
14:13, 14:19, 17:16,
17:18, 17:23, 18:2,
26:3, 32:16, 33:16,
38:10, 44:14, 48:21,
49:20, 50:12, 59:4,
66:2, 66:5
**type** [4] - 16:23, 16:24,
22:1, 34:1
**typical** [3] - 11:7,
56:14, 56:17
**typically** [2] - 47:12,
51:9

## U

**U.S** [2] - 43:3, 72:14
**ultimately** [8] - 9:9,
9:21, 12:3, 25:6,
28:18, 32:15, 37:19,
48:12
**unauthorized** [1] -
36:15
**under** [15] - 4:12, 6:9,
6:19, 14:5, 16:18,
23:24, 28:15, 37:25,
42:15, 51:24, 57:6,
60:4, 62:5, 65:14,
67:13
**understood** [1] - 32:8
**Understood** [1] - 42:4
**undisputed** [5] - 6:24,
8:25, 23:4, 33:18,
33:21
**uneventfully** [2] -
58:23, 70:25
**uniform** [1] - 41:23
**unintentional** [1] -
16:16
**UNITED** [1] - 1:1
**United** [4] - 43:4, 43:7,
45:12, 45:13
**unlearn** [1] - 31:20
**unlearned** [1] - 16:2
**unless** [1] - 58:1
**unlike** [2] - 19:22,
32:16
**unnecessarily** [2] -
63:20, 64:6
**unrestricted** [1] - 44:5
**unspecified** [1] - 14:4
**unusual** [2] - 17:15,
60:12

**unwillingness** [2] -
14:14, 15:1
**up** [20] - 11:17, 12:15,
40:18, 41:18, 44:16,
45:21, 46:10, 50:13,
50:14, 52:9, 57:22,
59:11, 60:6, 60:18,
61:8, 66:11, 66:14,
67:22, 71:8, 71:24
**upset** [1] - 70:13

## V

**valid** [1] - 43:14
**value** [1] - 59:4
**variation** [1] - 63:18
**vehicle** [3] - 26:10,
26:13, 31:2
**version** [1] - 46:20
**versus** [2] - 3:3, 42:8
**vetted** [1] - 5:5
**vetting** [1] - 64:19
**viable** [1] - 31:16
**videographer** [1] -
62:2
**view** [1] - 9:4
**violation** [1] - 23:19
**vis-à-vis** [1] - 20:17
**voluntary** [1] - 38:4

## W

**Wadding** [1] - 18:22
**wag** [1] - 6:23
**wait** [1] - 71:25
**walked** [1] - 24:15
**wall** [5] - 24:11, 24:18,
27:11, 36:19, 36:24
**wants** [1] - 52:6
**warrant** [3] - 44:9,
51:2, 54:13
**warranted** [1] - 36:7
**warranting** [1] - 37:8
**Wasim** [1] - 25:19
**wasim** [1] - 26:15
**waste** [1] - 47:1
**ways** [1] - 16:5
**weapon** [1] - 63:19
**week** [12] - 48:21,
48:25, 49:6, 49:7,
66:22, 67:21, 67:23,
67:24, 69:9, 69:10
**West** [1] - 52:15
**whatsoever** [1] -
34:10
**white** [3] - 50:23, 55:8,
55:10
**whole** [1] - 66:3
**willing** [4] - 25:1,
51:13, 53:24, 57:18

**willingness** [1] - 15:10
**Wilmington** [1] - 1:10
**window** [1] - 43:6
**wireless** [1] - 26:10
**wish** [1] - 30:14
**wishes** [1] - 32:23
**withstanding** [1] -
10:2
**witness** [13] - 46:19,
50:11, 50:12, 51:1,
51:4, 51:13, 51:25,
52:4, 52:5, 52:9,
54:9, 57:8, 60:23
**witnesses** [38] -
22:10, 38:4, 42:14,
44:14, 45:10, 45:11,
46:19, 47:8, 47:14,
47:17, 49:2, 50:20,
51:23, 52:16, 52:22,
52:24, 53:5, 53:14,
53:17, 55:5, 57:21,
64:25, 65:4, 65:7,
65:19, 66:5, 66:17,
66:20, 66:21, 66:22,
68:2, 68:6, 68:10,
68:12, 68:18, 69:7,
69:22
**WL** [1] - 14:6
**word** [2] - 57:9, 59:13
**words** [2] - 8:4, 18:14
**workable** [1] - 70:10
**world** [1] - 13:3
**worries** [1] - 43:15
**worry** [3] - 60:16,
61:8, 62:15
**worse** [1] - 62:11
**writing** [1] - 51:12
**written** [1] - 32:22
**wrote** [1] - 46:24

## X

**XM** [107] - 1:7, 3:3,
3:21, 4:12, 4:14,
4:18, 4:19, 5:4, 5:7,
5:21, 5:22, 6:6, 6:24,
7:1, 8:23, 9:21, 10:2,
10:4, 10:14, 11:10,
12:4, 12:18, 12:22,
13:21, 15:4, 15:5,
15:15, 15:22, 18:22,
19:11, 19:12, 19:17,
19:24, 20:17, 20:18,
21:4, 21:5, 21:7,
21:13, 21:18, 22:2,
22:25, 23:4, 23:14,
23:23, 24:12, 24:23,
25:17, 26:3, 27:9,
27:10, 27:21, 28:7,
29:16, 30:19, 30:21,
31:4, 31:13, 32:18,

33:17, 34:3, 34:21,
34:22, 34:25, 35:3,
35:10, 35:15, 35:17,
35:21, 35:25, 36:12,
36:17, 36:21, 36:23,
36:25, 37:11, 37:17,
38:5, 38:6, 38:13,
43:2, 44:18, 44:19,
47:17, 50:17, 51:8,
51:23, 52:14, 52:16,
52:21, 53:2, 53:14,
56:2, 59:16, 59:23,
60:13, 61:4, 64:3,
65:3, 65:15, 66:20,
67:3, 67:6, 71:19,
71:21, 71:24
**XM's** [20] - 7:15, 8:20,
9:4, 16:10, 19:24,
21:24, 22:22, 26:2,
26:4, 26:8, 29:6,
33:10, 33:14, 34:4,
34:14, 34:20, 35:2,
36:5, 37:9, 41:17

## Y

**year** [2] - 42:12, 68:17
**years** [2] - 18:24,
63:10
**York** [3] - 2:3, 53:16
**yourself** [1] - 12:9

## Z

**zero** [1] - 48:19
**zones** [4] - 50:21,
53:11, 54:9, 55:6
**ZUR** [1] - 1:4