

June 16, 2022

<u>**VIA E-FILING**</u>
The Honorable Sherry R. Fallon
J. Caleb Boggs Federal Building
844 N. King Street                                       **FILED UNDER SEAL**
Wilmington, DE 19801-3555

> Re:    *Fraunhofer Gesellschaft zur Förderung der angewandten Forschung e.V. v. Sirius XM Radio Inc.*, No. 17-184-JFB-SRF

Dear Judge Fallon:

Fraunhofer hereby submits this opposition to SXM's opening letter brief (D.I. 571). For the reasons detailed below, SXM's privilege challenges are all without merit and should be denied.

## I.    SXM's Privilege Challenges Should Be Rejected As Untimely

As an initial matter, SXM's privilege challenges should be rejected on procedural grounds as SXM failed to timely raise these issues during fact discovery, despite ample opportunity to do so.

The fact discovery deadline in this case passed on November 19, 2020 (D.I. 280), and the Court confirmed in early 2021 that "[f]act discovery is now complete apart from the depositions of certain German witnesses." D.I. 427 at 4. All of the challenged log entries were disclosed to SXM well before this deadline, either in Fraunhofer's original (Nov. 2017) or supplemental (Sept. 2020) logs. *See* Exs. A, B. As the Court noted earlier, SXM could have—and should have—timely raised any disputes about these "properly identified" entries before fact discovery closed, but chose not to "challenge the assertion of privilege until now." Ex. G at 71:11-14. Moreover, SXM made no effort to address these privilege issues before the depositions of the relevant witnesses, nor did it ask about any privilege log entries during the depositions themselves. *Id.* at 73:4 – 74:14.

With respect to the IPXI issues, SXM's opening brief continues to advance the falsehood that Fraunhofer's reliance on the common interest privilege is somehow a new position that Fraunhofer only recently "pivoted" to. D.I. 571 at 3. The Court already rejected this argument as well:

> I also find some ***delay on Sirius XM's part*** in that it had the privilege log since September of 2020. The privilege log ***clearly shows*** that documents involving Mr. Lipp … had been subject to assertion of the ***common interest privilege***.

Ex. G at 78:2-21 (emphasis added). Fraunhofer's privilege claims relating to Mr. Schubert were also disclosed to SXM by September 2020 at the latest (about 21 months ago), and Mr. Schubert himself was identified in 2017 as a relevant witness with knowledge of "licensing agreements" and "patent-related issues." Ex. 7. That was more than enough time for SXM to pursue any additional discovery or public-records research into the scope and nature of Mr. Schubert's legal qualifications, to the extent SXM believed this might be relevant to Fraunhofer's privilege claims. Given that document discovery has now been closed for over 18 months, it is far too late for SXM to attempt to belatedly raise such issues now.

In any event, SXM's various challenges to Fraunhofer's privilege claims also fail on their merits.

## II.    Fraunhofer Properly Claimed Privilege With Respect To Mr. Schubert

The first set of challenged privilege log entries all relate to Mr. Helmut Schubert, a long-time Fraunhofer employee who was head of the Patent and Licensing Department from the late 1990s until his retirement in 2017. Ex. C (Schubert Tr.) at 9:8-13; 10:1-3; 31:12-23; *see also* D.I. 219, Ex. F at 10. SXM has challenged a set of nine privilege log entries involving Mr. Schubert, specifically Nos. 65, 71, 228, 325, 330, 381, 383, 386, 387. *See* D.I. 571 at 1; Exs. A, B.

SXM's primary argument against privilege is premised on Mr. Schubert's status as a *Patentassessor* under German law, which SXM asserts is a "non-attorney" title that cannot give rise to any privilege in this case. D.I. 571 at 1-2. However, this assertion is incorrect:

> **A 'Patentassessor' is an in-house patent attorney** who is qualified to practice before the German Patent Office, but who is not able to represent a client before the German District Court.

*Heidelberg Harris, Inc. v. Mitsubishi Heavy Ind., Ltd.*, 1996 WL 732522, *9 (N.D. Ill. Dec. 18, 1996) (emphasis added); *see also* Ex. 8 at 4 ("patent assessor has the same powers as a patent attorney"). To become a *Patentassessor*, one must pass the "German patent attorney exam"—a "three-day 'bar' exam" that "concentrat[es] on German patent law, but also cover[s] other areas of German law." Ex. 9 at 1; *Heidelberg*, 1996 WL 732522 at *9. By the same token, *Patentassessors* are **not** limited to merely prosecuting patents before a Patent Office (as SXM suggests), but are authorized to provide legal advice on a range of subjects. *See, e.g.*, *Heidelberg*, 1996 WL 732522 at *9 ("Patentassessors may also provide legal advice to clients on such issues as patentability, patent infringement, and validity."); Ex. 9 at 2 (patent assessors may legally perform tasks such as "securing rights to the results of development work," "negotiating licences," and "pursuing property right infringements").

A distinctive feature of *Patentassessors* is that they are usually employed **in-house** within "industry patent departments" and may only "represent third parties" in certain situations. Ex. 9 at 1; Ex. 8 at 3 (*Patentassessors* generally "may only act for [their] employer"). By contrast, a *Patentanwalt* under German law is more closely analogous to a patent attorney at a law firm, having greater flexibility to represent multiple clients as outside counsel. *See* Ex. O & P; *see also Renfield Corp. v. E. Remy Martin & Co., S.A.*, 98 F.R.D. 442 (D. Decl. 1982) (describing similar role for French "in-house counsel," who may "render legal advice" despite lacking formal bar membership and specific attorney titles).

SXM does not attempt any substantive analysis of the *Patentassessor* role but rather points to differences between **U.S.-style patent agents** and patent attorneys—apparently relying on the fact that *Patentassessor* is sometimes translated into English as "patent agent." *See* D.I. 571 at 1-2. But SXM's linguistic sleight-of-hand is unavailing as the proper analysis is a functional one that does not turn on mere labels. In this case, the overwhelming weight of authority confirms that communications with German patent agents or *Patentassessors* are indeed subject to privilege. *See, e.g.*, *Heidelberg*, 1996 WL 732522 at *9 (*Patentassessor* is the "functional equivalent of an attorney" and "the attorney client privilege therefore applies"); *Cadence Pharm., Inc. v. Fresenius Kabi USA*, LLC, 996 F. Supp. 2d 1015, 1022-23 & n.4 (S.D. Cal. 2014) ("Under German law, written and oral communications between a patent attorney **or agent** and his clients are deemed confidential, and German courts may not compel disclosure or production of such communications."); *Softview Computer Products Corp. v. Haworth, Inc.*, 2000 WL 351411, at *11 (S.D.N.Y. Mar. 31, 2000) (communications with "German patent agents are protected by the

attorney-client privilege to the same extent as communications to [U.S.] attorneys."); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 524 (S.D.N.Y. 1992) ("'Patent Attorney' in Germany is the equivalent of a patent agent," and "German courts may not compel a Patent Attorney to disclose [confidential] communications"); *Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 99 (S.D.N.Y. 2002) ("German law promises confidentiality to communications between a patent attorney *or agent* and his clients … courts may not compel such a patent attorney *or agent* to disclose or produce those communications, whether written or oral."); *see also Renfield*, 98 F.R.D. at 444-45 (applying attorney-client privilege to communications with French "in-house counsel" who was "employed to give legal advice to corporate officials" and "permitted by law to do so," despite lacking "equivalent to [an] American 'bar' … membership").

Thus, contrary to SXM's argument, Mr. Schubert's status as *Patentassessor* is fully consistent with and supports Fraunhofer's privilege claims. SXM's reliance on the limitations of the *U.S.* patent agent privilege has no relevance here, as the privilege applicable to *Patentassessors* broadly extends to *any* communications that "relate to the rendition of legal services." *Cadence*, 996 F. Supp. 2d at 1023, 1025. As a *Patentassessor*, Mr. Schubert was not limited to providing advice regarding the "prosecution of a patent before a Patent Office." *Cf.* D.I. 571 at 2; *see also* Ex. 9 at 2; Exs. O & P. And in any event, the Asserted Patents were all first filed as PCT applications in the European Patent Office (D.I. 1, Exs. A-D) (showing "EP" code), consistent with Mr. Schubert's undisputed qualifications to advise clients on EPO-related matters. *See* Ex. E at 2.[1]

### III.    Fraunhofer Properly Claimed Common Interest Privilege For IPXI Documents

The second set of challenged entries relate to certain Fraunhofer communications with a now-defunct patent licensing entity known as IPXI. SXM has identified seven privilege log entries in this category, specifically Nos. 350, 351, 353, 354, 355, 370, and 371. *See* D.I. 571 at 3; Ex. B. All of these entries contain protected attorney-client communications and attorney work product (*see, e.g.*, Ex. J at 5 & n.7), and certain portions of these documents also reflect content that was shared with IPXI pursuant to a common interest. Notably, SXM's challenge to these entries is directed solely to Fraunhofer's common interest claim; SXM has not disputed any privilege claim for aspects of these documents that were *not* shared with IPXI. *See id.* at 1, 5-6.

SXM's primary approach to this category of documents is to complain about *timing*, asserting that the common interest between Fraunhofer and IPXI allegedly did not yet exist when most of the communications identified in the cited log entries took place (i.e., between November 2013 and January 2014). D.I. 571 at 3-4. This argument is simply mistaken as a matter of both fact and law.

On the facts, the evidentiary record shows that a common interest was already established by the relevant time period. For example, Fraunhofer and IPXI executed a Mutual Nondisclosure Agreement regarding their "mutual interest" no later than April 2013. Ex. 10. The subject matter of this mutual interest was further detailed in a "Private Sponsor Confidential Information Memorandum" from a few months earlier (January 2013), which included a version of the Master Agreement that was ultimately executed by Fraunhofer and IPXI. *Compare* Ex. 11 at -596 *with* Ex. M. That Master Agreement describes coordinated efforts to achieve the exclusive licensing, sublicensing, and/or enforcement of rights pertaining to Fraunhofer's '289 patent. *See* Ex. M at -

---

[1] Additional grounds supporting Fraunhofer's privilege claims were disclosed to SXM in Ex. E, including certain communications to Fraunhofer's in-house attorney Thomas Fischer (Nos. 325, 330) and correspondence incorporating legal communications with the Schoppe firm (No. 383).

154. The agreement also set forth specific provisions spelling out how income resulting from these efforts was to be shared between Fraunhofer and IPXI, meaning that both sides shared an identical legal interest in the strength of the subject patent rights. *See, e.g., id.* § 9; *see also* Ex. 12 ("Exclusive License Agreement"); Ex. L. Given the 2013 NDA, the contemporaneous materials describing the contemplated joint interest, and the ongoing, good-faith discussions toward additional agreements, it is clear that "that at the time of the communications at issue, [Fraunhofer and IPXI] had an expectation that their communications would be confidential." *Crane Sec. Techs*., 230 F. Supp. 3d at 18; *see also Patagonia, Inc. v. Anheuser-Busch, LLC*, 2020 WL 6260005, at *3 (C.D. Cal. Aug. 12, 2020) (relying in part on NDA to find common interest supporting privilege); *see also* Ex. L at -184 (common interest provision).

In any event, there is no legal basis for SXM's argument that a common interest could not have arisen before a full-scale deal was consummated. For example, the Federal Circuit has found that a qualifying common interest exists between an "inventor/patentee" and an "optionee and *potential* licensee," as both entities have the "same interest" in "strong and enforceable patents" that would support "royalty income" and other "commercial activity." *Regents*, 101 F.3d at 1390 (Fed. Cir. 1996). Other courts have similarly confirmed that communications "concerning the strength and enforceability of patents *as [parties] are negotiating exclusive license agreements* are protected under the common-interest doctrine." *Crane Sec. Techs., Inc. v. Rolling Optics*, 230 F. Supp. 3d 10, 19 (D. Mass. 2017). Indeed, SXM's own cited authority confirms that there is no requirement that "parties must have a written agreement or have filed suit to share a legal interest." *TC Tech. LLC v. Sprint Corp.*, 2018 WL 6584122, at *5 (D. Del. Dec. 13, 2018) (applying common interest doctrine and finding "no reason why the formation date should be a hard cut-off for privilege"); *Hilsinger Co. v. Eyeego, LLC*, 2015 WL 11120842, at *2 (D. Mass. Aug. 13, 2015) ("absence of an exclusive licensing agreement at the time the e-mails were sent does not necessitate a finding that the parties to the communication shared no common legal interest"). In essence, SXM is inviting the same "clearly erroneous" approach that was criticized in *AgroFresh Inc. v. Essentiv LLC*, 2019 WL 4917894 (D. Del. Oct. 4, 2019), where no common interest was found despite an early executed agreement to "keep all information confidential" as the parties continued to engage in "future negotiations." *Id.* at *3. That error should not be repeated here.

Finally, SXM is wrong to argue that the existence of *any* potential commercial interest is sufficient to destroy the common interest privilege. It is well-settled that "an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest." *Regents*, 101 F.3d at 1390 (common legal interest in "valid and enforceable patents" intended to "support royalty income"); *Crane Sec. Techs.,* 230 F. Supp. 3d at 16 ("[C]ommunications concerning the strength and enforceability of patents between parties who are negotiating exclusive patent licenses are protected under the common-interest doctrine, even though the communications obviously have a commercial purpose, as well.") (collecting cases); *see also MobileMedia*, 890 F. Supp. 2d at 515 (rejecting argument that legal analysis and communications "regarding coverage under the patents being considered, including mapping the extent of each patent's coverage to help determine its value" related solely to shared commercial interests). And of course, a common interest contemplated during negotiation of a potential patent deal is not destroyed simply because the deal falls through or is unsuccessful. *See TC Tech.*, 2018 WL 6584122, at *4 (interest "in acquiring and enforcing a patent is a legal interest," and later settlement "should not retroactively taint the [privileged] communications").

Fraunhofer therefore submits that SXM's privilege challenges should be rejected in their entirety.

4

Respectfully submitted,

/s/ *Michael J. Farnan*

Michael J. Farnan

cc: Counsel of Record (Via E-Mail)