# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| FRAUNHOFER-GESELLSCHAFT ZUR FÖRDERUNG DER ANGEWANDTEN FORSCH E.V. | ) ) ) ) |  |
| Plaintiff, | ) ) ) | C.A. No. 17-184-VAC-SRF |
| v. | ) |  |
| SIRIUS XM RADIO INC., | ) ) |  |
| Defendant. | ) |  |

**PLAINTIFF'S SUPPLEMENTAL DISCLOSURES PURSUANT TO**
**FEDERAL RULE OF CIVIL PROCEDURE 26(A)(1)**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff Fraunhofer-Gesellschaft Zur Förderung der angewandten Forschung e.V. ("Fraunhofer") provides the following supplemental disclosures based on presently known and available information.

Fraunhofer's disclosures represent a good faith effort to identify information it reasonably believes is discoverable and that it may use to support its claims as required by Rule 26(a)(1) of the Federal Rules of Civil Procedure. These disclosures, while based on diligent exploration by Fraunhofer and its counsel, reflect only the current state of Fraunhofer's knowledge, understanding, and belief on these subjects. Discovery in this case has just recently commenced and Fraunhofer continues to investigate the facts relating to this action. Accordingly, these disclosures are neither intended as, nor shall in any way be deemed, an admission or representation that further disclosures will not be necessary or that previous disclosures were insufficient or incomplete. Fraunhofer anticipates that, as this action proceeds, further information may be discovered, or its significance better understood, and without in any

grounds, including, without limitation, the attorney-client privilege, the work product doctrine and the common interest privilege.  Fraunhofer does not consent to or authorize any communication by Defendant or its counsel with Fraunhofer's employees, officers, directors, agents, or consultants, whether currently or formerly associated with Fraunhofer, and does not consent to or authorize any communication otherwise prohibited by any applicable rule of professional conduct, including applicable rules barring communication with represented parties.

Fraunhofer is not aware of, and hence has not identified, all employees or persons under Defendant's control or known to Defendant who may have discoverable information that Fraunhofer may use to support its claims, as information about the identities of all such individuals is not currently in Fraunhofer's possession.  Fraunhofer also has not identified all employees or persons under third-party control who may have discoverable information that Fraunhofer may use to supported its claims, as information about the identities of all such individuals is not currently in Fraunhofer's possession.  Fraunhofer reserves the right to amend, supplement, or otherwise modify these disclosures based on facts that may be disclosed during discovery.

Subject to the foregoing qualifications, Fraunhofer identifies the following individuals who potentially have discoverable information that Fraunhofer may use to support its claims, unless solely for impeachment:

| Witness | Contact | Summary of anticipated information |
|---|---|---|
| Heinz Gerhäuser | Fraunhofer Counsel | The invention of the asserted 6,314,289; 6,931,084; 6,993,084; and 7,061,997 patents |
| Ernst Eberlein | Fraunhofer Counsel | The invention of the asserted 6,314,289; 6,931,084; 6,993,084; and 7,061,997 patents |

3

| Witness | Contact | Summary of anticipated information |
|---|---|---|
| Sabah Badri | Fraunhofer Counsel | The invention of the asserted 6,931,084; 6,993,084; and 7,061,997 patents |
| Stefan Lipp | Fraunhofer Counsel | The invention of the asserted 6,931,084; 6,993,084; and 7,061,997 patents |
| Stephan Buchholz | Fraunhofer Counsel | The invention of the asserted 6,931,084; 6,993,084; and 7,061,997 patents |
| Albert Heuberger | Fraunhofer Counsel | The invention of the asserted 6,931,084; 6,993,084; and 7,061,997 patents |
| Marco Breiling | Fraunhofer Counsel | The invention of the asserted 6,314,289 patent |
| Jan Stoessel | Fraunhofer Counsel | The invention of the asserted 6,314,289 patent |
| Robert Fischer | Fraunhofer Counsel | The invention of the asserted 6,931,084 patent |
| Michael Schlicht | Fraunhofer Counsel | Patents-in-suit; chip set designs and integration; related patents and their applications; accused products and agreements; communications between WorldSpace and Fraunhofer, XM and Fraunhofer, and Sirius XM and Fraunhofer |
| Martin Speitel | Fraunhofer Counsel | Designs for CDEC, RDEC, HDEC, HRDEC, and HCDEC; communications with suppliers for CDEC integration |
| Martin Leyh | Fraunhofer Counsel | Designs for CDEC, RDEC, HDEC, HRDEC, and HCDEC |
| Helmut Schubert | Fraunhofer Counsel | Fraunhofer's licensing agreements and contractual patent-related issues |

4

investigation are continuing, Fraunhofer reserves the right to supplement this supplemental disclosure pursuant to Federal Rule of Civil Procedure 26(e).

Dated:  June 15, 2017                                  Respectfully submitted,

                                                      FARNAN LLP

                                                      /s/ Brian E. Farnan
                                                      Brian E. Farnan (Bar No. 4089)
                                                      Michael J. Farnan (Bar No. 5165)
                                                      919 N. Market Street, 12th Floor
                                                      Wilmington, Delaware 19801
                                                      Telephone: (302) 777-0300
                                                      Facsimile: (302) 777-0301
                                                      bfarnan@farnanlaw.com
                                                      mfarnan@farnanlaw.com

                                                      Ben J. Yorks (admitted *pro hac vice*)
                                                      David McPhie (admitted *pro hac vice*)
                                                      IRELL & MANELLA, LLP
                                                      840 Newport Center Drive, Suite 400
                                                      Newport Beach, CA 92660
                                                      Telephone: (949) 760-0991
                                                      Facsimile: (949) 760-5200
                                                      byorks@irell.com
                                                      dmcphie@irell.com

                                                      *Attorneys for Plaintiff*

8

# EXHIBIT 8

WIKIPEDIA

# patent assessor

In Germany , a **patent assessor** is the name of a professional qualification that is obtained by anyone who can prove the legal knowledge required for the profession of patent attorney by successfully passing a state examination . Qualification as a patent assessor is the most important requirement for admission to the office of patent attorney.

## Table of Contents

**test**
    Requirements for admission to the exam
        Application and technical qualification
        Training in the field of industrial property protection
        Working as a patent clerk
    content of the exam
    Special rules for EU or EEA foreigners and Swiss
    Training and examination regulations

**competencies**
    personal limitation
    Procedural Powers

**See also**

**itemizations**

**literature**

**web links**

# Examination

Pursuant to Section 11 (1) of the Patent Attorney Code (PAO) [1] , the prerequisite for being entitled to use the designation "Patentassessor" or "Patentassessor" is passing the examination in accordance with Section 8 PAO. For EU or EEA foreigners and Swiss who already have the professional qualifications for patent attorney activities in their home country, there is a special aptitude test in accordance with the Act on the Activities of European Patent Attorneys in Germany (EuPAG). [2]

## Prerequisites for admission to the exam

### Application and technical qualification

Admission to the examination is granted upon application to the President of the German Patent and Trademark Office (DPMA), who decides on the application, Section 10 (1) PAO.

The applicant must prove that he has acquired a technical qualification ( Section 6 PAO) and the required training in the field of industrial property protection ( Section 7 PAO) or a specific long-term experience as a patent clerk.

The technical qualification is acquired when a course of study in natural sciences or technical subjects at a scientific university in Germany or an equivalent study abroad [3] has been successfully completed through a state or academic examination. In addition, at least one year of practical technical work must be completed. Exceptions are possible if the applicant proves that he/she has acquired the practical technical activity required for the profession of patent attorney in another way.

**Education in the field of intellectual property**

The general case for admission is the completion of a training specified in § 7 PAO (so-called candidate period):

1. The training period (after acquiring the technical qualification) lasts 34 months and must always be completed in Germany. It consists of (at least) 26 months with a patent attorney or patent assessor, 2 months at the DPMA and 6 months at the Federal Patent Court . Training at a court for patent litigation can be credited with up to 2 months of training with a patent attorney or patent assessor.
2. Upon application, practical training in the field of industrial property protection carried out abroad can be counted towards training with a patent attorney or patent assessor for up to six months.
3. A degree in general law must be completed at a university that covers the legal areas required for a patent attorney or patent assessor. These include the basics in the fields of contract law , employment contract law , commercial law , judicial procedural law , constitutional law , general administrative law and European law . The course must be completed with an examination. A special two-year course has been set up for this purpose at the FernUniversität in Hagen . To this day, this course is the only recognized course set up specifically for patent attorney candidates.

A first legal state examination in law or a bachelor's degree in law that covers the above-mentioned areas of law would be possible as an alternative.

**Working as a patent clerk**

Those who did not or could not go through the regulated training according to § 7 PAO can still be admitted to the examination according to § 158 Para. 1 PAO if they have been working full-time as a consultant or representative for at least ten years due to a permanent service or similar employment for a client has exercised in the field of industrial property protection and is still exercising such an activity within the scope of this Act, which is significant in terms of type or scope. For applicants who take the European qualifying examination for before the European Patent Officeauthorized representative, the period is at least eight years. A degree from a university of applied sciences or a vocational academy is sufficient as proof of technical qualification.

Theoretically, it would also be possible to be admitted to a scientific university if you have started your studies in natural sciences or technical subjects but have not completed them for special reasons (§ 158 Para. 2 PAO). However, for this approval u. at least 10 years of activity as a patent clerk before 1966 can be proven. This special regulation was aimed at the generation of war veterans.

## Content of the exam

According to sentence 1 of this provision, the required legal knowledge must be proven by a two-part written and oral examination before the examination committee formed at the DPMA ( § 9 PAO). "The examination should also focus on whether the applicant has the ability to apply the provisions of industrial property law in practice, including the knowledge of general law required for their application; it should cover all areas of industrial property protection in which the patent attorney may advise and represent", § 8 sentence 2 PAO. The exam takes place three times a year in Munich. It is to be filed in German.

## Special rules for EU or EEA foreigners and Swiss

Anyone who is a national of a member state of the European Union or another state party to the Agreement on the European Economic Area or of Switzerland who already has the professional qualifications to work as a patent attorney can become a patent assessor by passing a special aptitude test. [2] This proficiency test examines the ability to also practice the profession of patent attorney in Germany. Evidence of the professional requirements for direct access to the foreign patent attorney profession must be provided.

Admission to the aptitude test is granted upon application. [4] The proficiency test carried out by the committee responsible for the patent assessor examination also consists of a two-part written part and an oral part. It is also to be taken in German.

## Training and Examination Regulations

The training and examination regulations (PatAnwAPO) supplement the PAO. It regulates details of the admission requirements for the examination as well as the conduct of the examination itself and the evaluation of the examination results. In detail, a first part (Sections 1 and 2, Sections 1 to 24 PatAnwAPO) deals with training in the field of intellectual property ( Section 7 PAO). A second part (sections 1 to 3, §§ 26 to 40 PatAnwAPO) is dedicated to the examination ( § 8 PAO). In a third part ( §§ 43a to 43l PatAnwAPO) the securing of the maintenance of the applicant is regulated. A fourth part ( §§ 44 to 44g PatAnwAPO) regulates the examination according to § 1of the law on the aptitude test for admission to the office of patent attorney (PAZEignPrG). Finally, a fifth part ( §§ 45, 46 APrPatAnwAPO) deals with transitional and final provisions .

# Competencies

The powers of a patent assessor result in particular from Section 155 (1) PAO. A patent assessor may " advise and represent" a third party according to Section 3 (2) and (3) PAO.

## Personal limitation

In contrast to a patent attorney, who is an independent organ of the administration of justice, [5] the restriction applies to the patent assessor that he may only act for his employer (referred to in the legal text as the *employer* ) as a representative or authorized recipient. [6] The patent assessor may also act for companies that are contractually affiliated with the employer or in a group (referred to as *third parties in the legal text) if "the third party and the employer of the patent assessor are* group

companies in relation to each other ( § 18 of the German Stock Corporation Act (AktG)) or Contract parts of an enterprise contract ( § 291 and Section 292 of the Stock Corporation Act (AktG)); or the third party has neither a place of residence nor a branch in Germany and he has contractually assigned the protection of his interests in the field of industrial property rights to the employer of the patent assessor" . *Counsel* .

## Powers for procedures

In fact, the patent assessor has the same powers as a patent attorney . Specifically, these are [8] :

1. "to advise others in matters of obtaining, maintaining, defending and contesting a patent , a supplementary protection certificate of a utility model , a registered design , the protection of a topography , a trademark or another characteristic protected under the trademark law (industrial property rights) or a variety protection right and to represent towards third parties;
2. to represent others before the Patent Office and the Patent Court in matters falling within the purview of the Patent Office and the Patent Court;
3. to represent others before the Federal Court of Justice in proceedings for the declaration of invalidity or withdrawal of the patent or supplementary protection certificate or for the granting of a compulsory license ;
4. to represent others before the Federal Plant Variety Office in matters of plant variety protection ,
5. "in matters for which a question is of importance, which concerns an industrial property right, a data processing program , an unprotected invention or another achievement that enhances technology, a plant variety right or an unprotected achievement in the field of plant breeding that enriches crop production, or for whom a legal question directly related to such a question is important, to advise others and to represent them in dealings with third parties, even if the requirements of paragraph 2 number 1 are not met;
6. to represent others before arbitral tribunals and before other administrative authorities ".

Like the patent attorney, the patent assessor has the right to speak in court in certain legal disputes .

## See also

- patent attorney
- patent
- utility model
- trademark (law)
- Registered design
- exclusive right
- semiconductor protection law
- plant variety protection

## Itemizations

1. Text of the Patentanwaltsordnung
2. Text of the Act on the Activities of European Patent Attorneys in Germany (EuPAG)
3. "The president decides on the equivalence in consultation with the competent supreme state authority of the state in which the patent office is located", § 6 paragraph 2 sentence 2 PAO.

4. § 44 paragraph 1 Training and Examination Regulations (PatAnwAPO); Section 12 Patent Attorney Training and Examination Regulations (PatAnwAPO); Sections 1 and 2 of the Law on the Activities of European Patent Attorneys in Germany (EuPAG)

5. § 3 para. 1 PAO

6. § 155 para. 1 PAO

7. § 155 para. 2 PAO

8. § 3 para. 2 and 3 PAO

# Literature

- Günter Kelbel, Commentary on the Patent Attorney Regulations, Cologne, Berlin, Bonn, Munich 1974

# Web Links

- Information from the German Patent and Trademark Office on patent attorney training (https://www.dpma.de/dpma/wir_ueber_uns/weitere_aufgaben/patentanwaltsausbildung/index.html/index.html)
- *kandidatentreff.de* Private platform for patent attorney applicants (https://kandidatentreff.de)

 Please note the information on legal issues!

Abgerufen von „https://de.wikipedia.org/w/index.php?title=Patentassessor&oldid=216032616"

**This page was last edited on October 1, 2021 at 2:05 p.m.**

Text is available under a Creative Commons Attribution/Share Alike license ; Information on the authors and the license status of integrated media files (e.g. images or videos) can usually be called up by clicking on them. Content may be subject to additional terms and conditions. By using this website, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of Wikimedia Foundation Inc.

# EXHIBIT 9



Vereinigung von Fachleuten des Gewerblichen Rechtsschutzes
Association of Intellectual Property Experts
Association des Experts en Propriété Industrielle

**About VPP**

**Events**

**Publications**

**Service**

**Training**

**Contact the VPP**

**Change contact details**

 You are not logged in.
**Login**

  

# Job description

## Job description

The Legal Advice Act in Germany only allows certain professional groups to advise and represent others in the protection of intellectual property. Alongside attorneys at law, these are in particular:

### Patent attorneys

These may advise third parties and represent them in dealings with the German Patent and Trade Mark Office, the German Federal Patent Court, the German Federal Plant Varieties Office and the German Federal Court of Justice, and may present arguments before the ordinary courts in industrial property disputes.

### Patent assessors

Anyone who has passed the ""German patent attorney exam"" is entitled to call themselves a patent assessor. One step more, and they can be licensed as a patent attorney or a representative before the Office for Harmonization. Patent assessors are mostly employed in industry patent departments and may represent third parties for their employers within strict limits.

### Professional representatives before the European Patent Office
### (European Patent Attorneys)

These representatives in the 38 Contracting States that are currently signatories of the European Patent Convention may represent third parties before the European Patent Office based in Munich. In this capacity, they may also work on international applications.

### Professional representatives before the Office for

**Harmonization in the Internal Market (European Trademark Attorneys)**

This professional group in the European Union may represent others before the Office for Harmonization in the Internal Market in Alicante in matters of EU trade mark protection. This is conditional upon their holding power of representation before the national authorities.

## Areas of activity

The protection of industrial property covers the following areas in particular:

- Patent law
- Utility model law
- Design law
- Trade mark law
- Integrated circuit layout design protection law
- Law on employee inventions
- Competition law
- Copyright

A representative in the field of industrial property protection has the task, under these laws:

- of securing rights to the results of development work
- of acquiring protection for inventions, designs, trade marks and plant varieties
- of challenging the validity of property rights of 3rd parties not meeting the requirements for protection and therefore of providing freedom to operate for a client;
- of negotiating licences
- of pursuing property right infringements
- of providing development and marketing departments with information on inventions of third party



© 2005–2022 VPP - all rights reserved | Data Privacy Policy | Sitemap | Impressum | Contact the VPP

# EXHIBIT 10

EXECUTION VERSION



**Trading Innovation®**

## MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement is made and entered into as of April *17TH*, 2013, by and between IPXI Holdings, LLC, and Fraunhofer Gesellschaft zur Förderung angewandter Forschung e. V.

1.  Purpose. The parties wish to explore a business opportunity of mutual interest and in connection with such potential opportunity, a party may disclose to another certain confidential technical and business information which the disclosing party desires the receiving party to treat as confidential.

2.  "Confidential Information" means any information disclosed by a party to another party, either directly or indirectly, in writing, orally or by inspection of tangible objects (including, without limitation, documents, prototypes, samples and equipment), which is designated as "Confidential," "Proprietary" or some similar designation. Information communicated orally shall be considered Confidential Information unless such information is confirmed in writing as being public information within a reasonable time after the initial disclosure. Confidential Information may also include information disclosed to a disclosing party by third parties. Confidential Information shall not, however, include any information which: (a) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (b) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (c) is already in the possession of the receiving party at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; (d) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; (e) is independently developed by the receiving party without use of, or reference to, the disclosing party's Confidential Information, as shown by documents and other competent evidence in the receiving party's possession; or (f) is required by law to be disclosed by the receiving party, provided that the receiving party gives the disclosing party prompt written notice of such requirement prior to such disclosure and assistance in obtaining an order protecting the information from public disclosure.

3.  Non-use and Non-disclosure. Each party agrees not to use any Confidential Information of another party for any purpose except to evaluate and engage in discussions concerning a potential business relationship among the parties. Each party agrees not to disclose any Confidential Information of another party to third parties or to such party's employees or agents, except to those employees or agents of the receiving party who are required to have the information in order to evaluate or engage in discussions concerning the potential transaction. No party shall reverse engineer, disassemble or decompile any prototypes, software (save to the extent permitted by law), reports or other tangible objects which embody another party's Confidential Information and which are provided to a party hereunder. Each party, for itself and its successors and assigns, agrees that it will not use the Confidential Information disclosed hereunder, or the fact of such disclosure, as evidence in any current, ongoing or future legal or administrative proceeding, including, without limitation, to establish (i) the existence of a justiciable controversy, (ii) knowledge, (iii) intent or (iv) willfulness.

 INTERNATIONAL®

**Trading Innovation®**

4.    Maintenance of Confidentiality.  Each party agrees that it shall take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information of each other party.  Without limiting the foregoing, each party shall take at least those measures that it takes to protect its own most highly-confidential information and shall ensure that its employees who have access to Confidential Information of another party have signed a non-use and non-disclosure agreement similar in content to the provisions hereof, prior to any disclosure of Confidential Information to such employees.  No party shall make any copies of the Confidential Information of another party unless the same are previously approved in writing by such other party.  Each party shall reproduce each disclosing party's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original.

5.    No Obligation.  Nothing herein shall obligate any party to proceed with any transaction among them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity.

6.    No Warranty.    ALL  CONFIDENTIAL  INFORMATION  IS  PROVIDED  "AS  IS".    EACH  PARTY  MAKES  NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, QUALITY COMPLETENESS OR PERFORMANCE.

7.    Return of Materials.  All documents and other tangible objects containing or representing Confidential Information which have been disclosed by a party to another party, and all copies thereof which are in the possession of such other party, shall be and remain the property of the disclosing party and shall be promptly returned to the disclosing party upon the disclosing party's written request.

8.    No License.  Nothing in this Agreement is intended to grant any rights to either party under any trademark, trade secret, patent, mask work right or copyright of the other party, nor shall this Agreement grant any party any rights in or to the Confidential Information of the other party except as expressly set forth herein.

9.    Term.  The obligations of each receiving party hereunder shall survive until such time as all Confidential Information of the other party disclosed hereunder becomes publicly known and made generally available through no action or inaction of the receiving party.

10.    Remedies.  Each party agrees that any violation or threatened violation of this Agreement may cause irreparable injury to the other party, entitling the other party to seek injunctive relief in addition to any other legal remedies.

11.    General.  This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns.  This Agreement shall be governed by the laws of the England and Wales, without reference to conflict of laws principles.  This document contains the entire agreement between the parties with respect to the subject matter hereof, and no party shall have any obligation, express or implied by law, with respect to trade secret or proprietary information of another party except as set forth herein.  Each of the parties acknowledges and agrees that in entering into this Agreement, it does not rely on, and shall have no remedy in respect of, any statement, representation, warranty or undertaking (whether negligently or innocently made) other than as expressly set out in this Agreement.  Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision.  This Agreement may not be amended, nor any obligation waived, except by a writing signed by each of the parties hereto and stating as its purpose the amendment of this agreement.

EXECUTION VERSION

 **IPX** INTERNATIONAL®

*Trading Innovation*®

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date(s) written below:

Address:   IPXI Holdings, LLC
           10 S LaSalle Street, Suite 2130
           Chicago, IL 60603

By: _____
Printed Name: Donald L. Horwitz, Esq.
           IPXI Holdings, LLC
Title: Managing Director and General **Counsel**
Date:   4 – 17 – 2013

Address:  Fraunhofer Gesellschaft zur Förderung
           Angewandter Forschung e.V.
           Hansastraße 27C, 80686 Munich, Germany

By: _____
Printed Name:   DR. HELMUT SCHUBERT
Title:   HEAD OF PATENT & LICENSING DEPT.
Date:   22.04.2013

# EXHIBIT 11



**802.11n**

**Multi-Party Offering**

**Terms of Offering**

**Private Sponsor Confidential Information Memorandum**

**January 29, 2013**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382532

[PAGE INTENTIONALLY LEFT BLANK]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    F00382533



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



January 2014

IPXI Holdings, LLC
10 South LaSalle Street
Suite 2130
Chicago, IL 60603

Ladies and Gentlemen:

We have prepared the information materials forwarded herewith (the "Evaluation Material"), and the information contained therein. We refer to the proposed series of Unit License Right™ (ULR™) contracts covering patents with one or more patent claims that are essential to IEEE Std 802.11n-2009 ("802.11n"), which amended IEEE Std 802.11-2007, to provide higher throughput for wireless LAN communications as "the Offering."

Any projections or forward-looking statements included in the Evaluation Material are based on assumptions and estimates developed by IPXI Holdings in good faith and we believe such assumptions and estimates to be reasonable as of the date of the Evaluation Material. Whether or not such projections or forward-looking statements are in fact achieved will depend upon future events which are not within the control of IPXI Holdings. Accordingly, actual results may vary from the projections and such variations may be material. The projections included in the Evaluation Material should not be regarded as a representation by IPXI Holdings that the projected results will be achieved.

We are distributing the Evaluation Material to such recipients ("Recipients") that we deem may be appropriate to be included in the Offering. We agree that we will rely on, and that you are authorized to rely on, the undertakings, acknowledgments and agreements contained in the NDA provided to you and the Notice to and Undertaking, provided to you in the Private Sponsor Confidential Information Memorandum, by Recipients accompanying the Evaluation Material or otherwise acknowledged by Recipients of the Confidential Information Memorandum.

We seek your indication of intention to join the Offering. We request each participating party return to IPXI the Form of Commitment Letter found herein no later than February 15, 2014.

Yours sincerely,

/s/ Gerard J. Pannekoek

Gerard J. Pannekoek
Chief Executive Officer and President
IPXI Holdings, LLC

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382536

Case 1:17-cv-00184-JFB-SRF    Document 577-1    Filed 06/23/22    Page 25 of 125
PageID #: 23444    **802.11n Multi-Party Offering**

*TABLE OF CONTENTS*

|  | **Section** |
|---|---|
| Administrative Documents | 1 |
| Executive Summary | 2 |
| Structure of Offering | 3 |
| Participation Requirements | 4 |
| Independent Essentiality Experts | 5 |
| Joining the Offering | 6 |
| Total and Jurisdiction Asset Contribution Weights | 7 |
| Additions to the Offering | 8 |
| Withdrawing from the Offering | 9 |
| Unit Base | 10 |
| Pricing the Offering | 11 |
| Amnesty | 12 |
| Enforcement | 13 |
| Voting | 14 |
| Netting of Licenses | 15 |
| Regulatory Review | 16 |
| Entities and Deal Documents | 17 |



**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382537

# Section 1
# Administrative Documents

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382538



CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## CONTACTS

**IPXI Holdings, LLC**

10 South LaSalle Street
Suite 2130
Chicago, IL 60603
Fax: (312) 275-2790

| | |
|---|---|
| **Robert Moore**<br>Managing Director and CFO | (312) 275-2706<br>rmoore@ipxi.com |
| **Ian McClure**<br>Director | (312) 275-2707<br>imcclure@ipxi.com |
| **Doug Kochelek**<br>Director | (312) 275 2711<br>dkochelek@ipxi.com |
| **Hannah Wolfert**<br>Associate | (312) 275-2723<br>hwolfert@ipxi.com |
| **Jeff Charbeneau**<br>Associate | (312) 275-2720<br>jcharbeneau@ipxi.com |



**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382540

# FORM OF COMMITMENT LETTER

[On Participant's Letterhead]

February __, 2014

IPXI Holdings, LLC
10 South LaSalle Street
Suite 2130
Chicago, IL 60603

Attention:     Ian McClure

E-mail:        imcclure@ipxi.com
Facsimile:     (312) 275-2707

Re:            IPXI Holdings, LLC ("Arranger")
               Unit License Right™ (ULR™) contract series covering patents with one or more patent claims that are essential to IEEE Std 802.11n-2009 ("802.11n"), which amended IEEE Std 802.11-2007, to provide higher throughput for wireless LAN communications (the "Offering")

Ladies and Gentlemen:

We have reviewed the Confidential Information Memorandum and Summary of Terms and Conditions for the above Offering. Our executed IPXI member agreement is enclosed herein [IF NOT A MEMBER ALREADY].

We have made our own independent analysis and decision to enter into this commitment without relying on you, any of your affiliates, or any of your or your affiliates' directors, officers, employees, advisors, attorneys, agents or other representatives.

Our participation is subject to the parties' mutual satisfaction with the terms of the legal documents, and their execution and delivery by all parties thereto, as well as our compliance with the multi-party Offering participation requirements of the Confidential Information Memorandum. Neither party shall have an obligation to the other if this does not occur, for any reason.

Very truly yours,

[Name of Sponsor]

By:

Title:



1 – 3

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382541

**ADMINISTRATIVE DETAILS FORM**

Please complete the following and return to Ian McClure via fax (312) 275-2790 or email imcclure@ipxi.com

Full legal name of Sponsor: _____

Sponsor name for publicity
purposes: _____

Legal office address: _____

_____

_____

**Contacts**

|  | **Primary** | **Secondary** |
|---|---|---|
| Name: | _____ | _____ |
| Address: | _____ | _____ |
|  | _____ | _____ |
| Phone: | _____ | _____ |
| Fax: | _____ | _____ |
| E-mail: | _____ | _____ |



1 – 4

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382542

# Section 2
# Executive Summary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          F00382543

**CONFIDENTIAL**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382544





**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382545

**CONFIDENTIAL**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382546

**CONFIDENTIAL**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382547



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382548



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382549

Section 3
Structure of Offering

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382550



CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382551



3 – 2

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382552



CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382553



3 – 4

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382554

Section 4
Participation Requirements

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY







CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382556

# Section 5
# Independent Essentiality Experts

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382557



CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382558

# Section 6
# Joining the Offering

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382559



**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382560

# Section 7
# Suggested Total and Jurisdiction
# Asset Contribution Weights

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**7 – 1**

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          F00382562



7 – 2

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



7 – 3

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382564



**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382565

# Section 8
# Additions to the Offering

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382567

# Section 9
# Withdrawing from the Offering

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382569

Section 10
Unit Base

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382570





**10 – 1**

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382571

# Section 11
# Pricing the Offering

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382572



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382573



---

[2] See http://www.vialicensing.com/licensing/ieee-80211-fees.aspx

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382574

Section 12
Amnesty

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382575



12 – 1

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382577

# Section 13
# Enforcement

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



13 – 1

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382579



CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382580



13 – 3

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Section 14
Voting

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Section 15
# Netting of Licenses

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382584



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382585

# Section 16
# Regulatory Review

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382586





**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382587

# Section 17
# Entities and Deal Documents

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382588



16 – 1

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382589



16 – 2

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382591



**EXHIBIT A**

**Corporate Member Agreement**

This Corporate Member Agreement ("Agreement") is made as of [Date] by and between **Intellectual Property Exchange International, Inc.** a Delaware corporation having an office and place of business at 10 South LaSalle Street, Suite 2130, Chicago, IL 60603 ("IPXI") and **[Company]** having an office and place of business at [Address] ("COMPANY"). Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings ascribed to them in the IPXI Market Rulebook, as supplemented or amended from time to time ("Rulebook").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, IPXI and COMPANY agree as follows:

1.  COMPANY agrees to be bound by all obligations and limitations on, or waivers of, rights applicable to Corporate Members under the Rulebook including, but not limited to, (i) all obligations pertaining to the submission, evaluation, issuance, purchase, sale, transfer, disposition and consumption of Authorized Products and (ii) all obligations arising from the conduct of any employee, agent, or other representative of COMPANY. IPXI agrees to grant COMPANY all of the rights afforded to Corporate Members under the Rulebook, subject to such conditions and limitations as provided in the Rulebook. IPXI agrees to provide to COMPANY notice of amendments and supplementations to the Rulebook in advance of their effective dates, in the manner prescribed by the Rulebook.

2.  Upon execution of this Agreement, COMPANY shall pay to IPXI a corporate membership fee of US $5,000 for the period through December 31, 2014. This Agreement shall automatically renew on January 1, 2015, and upon such renewal, COMPANY shall pay a pro rata corporate membership fee based upon the date of execution of this Agreement through the end of 2014. Thereafter, this Agreement shall automatically renew on January 1 of each year, and upon such renewal, COMPANY shall pay the corporate membership fee specified in the schedule of fees published by IPXI, as IPXI may update from time to time.

3.  COMPANY authorizes IPXI to include COMPANY's name in materials identifying the IPXI membership, whether distributed in print or electronic form. IPXI may further include that COMPANY is a Corporate Member in

**Intellectual Property Exchange International, Inc.** • 10 South LaSalle • Suite 2130 • Chicago, IL 60603

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382592



such materials. COMPANY may provide IPXI with a suitable logo that COMPANY authorizes IPXI to include in materials identifying the IPXI membership.

4. COMPANY may resign its Corporate Membership in IPXI at any time, without penalty or refund, upon providing one week advance written notice of such resignation to IPXI. IPXI reserves the right to revoke COMPANY's Corporate Membership at any time at its sole discretion with a pro rata refund of the corporate membership fee for that year, except that COMPANY shall not be entitled to a refund if IPXI determines, at its sole discretion, that COMPANY has engaged in activity which is detrimental to IPXI, its Members, or the integrity of its mission.  Upon the effective date of a resignation of membership by COMPANY or termination of COMPANY's membership by IPXI, this Agreement shall be terminated, subject to Section 5 of this Agreement.  This Agreement may only be terminated pursuant to this Section 4.

5. In the event this Agreement is terminated pursuant to Section 4, this Agreement shall become null and void and all obligations and rights under this agreement shall terminate, except that (i) termination shall not relieve COMPANY from any obligations arising from the pre-termination conduct of the COMPANY or any of the COMPANY's employees, agents, or representatives or any related limitations on, or waivers of, the COMPANY's rights , (ii) termination shall not affect the rights of IPXI arising from the pre-termination conduct of the COMPANY or the COMPANY's employees, agents, or representatives (including rights to sanction any such pre-termination conduct pursuant to the Rulebook), (iii) termination of this Agreement shall not affect the rights and obligations of both IPXI and COMPANY under law or other agreements and (iv) the provisions of this Section 5 and Section 6 of this Agreement shall survive termination of this Agreement.

6. COMPANY agrees and acknowledges that neither IPXI (including its affiliates and any contractors and sub-contractors providing services related to IPXI), nor any of its successors, assigns, directors, officers, employees, agents, partners, consultants, licensors, or members (each, a "Disclaiming Party"), shall bear any liability for transactions entered into by COMPANY including, the purchase, sale or sponsorship of Authorized Products. Furthermore, the COMPANY understands that any limitation on the liability

**Intellectual Property Exchange International, Inc.** • 10 South LaSalle • Suite 2130 • Chicago, IL 60603

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                            F00382593



of the Disclaiming Parties under this Section 6 shall be in addition to and shall not affect any limitation on liability or any indemnification of the Disclaiming Parties under the Rulebook, any agreement relating to the sponsorship or purchase of an Authorized Product or any other agreement. IPXI SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE PERTAINING TO ANY AUTHORIZED PRODUCT AS THAT TERM IS DEFINED IN THE RULEBOOK.

7. Each Party hereby represents and warrants to the other Party, as of the Effective Date, that: (i) such Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof; (ii) such Party has taken all necessary action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder; (iii) this Agreement has been duly executed and delivered on behalf of such Party, and constitutes a legal, valid, binding obligation, enforceable against it in accordance with the terms hereof; and (iv) the execution, delivery and performance of this Agreement by such Party will not constitute a default under nor conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it is bound, nor violate any law or regulation of any court, governmental body or administrative or other agency having jurisdiction over such Party. Each Party covenants to the other Party that it will notify the other Party if, subsequent to the execution of this Agreement, any representation in this Section 7 is no longer true.

8. All notices, requests, demands and other communications required under this Agreement shall be in writing and shall be delivered as set forth below, or pursuant to such other instructions as may be designated by notice given in accordance with this Section 8 by the party to receive such notice:

Any notice to IPXI shall be addressed to:

IPXI General Counsel
Intellectual Property Exchange International, Inc.
10 South LaSalle Street
Suite 2130
Chicago, IL 60603

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382594

Corporate Member Agreement of [COMPANY]
[DATE]
Page 4 of 4



NOTICE@ipxi.com

Any notice to COMPANY shall be addressed to:

[COMPANY ADDRESS]

9.  The COMPANY may not assign any of its rights or delegate any of its obligations under this Agreement, by operation of law or otherwise.  Any purported assignment or delegation in contravention of this Section 9 shall be null and void.

10. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when two or more counterparts, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.  The execution and delivery of this Agreement may be effected by facsimile or any other electronic means such as ".pdf" or ".tiff" files.

11. This Agreement shall be governed by the law of the State of Illinois.  This Agreement may not be amended except by an agreement in writing signed by both parties and stating as its purpose the amendment of this Agreement.

**INTELLECTUAL PROPERTY EXCHANGE INTERNATIONAL, INC.**

By  _____

Its  _____

**[COMPANY]**

By  _____

Its

**Intellectual Property Exchange International, Inc.** • 10 South LaSalle • Suite 2130 • Chicago, IL 60603

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382595

# EXHIBIT B

## 802.11n MASTER AGREEMENT

_____, 2014

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382596

Contract ID No. _____                                         Page 2

## MASTER AGREEMENT

This Master Overarching Agreement (together with the **attached exhibits**, this "**Agreement**" or "**Master Agreement**") is made as of the effective date indicated in the signature box below (the "**Effective Date**") and is entered into by [LIST PARTIES HERE]  (collectively the "**Sponsors**", individually herein the "**Sponsor**") and the supplier named in the signature box below, a Delaware Limited Liability Company, having its principal place of business located at 10 South LaSalle Street, Suite 2130, Chicago, Illinois 60603  ("**IPXI**" or "**Supplier**").

Sponsors and Supplier, by signing in the signature blanks below, agree to the terms set forth in this Agreement.

---

Contract ID No: _____

Effective Date: _____

**IPXI Holdings, LLC**


By:  _____        By:  _____

Name:  Gerard Pannekoek_____        Name:  _____

Title:  President & CEO_____        Title:  _____

Date:  _____        Date:  _____

---

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                         F00382597

## 1.    DEFINITIONS

The definitions set forth in this Article shall apply to the following terms when used with initial capital letters in this Agreement, and any amendments or supplements hereto.

1.1    "802.11n Standard" shall mean (i) IEEE Std. 802.11n-2009 as published by IEEE on October 29, 2009, or (ii) IEEE Std. 802.11-2012, as published by IEEE on March 29, 2012, to the extent that any provisions of IEEE St. 802.11-2012 to which the one (1) chipset of a Licensed Product (as defined in Section 1.18) conforms, supersede corresponding provisions in IEEE Std. 802.11n-2009.

1.2    "A la Carte Offering" shall mean a ULR Contract or ULR Contracts (as defined in clause 4.2), in accordance with context, that includes a single Sponsor's Licensed Patents.

1.3    "Affiliate" shall mean, with respect to a Party, any Person or entity that is Controlled by such Party.

1.4    "Control" and the correlative term "Controlled", with respect to a Person or an entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another Person or entity, whether through the ability to exercise voting power, by contract, or otherwise. Without limiting the generality of the foregoing, a Person or entity shall be deemed to be Controlled by another Person or entity if such other Person or entity possesses, directly or indirectly, power to vote 50% or more of the securities having voting power for the election of directors, managing general partners or the equivalent.

1.5    "Combined Offering" shall mean a ULR Contract or ULR Contracts (as defined in clause 4.2), in accordance with context, that includes every Sponsor's Licensed Patents.

1.6

1.7    "Enforcement Action" means any suits or other proceedings relating to (a) the enforcement within the Licensed Field, of any Licensed Patent underlying ULR Contracts issued by SPV (defined in clause 4.3) against third parties and (b) the defending, within the Licensed Field, of the Licensed Patent underlying ULR Contracts issued by SPV against third-party challenges to the validity and enforceability of such Licensed Patent.

1.8    "Engagement" shall have the meaning provided in Paragraph 2 of this Agreement.

1.9    "Essentiality Analysis" shall mean a written analysis performed by an Essentiality Expert that demonstrates that, with respect to Intellectual Property that a prospective Sponsor wishes to offer on the Exchange, one or more patent claims of the Intellectual Property are essential to the 802.11n Standard.

1.10   "Essentiality Expert" shall mean a Person commissioned to perform an Essentiality Analysis.

1.11   "Exchange" shall have the meaning provided in Article 2 of this Agreement.

1.12   "Exclusive License Agreement" shall have the meaning provided in clause 4.3 of this Agreement.

1.13   "Including," "includes," or "include" shall be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance.

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                        F00382598

1.14    Intellectual Property" shall have the meaning provided in Article 2 of this Agreement.

1.15    "Jurisdiction Asset Contribution Weight" shall have the meaning provided in clause 5.8 of this Agreement.

1.16    "Licensed Field" shall mean within each Licensed Territory, any practice of any claim of a Licensed Patent for the purpose of practicing the 802.11n Standard.

1.17    "Licensed Patents" shall mean the Intellectual Property that is the subject of an Exclusive License Agreement that references this Master Agreement.

1.18    "Licensed Product" shall  up to 1,000 (one thousand) chipsets  implementing the 802.11n Standard in the Licensed Field for which it would be an act of infringement to make, have made, use, sell, or offer for sale in a Licensed Territory or import into a Licensed Territory absent a license to practice any Licensed Patent.

1.19    "Licensed Territory" shall mean, for each Licensed Patent, any country where such Licensed Patent would be infringed absent a license thereunder at the time of such infringement.

1.20    "Litigation Proceeds" shall mean the monetary proceeds resulting from a lawsuit involving the infringement of a Licensed Patent, whether awarded by a jury, Court, through settlement, or otherwise.

1.21    "Option Agreement" shall have the meaning provided in the recitals to this Agreement.

1.22    "Party" shall mean either Supplier or Sponsor as the context requires. "Parties" shall mean Supplier, Sponsor, and/or Sponsors, individually and collectively, as the context requires.

1.23    "Patent" shall mean any issued patent or issued utility model of any country or jurisdiction, or any allowed patent application or allowed utility model application in any country or jurisdiction.

1.24    "Person" shall mean any natural person, corporation, company, partnership, limited partnership, limited liability company, firm, association, trust, government, governmental agency, or any other entity, whether acting in an individual, fiduciary or other capacity.

1.25    "Related Patents" shall mean a group of patents related by a common claim of priority and issuing in the same country.

1.26    "Rulebook" shall mean the IPXI Market Rulebook, published by IPXI, as may be supplemented or amended from time to time

1.27    "Series" shall have the meaning set forth in Article 10.

1.28    "Total Asset Contribution Weight" shall have the meaning provided in Section 5.8 of this Agreement.

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                          F00382599

## 2.    AGREEMENT STRUCTURE

Each Sponsor and Supplier may wish, from time to time, to evaluate the possibility of forming, modifying and/or expanding business relationships whereby each Sponsor intends to submit certain intellectual property rights ("**Intellectual Property**"), as set forth in Exhibit A, as an offering on a proprietary exchange (the "**Exchange**") operated by Intellectual Property Exchange International, Inc., wholly owned by Supplier ("**Engagement**").  The time period for the Engagement shall be determined by the relevant Exchange Agreement(s). In order to facilitate the Engagement, the parties hereto have entered into this Agreement which describes each of the applicable phases and the corresponding agreements that each party is required to execute as part of the Engagement ("**Exchange Agreements**"). The terms set forth in **Article 4** (**Overarching Terms and Conditions**), and **Paragraphs 16.2** (**Assignment**) and **16.11** (**Audit**) shall apply to each Engagement phase. In the event of a conflict, this Agreement shall govern.

## 3.    COMMUNICATIONS

### 3.1    Notices

All notices must be in writing and will be deemed given only when sent by first class mail (return receipt requested), hand-delivered or sent by a nationally recognized overnight delivery service to the party to whom the notice is directed, at its address as indicated in Exhibit E:

### 3.2    Publicity

From time to time, Supplier may utilize the name of a Sponsor(s) in its advertising, announcements, press releases or promotional materials, including testimonials, quotations, case studies, and other endorsements. Supplier also may identify Sponsors or their Affiliates as the owner of record as stated in the publically available USPTO assignment database of any Intellectual Property being marketed or offered as ULR Contracts pursuant to this Agreement.

## 4.    THE EXCHANGE AGREEMENTS

The following is a brief description of the three separate phases of the Engagement and the applicable Agreements:

### 4.1    **Phase One of the Engagement ("Phase One")** – During Phase One, each Sponsor, at its own expense, shall have an Essentiality Analysis conducted.  Upon completion and submission of all Essentiality Analyses to Supplier, Supplier shall prepare a Preliminary Offering Summary document for submission to Supplier's Selection Committee.  Phase One will be completed upon submission of the Offering Summary document to the Selection Committee.

### 4.2    **Phase Two of the Engagement ("Phase Two")** – Once Phase One is complete, each Sponsor will enter into an agreement with Supplier which will provide Supplier with an option to an exclusive license to issue sublicense rights to the Intellectual Property (**"Option Agreement"**) and engage in Phase Two.  During Phase Two, Supplier shall further evaluate the Essentiality Analyses with the assistance of third parties, consistent with the provisions of Section 16.9 ("**Subcontractors**"). Supplier shall prepare a Final Offering Summary document that describes the suggested proposed terms of a proposed ULR offering (**"ULR Offering" or the "Offering"**) that includes the Intellectual Property. Sponsors shall approve the Final Offering Summary document before its submission to the Selection Committee for approval.  The Selection Committee may then make a recommendation as to whether to proceed with the Offering to the Executive Committee, who may then make a recommendation as to whether to proceed with the Offering to the Board of Directors of Intellectual Property Exchange International, Inc. Upon approval from the Board, Supplier will market non-exclusive sublicense contracts (**"Unit License Right Contracts"** or "**ULR Contracts**") related to the Intellectual Property in accordance with this Agreement.   Phase Two will be complete when Supplier has found sufficient interested parties to purchase ULR Contracts for Sponsors' Intellectual Property in accordance with the Option Agreement. Phase Two shall be completed upon the exercise of the Option.  The Option may be exercised by a vote

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382600

of all Sponsors, in proportion to a Sponsor's Total Asset Contribution Weight as a portion of all Sponsors' Total Asset Contribution Weights, with a majority vote being determinative.

4.3    **Phase Three of the Engagement ("Phase Three")** – Once Phase Two is complete, Supplier will assign all Option Agreements to a Special Purpose Vehicle (SPV) created by Supplier. The operation of the SPV shall be governed by an operating agreement ("**Operating Agreement**"). Sponsor will then enter into an "Exclusive License Agreement" ("**ELA**") with SPV. The ELA shall provide the SPV with the right to grant non-exclusive sublicenses to the Intellectual Property as permitted by the ELA. Each ELA shall be a stand-alone document between a Sponsor and SPV. However, the Parties agree, warrant, and covenant that each ELA shall include at least the terms and conditions as set forth in Article 7 ("**Agreement to Grant Exclusive License**") of this Agreement.    SPV and each Sponsor shall also enter into an agreement ("**Income Sharing Agreement**") to share in the proceeds from issuance of ULR contracts and Litigation Proceeds,, as specified in the Operating Agreement.    Supplier is solely responsible for the day to day operational and corporate duties of the SPV and any Secondary SPVs. The SPV and any Secondary SPV shall sell ULR Contracts to purchasers through Supplier's trading platform.

## 5.    OVERARCHING TERMS AND CONDITIONS

The following provisions shall apply to all Sponsors for each Phase of the Engagement:

### 5.1    Reservation to Sponsor

Each Sponsor reserves the right, for each Patent of its Intellectual Property (a) for itself to make, to have made, to use, to sell, and to offer to sell products and services encompassing (wholly or partially) the Intellectual Property as its own products in any country where such Intellectual Property would be infringed absent a license thereunder at the time of such infringement and to import such products into such country, (b) to grant any license, release, or covenant not to sue under its Intellectual Property with respect to activity occurring (i) wholly outside of any such country or (ii) inside such country but wholly outside the scope of any lawful practice of any claim of the Intellectual Property, and c) to grant licenses to the Intellectual Property that include other patents from Sponsor's portfolio that are not the subject of this Agreement, provided that the number of such patents substantially exceeds the Intellectual Property. For the avoidance of doubt, in no event shall a Sponsor have the right to grant or otherwise authorize or agree to any license, release, covenant not to sue, waiver or other right, express or implied, within the scope of the exclusive rights granted to Suppler in Article 7.

### 5.2    Patents Not Identified but Deemed Essential

If a patent of a Sponsor that is not identified in this Agreement is later determined to be essential to the practice of the 802.11n Standard either: 1) by an analysis by an independent essentiality expert, 2) by a court of competent jurisdiction or other tribunal, whether domestic or in a foreign territory, without regard to any issues of preclusion or collateral estoppel, or 3) if a Sponsor admits in a legal pleading or under oath that a patent is essential to the practice of the 802.11n Standard, that Sponsor agrees to submit that patent to become a part of this Agreement and the Exchange Agreements, and such patent shall be subject to the terms and conditions of this Agreement and the Exchange Agreements, and any future amendments or supplements, and shall become a Licensed Patent and a part of that Sponsor's ELA.

### 5.3    Supplier's Rights

For purposes of clarity, Supplier has no rights whatsoever to the Intellectual Property other than to provide a sublicense or otherwise operate in accordance with the Exchange Agreements.

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    F00382601

Contract ID No. _____                                                          Page 6

5.4    Duty to Maintain

Each Sponsor shall have the sole right and responsibility, at its own expense, to pay all maintenance fees or other fees that are required to maintain its Intellectual Property in full force and effect throughout the term of this Agreement. Upon execution of the ELA, the provisions of the ELA as to the duty to maintain a Sponsor's Licensed Patents shall apply.

5.5    Duty to Prosecute

Subject to Paragraph 5.6, each Sponsor shall have the sole right and responsibility, at its own expense, to prosecute any proceedings pertaining to the Intellectual Property that take place before a patent office having jurisdiction over such Intellectual Property, including any interference, reissue, reexamination, supplemental or post-grant proceeding, and further including any appeals from such proceedings. In its performance pursuant to this clause, Sponsor shall exercise commercially reasonable efforts to preserve the scope and validity of the claims of its Intellectual Property at issue, and to prevent the abandonment or cancellation of any Intellectual Property or any claim of any Intellectual Property during the course of such proceeding.  Upon execution of the ELA, the provisions of the ELA as to the duty to prosecute a Sponsor's Licensed Patents shall apply.

5.6    Sponsor Agreement Not to Enforce

Each Sponsor and their Affiliates shall not file or amend any case, action, complaint, claim or counterclaim to allege infringement of any Intellectual Property without the written consent of Supplier, which shall not be unreasonably withheld.  Sponsors and their Affiliates shall not issue cease-and-desist letters, make offers to license or otherwise make allegations of infringement to third parties of any Intellectual Property, except for as expressly provided for in this Agreement or the Exchange Agreements. Each Sponsor and their Affiliates also shall not initiate any post grant procedure of any Intellectual Property, including but not limited to re-examination, derivation, or post-grant review in any jurisdiction without the written consent of Supplier, which shall not be unreasonably withheld.

5.7    Cross-License

Notwithstanding Paragraph 5.1 above, Sponsor may enter into a cross-license that includes its Intellectual Property if either:  1)  a third party has asserted or otherwise used its patents such that standing would be conferred upon Sponsor to file a Declaratory Judgment action against said third party concerning such patent or 2) a third party has filed suit accusing Sponsor of patent infringement provided that such event in the foregoing subsection 1) and/or 2) did not occur at the instigation of or with the cooperation of Sponsor.

5.8    Calculation of Control by Vote and Revenue Allocation

Each Sponsor to the Master Agreement, upon execution of an Option Agreement, shall receive a Total Asset Contribution Weight, which shall be based upon a Sponsor's Licensed Patents in proportion to the total of all Sponsors, calculated in the manner set forth in Exhibit B.  The Total Asset Contribution Weights of Sponsors shall be used to weight votes of the Sponsors.  Each Sponsor shall also receive a Jurisdiction Asset Contribution Weight, which shall be based upon a Sponsor's Licensed Patents in proportion to the total in a given country, which also shall be calculated in the manner set forth in Exhibit B.  The Jurisdiction Asset Contribution Weights of Sponsors shall be used to allocate Net Combined ULR Proceeds, as set forth in Article 9.  When a vote is taken based upon either the Total Asset Contribution Weight, "majority rule" will be determinative.

5.9    Funding of Litigation

a)    Enforcement Fund.  An Enforcement Action may be funded through the use of an Offering Enforcement Fund (the "Enforcement Fund" or the "Fund").  However, the Fund shall not be used to fund: 1) activities or proceedings where the Enforcement Action has been stayed; 2) activities related to any procedure at a country's Patent Office, including but not limited to the United States Patent Office,

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00382602

such as but not limited to the reexamination of a Licensed Patent or 3) an action where monetary damages are not a form of relief.  Approval of a Sponsor's use of the Fund will be determined by a vote of the Sponsors to the Master Agreement.  Sponsor's vote will be weighted in accordance with its Total Asset Contribution Weight as a portion of all voting Sponsors' Total Asset Contribution Weights.

b)      Issuance and Maintenance.  A new Enforcement Fund shall commence upon the issuance of a new Series, and each Fund shall be funded and maintained in accordance with Section 7.2.f.

5.10    Additions of Intellectual Property and Sponsors to This Agreement

At IPXI's discretion, additional Intellectual Property and/or Sponsors may be added to this Agreement.  Any additional Intellectual Property and/or the addition of any new Sponsors shall be subject to the terms and conditions of this Agreement, and any future amendments or supplements.

5.11    Removal of Intellectual Property from the Agreement

Subject to the provisions of Section 16.7, this Agreement, and its terms and obligations hereunder, shall end as to the Intellectual Property of a Sponsor if:  a) a Sponsor fails to obtain an Essentiality Analysis as set forth in Article 6, or b) a Sponsor fails to execute an Option Agreement that includes such Intellectual Property.

5.12    No Grants or Covenants Not to Sue Amongst Sponsors

Each Sponsor agrees that no rights, covenants, or other grants are bestowed upon it as to any other Sponsor's Intellectual Property by virtue of its participation in the Engagement.

6.    **ESSENTIALITY ANALYSIS**

6.1    Commission of the Essentiality Analysis

Each Sponsor, at its own expense and for each Patent it wishes to offer on the Exchange, shall commission an Essentiality Analysis, which shall be performed by an independent Essentiality Expert.

6.2    Selection of the Essentiality Expert

A Sponsor may recommend a proposed Essentiality Expert, who is subject to the approval of Supplier, by submitting a petition to Supplier.  The petition shall establish the following minimum criteria:

a)      have legal and technical expertise with the 802.11n Standard to opine credibly and competently;

b)      shall not have an explicit or implicit ownership or other financial interest in the Intellectual Property it is evaluating or the outcome of the essentiality determination; and

c)      shall not otherwise present a conflict of interest or partiality.

6.3    Administration of Essentiality Analyses

All Essentiality Analyses commissioned by Sponsors shall be administered and evaluated by an Essentiality Expert selected by Supplier at its sole discretion.

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        F00382603

Contract ID No. _____                                                                           Page 8

## 7.    AGREEMENT TO GRANT EXCLUSIVE LICENSE

The Parties to this Agreement agree that the following terms below shall be included in each ELA entered into by Sponsor and SPV and shall apply to each Sponsor to this Master Agreement:

### 7.1    Grant of Exclusive License

#### a)    Grant

Subject to the terms and conditions of this Agreement, Sponsor shall grant to SPV a , worldwide, royalty-free license, subject to the provisions of Paragraph 7.1(b), under the Licensed Patents, for the purpose of practicing the 802.11n Standard, to have made, to use, to sell, and to offer to sell Licensed Products in the Licensed Territory and to import Licensed Products into the Licensed Territory that are i) part of an A la Carte Offering or ii) part of a Combined Offering.  This grant shall be exclusive to SPV.  Subject to the afore-going terms of this paragraph, any license granted under this ELA includes the right (even as to the Sponsor) to sublicense the Licensed Patents, and grant covenants not to sue under the Licensed Patents and collect and receive revenues from any such sublicense, within the Licensed Field and Licensed Territory in accordance with the ELA. Without limiting the foregoing, the right of the SPV to grant sublicenses shall include the exclusive right to grant sublicenses, releases, and covenants not to sue for acts that occur prior to the grant of the sublicense, release, or covenant not to sue to the extent such acts would be covered by the sublicense, covenant not to sue or release if they occurred after the date thereof.

#### b)    Reservation to Sponsor

Sponsor reserves the right (i) for itself under the Sponsor's Licensed Patents  to make, to have made, to use, to sell, and to offer to sell Licensed Products as its own products in the Licensed Territory and to import Licensed Products into the Licensed Territory, (ii) to grant any license, release, or covenant not to sue under the Licensed Patents with respect to activity occurring (1) wholly outside of the Licensed Territory or (2) inside the Licensed Territory but wholly outside the Licensed Field, and (iii) to grant licenses that include patents from Sponsor's portfolio that do not fall within the terms and provisions of this ELA ("Outside Patents"), provided that the number of such Outside Patents exceeds the number of Licensed Patents. For the avoidance of doubt, in no event except that provided in section 5.7 of the Master Agreement shall Sponsor have the right to grant or otherwise authorize or agree to any license, release, covenant not to sue, waiver or other right, express or implied, under the Licensed Patents within the scope of the exclusive rights granted to Issuer in clause (a) above.

#### c)    Patents Not Identified but Deemed Essential

If a patent of Sponsor that has not been identified in the ELA as a Licensed Patent is later determined to be essential to the practice of the 802.11n Standard either: 1) by an analysis by an independent essentiality expert, 2) by a court of competent jurisdiction or other tribunal, whether domestic or in a foreign territory, without regard to any issues of preclusion or collateral estoppel, or 3) if a Sponsor admits in a legal pleading or under oath that a patent is essential to the practice of the 802.11n Standard, that Sponsor agrees to submit such patent to become a part of the ELA, and such patent shall be subject to the terms and conditions of the ELA, and any future amendments or supplements.   .

#### d)    Related Patents Not Part of This Agreement

Any Related Patents that have not been identified in the ELA as a Licensed Patent shall become a part of the ELA and shall be subject to the ELA's terms and conditions and shall become a part of the Master Agreement and other Exchange Agreements as applicable.

### 7.2    Enforcement

Sponsor agrees that enforcement shall be governed by the Rulebook, including the institution of any Enforcement Actions, and that the ELA shall further include the following enforcement provisions:

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                          F00382604

Contract ID No. _____                                                                    Page 9

        a)     <u>Licensed Patent Availability</u>.  Sponsor agrees to make its Licensed Patents available for use in an Enforcement Action, subject to Paragraph 7.2(b) hereof.

        b)     <u>Right to Veto Enforcement</u>.  Sponsor shall have the primary right, but not the obligation, to enforce any of its Licensed Patents in accordance with Rules 701 and 702 of the Rulebook, whether in a Complaint or any other paper that includes a claim of patent infringement of a Licensed Patent, subject to SPV's express written consent, which may be withheld at SPV's sole discretion.  In the event that Sponsor notifies SPV that it has elected not to enforce the Licensed Patents, then the SPV shall have the right to enforce such Licensed Patents subject to Sponsor's express written consent, which may be withheld at Sponsor's sole discretion. Sponsor agrees that if such consent is given by SPV, any terms or conditions placed upon such consent pursuant to the Rulebook shall be deemed reasonable. To the extent necessary to enable a Sponsor to enforce its Intellectual Property, Sponsor agrees that it may be joined as a plaintiff in any action instituted by SPV and will cooperate with SPV in the conduct of any litigation.

        c)     <u>Irreparable Harm</u>.  Sponsor acknowledges that its breach of Paragraph 7.2(b) will cause irreparable harm to SPV, for which money damages will be inadequate. SPV shall be entitled to obtain preliminary or injunctive relief from such breach.

        d)     <u>Proceeding Jointly</u>.  Pursuant to the Rulebook, if a petition for enforcement of multiple Licensed Patents, belonging to multiple Sponsors, receives IPXI consent and is approved, Sponsor may proceed jointly with the other the applicable Sponsors or may pursue enforcement independently.  If Sponsor proceeds jointly, it may hire a litigation counsel with other Sponsors jointly for that purpose.

        e)     <u>Sponsor's Participation in the Enforcement Fund</u>.  Sponsor shall only be eligible to seek the use of an Enforcement Fund, pursuant to Section 7.2.h, in which it has Licensed Patents in a corresponding Series pursuant to Section 5.9 of the Master Agreement.

        f)     <u>Maintenance of the Fund</u>.

        <u>i</u>.     The Fund shall be created using a percentage of revenues from sales of ULR Contracts otherwise payable to Sponsor, which shall be ten percent (10%) Sponsor's share of any Net Combined ULR Proceeds (defined in clause 9.1). Contributions to the Fund shall be made until the Fund contains five million ($5,000,000) dollars.  Accordingly, the amount of money Sponsor shall contribute to the Fund will be dependent upon the amount of revenue it is entitled to receive from ULR Contract sales.

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |

        ii.     Sponsor shall agree to replenish the Fund as needed pursuant to vote by Total Asset Contribution Weight by the Sponsors to the Master Agreement. Replenishment shall be in accordance with clause (i) above and shall continue until the Fund contains five million ($5,000,000) dollars.

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                    F00382605

f)      Management of the Fund. The Fund shall be administrated and managed by SPV.  To the extent monies allocated to the Fund are invested, they shall be invested in United States government securities.

h)      Fund Amount to Sponsor.  If Sponsor receives approval to use the Fund, it shall be entitled to a maximum of five hundred thousand dollars ($500,000) from the Fund.  If other Sponsors also receive approval to use the Fund, Sponsor's apportioned share of the Fund shall not exceed other Sponsors' shares and shall not exceed five hundred thousand dollars ($500,000)

i)      Liquidation of the Fund. Upon the termination of the ELA, any monies in any Fund(s) shall be liquidated and distributed to Sponsor in proportion to its contribution to the Fund(s). However, in no event shall Sponsor be entitled to an amount .

j)      Allocation of Litigation Proceeds.  Litigation Proceeds shall first be allocated to satisfy any a) costs and expenses of SPV, as set forth in the Operating Agreement, incurred by SPV in connection therewith (including legal fees), (b) any other amounts payable by SPV or reserved for by the SPV related thereto as determined in the discretion of the manager of the SPV, and c) any and all Retroactive Compliance fees as defined in Rule 708 ("Retroactive Compliance") of the Rulebook.  Any amounts paid under subsection (b) of this section shall be reasonable and necessary for the efficient operation of SPV.  Any amounts reserved under subsection (b) of this section shall be limited to reasonably anticipated costs of SPV, and if greater than $5,000 USD, approved in advance by Sponsor, which approval shall not be unreasonably withheld.  Sponsor agrees that the remaining Litigation Proceeds shall be divided amongst Sponsors to the Master Agreement who consented to the enforcement of their Licensed Patents and that Sponsor shall receive its allocations as follows:  1) Sponsor shall receive a portion of sixty percent (60%) of any Litigation Proceeds, in proportion to its Jurisdiction Asset Contribution Weight, with respect to any Licensed Patents that received consent, pursuant to Section 7.2(b), to be the subject of an Enforcement Action;  2)  Sponsor shall receive a portion of forty percent (40%) of Litigation Proceeds, in proportion to its Jurisdiction Asset Contribution Weight, if it did not veto enforcement of its Licensed Patents, but its Licensed Patents did not receive consent to the be subject of an Enforcement Action; or 3) If Sponsor vetoed enforcement of its Licensed Patents, it shall not be entitled to any Litigation Proceeds.

k)      The Division of Litigation Proceeds.  If Litigation Proceeds from an accused infringer in an Enforcement Action are of an amount less than five million dollars ($5,000,000), Sponsor agrees that any future ULR contract sales to such accused infringer will also be shared in the manner set forth in paragraphs 7.2(j) until the five million dollars ($5,000,000) amount is reached.

7.3     Removal of Licensed Patents from ULR Contracts

a)      If a Licensed Patent is held invalid and/or unenforceable in a court of competent jurisdiction or other tribunal a) in a final, non-appealable judgment or b) and the time for any appeals have been exhausted, such Licensed Patent shall be removed from any future ULR Contract.  Such Patent shall remain as a part of any previously purchased ULR Contract.  Notwithstanding the foregoing, a ULR Contract purchaser may delete any such Licensed Patent from its ULR Contract.

b)      If a Licensed Patent expires, such Patent shall remain as a part of any currently offered Series.  Such Licensed Patent may be removed from any future Series issued.

7.4     Declaratory Relief Against SPV

If at any time a claim for declaratory relief is made against SPV relating to any Licensed Patent, including any action related to the infringement, validity or enforceability of such Licensed Patent, Sponsor shall provide commercially reasonable cooperation and assistance to SPV, such assistance to include making witnesses and inventors available for interviews, depositions, hearings and trials, producing documents and things, providing access to plants and facilities, and providing consultation.

7.5     Declaratory Relief Against Sponsor

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                      F00382606

If at any time a claim for declaratory relief is made against Sponsor relating to any of its Licensed Patent, including any action related to the infringement, validity or enforceability of any Licensed Patent, Sponsor shall notify SPV of such claim as soon as practicable. Sponsor shall, in consultation with SPV, exercise commercially reasonable efforts to ensure the scope, validity and enforceability of such Licensed Patent.

## 8.    CONFIDENTIALITY

All information which is identified as "Confidential" ("**Confidential Information**") by a Party to this Agreement disclosing such information ("**Disclosing Party**") will be treated with the same care and discretion to avoid disclosure, publication or dissemination as the party receiving the information ("**Receiving Party**") uses with its own similar information that it does not wish to disclose, publish or disseminate. Confidential Information will either be marked as confidential or, if disclosed orally, identified as confidential at the time of disclosure followed by written confirmation of the disclosure. Confidential Information may be a third party's information.

The Receiving Party will only disclose such Confidential Information to its employees and employees of its parent and subsidiary companies that have a need-to-know, and any other party with prior written consent of the Disclosing Party, and the Receiving Party will have a written agreement with such party sufficient to require that party to treat Information in accordance with this Agreement.

No obligation of confidentiality applies to any Confidential Information that the Receiving Party (a) already possess without obligation of confidentiality; (b) develops independently; (c) rightfully receives without obligation of confidentiality from a third party; or  (d) is required by law to be disclosed by the Receiving Party, provided that the Receiving Party gives the Disclosing Party prompt written notice of such requirement prior to such disclosure and assistance in obtaining an order protecting the information from public disclosure.  No obligation of confidentiality applies to any Confidential Information that is, or becomes, publicly available without breach of this Agreement.

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## 9.   INCOME SHARING AGREEMENT TERMS



802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382609

## 11.    REPRESENTATIONS AND WARRANTIES

### 11.1    Mutual Representations and Warranties

Each Sponsor represent and warrants to Supplier and Supplier represents and warrants to each Sponsor as follows:

a)    Each Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof;

b)    Each Party has taken all necessary action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder;

c)    This Agreement has been duly executed and delivered on behalf of each Party, and constitutes a legal, valid, binding obligation, enforceable against it in accordance with the terms hereof; and

d)    The execution, delivery and performance of this Agreement by each Party will not constitute a default under nor conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it is bound, nor violate any law or regulation of any court, governmental body or administrative or other agency having jurisdiction over such Party.

### 11.2    Sponsor's Representations and Warranties

Each Sponsor hereby represents and warrants to Supplier that, as of the Effective Date:

a)    Sponsor has the right and authority to grant the rights and licenses specified in Article 7;

b)    Sponsor has not entered into any agreement or otherwise granted any now-existing, or future, license, right, option or privilege which conflicts, may conflict, or is otherwise inconsistent with this Agreement;

c)    Sponsor has no knowledge of any actions, suits, investigations, cases, claims or proceedings pending or threatened relating to the Intellectual Property which it has not disclosed to Supplier; and

d)    Sponsor has no knowledge of any actual infringement of any Intellectual Property which it has not disclosed to Supplier.

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        F00382610

11.3    NO OTHER WARRANTY

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY NOR ITS AFFILIATES OR PARENT COMPANIES MAKES ANY REPRESENTATION OR EXTENDS ANY WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY WARRANTY THAT ANY PATENT RIGHTS LICENSED ISSUER HEREUNDER ARE VALID OR ENFORCEABLE OR THAT THEIR EXERCISE DOES NOT INFRINGE OR MISAPPROPRIATE ANY PATENT RIGHTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES.

## 12.    INDEMNITY

12.1    Indemnity from Third Party Claims

From and after the Effective Date, each party to this Agreement (the "Indemnifying Party") shall defend, indemnify and hold harmless the other parties and the other parties' Affiliates and the other parties' and the other parties' Affiliates' officers, directors, shareholders, members, employees, agents, successors and assigns (collectively "Indemnified Parties") from and against any claim, action, damage, loss, liability, cost, charge, expense (including reasonable attorney's fees and costs), or payment that such person pays, suffers, incurs or is liable for, arising out of third-party claims against any such Indemnified Party based upon a breach of this Agreement by the Indemnifying Party, including the breach of any representations, warranties or covenants herein.

12.2    Indemnity for Declaratory Judgments

Notwithstanding Paragraph 12.1, to the extent that Supplier and its Affiliates are not indemnified by others, each Sponsor shall defend, indemnify and hold harmless Supplier and its Affiliates and their officers, directors, shareholders, members, employees, agents, successors and assigns from and against any claim, action, damage, loss, liability, cost, charge, expense (including reasonable attorney's fees and costs), or payment that such person pays, suffers, incurs or is liable relating to any declaratory judgment action, arbitration, re-examination, reissue, post-grant proceeding, or interference that concerns that Sponsor's Intellectual Property and that is attributable to conduct by such Sponsor or its agents during the term of this Agreement.

12.3    Notice of Indemnity

A party seeking indemnification pursuant to this article shall provide written notice to the Indemnifying Party within ninety (90) days after the Party seeking indemnification becomes aware of the case, action or claims against it. The indemnifying Party shall have sole control of the defense of any indemnified claim and all negotiations for its settlement. The indemnified Party shall cooperate and provide all reasonable assistance to the Indemnifying Party, at the Indemnifying Party's expense, in connection with the defense of such claim.

## 13.    LIMITATION OF LIABILITY

13.1    Limitation on Consequential and Indirect Damages

EXCEPT FOR CLAIMS OF A THIRD PARTY WHICH ARE SUBJECT TO INDEMNIFICATION UNDER ARTICLE 12 OR AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT, NO PARTY WILL BE LIABLE TO ANY OTHER PARTY TO THIS AGREEMENT FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR OTHER INDIRECT DAMAGES OR LOST OR IMPUTED PROFITS OR ROYALTIES, LOST DATA OR COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES,, REGARDLESS OF THE FORM OF THE ACTION OR THE THEORY OF RECOVERY, EVEN IF THAT PARTY OR ANY REPRESENTATIVE OF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE DAMAGES.

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                            F00382611

13.2    Exclusions

The limitations of liability set forth in Paragraph 13.1 (**Limitation on Consequential and Indirect Damages**) will not apply to losses or obligations arising in connection with (i) death, personal injury, bodily injury or property damage caused by either party or their respective employees or by any other individual acting on their behalf (each an "**Agent**"); (ii) the gross negligence or willful or reckless acts or omissions of a party or their respective Agents; (iii) either Party's or their respective personnel's breach of the confidentiality provisions set forth in Paragraph 8 (**Confidentiality**); or (iv) the indemnification provisions set forth in Paragraph 12 (**Indemnity**).

## 14.    GOVERNING LAW

The Agreement is deemed to be made under and shall be construed according to the laws of the State of Illinois, without regard to the conflict of law principles thereof. With regard to any dispute arising out of or in connection with this Agreement, except as expressly contemplated by another provision of this Agreement, the parties irrevocably consent and submit to the exclusive jurisdiction of the federal and state courts located in Chicago, Illinois, and waive any objection to the laying of venue of any such proceeding brought in such courts and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

## 15.    TERM, WITHDRAWAL, AND TERMINATION

15.1    Term and Withdrawal

This Agreement is effective from the Effective Date until terminated in accordance with its terms. Notwithstanding Paragraph 15.2 ("Withdrawal"), this Agreement shall terminate 1) as to that Sponsor upon the failure of that Sponsor to become a member of IPXI or 2) as to any Intellectual Property where a Sponsor fails to obtain an Essentiality Analysis, pursuant to Article 6, for its offered Intellectual Property. As to clause (b), if a Sponsor has no remaining Intellectual Property that is the subject of this Master Agreement, then the Agreement will also terminate as to that Sponsor.

15.2    Withdrawal and Termination

A Sponsor may upon prior written notice, and without incurring any penalty or cancellation fee, terminate this Agreement in the following instances:

a)    The announcement of the issuance of a new series of ULR Contracts, in which instance a Sponsor's participation may terminate as to the new series;

b)    Total sales of ULR Contracts of a new series fail to reach a gross amount of $_____ within _____ from the issuance of the series, in which instance the Agreement shall end as to the new series;

c)    No ULR Contract sales, following the close of Tranche A, for a period of 12 (twelve) months;

d)    A Sponsor's Total Asset Contribution Weight for every Series is zero; or

e)    A unanimous vote by all Sponsors to terminate the Offering, so long as no Enforcement Action is pending, wherein a vote pursuant to this clause shall take effect only upon the settlement of any such Enforcement Action or upon the adjudication of any such Enforcement Action, with all rights to appeal being exhausted, and all Litigation Proceeds having been distributed in accordance with Section 7.2(j).

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    F00382612

15.3    Removal of Sponsor by Vote

Notwithstanding the provisions of Section 16.6, if a Sponsor should materially breach this Agreement or be unable to perform its duties and obligations pursuant to this Agreement, for any reason, including but not limited to insolvency, the other Sponsors may elect to vote to terminate such Sponsor's participation in this Agreement.  Such vote will be counted pursuant to each Sponsor's Total Asset Contribution Weight as a portion of all Sponsors' Total Asset Contribution Weights.  The Sponsor who is the subject of such a vote shall not cast a vote.

15.4    <u>Fees and Payments - Term and Termination</u>

Notwithstanding Sections 15.1, 15.2, and 15.3, this Article shall not apply to eliminate any fees or payments, if any, in the Submission Agreement, Option Agreement, Exclusive License Agreement, or Operating Agreement for any ULR Offering, or to terminate any agreement which was executed prior to the termination of this Agreement.

15.5    Repayment of a Sponsor's Fund Contribution

a)    Withdrawal or Termination of Sponsor.  Upon the withdrawal or termination of of a Sponsor: i) pursuant to Section 15.2 ("**Withdrawal and Termination**"), ii) pursuant to Section 15.3 ("**Termination of Sponsor by Vote**"), or iii) when a Sponsor's Total Asset Contribution Weight for each Series is zero, a Sponsor shall be entitled to repayment of its percent contribution into each Fund into which it contributed as a portion of the total contributed by all Sponsors to such Fund, with repayment being prorated in proportion to the total amount of monies in such Fund at the time of Sponsor's withdrawal.  However, in no event under this clause shall Sponsor's repayment be larger than its total contribution to the Fund(s)

b)    Termination of the Agreement.  Upon termination of this Agreement pursuant to Section 15.2 ("**Withdrawal and Termination**"), each Sponsor shall be entitled to repayment of its percent contribution into each Fund into which it contributed as a portion of the total contributed by all Sponsors to such Fund at the time of termination.

15.6    <u>Survival</u>

a)    <u>Paragraphs</u>.  The provisions relating to the following rights and obligations shall survive the termination, cancellation, expiration and/or rescission of this Agreement as to any Sponsor: Articles 8, 11, 12, and 13 and Sections 15.5 and 16.6.

**16.    GENERAL**

16.1    <u>Interpretation</u>

Each party acknowledges that this Agreement has been the subject of active and complete negotiations, and that this Agreement should not be construed in favor of or against any party by reason of the extent to which any party or its professional advisors participated in the preparation of this Agreement. If a term in an Exchange Agreement conflicts with a term in this Agreement, the provisions of this Agreement will prevail unless the Exchange Agreement specifically states that the term in Exchange Agreement will prevail.

16.2    <u>Assignment</u>

No Sponsor may assign any of its rights or delegate any of its obligations under this Agreement, whether by sale, assignment or transfer of the Intellectual Property, or by sale, merger, reorganization of business, or other acquisition of Sponsor, by operation of law or otherwise, without the prior the written consent of the Supplier, which shall not be unreasonably withheld.  Any purported assignment or delegation in contravention of this Paragraph shall be null and void. Any sale, assignment or other

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382613

transfer by Sponsor of any of its Intellectual Property must be made subject to the terms and conditions of this Agreement, provided that any such recipient by sale, assignment or other transfer of the Intellectual Property assumes in writing all the responsibilities and obligations of Sponsor under this Agreement.

### 16.3   Independent Contractors

Supplier and each Sponsor will at all times be independent contractors. No Party will have any right, power or authority to enter into any agreement for or on behalf of, or to assume or incur any obligation or liabilities, express or implied, on behalf of or in the name of, any other Party. This Agreement will not be interpreted or construed to create an association, joint venture or partnership between the Parties or to impose any partnership obligation or liability upon either party.

### 16.4   No Modification; Waiver

Except as expressly provided in this Agreement, no amendment, modification or change of this Agreement will be valid unless in writing and signed by an authorized representative of the Part(ies) to be affected and bound. No pre-printed information on invoices, purchase orders, order acknowledgements, quotations or the like will have any force or effect between the Parties. Payment of an invoice does not constitute an agreement to the content of the invoice. No waiver of any right or remedy under this Agreement shall be effective unless it is in writing (and not in electronic form) and such writing is signed by an authorized representative of the party to be charged therewith.

### 16.5   Acquisition of Sponsor

Subject to Section 16.2, should Sponsor be sold, purchased, merged, or otherwise acquired such that it ceases to exist, the new or surviving entity shall assume the obligations of and shall be subject to the terms and conditions of this Agreement, and any such new or surviving entity assumes in writing all the responsibilities and obligations of Sponsor under this Agreement.

### 16.6   Breach and Remedies

The failure of any Party to a) act in accordance with the terms of this Agreement, or b) fulfill its duties and obligations under this Agreement shall constitute a breach.  The Parties acknowledge and agree that any breach of the terms of this Agreement could give rise to irreparable harm for which money damages may not be an adequate remedy.  Accordingly, if such failure is not substantially remedied within 30 days after written notice of such failure, the Parties agree that, in addition to any other remedies, any Party shall be entitled to obtain preliminary or injunctive relief and to enforce the terms of this Agreement by a decree of specific performance.

### 16.7   Rights and Remedies Cumulative

Unless expressly stated otherwise in this Agreement, all rights and remedies provided for in this Agreement will be cumulative and in addition to, and not in lieu of, any other remedies available to either party at law, in equity or otherwise. If either Party has a choice of one action "or" another action, that Party may take both of those actions.

### 16.8   Severability

If any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, that provision will be deemed to be restated to reflect as nearly as possible the original intentions of the parties in accordance with applicable law. The remaining provisions of this Agreement and the application of the challenged provision to persons or circumstances other than those as to which it is invalid or unenforceable will not be affected thereby, and each of those provisions will be valid and enforceable to the full extent permitted by law.

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        F00382614

16.9    Subcontractors

Supplier may use subcontractor(s) of Supplier's choosing for any analyses and administration required to carry out the terms of this Agreement.    All subcontractors hired pursuant to this Agreement shall be bound by a duty of confidentiality.  Supplier shall reveal the identities of all subcontractors upon a Sponsor's request.  This paragraph shall not be construed to limit Supplier's ability to retain or engage legal counsel of its own choice, or otherwise waive any privileges, including, but not limited to, the attorney-client privilege.

16.10    Entire Agreement

This Agreement, and its attached Schedules and Exhibits, hereto constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements and understandings with respect thereto. No modification of or addition to this Agreement shall be effective unless it is in writing and signed by an authorized representative of each party.

16.11    Audit

 Supplier will permit technical, financial and operational audits of its service locations and systems by the auditors, personnel of Sponsors, and any regulatory agency with supervisory responsibility for a Sponsor ("**Auditors**").  Auditors shall not have access to the confidential information of other Sponsors or third parties, including Supplier's members, or confidential information regarding ULR offerings that do not include Sponsor's Intellectual Property, or materials protected by the attorney-client privilege.  Supplier employees may be interviewed during any such audits.  Supplier will, in a timely manner, fully cooperate with the Auditors and provide the Auditors all assistance and access to all systems, service locations and materials as required, including Supplier (or its auditors) audit reports.  Supplier may, at its sole discretion, require the Auditors to sign a confidentiality agreement before providing confidential information. Supplier shall promptly fix all problems discovered during the audit.

16.12    Mandatory Language

Where this Agreement states that a Party "will" or "shall" perform in some manner or otherwise act or omit to act, it means the Party is legally obligated to do so in accordance with this Agreement.

16.13    Drafting Presumption

No provision of this Agreement shall be construed against a party solely on the ground that the party was responsible for the preparation of this Agreement or that provision.

16.14    Headings

The captions, titles and headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

16.15    Execution in Multiple Counterparts

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

16.16    Further Assurances

Each party to this Agreement agrees to execute, acknowledge and deliver such further instructions, and to do all such other acts as may be necessary or appropriate in order to carry out the purposes and intent of this Agreement

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                   F00382615

Contract ID No. _____

**EXHIBIT A**

**INTELLECTUAL PROPERTY SCHEDULE**

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    F00382616

Contract ID No. _____

**EXHIBIT B**
**TOTAL AND JURISDICTION ASSET CONTRIBUTION WEIGHT CALCULATIONS**



802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382617

Contract ID No. _____



802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00382618

Contract ID No. _____

**EXHIBIT C**
**ULR CONTRACT CONVERSION CALCULATIONS**



802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Contract ID No. _____

## EXHIBIT D
## AMNESTY DISCOUNT CALCULATIONS



802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Contract ID No. _____

Exhibit E

Notice.

Notice in accordance with Article 3 of this Master Agreement shall be provided as follows:

If to [EACH SPONSOR LISTED INDIVIDUALLY]:

If to Supplier:

IPXI Holdings, LLC
10 South LaSalle Street, Suite 2130
Chicago, Illinois, 60603
Attention: General Counsel

With a copy to:

notice@ipxi.com

802.11n, Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                F00382621

# EXHIBIT 12

# Exclusive License Agreement

This Exclusive License Agreement ("ELA" or "Agreement") has an effective date of _____ (the "Effective Date") and is entered into by and between Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V, having offices at Hansastrasse 27c, 80686 Munich, Germany ("Sponsor" or "Fraunhofer"), and _____ a limited liability company incorporated under the laws of the State of Delaware, having offices at 10 South LaSalle Street, Suite 2130, Chicago, Illinois 60603 ("Issuer" or "SPV"). This Agreement includes the attached schedule ("Schedule").

## RECITALS

WHEREAS, Sponsor and IPXI Holdings, LLC ("IPXI Holdings") entered into the IPXI "802.11n Master Agreement" ("Master Agreement") that provided for entering into a series of agreements upon certain conditions being met. Sponsor and IPXI Holdings further entered into an Exclusive License Option Agreement on _____ (the "Option Agreement") wherein Sponsor granted to IPXI Holdings an assignable option to obtain an Exclusive License (as defined below) to the Licensed Patents (as defined below) subject to the terms and conditions set forth therein, and IPXI Holdings has assigned such Option Agreement to Issuer.

WHEREAS, Issuer has elected to exercise its right under the Option Agreement to obtain an Exclusive License to the Licensed Patents subject to the terms and conditions set forth in this Agreement.

WHEREAS, Sponsor intends to grant, and to cause its Affiliates, as applicable, to grant to Issuer an exclusive license to the Licensed Patents and Issuer has agreed to accept such exclusive license, subject to the terms and conditions set forth in this ELA for the purposes of (a) developing and promoting the Licensed Patents, and (b) enabling certain rights under the Licensed Patents to be traded as marketable instruments on the exchange operated by Intellectual Property Exchange International, Inc. ("IPXI"), specifically as Unit License Rights or ULR unit sublicense agreements substantially in the form of Exhibit A hereto ("ULR Contracts").

NOW THEREFORE, in consideration of the promises and the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree and covenant as follows.

1.    Definitions

The definitions set forth in this Article shall apply to the following terms when used with initial capital letters in this ELA, and any amendments or supplements hereto. A capitalized term not defined below and used in this ELA shall have the meanings assigned to them in the Master Agreement.

1.1    "802.11n Standard" shall mean (i) IEEE Std. 802.11n-2009 as published by IEEE on October 29, 2009, or (ii) IEEE Std. 802.11-2012, as published by IEEE on March 29, 2012, to the extent that any provisions of IEEE St. 802.11-2012 supersede corresponding provisions in IEEE Std. 802.11n-2009.

1.2    "Affiliate" shall mean, with respect to a Party, any Person or entity that directly or indirectly Controls, is under common Control with, or that directly or indirectly is Controlled by such Party.

1.3    "A la Carte Offering" shall mean a ULR Contract or ULR Contracts, in accordance with context, that includes only a single Sponsor's Licensed Patents.

Copyright © 2014 by IPXI Holdings, LLC        1 of 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                F00372189

*Exclusive License Agreement by and Between Fraunhofer and Issuer*

1.4    "Combined Offering" shall mean a ULR Contract or ULR Contracts, in accordance with context, that includes, with respect to a Series, the Licensed Patents of every Sponsor to the Master Agreement.

1.5    "Continuous Compliance" means a purchaser is continuously purchasing a sufficient quantity of ULR Contracts so as not to infringe any Licensed Patent and is submitting reports in accordance with the ULR Contract.

1.6    "Control" and the correlative term "Controlled," with respect to a Person or an entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another Person or entity, whether through the ability to exercise voting power, by contract, or otherwise. Without limiting the generality of the foregoing, a Person or entity shall be deemed to be Controlled by another Person or entity if such other Person or entity possesses, directly or indirectly, power to vote 50% or more of the securities having voting power for the election of directors, managing general partners or the equivalent.

1.7    "Covered Product" shall mean any machine, manufacture, composition of matter, process or product of a process for which it would be an act of infringement to make, have made, use, sell, or offer for sale in any country or jurisdiction or import into any country or jurisdiction absent a license to practice any Licensed Patent.

1.8    "Including," "includes," or "include" shall be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance.

1.9    "Indemnified Party" shall have the meaning set forth in Section 9.1 of this ELA.

1.10    "Indemnifying Party" shall have the meaning set forth in Section 9.1 of this ELA.

1.11    "Licensed Field" shall mean within each Licensed Territory, any practice of any essential claim of a Licensed Patent solely for the purpose of and limited to practicing the 802.11n Standard.

1.12    "Licensed Patents" shall mean the patents that are the subject of this ELA and include the patents identified in the attached Schedule.

1.13    "Licensed Product" shall mean up to 1,000 chipsets implementing the 802.11n Standard in the Licensed Field for which it would be an act of infringement to make, have made, use, sell, or offer for sale in a Licensed Territory or import into or export out of a Licensed Territory absent a license to practice any Licensed Patent.

1.14    "Licensed Territory" shall mean, for each Licensed Patent, any country where such Licensed Patent would be infringed absent a license thereunder at the time of such infringement

1.15    "Option Agreement" shall have the meaning provided in the recitals to this Agreement.

1.16    "Party" shall mean either Issuer or Sponsor as the context requires. "Parties" shall mean Issuer and Sponsor individually and collectively.

1.17    "Patent" shall mean any issued patent or issued utility model of any country or jurisdiction, or any allowed patent application or allowed utility model application in any country or jurisdiction.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00372190

1.18 "Person" shall mean any natural person, corporation, company, partnership, limited partnership, limited liability company, firm, association, trust, government, governmental agency, or any other entity, whether acting in an individual, fiduciary or other capacity.

1.19 "Related Patents" or "Related Patent," depending on context, shall mean one or more Patents related to a Licensed Patent by a common claim of priority.

1.20 "Report" shall have the meaning as set forth in Article 3 of the ULR Contract substantially in the form attached at Exhibit A hereto.

1.21 "Rulebook" shall mean the IPXI Market Rulebook, published by IPXI, as may be supplemented or amended from time to time.

1.22 "ULR Contract" shall refer to the agreement substantially in the form attached at Exhibit A hereto.

2. Grant of Exclusive License

2.1 Scope of Grant. Subject to any prior commitments entered into by Sponsor prior to the Effective Date, Sponsor shall grant to SPV a worldwide, royalty-free license, subject to the provisions of Paragraph 7.1.b, Article 9 and any other applicable terms and conditions of the Master Agreement, under the Licensed Patents, solely for the purpose of sublicensing the practice of the 802.11n Standard to make, to have made, to use, to sell, and offer to sell Licensed Products in the Licensed Territory and to import Licensed Products into the Licensed Territory or export Licensed Products from the Licensed Territory as i) an A la Carte Offering or ii) a Combined Offering. This grant shall be exclusive to SPV. Subject to the foregoing terms of this Section 2.1, this grant shall further include the exclusive right (even to the exclusion of Sponsor) to sublicense the Licensed Patents and grant covenants not to sue under the Licensed Patents, except to IPXI Affiliates, and collect and receive revenues from any such sublicense, within the Licensed Field and Licensed Territory in accordance with this Agreement. Without limiting the foregoing, the right of SPV to grant sublicenses shall include the exclusive right to grant sublicenses, releases, and covenants not to sue for acts that occur prior to the grant of the sublicense, release, or covenant not to sue to the extent such acts would be covered by the sublicense, covenant not to sue or release if they occurred after the date thereof. .

2.2 Reservation to Sponsor. Sponsor reserves the rights for itself and its Affiliates set forth in Section 7.1.b of the Master Agreement, including its subsections, which are hereby incorporated by reference into this Agreement, and its terms, conditions and obligations form a part of this ELA.

2.3 Patents Not Identified but Deemed Essential. This provision shall be governed by, and subject to all terms and provisions of Section 7.1.c of the Master Agreement, with only certain provisions from that section reproduced herein: If a Patent of Sponsor that has not been identified in this ELA as a Licensed Patent is later represented to be essential to the practice of the 802.11n Standard either: a) by Sponsor's representation to a standards setting committee or organization including, but not limited to, the Institute of Electrical and Electronic Engineers (IEEE), b) by a court of competent jurisdiction or other tribunal, whether domestic or in a foreign territory, without regard to any issues of preclusion or collateral estoppel, or c) if a Sponsor asserts or admits in a legal pleading or under oath that a Patent is essential to the practice of the 802.11n Standard, the following provision shall apply.

x) Sponsor shall not enforce such Patent in the Licensed Field against any ULR Contract purchaser who purchased a ULR Contract and remains in Continuous Compliance, until such time such Patent is added to a subsequent Series, as long as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00372191

*Exclusive License Agreement by and Between Fraunhofer and Issuer*

such subsequent Series is issued within 12 months following the date such Patent is identified as essential to the practice of the 802.11n Standard, pursuant to the entirety of the provisions of Section 7.1.c of the Master Agreement; and

y)    Upon the addition of a Patent to a subsequent Series pursuant to this Section 2.3, Sponsor shall continue to refrain from seeking to enforce such Patent against a ULR Contract purchaser, who remained in Continuous Compliance, for any acts that fall within the scope of the license of Section 2.1 (Grant of Exclusive License) that occurred prior to the addition of such Patent to such Series.

2.4    Related Patents Not Identified.  This provision shall be governed by, and subject to all terms and provisions of Section 7.1.d of the Master Agreement, with only certain provisions from that section reproduced herein:  Related Patents that have not been identified in this ELA as a Licensed Patent shall be subject to the provisions of Section 2.3, clauses (x) and (y), provided, however, that a Related Patent shall not be subject to the provisions of Section 2.3.x or 2.3.y if such Patent has been determined to be not essential to the practice of the 802.11n Standard by a) a court of competent jurisdiction or other tribunal, whether domestic or in a foreign territory, without regard to any issues of preclusion or collateral estoppel or b) pursuant to Section 7.2.d.ii of the Master Agreement.

2.5    If Sponsor is unable to grant a license pursuant to Section 2.1 (Grant of Exclusive License) to a Related Patent or a Patent deemed essential pursuant to Sections 2.3 or 2.4, Sponsor in any event shall, to the extent it retains the right to do so and for the duration of this ELA, refrain from enforcing such Patent against a ULR Contract purchaser, for acts that fall within the scope of the license, who remains in Continuous Compliance..

2.6    FRAND Obligations.  SPV acknowledges that some to all of the Licensed Patents to be exclusively licensed pursuant to this ELA may be subject to the obligation to be licensed on fair, reasonable and non-discriminatory terms.  SPV agrees to take all actions that may be reasonably required and permitted by this Agreement to satisfy such obligations

2.7    Marking.  Issuer shall require that sublicensees appropriately mark any Licensed Product, or device incorporating a Licensed Product, with the number of any Licensed Patent that such sublicensee reasonably believes such Licensed Product to embody, as set forth in the ULR Contract. Sponsor shall include appropriate marking of substantially all of its own Covered Products (if any) with the number of any Licensed Patent that Sponsor reasonably believes such Covered Product to embody. Notwithstanding the foregoing, nothing herein shall be construed to require Sponsor to determine, offer an opinion on, or make a special inquiry into whether a particular Covered Product embodies a particular Licensed Patent.

2.8    No Other License, Release or Covenant Not To Sue. Except as expressly provided in this Agreement, no licenses, releases or covenants not to sue are granted by either Party in, to or under any intellectual property or other rights of such Party, either expressly or by implication, estoppel or otherwise, and nothing contained in this Agreement shall be construed as an obligation of any Party or any Affiliate of any Party to furnish any technical or other information or know-how. Any rights not expressly granted under this Agreement are hereby reserved by the respective owner.

2.9    Limited Admissibility. Sponsor agrees, and authorizes Issuer to agree on behalf of Sponsor and Sponsor's successors-in-interest, that (a) any negotiations related to a sublicense, release or covenant not to sue pursuant to a ULR Contract shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of such agreement, (b) any offer, acceptance, rejection, purchase, sale, transfer, bid, ask, price or quote for a ULR Contract shall not be admissible to prove infringement, notice or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        F00372192

willfulness of infringement before any court, agency, arbitrator, or other tribunal, and (c) to the extent permissible under applicable law, any and all of the foregoing in subsections (a) and (b) shall be subject to Federal Rule of Evidence Rule 408.

3.    **Issuance of ULR Contracts**

In consideration for the rights granted by Sponsor to Issuer pursuant to Article 2 of this Agreement, Issuer shall issue ULR Contracts substantially in the form of Exhibit A hereto.

4.    **Records and Inspection**

4.1    Records. Issuer shall keep, or have kept on its behalf, true and accurate records of the sublicenses granted by Issuer pursuant to Article 2 of this Agreement, specifically including (i) the identity of the sublicensees that have submitted Reports, as defined within and pursuant to the ULR Contract and (ii) the total number of Reports submitted by all sublicensees collectively. Issuer shall maintain those Reports for six (6) years after the date of those Reports.

4.2    Inspection. Upon written request from Sponsor, Issuer shall, within thirty (30) days of receiving a written request, provide, at Sponsor's sole expense, the (i) identity of the sublicensees that have submitted Reports pursuant to Article 3 of the ULR Contract and (ii) the total number of Reports submitted.

5.    **Maintenance of the Licensed Patents**

5.1    Duty to Maintain. Sponsor shall have sole right and responsibility to pay all maintenance fees or other fees that are required to maintain the Licensed Patents in full force and effect throughout the term of this Agreement. If at any point in time a Patent is excluded from all ULR Contracts then available for purchase, Sponsor shall be relieved of such responsibility for such Patent.    This section shall supersede Section 6.3 (**Duty to Maintain**) of the Master Agreement.

5.2    Limited Authorization to Issuer. If Sponsor has not paid all maintenance fees or other fees specified in clause 5.1 within ninety (90) days of the date they are due for any Licensed Patent, Sponsor authorizes Issuer to make a payment of such fees, any applicable late fees, and any other necessary fees on Sponsor's behalf. Issuer shall provide written notice to Sponsor of any payment made pursuant to this clause, and Sponsor shall reimburse Issuer for any such payment plus interest which shall accrue at a rate of five percent (5%) per year beginning ninety (90) days after Issuer provides such written notice to Sponsor.

5.3    No Obligation on Issuer. In no event shall Issuer be obligated to pay any fees under clause 5.2, and Issuer shall have no liability to Sponsor for payment or non-payment of such fees. Sponsor agrees to indemnify and to hold Issuer harmless from any third-party claim arising from Sponsor's or Issuer's payment or non-payment of such fees.

5.4    Foreign Exchange. If any fees paid by Issuer pursuant to clause 5.2 are denominated in a currency other than United States dollars, Sponsor shall reimburse Issuer in United States dollars at the exchange rate in effect at the close of business on the date such fees and interest, if applicable, were paid by Issuer.

6.    **Subsequent Examination Related to the Licensed Patents**

6.1    Duty to Prosecute. Sponsor shall have the sole right and responsibility, at Sponsor's expense, to prosecute any proceedings pertaining to a Licensed Patent that take place before a patent office having jurisdiction in the Licensed Territory or any portion thereof, including any interference, reissue, reexamination, supplemental or post-grant

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00372193

Exclusive License Agreement by and Between Fraunhofer and Issuer

proceeding, and further including any appeals from such proceedings. This clause 6.1 shall not apply to actions concerning the infringement or alleged infringement of a Licensed Patent. This section shall supersede Section 5.4 (Duty to Prosecute) of the Master Agreement.

6.2    Preservation of Scope. In its performance pursuant to clause 6.1, Sponsor shall exercise commercially reasonable efforts to preserve the scope and validity of the claims of any Licensed Patents at issue, and to prevent abandonment of any Licensed Patent or any claim of any Licensed Patent during the course of such proceeding. Sponsor shall keep Issuer reasonably informed with respect to the conduct of any proceeding contemplated by clause 6.1.

6.3    Abandonment or Cancellation. Notwithstanding the efforts specified in clause 6.2, Sponsor shall (a) provide at least two (2) weeks advance written notice to Issuer before abandoning or canceling, or allowing the abandonment or cancellation of, any claim of a Licensed Patent; (b) contemporaneously with such notice, authorize Issuer or Issuer's designee to prosecute or otherwise direct such proceeding in advance of such abandonment or cancellation; and (c) execute such other agreements as may be necessary to give effect to the exercise of the option under the foregoing clause 6.3(b). Issuer shall provide written notice to Sponsor of any fees, costs or other expenses incurred pursuant to this clause, and Sponsor shall reimburse Issuer for any such fees, costs or other expenses plus interest which shall accrue at a rate of five percent (5%) per year beginning ninety (90) days after Issuer provides such written notice to Sponsor.

6.4    Cooperation. Sponsor shall provide any cooperation and assistance reasonably required or requested by Issuer or Issuer's designee in connection with the prosecution or direction of proceedings pursuant to clause 6.3, including making available witnesses or inventors for interviews, depositions, hearings and trials, producing documents and materials, providing access to plants and facilities, and providing consultation.

6.5    Issuer's Consent. Sponsor shall not file or otherwise initiate any interference, reissue, reexamination, supplemental or post-grant proceeding pertaining to any Licensed Patent without the written consent of Issuer, which shall not be unreasonably withheld, and subject to any terms or conditions that Issuer places upon such consent, if given. Sponsor agrees that consent withheld pursuant to the Rulebook shall be deemed reasonably withheld. Sponsor further agrees that if such consent is given, any terms or conditions placed upon such consent pursuant to the Rulebook shall be deemed reasonable.

7.    Enforcement and Defense

7.1    Threatened Infringement. If at any time during the term of this Agreement, a Party believes that a third party has infringed or has threatened to infringe a Licensed Patent in a Licensed Field, such Party shall promptly notify the other Party of such belief and shall provide the reasonable details of such infringement to the extent such disclosures would not violate any confidentiality or other obligation owed to a third party.

7.2    Enforcement. As between Sponsor and Issuer, enforcement shall be governed by the provisions set forth in clauses 7.2, 7.3, 7.4 and 7.5 of the Master Agreement, including its subsections, which are hereby incorporated by reference into this Agreement, and its terms, conditions and obligations form a part of this Agreement.

7.3    Obligation to Disclaim. In the event that any claim(s) of a Licensed Patent is found to be invalid by a court of competent jurisdiction through an order which is final and not subject to further review or appeal, Sponsor hereby agrees to disclaim said invalid claim(s) by filing a disclaimer with the United States Patent and Trademark Office pursuant to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00372194

*Exclusive License Agreement by and Between Fraunhofer and Issuer*

35 U.S.C. § 288, or with the appropriate government agency in the jurisdiction of the Licensed Patents containing the invalid claim(s).

7.4 IN NO EVENT SHALL ISSUER HAVE ANY LIABILITY TO SPONSOR ARISING FROM ANY CASE, ACTION, CLAIM OR COUNTERCLAIM CONCERNING THE INFRINGEMENT, VALIDITY OR ENFORCEABILITY OF ANY LICENSED PATENT, INCLUDING ANY CASE, ACTION, CLAIM OR COUNTERCLAIM FOR DECLARATORY RELIEF.

8. **Representations, Warranties and Covenants**

8.1 <u>Mutual Representations and Warranties</u>. Each Party hereby represents and warrants to the other Party, as of the Effective Date, that:

    a) Such Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof;

    b) Such Party has taken all necessary action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder;

    c) This Agreement has been duly executed and delivered on behalf of such Party, and constitutes a legal, valid, binding obligation, enforceable against it in accordance with the terms hereof; and

    d) The execution, delivery and performance of this Agreement by such Party will not constitute a default under nor conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it is bound, nor violate any law or regulation of any court, governmental body or administrative or other agency having jurisdiction over such Party.

8.2 <u>Sponsor's Representations and Warranties</u>. Sponsor hereby represents and warrants to Issuer that, as of the Effective Date:

    a) Sponsor has the right and authority to grant the rights and licenses specified in Article 2;

    b) To the best of its knowledge, including Sponsor's department responsible for licensing and Patents, Sponsor has not entered into any agreement or otherwise granted any now-existing, or future, license, right, option or privilege which conflicts, may conflict, or is otherwise inconsistent with this Agreement;

    c) Sponsor has no knowledge of any actions, suits, investigations, cases, claims or proceedings pending or threatened relating to the Licensed Patents, except those which it has disclosed to IPXI; and

    d) All maintenance or other fees currently due or due within 90 days of the Effective Date of this Agreement to maintain the enforceability of any Licensed Patent in any Licensed Territory have been paid.

8.3 <u>No Other Warranty</u>. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY NOR ITS AFFILIATES OR PARENT COMPANIES MAKES ANY REPRESENTATION OR EXTENDS ANY WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY WARRANTY THAT ANY PATENT RIGHTS LICENSED ISSUER HEREUNDER ARE VALID OR ENFORCEABLE OR THAT THEIR EXERCISE DOES NOT INFRINGE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00372195

OR MISAPPROPRIATE ANY PATENT RIGHTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES.

9. **Indemnity**

9.1 <u>Mutual Indemnity from Third Party Claims Resulting from Breach</u>. From and after the Effective Date, each Party's indemnity obligations to the other Party shall be made in accordance the terms set forth in the Fraunhofer Addendum to IPXI 802.11n Master Agreement except shall be made as between Sponsor and SPV.

9.2 <u>Notice of Indemnity</u>. A Party seeking indemnification pursuant to this article shall provide written notice to the indemnifying Party within ninety (90) days after the Party seeking indemnification becomes aware of the case, action or claims against it. The indemnifying Party shall have sole control of the defense of any indemnified claim and all negotiations for its settlement. The indemnified Party shall cooperate and provide all reasonable assistance to the indemnifying Party, at the indemnifying Party's expense, in connection with the defense of such claim.

9.3 <u>Limitation on Liability</u>. EXCEPT FOR CLAIMS OF A THIRD PARTY WHICH ARE SUBJECT TO INDEMNIFICATION UNDER THIS ARTICLE 9 OR AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT, NEITHER SPONSOR NOR ISSUER, NOR ANY OF THEIR AFFILIATES WILL BE LIABLE TO THE OTHER PARTY TO THIS AGREEMENT OR ITS AFFILIATES FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR OTHER INDIRECT DAMAGES OR LOST OR IMPUTED PROFITS OR ROYALTIES, LOST DATA OR COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, WHETHER LIABILITY IS ASSERTED IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT PRODUCT LIABILITY), INDEMNITY OR CONTRIBUTION, AND IRRESPECTIVE OF WHETHER THAT PARTY OR ANY REPRESENTATIVE OF THAT PARTY HAS BEEN ADVISED OF OR OTHERWISE MIGHT HAVE ANTICIPATED THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE.

10. **Assignment and Transfer**

Except as provided for in Sections 16.2 and 16.5 of the Master Agreement, no Party may assign any of its rights or delegate any of its obligations under this ELA, by operation of law or otherwise, without the prior the written consent of the other Party, which shall not be unreasonably withheld. Any purported assignment or delegation in contravention of this Article 10 shall be null and void. Any sale, assignment or other transfer of any of the Licensed Patents by Sponsor must be made subject to the terms and conditions of this ELA, provided that any such recipient by sale, assignment or other transfer of the Licensed Patents assumes in writing to all the responsibilities and obligations of Sponsor under this ELA.

11. **Term; Termination**

11.1 <u>Term</u>. This ELA and the rights and licenses granted under this ELA shall become effective on the Effective Date and, unless sooner terminated in accordance with clause 11.2 below, shall continue in effect until the date on which: (i) no Patent among the Licensed Patents remains pending or in effect in any Licensed Territory, (ii) no such Patent may later be made effective by operation of law or as a result of the action of any Party; and (iii) the statute of limitations or similarly applicable time limitation on enforcement or recovery with respect to each and every Licensed Patent has expired.

11.2 <u>Termination</u>. This Agreement may be terminated by either Party upon sixty (60) days written notice to the other Party upon:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00372196



Exclusive License Agreement by and Between Fraunhofer and Issuer

a)   Failure by the other Party to comply with or perform any material agreement or obligation to be complied with or performed by the other Party in accordance with this Agreement, if such failure is not substantially remedied within 30 days after written notice of such failure is provided to the other Party;

b)   A representation made or repeated or deemed to have been made or repeated by the other Party in this Agreement proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated; or

c)   The occurrence of the events set forth in Section 15.2.d of the Master Agreement.

11.3   Effect of Termination. Upon expiration or termination of this ELA for any reason, all rights conveyed to Issuer hereunder shall immediately terminate and shall revert to Sponsor, except that any ULR Contracts in effect on such day and all rights granted thereunder shall remain in full effect until their respective expiration or termination in accordance with their respective terms, notwithstanding the termination of this ELA, and further that any release, covenant not to sue, or other right granted pursuant to any such ULR Contracts shall survive and remain in full force and effect.

11.4   Survival. Clauses 2.3, 4.1 and 11.3, this clause 11.4 and Articles 6, 9, 12 and 13 shall survive the expiration or termination of this Agreement.

12.   Choice of Law and Jurisdiction

12.1   Choice of Law. This ELA shall be governed by the laws of the State of New York without regard to conflict of laws principles thereof.

12.2   Jurisdiction and Venue. If any dispute arises out of or in connection with this ELA, except as expressly contemplated by another provision of this Agreement, the Parties (a) irrevocably consent and submit to the exclusive jurisdiction federal and state courts located in New York City, New York; and (b) waive any objection to the laying of venue of any such proceeding brought in such courts and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum, provided, however, that a suit may be brought in any court having requisite jurisdiction in the event that the aforementioned New York courts determine they do not have jurisdiction over the dispute.

12.3   Remedies. The Parties acknowledge and agree that any breach of the terms of this ELA could give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the Parties agree that, in addition to any other remedies, each Party shall be entitled to seek preliminary or injunctive relief and to enforce the terms of this ELA by a decree of specific performance.

13.   Miscellaneous

13.1   No Agency. This ELA shall not be construed to create a partnership, principal-agent relationship, employment, fiduciary, trust or joint venture relationship. Neither Party is an agent of the other Party, and a Party shall not hold itself out as an agent of the other Party.

13.2   No Other Rights. Except as expressly set forth in the ELA, this ELA shall not be deemed to confer any rights or remedies upon any Person not a Party hereto.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00372197

Exclusive License Agreement by and Between Fraunhofer and Issuer

13.3    **Successors.** All covenants, agreements, representations, warranties and undertakings in this ELA made by and on behalf of either Party shall bind and inure to the benefit of the successors and permitted assigns of such Party.

13.4    **Notice.** Any notice or other communication under this ELA must be in writing and will be deemed given only when sent by first class mail (return receipt requested), hand-delivered, sent by a nationally recognized overnight delivery service, or sent by email to the address set forth for such Party in the Schedule.

13.5    **Waiver.** A waiver of any right arising from a breach of this ELA shall be in writing and signed by the Party granting the waiver. The failure of a Party to assert a right hereunder or to insist upon compliance with any term or condition of this ELA shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition. No waiver in a particular instance shall be construed to be a continuing waiver with respect to any subsequent instances. This clause may not itself be waived except in writing.

13.6    **Amendment.** This ELA may not be amended except in writing signed by a duly authorized officer or representative of each of the Parties and stating as its purpose the amendment of this Agreement.

13.7    **Entire Agreement.** This ELA, the Schedule, and the Exhibits attached hereto constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior negotiations, agreements and understandings with respect thereto. No modification of or addition to this Agreement shall be effective unless it is in writing and signed by an authorized representative of each Party.

13.8    **Severability.** Any provision of, or the application of any provision of, this ELA or any power which is prohibited in any jurisdiction is, in that jurisdiction, ineffective only to the extent of that prohibition. Moreover, if one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad or unreasonable as to the scope, duration, area, activity or subject so as to be unenforceable at law, such provision or provisions shall be modified or substituted by the appropriate judicial body so as to cover the maximum scope, duration, area, activity or subject permitted by applicable law. Any provision of, or the application of any provision of, this Agreement which is void, illegal or unenforceable in any jurisdiction does not affect the validity, legality or enforceability of that provision in any other jurisdiction or of the remaining provisions in that or any other jurisdiction. If any article, section or clause is void, illegal or unenforceable, it may be severed without affecting the enforceability of the other provisions in this ELA.

13.9    **Mandatory Language.** Where this ELA states that a Party "will" or "shall" perform in some manner or otherwise act or omit to act, it means the Party is legally obligated to do so in accordance with this Agreement.

13.10   **Drafting Presumption.** No provision of this ELA shall be construed against a Party solely on the ground that the Party was responsible for the preparation of this ELA or that provision.

13.11   **Headings.** The captions, titles and headings used in this ELA are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this ELA.

13.12   **Execution in Multiple Counterparts.** This ELA may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    F00372198

13.13    Further Assurances. Each Party agrees to execute, acknowledge and deliver such further instructions, and to do all such other acts as may be necessary or appropriate in order to carry out the purposes and intent of this ELA.

13.14    Rights in Bankruptcy. All rights and licenses granted to Issuer pursuant to this ELA are, and will otherwise be deemed to be, for purposes of the Title 11 of the United States Code, as amended from time to time (the "Bankruptcy Code"), licenses of rights to "intellectual property" as defined under Section 101 of the Bankruptcy Code. The Parties agree that Issuer will retain and may fully exercise all of its rights and elections as a licensee of intellectual property under the Bankruptcy Code. The Parties further agree and acknowledge that enforcement by Issuer of any rights under Section 365(n) of the Bankruptcy Code in connection with this ELA shall not violate the automatic stay of Section 362 of the Bankruptcy Code and waive any right to object on such basis.

(Remainder of this page intentionally left blank – signature page follows)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

F00372199

Exclusive License Agreement by and Between Fraunhofer and Issuer

IN WITNESS WHEREOF, each of the undersigned has caused this ELA to be duly executed and delivered as of the date first above written.

By: _____

Name:
Title:
Date:


FRAUNHOFER-GESELLSCHAFT    ZUR    FÖDERUNG    DER
ANGEWANDTEN FORSCHUNG E.V

By: _____

Name:
Title:
Date:    Dr. Helmut Schubert
Head of Patents and Licensing
Fraunhofer-Gesellschaft zur Förderung
der angewandten Forschung e.V.


12 of 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    F00372200

Schedule to Exclusive License Agreement by and Between Fraunhofer and Issuer

## Schedule to the Exclusive License Agreement

1.    Additional Definitions

1.1    "Licensed Patents" under this ELA shall include:

| Patent or Application Number | Title | Jurisdiction | Filing Date |
|---|---|---|---|
| US 6344129 | | USA | 03.12.1998 |
| DE 69808800 | | DE | 03.12.1998 |
| ES 2185244 | | ES | 03.12.1998 |
| FR-EP 1015339 | | FR | 03.12.1998 |
| GB-EP 1015339 | | GB | 03.12.1998 |
| IT-EP 1035339 | | IT | 03.12.1998 |
| PL 192010 | | PL | 03.12.1998 |
| JP3464984 | | JP | 03.12.1998 |
| | | | |
| | | | |
| | | | |
| | | | |

2.    Notice

For the purpose of clause 13.4 of this ELA:

The address for notice to Issuer is:

c/o General Counsel
IPXI Holdings, LLC
10 South LaSalle Street, Suite 2130
Chicago, Illinois 60603

With a copy to:

notice@ipxi.com

Copyright © 2014 by IPXI Holdings, LLC        1 of 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
F00372201

Schedule to Exclusive License Agreement by and Between Fraunhofer and Issuer

The address for notice to Sponsor is:

Fraunhofer-Gesellschaft
Patente und Lizenzen
Hansastraße 27c · 80686 München
Attn: Dr. Helmut Schubert

2 of 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                              F00372202

Exhibit A: Form of ULR™ Unit Sublicense Agreement

Exhibit A

Form of ULR™ Unit Sublicense Agreement

(Attached)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY