FARNAN LLP

February 10, 2023

**VIA E-FILING**
The Honorable Sherry R. Fallon
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE 19801-3555

**FILED UNDER SEAL**

Re: *Fraunhofer Gesellschaft zur Förderung der angewandten Forschung e.V. v. SXM Radio Inc.*, No. 17-184-JFB-SRF

Dear Judge Fallon:

Fraunhofer submits this responsive letter brief in advance of the discovery teleconference scheduled for February 15, 2023. SXM's requests directed to Fraunhofer's expert Bruce Elbert are improper and should be denied. The original demands that SXM sought to present to the Court have now been rendered moot as a result of the deposition of Mr. Elbert that took place last week. Nevertheless, rather than withdraw this dispute as moot, SXM is now attempting to raise new (and much broader) demands that are entirely premature, as SXM only raised them for the first time earlier this month. Although Fraunhofer is willing to discuss these new issues with SXM, they are clearly not yet ripe for resolution by the Court given SXM's failure to meet and confer. In short, there is no relief to be granted at this point and SXM's requests should be denied.

**Mr. Elbert Already Provided The Radio And Vehicle Data Originally Requested By SXM**

SXM opens its letter brief with the assertion that "[f]or nearly three months," SXM requested that Fraunhofer "identify[] and mak[e] available for inspection the vehicles and equipment used by its proposed expert, Bruce Elbert." D.I. 631 at 1. This assertion is demonstrably incorrect.

The email that SXM cites from "nearly three months" ago (D.I. 631-1 (SXM Ex. 1) at 4) does ***not*** contain any request for inspection of vehicles or test equipment. The email does ***not*** make any demand for identification or information about Mr. Elbert's test equipment generally. Rather, the email expressly limits its request to ***two discrete pieces of information*** as follows:

> (1) [T]he model number for the aftermarket radio and (2) the vehicle VIN or Electronic Serial Number for the radio in the vehicle used in the purported testing that he ran.

*Id.* (email dated November 11, 2022). SXM later reiterated its request for these two specific items including at the parties' meet-and-confer on December 16, 2023. *Id.* at 1 (requesting [1] aftermarket radio model number and [2] vehicle VIN or ESN for vehicle radio); D.I. 630-1 (Fraunhofer Ex. 1) at 2 (same), 10 (same).

In response, Fraunhofer noted that it had offered Mr. Elbert for deposition on February 3 (the earliest date of any expert in this case) and that the proper approach would be for SXM to ask Mr. Elbert its requests for information at that time. *See, e.g.*, D.I. 630-1 (Fraunhofer Ex. 1) at 9 ("[W]e have now offered a date for Mr. Elbert's deposition … so SXM will soon have the opportunity to ask him its questions directly in the format contemplated under the Federal Rules.").

It is undisputed that Mr. Elbert provided these discrete pieces of information at his deposition on February 3, 2023. Ex. 3 at 103:11 (vehicle radio ID), 111:25 (aftermarket radio ID), 304:6, 25 (VIN numbers). Accordingly, the original issue raised by SXM is now clearly moot.

**Mr. Elbert Already Offered And Provided An Inspection Of The Experimental Dome**

On December 16, 2022, about two hours before the parties were scheduled to meet and confer on these two specific requests from SXM (along with the parties' Section 112 narrowing dispute), SXM sent an email that reiterated its prior requests and then added a new (third) request in passing: "[W]e would also like to inspect the dome that [Mr. Elbert] used." D.I. 631-1 (SXM Ex. 1) at 1. SXM did not mention the dome issue again until more than a month later, D.I. 630-1 (Fraunhofer Ex. 1) at 10, followed by another brief mention on January 31 (two weeks later). *Id.* at 5. Fraunhofer responded the very next day, indicating that, as a compromise, Fraunhofer was willing to make the dome available for inspection at Mr. Elbert's deposition in an effort to "resolve SXM's purported concerns." *Id.* at 5.

As promised, Mr. Elbert brought the dome to his deposition on February 3 and readily complied when asked to display it. Ex. 3 at 291:1–294:23. He provided a visual inspection of the dome from various angles, offered explanatory testimony regarding its shape, structure, and so forth, and indicated particular features as he testified. *Id.*

Nevertheless, SXM complains that this inspection was inadequate because it did not afford "an opportunity to inspect the Dome … so that SXM's expert would have the opportunity to fully consider all of Mr. Elbert's opinions ***before his responsive expert report***." D.I. 631 at 2. But SXM did not even request to inspect the dome until its email of December 16, just three business days before the responsive expert report deadline on December 21. D.I. 617. This was clearly not enough time for the parties to arrange an inspection before the rebuttal report deadline.[1]

Moreover, there is no indication that SXM's communicated in its December 16 email (or the meet-and-confer that same day) that SXM's expert would need to be involved in any inspection, nor did SXM specify any anticipated scope of inspection or any desired format (i.e., remote versus in-person), nor did SXM express any urgency to schedule something before the rebuttal report deadline. Thus, SXM cannot fairly claim that it did not have a "meaningful" opportunity to inspect the dome when it failed to exercise the most basic diligence to make that happen (including participating in an appropriate meet-and-confer).[2]

---

[1] SXM claims to have "promptly" made its request for inspection "[u]pon receipt of the Elbert report." *Id.* That is plainly not true. Mr. Elbert served his report on October 18, D.I. 605, and SXM did not request to inspect the dome until nearly ***two months later***, in its email of December 16. D.I. 631-1 (SXM Ex. 1) at 1.

[2] SXM's brief does not explain exactly what additional information it hoped to have gleaned from an in-person inspection. In any event, Fraunhofer specifically asked if SXM would prefer to conduct the deposition of Mr. Elbert in person to facilitate physical inspection, and/or even postpone the deposition entirely if necessary to make that happen. D.I. 630-1 (Fraunhofer Ex. 1) at 3. SXM declined to pursue either of these approaches. *Id.* at 2.

Accordingly, given the fact that SXM has already had reasonable opportunity to inspect the dome at Mr. Elbert's deposition and has not identified any reasonable need or basis for a further inspection, this aspect of the alleged dispute is also moot.

**SXM's Broad New Requests For Inspection Are Procedurally And Substantively Improper**

Unlike the three specific requests discussed above, SXM now asks the Court to order Fraunhofer to "identify ***all*** equipment used by Bruce Elbert and permit SXM an inspection of such test equipment." D.I. 631-2 (Proposed Order) (emphasis added). This request is both procedurally and substantively improper, and can be denied on either or both grounds.

As an initial matter, SXM's broad demand to inspect "all equipment" is completely new and has never been subject to a proper meet-and-confer. As detailed above, this is ***not*** something that was raised "nearly three months" ago, contrary to SXM's claim. Rather, it was not until February 1— over six weeks after the parties' telephonic meet-and-confer on December 16—that SXM first made any reference to the idea of broadly inspecting "***all*** of the equipment used in [Mr. Elbert's] purported testing." D.I. 630-1 (Fraunhofer Ex. 1) at 4 (emphasis added). Upon receiving this new request, Fraunhofer immediately responded by pointing out that SXM's prior requests had been limited to three specific items, and offered to "properly meet and confer" if SXM was now seeking something broader than previously discussed. *Id.* at 3. SXM did not accept the offer to meet and confer but rather confirmed the three specific items that had previously been raised. *Id.* at 2.

Thus, the record is unequivocal that the parties have ***not*** yet met and conferred regarding the relief that SXM is now seeking. Simply put, SXM's decision to go forward with this broad request without complying with the basic meet-and-confer requirement is inconsistent with this Court's rules and orders. Local Rule 7.1.1; D.I. 26 at 3 n.1 ("Counsel are expected to ***verbally*** discuss the issues/ concerns before seeking the Court's intervention."). As a result, the parties have been forced to spend time and resources briefing this unripe issue rather than undertaking a proper meet-and-confer directed to, for example, evaluating the extent to which inspection is necessary for test equipment from both sides' respective experts and the appropriate scope of such inspection including logistics, scheduling, and other practical issues. Fraunhofer remains willing to engage in such a discussion, but it would have been far preferable for SXM to undertake that effort ***before*** coming to the Court.

In any event, SXM has thus far failed to identify any substantive legal basis that could support its request for an inspection of "all equipment" used by Mr. Elbert. SXM relies on Fed. R. Civ. P. 26(a)(2)(B)(ii) but does not cite any authority suggesting that this provision requires experts to produce equipment for inspection (much less inspection in any particular format).[3] By its own terms, the Rule states that it requires disclosure of "the facts or data considered by the witness in forming" his or her opinions. *Id.* SXM provides no reason or authority for why this requirement was not met by the disclosures and descriptions of the test equipment that Mr. Elbert already provided in his report. D.I. 631-1 (SXM Ex. 4) ¶¶ 57–68 (describing the relevant features of the equipment used in testing, and describing in detail the process of constructing, refining, and calibrating the dome); *see also* Ex. 4 (additional supporting exhibits not cited by SXM).

---

[3] *ClearValue* is inapposite as it does not relate to any mandatory inspection of expert equipment.

**The Other Allegations In SXM's Letter Brief Are Incorrect And Irrelevant**

Finally, SXM makes a handful of other accusations in its opening brief that are not directly relevant to its claim for relief but appear to have been inserted in an attempt to color the Court's perception of Fraunhofer's expert with unfounded innuendo. For example:

- SXM insinuates that it is somehow improper that Mr. Elbert sold his personal vehicle that happened to include an SXM radio that was used for some of his drive tests. D.I. 631 at 3. But as already discussed, SXM did not ask to inspect any vehicle until only recently, and SXM has not identified anything special about the car itself that could plausibly require a physical inspection. Fraunhofer already provided the only specific information that SXM previously identified as relevant (VIN and radio ID). Ex. 3 at 103:11, 111:25, 304:6, 25.

- SXM also complains that Mr. Elbert's report includes an image of a disassembled RADOME that is not from Mr. Elbert's car. D.I. 631 at 3. However, the image in the report is clearly illustrative and the report never suggests otherwise. D.I. 631-1 (SXM Ex. 4) ¶ 58. The photo on its face shows a different car than the one used in the drive test on the same page. *See, e.g.*, *id.* ¶ 57, 58. In any event, SXM does not explain any connection between this photo and the present discovery dispute.

- SXM claims that "the Dome depicted throughout various images in [Mr. Elbert's] report was in fact not the same Dome ultimately used in the testing or with him at the deposition." D.I. 631 at 3. This argument inexplicably ignores the iterative process expressly described in Mr. Elbert's report whereby he started with the dome depicted in Paragraph 61 of his report and then made necessary adjustments to calibrate its absorption, resulting in the final dome that he used for his demonstration and presented at deposition. D.I. 631-1 (SXM Ex. 4) ¶¶ 60–68 (describing the calibration and modification process in detail); *see also* Ex. 3 at 296:22–25. The fact that the dome had varying appearances at different stages of this process is wholly unremarkable. The failure of SXM's counsel to understand this process is not a basis to grant relief.[4]

In summary, SXM's requests for further information and inspection relating to Mr. Elbert's report are all either moot or premature. SXM's motion should be denied in its entirety.[5]

---

[4] SXM's brief asserts that Mr. Elbert "created a 'shark-fin plastic cover called a RADOME.'" D.I. 631 at 1. This is incorrect and further demonstrates SXM's misunderstanding. The shark-fin RADOME is a preexisting component physically affixed to the car as manufactured, which is distinct from the removable dome created by Mr. Elbert for purposes of his technical demonstration.

[5] In footnote 2 of its opening brief, SXM refers to yet another alleged dispute for which the parties have not yet met and conferred. Fraunhofer disputes SXM's characterizations in this footnote but as SXM concedes the issue is not ripe, there is no need to address the issue further.

Respectfully submitted,

/s/ *Michael J. Farnan*

Michael J. Farnan

cc: Counsel of Record (Via E-Mail)

EXHIBIT 3

HIGHLY CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE

2

   - - - - - - - - - - - - - - - - -x

3                                    :

   FRAUNHOFER-GESELLSCHAFT ZUR       :

4  FÖRDERUNG DER ANGEWANDTEN         :

   FORSCHUNG E.V.,                   : Case No.

5                                    : 17-184-JFB-SRF

                   Plaintiff,        :

6                                    :

        vs.                          :

7                                    :

   SIRIUS XM RADIO INC.,             :

8                                    :

                   Defendant.        :

9  - - - - - - - - - - - - - - - - -x

10

11             *** HIGHLY CONFIDENTIAL ***

12

13         Remote video-recorded deposition of BRUCE R. ELBERT,

14  taken pursuant to Notice, was held via videoconference,

15  commencing February 3, 2023, at 10:08 a.m. CST, on the above

16  date, before Amanda McCredo, a Court Reporter and Notary

17  Public in the State of New York.

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 102

1   infamous guy --

2        Q     Howard Stern?

3        A     -- Howard Stern.

4              What he did for Sirius is amazing.  Who

5    would have ever thought that Howard Stern would make

6    Sirius into the major player that they were.  But he

7    was.

8              And I don't listen to him, and I don't care

9    for his brand of humor.  And I don't listen to NFL

10   and all that.

11             So, I have certain things I listen to, and

12   they're there.  So, I'm happy.

13             And there are zillions of other people that

14   have that.

15             But I'm not the content guy.  I just

16   respect its importance.

17             MR. BAGHDASSARIAN:  Why don't we take our

18        break.

19             THE VIDEOGRAPHER:  The time is 12:42.  We

20        are off the record.

21                      (Recess taken.)

22             THE VIDEOGRAPHER:  The time is 1:30.  We

23        are on the record.

24   BY MR. BAGHDASSARIAN:

25        Q     Mr. Elbert, in connection with the drive

HIGHLY CONFIDENTIAL

Page 103

1    testing that you did, you used your own personal

2    vehicle, correct?

3         A    Part of the -- part of the testing, yes, I

4    did use my own personal vehicle.  Part, I used a

5    separate standalone receiver unit designed for

6    portable use.

7         Q    What was the model number of the receiver

8    contained in your vehicle?

9         A    According to my account with XM --

10   Sirius XM, the radio ID is as follows:          as

11   in          ,                                          .

12        Q    Do you know the generation of chip set that

13   that model uses?

14        A    Well, I'm not in a position to know that.

15             But the radio unit comes -- came with my

16   Lexus RX 350, the year 2017.

17        Q    And you were looking at a paper in

18   answering my last two questions.

19             What -- is that paper your invoice from

20   Sirius XM?

21        A    That's interesting.

22             No.  That paper is -- I just wrote it down

23   at the bottom here (indicating) --

24        Q    Okay.

25        A    -- that information.  And it came from my

HIGHLY CONFIDENTIAL

Page 104

```
1   account with Sirius XM.  So, I looked there for that
2   model in my account.
3       Q    Okay.
4            And do you know what the electronical --
5   the electronic serial number is for the radio in
6   your vehicle?
7       A    No, I have no access to that.
8       Q    Okay.
9            Do you know the VIN number to your vehicle?
10      A    I think I can get that for you.
11      Q    Today -- you don't have that information
12  today, correct?
13      A    Not sitting here, no.
14      Q    Thank you.
15           Do you know what model of antenna your
16  vehicle uses?
17      A    No, I don't.  I know what kind of antenna
18  it uses, but not the model.
19      Q    What kind of antenna does your vehicle use?
20      A    Well, this is a combined antenna package on
21  top of the vehicle.  And I have an illustration in
22  my report of what those look like.  It doesn't have
23  to be mine, because I'd have to break it apart.  I'd
24  have to take the radome off, which looks like a
25  shark's fin.  And underneath, as I mentioned, there
```

HIGHLY CONFIDENTIAL

Page 110

1   BY MR. BAGHDASSARIAN:

2       Q    But you don't -- you don't know whether the

3   image you're showing here is the same type of

4   antenna or the same antenna that's used in your --

5   in your Lexus, correct?

6            MR. McPHIE:  Objection; form.

7       A    Well, that's a good point, that, you know,

8   we cannot see what I have in mine; only by the

9   external shape, only by its behavior.

10           But I can tell you I also ran the circuit

11  using that portable antenna, which is a -- an

12  antenna that is strictly just the patch.  And I

13  did -- I did run it with that, and I got the same

14  results.

15           So, I'm very confident that I'm on the

16  right path here in using the vehicle antenna,

17  because I also used a separate, portable-type

18  antenna that I just placed on the roof, and it held

19  itself in place with magnets.

20  BY MR. BAGHDASSARIAN:

21      Q    What is -- what was the model number of the

22  portable receiver that you used?

23      A    Okay.  That would be this picture here.

24           And I can read it off to you.

25      Q    Okay.

HIGHLY CONFIDENTIAL

Page 111

1      A     Model number R, as in Romeo, 101.

2            Now, there's other information here about

3  it.  I think it's called a Sportscaster.

4      Q     Is that a portable receiver that -- for

5  which you have a subscription?

6      A     I did have a subscription when I was doing

7  the testing.  I think I cancelled it.

8      Q     Okay.

9            Do you know the electronic serial number of

10 that portable receiver?

11     A     It has a bunch of numbers on it.  There is

12 what appears to be a serial number down here

13 (indicating) at the bottom.  I can read it off to

14 you.

15     Q     Why don't you read that.

16     A     Pardon?

17     Q     Why don't you read that, please.

18     A     Okay.  ████████████████████████ --

19 ████████████.

20            And believe it or not, there's another ID,

21 XM radio ID.

22     Q     What is that number?

23     A     Okay.  ████████████████████████ -- that's

24 ████████████████████████████████████.  So,

25 ████████████.

HIGHLY CONFIDENTIAL

Page 112

1    Q    Were you made aware that Sirius XM, prior

2    to today, had requested the model information of the

3    high band receivers that you used in connection with

4    your testing?

5         A    Yes, I am --

6              MR. McPHIE:  Hold -- well, I'm going to

7         object.  That calls for attorney-client

8         communications, so I move to strike it.

9              THE WITNESS:  Okay.

10             MR. BAGHDASSARIAN:  Well, David, you can

11        respond for my next question.

12   BY MR. BAGHDASSARIAN:

13        Q    Did you object to providing the information

14   that you just provided to me today regarding the

15   model numbers for the high band radios in your

16   vehicle and the portable radio that you used for

17   your testing?

18             MR. McPHIE:  And, again, I'll object.  That

19        question calls for attorney communication --

20        privileged communications, and I'll instruct

21        the witness not to answer.

22             MR. BAGHDASSARIAN:  David, I'm going to ask

23        you to reconsider that.  These were part of the

24        bases for his opinion.  That -- I don't think

25        that's protected under the circumstances.

HIGHLY CONFIDENTIAL

Page 290

1   with you.  I don't -- is that of your expert report?

2       A    Yes, I have -- let's see -- yes, this is

3   the expert report here.

4       Q    Do you have notes in that expert report?

5       A    No, sir, nothing -- nothing written in it.

6       Q    And the notes that you have regarding

7   criticisms of Dr. Lyon's report, are those in your

8   engineering notes that we talked about earlier?

9       A    That happens to be on a legal pad, my legal

10  pad.

11      Q    And when did you go through Dr. Lyon's

12  report and identify the criticisms that you've

13  referred to today?

14      A    I started immediately after I received the

15  report, so a month or so ago, maybe not even a

16  month.

17          MR. BAGHDASSARIAN:  There's probably only a

18      few minutes left.  Let's take a break and then

19      we'll come back and I'll finish up.

20          THE VIDEOGRAPHER:  The time is 7:01.  We

21      are off the record.

22                  (Recess taken.)

23          THE VIDEOGRAPHER:  The time is 7:12.  We

24      are on the record.

25

HIGHLY CONFIDENTIAL

Page 291

1   BY MR. BAGHDASSARIAN:

2       Q     Mr. Elbert, your counsel indicated that you

3   have with you, in person, the dome that you used for

4   your testing; is that right?

5       A     Yes, I do.

6       Q     Can I -- can you show that dome on the

7   screen, please.

8       A     Yes.  (Witness showing dome.)

9       Q     Did --

10          MR. McPHIE:  And maybe rotate it around so

11       he can see the full thing.

12          Yeah, there you go.

13      A     (Witness complies.)

14  BY MR. BAGHDASSARIAN:

15      Q     Mr. Elbert, obviously this is a remote

16  deposition, but if I was there in person -- well,

17  let me say it this way.

18          Looking at the dome on the screen here, is

19  there anything that I or an expert on behalf of

20  Sirius XM can do to evaluate that dome by just

21  looking at it on the screen?

22          MR. McPHIE:  Objection to form.

23      A     Well, one thing is the geometry of the

24  dome.  That I arrived at this geometry so that the

25  satellite is coming in perpendicular to the surface.

HIGHLY CONFIDENTIAL

Page 292

1    That is to provide consistent attenuation through

2    and to minimize the effect of any reflections off of

3    the top of the car, by having that geometry.

4            So, that's why, you'll notice that it is

5    kind of off center.  That's so that it can sit on

6    the car this way (indicating), if the car is tilted

7    down, so that way it is truly perpendicular.

8            And as I mentioned before, here in Austin,

9    Texas, the satellite is -- both satellites are

10    50 degrees elevation.

11   BY MR. BAGHDASSARIAN:

12       Q    Sir, by looking and inspecting the dome on

13   the video here, can I determine whether the

14   attenuation -- or an expert on behalf of Sirius XM,

15   can they determine the attenuation just by looking

16   at it on the screen here?

17       A    Not without great difficulty, because the

18   attenuation is actually produced by this pattern,

19   this window-kind of pattern.  The silver color is

20   the actual absorptive material -- the RF absorption

21   material that you have in my report what it is, from

22   the supplier that I used.

23           And it's not solid, because if it were

24   solid, the attenuation would be too much.  So, to --

25   and I think I mentioned this, that the application

HIGHLY CONFIDENTIAL

                                              Page 293

1    engineer suggested that I cut openings in it, to

2    bring the attenuation down.  And that's why I went

3    through the rather detailed process of making it

4    come out 4 dB.  And there's one of the things --

5    another attachment to my report that shows before

6    and after.

7            And the "after" is after I arrived at this

8    pattern by what we call "cut and try."  Such that

9    the satellite could come in at any angle around the

10   compass and produce nominally 4 dB of attenuation.

11       Q    And -- right.

12           But in order for Sirius XM's expert to

13   determine if that dome is, in fact, as you say, a

14   4 dB attenuator, they would need to conduct their

15   own test on that, correct?

16           MR. McPHIE:  Objection to form.

17       A    I think so.

18   BY MR. BAGHDASSARIAN:

19       Q    And is that the dome that you used in

20   connection with the drive test that you performed in

21   this case?

22       A    Yes, it is.

23       Q    If you go to page 16 of your report, sir.

24       A    Believe it or not, I can't find where that

25   box is where I can fill in the page number.  So,

HIGHLY CONFIDENTIAL

Page 294

1    I'll just do it manually.

2          Okay.   Page 16.

3      Q    Right.

4          And under paragraph 61, that's the dome

5    that you presented in your expert report, correct?

6      A    That -- yes.   That picture?

7      Q    If you can hold up the dome that you have

8    next to you.

9      A    (Witness complies.)

10     Q    The color in the picture is gray.   The dome

11   that you have in front of you is white.

12         Why is there a color difference?

13     A    Okay.   So, this was an earlier picture, and

14   it would have been more appropriate to have a

15   picture of this.   But this is what got in the

16   report.

17         But if you look at the silver or gray

18   inside, you'll see it's the same color, because it's

19   the same material, which I cut away, in this

20   pattern.

21         And it goes on -- in the next paragraph, it

22   says, "I calibrated using an SXM receiver," et

23   cetera, et cetera, and --

24     Q    I -- I can read what's in your report, sir.

25         But I'm very concerned that what was --

HIGHLY CONFIDENTIAL

Page 295

1    what you present in your report is different than

2    the attenuator you're now showing me in person.

3              And when did you become aware of that

4    mistake?

5              MR. McPHIE:  Excuse me.  Hold on, hold on,

6         hold on.

7              Mark, you're making a very serious

8         accusation here, and I want you to -- and --

9         and rather than making an accusation, why don't

10        you just ask him questions so we can get things

11        on the record.  Okay?

12             That's all I'm saying.

13             You don't need to raise your voice or say

14        those sorts of things.  Let's just ask

15        questions and go forward here.

16             MR. BAGHDASSARIAN:  David, I don't know why

17        you're getting so defensive.  But I didn't

18        accuse him of anything.

19             I asked him when he became aware of that

20        mistake.  And I told him I was concerned about

21        that.

22             So, I'm asking:  When did you become aware

23        of that the picture presented in your report is

24        not the attenuator dome that you used in the

25        testing that you provide in your report?

HIGHLY CONFIDENTIAL

                                                  Page 296

1            Simple question.
2            MR. McPHIE:  Okay, great.  If that's all
3        you're saying.  But we don't know yet.  So,
4        let's ask him and find out.
5            MR. BAGHDASSARIAN:  You have to stop
6        talking.  So, let the witness answer, please.
7        A    All right.  So, the report goes into what
8    this dome -- this code is, why it's this shape.
9    BY MR. BAGHDASSARIAN:
10       Q    Sir -- Mr. Elbert, I'm sorry -- I'm sorry
11   to interrupt you.
12           MR. BAGHDASSARIAN:  Hang on, David.
13   BY MR. BAGHDASSARIAN:
14       Q    Because the problem is -- I asked you:
15   Just tell me when you identified that the dome you
16   actually used was different than the dome you
17   presented in your report.
18           I'm just asking for when.  I don't need a
19   whole explanation.  I'm just asking for when.
20           MR. McPHIE:  I'm going to object to form.
21       A    Okay.  So, you mischaracterized my report.
22           So, in paragraph 61, I'm talking about the
23   cone design, the shape.  And I happen to have a
24   picture of the absorption material before it was cut
25   away and before I had the plastic cover fabricated.

HIGHLY CONFIDENTIAL

Page 297

1          So, I'm not -- there's no attempt of

2    deception here whatsoever, or there is no mistake.

3          This is the shape.  That's all that's meant

4    to say.

5          And then it talked about my calibrating.

6          And then it says, in -- paragraph 64 goes

7    into the details.  It says [as read], "As initially

8    constructed the cone was far too absorbent to model

9    the 4.3 dB excepted drop -- measured attenuation --

10   measured attenuation was above 10 dB.  In

11   consultation with MAJR Products application

12   engineer, I determined that the best way to correct

13   the attenuation would be to remove portions of the

14   radiation absorbing material until approximately

15   4 dB fading was observed."

16         So, there is no error here.  I just don't

17   happen to have a picture of the same cone in this

18   form.

19         And if that resulted in confusion, I

20   apologize.

21         But you'd have to read the report to see

22   that cone up there is the absorptive material before

23   it's cut away, just to show the shape.

24   BY MR. BAGHDASSARIAN:

25       Q    If you would turn to page 15, the page

HIGHLY CONFIDENTIAL

Page 298

1   before in your report, please.

2       A    Page 15, okay.

3       Q    We looked at these images earlier.

4            Is that right?

5       A    I'm sorry, I didn't hear that.

6       Q    We looked at these images earlier on

7   page 15 of your report?

8       A    We talked about these, yes.

9       Q    Right.

10           And the -- on the right side, that's the

11  cone of the attenuator that you used; is that right?

12      A    Well, this was an earlier picture.  That

13  cone looks like it's gray.  So, it's the right

14  shape, but it's showing the material before I cut it

15  away.

16      Q    All right.

17      A    And -- although, it does say that -- give

18  me a second here.

19           It says, in paragraph 60, "The cone shaped

20  RADOME is out of flexible plastic sheet with a radio

21  absorbent material adhered to the inside."

22           So, that's clearly not what's shown in this

23  picture -- where'd it go?  This picture, this is the

24  cone shape, but without the plastic cover that's

25  identified in the report.

HIGHLY CONFIDENTIAL

Page 299

1          I mean, everything is here.  I don't see,
2     really, an issue.
3       Q    Are there any other changes -- sorry, let
4     me rephrase the question.
5          Are there any changes that you'd like to
6     make to your expert report, as you sit here today?
7       A    Did you say "any other changes"?
8          I don't see a need to change anything.
9       Q    Okay.
10      A    It's all covered in the report.
11         You asked for clarification.  That's why we
12    have this session.  So, I'm giving you
13    clarification --
14      Q    Okay.
15      A    -- but -- just like I don't see a need to
16    change anything in our discussion of the 4.3 dB and
17    how the testing was done.
18      Q    Fair enough.
19         So, you don't -- at this point, you don't
20    want to change anything in your report.  Understood,
21    sir.
22         MR. BAGHDASSARIAN:  I'm marking as
23      Exhibit 5 -- this will be the last thing we do.
24      It shouldn't take very long.  It's an article
25      entitled "Implementation Aspects for Combined

HIGHLY CONFIDENTIAL

Page 302

1   theoretical analysis by Fraunhofer which compared

2   code diversity to selection combining, right?

3          MR. McPHIE:  Objection; form.

4     A    Let's see, I tried to make this clear early

5   this morning, when this first came up -- I think it

6   was early this morning.

7          That the theoretical analysis performed

8   here based on a simulation is not a full system.

9   It's not even a receiver.  There's nothing much

10  there but a hypothetical potential of benefit,

11  relative to both code diversity combining and

12  selector combining, to say you wouldn't bother with

13  maximal-ratio.  They don't talk in there about

14  implementation issues of maximal-ratio.  But instead

15  they have there ready-conceived code diversity which

16  is superior, case closed.

17          MR. BAGHDASSARIAN:  I don't have any

18      further questions at this point -- I have no

19      further questions at this point, but I will --

20      I don't know if David has any questions.  I'll

21      make my reservations on the record after David

22      is done.

23          MR. McPHIE:  All right.  Just one brief

24      question, and thank you for your time today.

25  EXAMINATION BY

HIGHLY CONFIDENTIAL

Page 303

1    MR. McPHIE:

2        Q     Is it correct that during a break today, I

3    think you mentioned to me that you went to the

4    trouble of looking up the two VIN numbers for two

5    cars, including the car that was used in the test in

6    your report.

7              You got that information; is that right?

8        A     Yes, that's right.

9        Q     And you were not asked any questions about

10   those VIN numbers during your deposition; is that

11   right?

12       A     That's correct.

13             MR. McPHIE:  Okay.  That's all I have.

14             MR. BAGHDASSARIAN:  I'm sorry, did I miss

15        something?  I thought -- well, I guess maybe I

16        overlooked that.

17   FURTHER EXAMINATION BY:

18   MR. BAGHDASSARIAN:

19       Q     Mr. Elbert, could you read into the record

20   the two VIN numbers that you identified?

21             It looks like -- I know we talked about

22   that at a break.  I thought I had asked you about

23   those, what those VIN numbers were.

24             Could you please read those two VIN numbers

25   into the record?

HIGHLY CONFIDENTIAL

Page 304

```
 1          MR. BAGHDASSARIAN:  I appreciate that,
 2      David.  Thank you.  I didn't realize I hadn't
 3       asked him about that.
 4          MR. McPHIE:  No problem.
 5   A    Okay.  The first one is the 2014 RX 350.
 6          The VIN number is ███████████████.
 7  BY MR. BAGHDASSARIAN:
 8   Q    And that's the 2014 Lexus, correct?
 9   A    That is correct.
10   Q    And, Mr. Elbert, I just want to clarify one
11  thing on the record because, for a lot of the
12  deposition, I think we were referring to a 2017
13  Lexus as the one that you had conducted your test in
14  the loop that was presented in your expert report.
15          And I think -- later in the deposition, I
16  think you corrected yourself and said, "No, it was
17  actually the 2014 Lexus."
18          I just want to make sure I have that
19  testimony correct.
20   A    Yes, it is the 2014 that I did all of the
21  demonstrations, and the videos were done in that.
22   Q    Okay.
23          And then the -- if you could please read
24  the 2017 VIN number.
25   A    The 2017 VIN number is ███████████████.
```

HIGHLY CONFIDENTIAL

Page 305

1      Q    And that's the 2017 Lexus that you
2   identified during your deposition testimony today?
3      A    It's an RX 450h, yes, 2017.
4          MR. BAGHDASSARIAN:  Okay.
5          All right.  Thank you, Mr. Elbert.  I don't
6       have any other questions.
7          THE VIDEOGRAPHER:  All right, Counsel.
8          Go ahead.
9          MR. McPHIE:  One last thing is I'll just --
10       I'd like to designate the transcript highly
11       confidential.
12          MR. BAGHDASSARIAN:  And that's fine.
13          Let me just reserve our rights to keep the
14       deposition open.
15          And to the extent the parties here and
16       counsel can't resolve what I believe will be
17       disputes that come up during the course of
18       today's deposition, we reserve the right to
19       bring back Mr. Elbert, if necessary, or take
20       other appropriate action in connection with
21       what we've learned today.
22          With that reservation of rights, I have
23       nothing further.
24          MR. McPHIE:  Obviously we disagree.
25          We're done.

HIGHLY CONFIDENTIAL

Page 307

1                 C E R T I F I C A T E

2

3          I, AMANDA McCREDO, a Shorthand Reporter

4     and Notary Public of the State of New York, do

5     hereby certify:

6     That the witness whose examination is

7     hereinbefore set forth was duly sworn, and that

8     such examination is a true record of the

9     testimony given by such witness.

10    I further certify that I am not related to any

11    of the parties to this action by blood or

12    marriage, and that I am in no way interested in

13    the outcome of this matter.

14

15

16                  *Amanda McCredo*

17             AMANDA McCREDO

18

19

20

21

22

23

24

25

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 4

# Exhibit E

**EMI / RFI  Shielding  Products**

**PRODUCT DATA SHEET**

ISO 9001:2000 REGISTERED

"MAJR Difference MAJR Satisfaction"

DS-6-1-2020

# M6504 Low Frequency Microwave Absorber Material

## Product Summary

M6504 low frequency microwave absorber material performs in a range from 1 MHz to 3 GHz and is non-conductive, corrosion resistant, UL-94VO rated and RoHS Compliant.  Available with or without an adhesive.

## Product Application

The 6504 material is a thin, low frequency absorber.  This magnetically loaded material reduces reflections and damps electronic cavity resonances, thus reducing EMI emissions and crosstalk in electronic devices within a frequency range of 1 MHz to 3 GHz. It is also effective in reducing antenna side lobes and back reflections.  This low frequency absorber exhibits a UL94-V0 flammability rating, can survive outdoor exposure, and has a working temperature range of -60 deg. F to 375 deg. F.  Available in sheets or die-cut into a specific shape (with or without adhesive, on one or both sides).



## Technical Specifications



## Technical Specifications (cont.)

**Operating Temperature:** -60 deg. F to 375 deg. F

**Flammability Rating:** UL94-V0

**Hardness:** Shore A 60-80

**Thickness:** 0.040 in. (1.0mm)

**Adhesive Thickness:** 0.002 in. (0.05mm)

**Color:** Dark Gray

## Availability

**Standard Sheet Sizes:** 12 in. x 24 in.

**Rolls:** 12 in. wide available upon request

**Format:** Die Cut, Sheets, Kiss Cut pads

**Part Number Example:**
    M6504-0401224-1M/3G-26-01

*Legend*:
  M6504      *(Low Frequency Absorber)*
  0401224    *(T x  L x W)*
  1M/3G      *(1 MHz to 3 GHz)*
  26         *(silicone material)*
  01         *(adhesive one side, 02 for both
             sides, or 00 for no adhesive)*

**Application:** A method for application of surface wave absorbers is to utilize pressure sensitive tape (PSA) on the back of the absorber.  If mounting on a non-conductive surface a metal tape backing can be applied upon request to increase absorption effectiveness of the absorber.

Veteran  Owned, ISO-2001 Registered  Manufacturer

*MAJR  Products  Corporation*
780 South Street
Saegertown,  PA  16433
PH: (814) 763-3211  FX: (814) 763-2952
www.majr.com    email;  sales@majr.com

# Exhibit F

Measurements taken on May 5, 2021, using FieldFox and Sportscaster antenna

| No radome | -78.7 | | -79.0 | | Average | Average |
|---|---|---|---|---|---|---|
| 0 | -86.0 | 7.3 | -87.0 | 8.0 | -86.5 | 7.7 |
| 30 | -85.0 | 6.3 | -85.5 | 6.5 | -85.2 | 6.4 |
| 60 | -86.0 | 7.3 | -87.0 | 8.0 | -86.5 | 7.7 |
| 90 | -87.0 | 8.3 | -87.5 | 8.5 | -87.2 | 8.4 |
| 120 | -84.0 | 5.3 | -84.5 | 5.5 | -84.2 | 5.4 |
| 150 | -82.5 | 3.8 | -82.0 | 3.0 | -82.2 | 3.4 |
| 180 | -83.0 | 4.3 | -84.0 | 5.0 | -83.5 | 4.7 |
| 210 | -85.0 | 6.3 | -83.0 | 4.0 | -83.9 | 5.3 |
| 240 | -83.5 | 4.8 | -83.0 | 4.0 | -83.2 | 4.4 |
| 270 | -86.0 | 7.3 | -85.0 | 6.0 | -85.5 | 6.7 |
| 300 | -87.0 | 8.3 | -86.5 | 7.5 | -86.7 | 7.9 |
| 330 | -87.0 | 8.3 | -86.0 | 7.0 | -86.5 | 7.7 |
| 360 | -87.0 | 8.3 | -85.0 | 6.0 | -85.9 | 7.3 |



**Measurements taken on May 10, 2021, using FieldFox and Sportscaster antenna**
**After adjusting openings**

| No radome | -78.0 | |
|---|---|---|
| 0 | -82.0 | 4.0 |
| 30 | -82.5 | 4.5 |
| 60 | -82.5 | 4.5 |
| 90 | -82.5 | 4.5 |
| 120 | -82.5 | 4.5 |
| 150 | -82.5 | 4.5 |
| 180 | -82.0 | 4.0 |
| 210 | -82.5 | 4.0 |
| 240 | -82.5 | 4.0 |
| 270 | -82.0 | 4.0 |
| 300 | -82.5 | 4.5 |
| 330 | -82.5 | 4.5 |
| 360 | -82.0 | 4.0 |
| **Average** | | **4.3** |



Merasurement error, +/-0.25 dB