IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRAUNHOFER-GESELLSCHAFT ZUR FORDERUNG DER ANGEWANDTEN FORSCHUNG E.V., <br><br> Plaintiff, <br><br> v. <br><br> SIRIUS XM RADIO INC., <br><br> Defendant. | 1:17CV184 <br><br> MEMORANDUM AND ORDER |

A number of motions for summary judgment and to exclude expert testimony pend before the Court. D.I. 637, D.I. 639, D.I. 641, D.I. 643, D.I. 644, D.I. 646, D.I. 649, D.I. 651, D.I. 653, D.I. 654, D.I. 657, D.I. 658, D.I. 660, D.I. 663, D.I. 664, D.I. 667, D.I. 669, D.I. 671, D.I. 673, D.I. 675, D.I. 679, D.I. 681, D.I. 683. The Court finds this patent-infringement complaint equitably estopped.

In the 1990s, plaintiff, Munich-based research organization Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V. ("Fraunhofer"), obtained several United States patents claiming technology underlying satellite communication networks. Via an exclusive and irrevocable license to WorldSpace International Network Inc., dated March 4, 1998, and a sublicense dated that July 24 (made irrevocable by June 7, 1999, amendment), the technology came to defendant Sirius XM Radio Inc.'s ("SXM") predecessor, American Mobile Radio Corporation. Joint development of the technology ensued, employing both Fraunhofer's already sublicensed patents and more, per a July 16, 1999, consulting agreement. *Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372 (Fed. Cir. 2019); D.I. 676-1 (Exs. 3–5).

1

On October 17, 2008, WorldSpace filed for bankruptcy. Among the settlements, an earlier iteration of SXM paid WorldSpace a lump sum of $298,517 to maintain the irrevocable sublicense (Bankruptcy Court approved on July 13, 2009), and then a year later, in potential contradiction, WorldSpace and Fraunhofer rejected (the parties dispute the meaning of the term here) the master license agreement (approved June 2, 2010). 940 F.3d at 1376; D.I. 676-1 (Exs. 4, 6–13).

But if Fraunhofer believed the sublicense also terminated, it kept that to itself for more than five years and, in the meantime, continued consulting with SXM as usual. Not until October 2015 did Fraunhofer notify SXM of its alleged infringement. And on November 13, 2015, further complicating the interpretation of the bankruptcy settlements, Fraunhofer formally terminated (if it had not already) WorldSpace's master license. 940 F.3d at 1376; D.I. 676-1 (Exs. 16–19); D.I. 709-1 (Exs. 129–38).

This Court dismissed Fraunhofer's February 2017 complaint, reasoning that the sublicense provided a complete defense. D.I. 146, D.I. 175. But the Federal Circuit reversed, questioning whether the master license had been terminated, and if so, when, and whether the sublicense survived. 940 F.3d at 1379–80. The present dispositive motions follow eventful discovery.[1]

There's no use complicating matters. Assume SXM's various mergers effected an assignment in violation of the sublicense and final settlement. D.I. 644. Assume Fraunhofer properly terminated the master license in 2010, and the sublicense lapsed. D.I. 646. Assume the consulting agreement gives SXM no right to the asserted patents. D.I. 649. And ignore whether Fraunhofer, having perhaps left the master license in limbo

---

[1] Citing only American law in the relevant briefing, the parties seem to assume, and the Court accepts, its application to this international dispute.

in 2010, retained any latent right to terminate it in 2015.  In other words, assume Fraunhofer's view: that SXM has been using Fraunhofer's patented technology without license since at least June 2010—and both knew it.

*Why the wait?*  If, as Fraunhofer so forcefully argues, the master license conclusively terminated in June 2010, then its undisputed *more than five-year* delay in asserting, let alone mentioning, its patent rights against a *known* former sublicensee and now-alleged infringer—who, for that matter, had consulted with Fraunhofer in further developing that patented technology and had paid nearly $300,000 the year before to maintain the sublicense—amounts to a bait and switch.  This equity estops.

It's noteworthy that Fraunhofer never attempts to explain the delay.  Instead, quoting *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, Fraunhofer notes that "silence alone will not create an estoppel unless there was a clear duty to speak."  D.I. 708 at 25.  True enough in general.  But in what the Court can only imagine to be unintentional drafting, Fraunhofer omits the material remainder of the quote—"*or* somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 767 F.3d 1339, 1349 (Fed. Cir. 2014) and 580 U.S. 328 (2017) (emphasis naturally added).  Indeed, as the Federal Circuit has confirmed more recently: silence, "accompanied by some other factor which indicates that the silence was sufficiently misleading as to amount to bad faith," *can* equitably estop a patent suit.  *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016).

*High Point* itself proves illustrative. To begin, Fraunhofer thinks relevant *only* its post(-alleged)-termination conduct. Granting the importance of that conduct, *High Point* nonetheless looked to the *entirety* of the patent owners' conduct during both licensed and unlicensed periods, where like here, Sprint and High Point's patent-owning predecessors had collaborated since the 1990s, with appropriate licenses. And there too, only after years of known and undisrupted unlicensed activity, High Point sued.

True enough, during that silence, High Point's predecessors had continued to work with Sprint and others in the relevant field, including "licensing arrangements involving the patents, discussing interoperability with other potentially infringing vendors, and continuing business relationships." 817 F.3d at 1331. But so too here, after Fraunhofer supposedly terminated the master license and extinguished the sublicense, it continued consulting as usual with SXM. D.I. 676-1 (Ex. 14); D.I. 709-1 (Ex. 129–31,[2] 133–38). Fraunhofer downplays the extent to which this continuing relationship implicated the asserted patents and notes most of SXM's later consulting payments had been due before the master license terminated. Accepting all this as true, it remains undisputed that SXM and Fraunhofer continued an otherwise ordinary business relationship for five-plus years following the supposed master-license termination before ever raising the matter of infringement.

Equity is a sliding scale. Where Sprint had *affirmatively exceeded* the bounds of its existing licenses, premised on equipment supplied by High-Point's predecessors or other approved vendors, by procuring unlicensed equipment from third parties, here SXM remained within the substantive bounds of the irrevocable sublicense it had just paid, with

---

[2] The Court accepts Fraunhofer's disavowal of SXM's Exhibit 132. D.I. 720 at 12, n. 11.

4

the Bankruptcy Court's approval, to maintain—the dispute being whether the agreement lapsed for other reasons. Sprint's greater deviation from the license logically required greater justification. At best for Fraunhofer, these differences come out awash.

Fraunhofer responds that courts generally refuse to recognize an implied license, which equitable estoppel effectively grants, where an agreement on point exists. But setting aside that licenses on point did not preclude estoppel in *High Point*, or that SXM's reliance on the believed sublicense here is the exception that proves the rule, Fraunhofer is talking out of both sides of its mouth. Its entire case rests on the premise that no license of the asserted patents exists between it and SXM (or WorldSpace for that matter). Similarly, Fraunhofer finds no absolution hiding behind its licensing intermediary. Fraunhofer told SXM to obtain a sublicence from WorldSpace, SXM did so, and Fraunhofer's case here is that it terminated the master license.

At bottom, if Fraunhofer believed that its 2010 rejection of the master license extinguished the sublicense that SXM had just fully paid and could point to Bankruptcy Court order approving, had consulted with Fraunhofer for years under, and would continue to consult in at least limited capacity for several more years, the record confirms that Fraunhofer *never said so* until five-plus years later. That undisputed and misleading silence-plus-more very reasonably implied approval of SXM's now-allegedly infringing activity.

SXM, unsurprisingly enough, relied on Fraunhofer's extended silence and conduct to its detriment. Following the Sirius and XM family mergers culminating in Sirius XM Radio in 2008, the new company had to decide which of the former pair's competing systems (referred to as the high-band and low-band systems) to continue and which to

5

retire.  The high-band system employed Fraunhofer's patents and collaborative efforts; the low-band did not.  Each move entailed shifting a substantial portion of carmakers from one hardware set to the other and launching and maintaining a network of satellites (*satellite* radio after all).  Viewed favorably to Fraunhofer, the record appears to reflect that the high-band system carried some meaningful, but by no means dispositive, technical benefits, though undisputed testimony reveals that either option would have been technically feasible (indeed, SXM has maintained legacy low-band service as recently as discovery in this suit).  Ultimately, as the parties agree, *e.g.*, D.I. 708 at 26, the choice came down to business pragmatics: SXM elected to shift over the smaller market share of the low-band system rather than shift over the larger market share of the high-band.  And, again unsurprisingly, SXM's license (or so it thought) proved material.  If barred from the high-band, SXM could and would have elected the low.  D.I. 676-1 (Exs. 22–24, Paul David Krayeski, David A. Birks, and Craig P. Wadin Dep. Trs.); D.I. 685-103 at 11 (Denise Karkos Dep. Tr.); D.I. 685-121 (Ex. 119, Wadin Tr. 283).[3]

Instead of proffering evidence to the contrary, Fraunhofer recasts Mr. Wadin's testimony as admitting the low band's infeasibility.  Review compels the opposite conclusion.  First, Mr. Wadin explained that SXM's reliance on radio sets installed in consumers' cars presented an "ugly" challenge in picking a single system to proceed with—SXM couldn't just shut off one band and send everyone a replacement radio to re-install in their car.  But that, instead of foreclosing the low-band system, in large part explains why SXM has kept the legacy low-band—the *alternative* to infringement—operational all these years.  D.I. 685-121 (Wadin Tr. 150–54, 162–63).  Second, Mr.

---

[3] The Court did not consider the late-arriving declaration of Craig Wadin, appended to SXM's opposition to Fraunhofer's third motion for summary judgment.  D.I. 709-4 (Ex. 152).

6

Wadin explained that rolling out new equipment with each carmaker proved a prime obstacle, an effort that lasted from 2010 to 2020. *Id.* (Tr. 169). Yet again, instead of foreclosing the low-band as an option, this both reemphasizes the noninfringing alternative's feasibility (recall, SXM kept it running) and (looking ahead) highlights the prejudice here—a decade's unrecoverable effort changing over automotive installations. And third, Mr. Wadin did describe counsel's hypothetical immediate shutdown of the high-band system in 2010 due to patent infringement suit as "a real disaster scenario," given SXM would have had to quickly redesign a noninfringing solution and because "if you turn off the service, it's not viable." But the alternative remained: "as I understood your question, *low band is still operational*." So, aside from highlighting the five years Fraunhofer sat on its hands, this testimony again reaffirms the low band to be a feasible alternative. *Id.* (Tr. 278–83).

Fraunhofer next posits that SXM determined upon the high-band system sometime between its July 2008 formation and the master license termination, though none of Fraunhofer's record citations seem to support this assertion, and other witness testimony places the decision sometime between 2010 and 2012, D.I. 676-1 (Ex. 23, Birks. Tr. 37). Even assuming the earlier decision, however, that would hardly diminish SXM's reliance on Fraunhofer's apparent approval of its decision over the next five years of the ten-year effort to shift over equipment manufacturing.

Finally on reliance, Fraunhofer faults SXM's apparently brazen, well, *reliance* on its sublicense when Fraunhofer finally raised the matter of infringement in late 2015. But this just confirms SXM's heartfelt (if indignant) belief that it had a valid sublicense.

Prejudice, undisputed, requires little inquiry. Besides the Deutsche Marks lost to history and the remaining hundreds of thousands of Euros paid to develop the high-band system before and *after* the supposed master-license termination, work it now apparently *can't use* without Fraunhofer's permission, D.I. 709-1 (Exs. 129–31, 135–37), SXM irretrievably installed hundreds of millions of dollars of equipment into peoples' cars during the ten years it took to shift car manufacturers over to the new system—or launched it into space, D.I. 685-121 (Ex. 119, Wadin Tr. 152, 157–58, 169). And it's worth highlighting (judicial notice permitting), now that high-speed cellular data permits music and podcast streaming to iPhones in cars across the nation, it's not just that SXM can't get its time back—from present vantage, that five-year period of Fraunhofer's silence may have been SXM's golden years.

To conclude, an undisputed record establishes a more than five-year period during which Fraunhofer's silence and course of conduct (intentional or not) misled SXM into reasonably believing it still had a valid and Bankruptcy Court approved sublicense to the asserted patents, during which SXM substantially developed its business in reliance, in an expenditure of time, product development, manufacturing shifts, and installations that (aside from the money) SXM could not get back were this stale claim permitted. 817 F.3d at 1330.

THEREFORE, IT IS ORDERED THAT SXM's motion for summary judgment, D.I. 638, is granted in part. All remaining motions are denied as moot. Judgment to follow.

Dated this 10th day of July, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge